1

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLUMBIA

 3


 4


 5   CAMPAIGN FOR ACCOUNTABILITY,      :
                                       :
 6                  Plaintiff,         :
                                       :  CA NO. 16-1068
 7   v.                                :
                                       :
 8   U.S. DEPARTMENT OF JUSTICE,       :
                                       :
 9                  Defendant.         :
     -------------------------------------------------------

10


11           TRANSCRIPT OF MOTIONS HEARING

12      BEFORE THE HONORABLE KETANJI BROWN JACKSON

13           UNITED STATES DISTRICT JUDGE

14               Tuesday, July 18, 2017

15   APPEARANCES:

16     For the Plaintiff:  Alexander Abraham Abdo, Esq.
                           Jameel Jaffer, Esq.
17                         KNIGHT FIRST AMENDMENT INSTITUTE
                           AT COLUMBIA UNIVERSITY
18                         535 West 116th Street
                           314 Low Library
19                         New York, NY 10027

20     For the Defendant:  Daniel S.G. Schwei, Esq.
                           Elizabeth Shapiro, Esq.
21                         U.S. DEPARTMENT OF JUSTICE
                           Civil Division, Federal Programs
22                         Branch
                           20 Massachusetts Ave, NW
23                         Room 7340
                           Washington, DC 20001

24
     Proceedings reported by machine shorthand, transcript
25   produced by computer-aided transcription.
```

2

<u>PROCEEDINGS</u>

1

2          DEPUTY CLERK:  Good morning, Your Honor.  This

3    is Civil Case 16-1068, Campaign for Accountability v.

4    U.S. Department of Justice.  I'm going to ask counsel to

5    please come to the podium, identify yourselves for the

6    record and introduce any parties at your table.

7          MR. ABDO:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. ABDO:  Alexander Abdo on behalf of the

10   plaintiff, Campaign for Accountability, and I'm joined

11   by my colleague, Jameel Jaffer.

12         THE COURT:  Good morning.

13         MR. SCHWEI:  Good morning, Your Honor.  Daniel

14   Schwei from the Department of Justice on behalf of the

15   United States.  Joining me at counsel table is Elizabeth

16   Shapiro, also from the Department of Justice.

17         THE COURT:  Good morning to the two of you as

18   well.

19         The Court has scheduled this hearing in order

20   to give the parties in this matter the opportunity to

21   provide oral argument and hopefully insight into the

22   pending dispositive motion, which is the Department of

23   Justice's motion to dismiss the complaint in this case.

24         I have reviewed your briefs.  I'm familiar

25   with your arguments, but certainly this is an

3

1    opportunity for you to restate them as you feel is

2    necessary and to provide as much background detail as

3    you think is important to illuminate the issues.

4         It is my practice to ask questions, although I

5    will try not to interrupt you too much, because I do

6    want to hear your presentation.  And it's also my

7    practice not to have time limits of any nature.  I just

8    want to focus on what you're saying and make sure that I

9    understand each side's position.

10         It's -- I do something that's a little

11   atypical, which is even though this is a defendant's

12   motion, I would like to have the plaintiff start just to

13   give us an overview of the case, explain the claims and

14   then we'll have the defense counsel come forward and

15   tell me why the claims as stated by the plaintiff should

16   be dismissed; then give the plaintiff the opportunity to

17   respond, and I'll entertain any replies as are

18   necessary.

19         All right.  So, Mr. Abdo, if you'll be arguing

20   on behalf of Campaign for Accountability.

21         MR. ABDO:  Thank you, Your Honor.

22         May it please the Court, this lawsuit

23   challenges the OLC's policy of treating its controlling

24   opinions of law as categorically exempt from the reading

25   room provision of FOIA.  Those provisions require

4

1    federal agencies affirmatively to index and publish

2    final opinions made in adjudication of cases as well as

3    interpretations that agencies have adopted.  And the

4    lawsuit focuses on OLC's formal written opinions which

5    the OLC itself has described as controlling legal advice

6    and as, quote, "controlling on questions of law within

7    the Executive Branch."

8              THE COURT:  Tell me where you're getting that

9    description.

10             MR. ABDO:  The first quote, "controlling legal

11   advice," comes from the OLC's Best Practices memo of

12   2010.

13             THE COURT:  Okay.

14             MR. ABDO:  And the second "controlling on

15   questions of law within the Executive Branch" comes from

16   the OLC's Best Practices memo of 2005.

17             THE COURT:  Let me ask you just so that I'm

18   clear about what we're talking about, do you concede

19   that the Best Practices memo at least of 2010 does not

20   purport to be implementing Section (2)(a)?

21             MR. ABDO:  We concede that the discretionary

22   release factors that the government lists in the Best

23   Practices memo as the government says are not

24   government's efforts to implement (a)(2).

25             THE COURT:  (a)(2)?

5

1          MR. ABDO:  On (a)(2) I think Government has a

2     fairly clear policy, which is reflected in its response

3     to the Campaign for Accountability's initial request in

4     which the government said that the OLC, OLC opinions are

5     generally not subject to the reading room provisions of

6     FOIA.  That has been the government's position for some

7     time.  It is the position that it articulated in that

8     letter.  It is the position that it defends in its legal

9     brief in this case.

10         THE COURT:  And is that the position that

11    you're challenging?

12         MR. ABDO:  Yes.

13         THE COURT:  So you're not really getting into

14    the weeds about the factors that they set forward in

15    these memoranda with respect to the opinions that they

16    deem are not subject to (a)(2), right?

17         MR. ABDO:  That's correct.  Our view -- the

18    reason why those discretionary release factors are

19    relevant is because they effectively are the only,

20    effectively the only avenue for OLC opinions to become

21    public at the moment.

22         The government's view is that the reading room

23    provisions of FOIA do not apply to their opinions, to

24    the OLC's opinions.  And so as an effective matter, the

25    only opinions that become public are those that, you

6

1    know, not navigate the discretionary release factors

2    that the government has set out.

3          THE COURT:  All right.  So tell me what is

4    your claim regarding the government's position.

5          MR. ABDO:  Our claim is that its view is

6    unsupportable.  That the OLC, in fact, issues formal

7    written opinions that are binding on the executive, and

8    I'd like to focus, you know, the government argues that

9    with 1300 opinions now released we should have pointed

10   to some as examples of the sort that we're seeking.  I'd

11   like to do just that if I might, because I think it

12   provides concrete context to the claims we're talking

13   about.

14         So in 2007, the Social Security Administration

15   asked the OLC for an opinion on whether the Defense of

16   Marriage Act prevented the administration from according

17   certain social security benefits to the child of a

18   same-sex union in Vermont.  And the OLC opined on that

19   question, and there are a couple critical points about

20   that opinion.

21         The first is that the Social Security

22   Administration as an independent agency that does not --

23   the head of which does not serve at the pleasure of the

24   president, first assured the OLC that it would be bound

25   by the OLC's opinion.  And that is a practice of the OLC

7

1   to ask independent agencies for that written assurance

2   before writing opinions, because independent agencies

3   are not subject to the more direct control of the

4   president that the OLC relies on in its otherwise

5   binding opinions.

6           THE COURT:  I'm sorry.  So what is the

7   implication of that?

8           MR. ABDO:  The implication is that it's a very

9   clear subset of the opinions we're talking about for

10  which there's no question that the opinions are binding

11  on the executive.  Where the agency seeking the opinions

12  themselves confirm in writing that they'll be bound.

13          THE COURT:  Ahead of time, though?  This is

14  not an after-the-fact.  Isn't there a situation in which

15  the OLC always asks that their opinions be binding in

16  the general sense, but there's still the opportunity for

17  the agency to reject or not to adopt the particular

18  legal analysis; right?

19          MR. ABDO:  So the OLC's, the practice and

20  custom and expectation of OLC is that their formal

21  written opinions are binding on the executive.  That is

22  what the OLC -- that is how they've always described

23  their opinions.

24          THE COURT:  Yes, that wasn't enough for the

25  D.C. Circuit in determining whether or not certain

8

1    opinions qualified in the *EFF* case, for example; right?

2              MR. ABDO:  For the opinion at issue, that is

3    true.  But there are a couple important facts about that

4    case.  Our claim is not that every opinion that the OLC

5    issues is a formal written opinion meant to be

6    controlling advice on the executive.

7              There are times when the OLC acts in a purely

8    advisory capacity where it has asked for its policy

9    advice and where it offers that advice and that advice

10   is not meant to be controlling on interpretations of

11   law.  And it appears that that is the case in the *EFF*

12   case.  The D.C. Circuit described that opinion as

13   examining -- as, quote, "Examining policy options

14   available to the FBI, the D.C. Circuit said that it

15   concerned the 'advisability of certain policies.'"

16             THE COURT:  I'm sorry, just going to the point

17   that you made previously, however, didn't OLC, pursuant

18   to its practice, ask for binding abilities?  I mean, so

19   I'm not sure what we take away from the facts that the

20   OLC says is binding.

21             MR. ABDO:  I don't know that -- I'm not sure

22   that they would have with respect to the FBI.  Their

23   practice -- the specific, you know, this question of

24   independent agencies I think only goes to independent

25   agencies.  But the OLC issues certain categoried opinion

1    that it perceives to be and understands to be and is

2    understood to be by other agencies prospective and

3    authoritative determinations of the law.

4           The opinion in the *EFF* case does not appear to

5    fall within that category.  It was a retrospective

6    opinion that dealt with policy options that the FBI

7    asked it to consider in the course of responding to an

8    investigation into a practice that the FBI had long

9    since disavowed based on the legal interpretation that

10   the FBI had long since disavowed.

11          And I don't think the D.C. Circuit was

12   purporting to cover opinions like the Social Security

13   Administration one, for example, that I was describing

14   where the administration agreed to be bound by the

15   opinion, where it clearly resolved in a conclusive

16   matter.  If when we get to discovery, you know, we'll

17   put forward examples of the OLC's opinions where there's

18   no question but that they are written in the nature of

19   judicial opinions.  They are written in the nature of

20   the OLC conclusively resolving questions for the

21   executive.

22          THE COURT:  All right.  I'm sorry.  And you've

23   gotten these opinions why?  Because they published them,

24   right?

25          MR. ABDO:  So they published them, that's

10

1    right.   They published 1300 of them.

2            THE COURT:   So to the extent that the agency

3    is publishing what it considers to be opinions that fall

4    within 552(A) or that otherwise meet its guidelines,

5    what's the problem?

6            MR. ABDO:   The problem is that the government

7    isn't publishing them because it thinks it is under a

8    legal obligation to do so.   And so we have no idea

9    whether it is publishing all the ones that a proper

10   reading of the reading provisions requires it to

11   publish.

12            It is, instead, selectively publishing a

13   subset those opinions pursuant to criteria that have

14   nothing to do with the statutory criteria for when the

15   government must publish its opinions.   The result is

16   that we have a selective set.

17            THE COURT:   So are you suggesting then that

18   all opinions of OLC are required to be published under

19   the statute?

20            MR. ABDO:   No.

21            THE COURT:   So which?

22            MR. ABDO:   So let me try to be as clear as I

23   can.   Our argument is that the formal written opinions

24   of the OLC that are described in the Best Practices memo

25   that are meant to be controlling interpretations of law

resolving important matters of Executive Branch law must
be published under the reading room provisions.  I think
there are two subsets of those opinions for which it is
particularly clear that they are intended to be binding
interpretations of law across the Executive.

The first are the ones I was referring to
earlier where an independent agency is requesting the
advice and as part of the OLC's custom is asked to
actually affirmatively agree in advance that it will
treat the opinion as binding.

The second category are OLC opinions that
resolve interagency disputes, and there's a large body
of those opinions where by virtue of executive order
directing agencies to submit disputes to the OLC,
agencies do just that.  They submit them to the OLC for
resolution, and the results are binding interpretations
of law that are meant to and do, in fact, bind the
executive on those questions of law.

THE COURT:  What do you do about *EFF*'s
suggestion is that it really isn't about the extent to
which the agency intends for its opinions to be binding
but what the actual impact is?  And to the extent that
OLC does not have actual authority to bind regardless of
any agreement made ahead of time by the agency, then it
seems to me the D.C. Circuit has said that doesn't count

1    no matter how much it was on a formal piece of paper and

2    how much OLC said this is a formal opinion, it has to do

3    with the impact of the opinion rather than OLC's intent

4    when it was issuing it.

5            MR. ABDO:  So respectfully, I don't think you

6    can read that opinion that broadly for a couple of

7    reasons.

8            First is that proposition is true with respect

9    to policy advice.  When the OLC is asked for policy

10   advice, not for controlling interpretations of law,

11   which are the sort of opinions we're after, but when

12   they're asked for policy advice in this other capacity

13   that the OLC does provide, then it is true that the

14   relevant question is, has that policy advice been

15   adopted.  Because absent adoption, policy advice is just

16   part of a deliberative process.

17           THE COURT:  Yes, but the policy advice that

18   this particular agency gives relates to the law.  It's

19   not like they just say, Oh, this is our, you know,

20   opinion in the abstract, right?  So how do you

21   distinguish between policy advice and controlling legal

22   interpretation in your view?

23           MR. ABDO:  So I think it's easier to do so

24   with respect to the *EFF* decision, because the policy

25   advice there, as the D.C. Circuit described it, was

advice that examined different policy options available

to the FBI with respect to past conduct and how to

describe that past conduct in an investigation by the

Office of Inspector General.

Prospectively in terms of the sort of how we

would foresee this Court ordering the OLC to comply with

the reading room provisions, the question would be

whether the OLC intended to bind executive agencies.

And if I could point to, you know, another

language from another OLC opinion just to give the Court

a sense of the way in which these opinions are crafted,

there's an opinion that was issued in 2009 governing

federal procurement.  So an issue that cuts across a

white swath of federal agencies, and the OLC said this

in its opinion:  It said, "Our conclusion that the

regulations we reviewed are reasonable is binding on all

Executive Branch agencies, notwithstanding any

Government Accountability Office decisions to the

contrary."

And it said later on, it quoted another

opinion issued by the OLC for the same point.  It says,

"This memorandum is being distributed to ensure that the

General Counsels of the Executive Branch are aware that

the OLC has interpreted the same appropriations law in a

manner contrary to the views of the GAO and to provide a

14

1    reminder that it is OLC that provides authoritative

2    interpretations of law for the Executive Branch."

3           We think that language and the function that

4    the OLC serves with respect to this category of

5    opinions, formal written opinions, not policy advice,

6    formal written opinions --

7           THE COURT:  So I'm sorry.  Explain to me the

8    distinctions, and you're going to have to slow down just

9    a little because our court reporter is struggling to

10   keep up with you.

11          So the categories are formal written opinions

12   versus what?

13          MR. ABDO:  Versus policy advice.  The OLC

14   issues a number of different opinions.  And that's one

15   of the reasons why it's impossible to understand *EFF* on

16   a limited record before it about that single opinion as

17   having resolved the way in which the reading room

18   provision applies to all the different categories of OLC

19   opinions.  It certainly didn't have that language before

20   it.  It certainly didn't have the language of the Social

21   Security Act Administration --

22          THE COURT:  But doesn't that undermine your

23   complaint to some degree?  I mean -- and we'll let you

24   come back.  This was not really meant to get into the

25   motion to dismiss, but I will say that there is -- isn't

1    there something to the government's contention that this

2    really can't be done in the abstract, that what you're

3    asking for does require the kind of granular look at

4    which types of opinions and what exactly OLC says, and

5    isn't that your responsibility as the plaintiff to the

6    extent that you are contending that they've failed to do

7    something or published something that they otherwise

8    should have published, then you got to point to the

9    particular circumstances in which they have failed.

10            MR. ABDO:  I think the government is exactly

11   wrong, respectfully, on this point.  In *Sears* itself,

12   the Supreme Court case on this question, the Supreme

13   Court dealt with categories of opinions authored by the

14   National Labor Relations Board, and it divided up its

15   analysis based on categories.  The requester there had

16   asked for five years' worth of appeals and advice

17   memoranda issued by that board, and the analysis of the

18   Supreme Court was a categorical one.

19            Now, certainly look at facts.  But a look at

20   facts in deciding which categories served as the working

21   law of the agency, and that's exactly the analysis that

22   we want this Court to go through.  It's the same

23   analysis that the D.C. Circuit did in *Coastal States*

24   where it looked at regional counsel memos of the

25   Department of Energy to see whether they were, in fact,

16

1    the working law of the Department of Energy.  It looked

2    at -- it's the same analysis that the D.C. Circuit went

3    through in *Tax Analyst 1* and *Tax Analyst 2* when it

4    looked at different categories of memos issued by the

5    chief counsel of the IRS.  That's the categorical

6    analysis that we want this Court to go through, and

7    that's what we think is appropriate under the reading

8    room provision.

9        THE COURT:  And it's your contention that the

10   Court can do so at the level of formal written opinion

11   of the OLC without any further information about the

12   context in which the receiving agency interpreted or

13   used or adopted that opinion?

14       MR. ABDO:  Yes.  And I think, you know, we're

15   not saying we don't want discovery to help flesh out the

16   facts.  I think we would want some limited discovery to

17   help flesh out the precise contours of the categories of

18   opinions the OLC issues.

19       At the broadest level we think formal written

20   opinions is a category.  But even within that, again, I

21   think there are two subsets for which there's really no

22   question that the OLC's opinions are meant to be and, in

23   fact, are binding.  And those are, again, the opinions

24   that resolve interagency disputes and the opinions for

25   which independent agencies have confirmed in advance

1    that they will treat the OLC's opinions as binding.

2            THE COURT:  And what allegations of fact do

3    you have that would lead one to believe that they are

4    not already publishing those items?

5            MR. ABDO:  The simple fact that when the

6    Campaign for Accountability requested that the OLC

7    comply with the reading room provisions and asked

8    specifically for formal written opinions, the OLC's

9    response was as a general matter the reading room

10    provisions are not applicable to the OLC.  It has a

11    categorical policy of treating --

12            THE COURT:  I understand.  But a policy

13    doesn't live in the abstract, especially from the

14    standpoint of you having standing to bring a lawsuit.

15    You have to show that pursuant to whatever policy they

16    have not done what you think the law requires.  So the

17    question is, you've identified certain categories, you

18    say the law requires them to publish them.  They have

19    published 1300 opinions.  How do we know that every one

20    of the opinions that they published don't satisfy the

21    requirements?

22            MR. ABDO:  I think in FOIA the burden is

23    slightly different, because by the very nature of a FOIA

24    request a requester can't know in advance.  So in *Sears*,

25    for example, or in *Coastal States* the requesters had

1   asked for these broad categories of memos without any

2   evidence that any particular one wasn't, in fact,

3   privileged or exempt.

4          And that's the case in all FOIA requests.  You

5   go in on a -- you go in having argument that the

6   government isn't processing memos in the way that they

7   are supposed to and litigating that question.  But even

8   more concretely, one of our claims is that the

9   government hasn't provided an index of the opinions that

10  are subject to the reading room provision as required by

11  the reading room provision.

12         THE COURT:  You think that lives apart from

13  whether or not they have to publish --

14         MR. ABDO:  Absolutely.  That is clearly a

15  separate statutory obligation of the government.

16         THE COURT:  So even if they didn't have to

17  publish the actual document pursuant to (a)(2), you're

18  saying they nevertheless have to publish an index?

19         MR. ABDO:  If the opinion, if the opinion is

20  subject to the reading room provision, then the

21  government is obligated by statute to index it.

22         THE COURT:  And to publish it.

23         MR. ABDO:  And to publish it.  Well, it may be

24  that individual exemptions excuse, excuse publication

25  even of a reading room provision opinion.  But yes,

1    that's correct.

2         THE COURT:  I guess what I'm trying to figure

3    out is is there a world in which you would have an index

4    of documents that they were not, the government was not

5    otherwise required to publish.

6         MR. ABDO:  Yes.  So if there are, if there are

7    opinions that are subject to the reading room provision

8    but, for example, are classified, those wouldn't -- the

9    government would be excused from publishing them because

10   they're classified because the other exemptions of FOIA

11   still apply.  But they would still nonetheless have to

12   index the opinion under the reading room provision.

13        THE COURT:  So you see the reading room

14   provision operating procedurally in the same way as

15   (a)(3)?  In other words, I suppose an argument could be

16   made that they're not subject to the reading room

17   provision if they don't satisfy -- or if the government

18   can allege an exemption?

19        MR. ABDO:  Well, I think they would still be

20   subject to the reading room provision.  There would just

21   be exempt information within the memo subject to the

22   reading room provision.  The only circumstance in which

23   they wouldn't be subject to the reading room provision

24   is if they are not final opinions within the meaning of

25   (a)(2)(A) or interpretations within the meaning of

20

1   (a)(2)(B).  But if they are, if they fit within

2   (a)(2)(A) or (a)(2)(B), then the government must

3   affirmatively publish them and index them, and the

4   affirmative publication is subject only to individual

5   exemptions under FOIA.

6         THE COURT:  All right.  Let me just ask you

7   one more clarifying question before I get the government

8   involved, and that is about the scope of relief that

9   you're seeking in this case.  We have the *CREW* case.  It

10   seems to foreclose any argument that you can be bringing

11   this lawsuit for the purpose of enforcing the

12   government's obligation to publish to the public.  Do

13   you agree with that, and does that mean we have to amend

14   your complaint, or do we just proceed as though you're

15   asking for them to give the records to you?

16         MR. ABDO:  I think it's a narrower -- it's a

17   lesser included subset of the relief that we're seeking.

18   And so when it comes time for us to seek a remedy, we

19   would conform our injunctive request to the D.C.

20   Circuit's opinion.

21         THE COURT:  So you don't have to amend, but

22   you do agree you can't enforce the public records?

23         MR. ABDO:  Right.  There's another reason why

24   we don't think the formality of an amendment is

25   necessary, which is that we also have a typical request

21

1    at the end of our prayer for relief for other relief

2    that is appropriate and necessary.  So to the extent

3    that our broader requests for relief don't encompass a

4    narrower order of disclosure directly to the Campaign

5    for Accountability, we think that catch-all would.

6             But, again, we think that the narrower is

7    included within the broader.  And as in any equitable

8    case, when we ask the Court for injunctive relief, the

9    Court would have to balance the equities and tailor

10   relief appropriate to the harms found and other equities

11   involved.

12            THE COURT:  All right.  Thank you.

13            Mr. Schwei.

14            MR. SCHWEI:  Thank you, Your Honor.  I want to

15   touch on many of the points that were just addressed

16   with the plaintiffs, but before doing so I thought it

17   might be useful to frame the history of this lawsuit to

18   explain, to shed light on some of the arguments that

19   were made in the briefing and what we're hearing now

20   from Plaintiffs today.

21            THE COURT:  All right.

22            MR. SCHWEI:  The complaint as originally

23   filed, the claim asserted there is that all controlling

24   OLC advice documents must be published.  In effect, that

25   would require this Court to conclude that no privileges

22

1    could ever apply to those advice documents, past or

2    future.  In the briefing, the *EFF* decision was

3    addressed, which I think makes clear that that broad

4    theory cannot be correct, that not all formal OLC advice

5    documents must be affirmatively disclosed.

6              And so in the opposition and now today CFA

7    tries to narrow its claim in various ways.  We think

8    that narrow claim as an initial matter is not the one

9    alleged in the complaint.  But even setting aside the

10   sort of pleading issues, it's still meritless and far

11   too general for this Court to consider, because today

12   what we're hearing is that they are challenging OLC's

13   policy, at first they said to treat controlling opinions

14   as categorically exempt from (a)(2).

15             And just to be clear, that is not OLC's

16   policy, as confirmed both by the 2000 Best Practices

17   memo as well as the Bies letter which is in the record

18   which states that, quote, "If OLC were to conclude

19   during the publication review process, the FOIA response

20   process or at any other time that the department had an

21   obligation under 55 U.S. 552(a)(2) to make an opinion

22   publicly available, we would do so at that time."

23             THE COURT:  So you're indicating that they're

24   just wrong about the sort of fundamental premise and

25   nature of OLC's policy with respect to 552(a)(2)?

23

1        MR. SCHWEI:  I think we're hearing different

2   things from the plaintiffs.  At times they assert that

3   the policy is to treat formal opinions as categorically

4   exempt.  I certainly think they are wrong about that.  I

5   think after some of the discussion with Your Honor,

6   they've reframed their claim again to be

7   characterizing -- challenging OLC's policy as treating

8   formal opinions as generally exempt from 552(a)(2).  We

9   think that is perfectly lawful, but just to consider

10  that claim, I think, underscores the ripeness problem

11  that Your Honor --

12       THE COURT:  Let me just try to peel back some

13  of the layers here so that I can understand what

14  everybody is saying.

15       We have this memo in which OLC -- the one that

16  I'm referring to is the 2010 document -- is talking

17  about issuing legal advice and written opinions.  They

18  do talk about it being controlling advice to Executive

19  Branch officials.  And then we have a whole section near

20  the end related to the publication or other public

21  disclosure of this, I guess the legal advice and written

22  opinions that have been previously referenced in this

23  memo.

24       So where does this fit in, because I was

25  struck by the fact that it did not appear from your

24

1    discussion of the factors, et cetera, that you were

2    implementing 552(a)(2) in this way, that you were saying

3    what we're trying to do with this memo is to tell you

4    how and under what circumstances we will publish

5    pursuant to that statute.  Am I wrong about that?

6         MR. SCHWEI:  So what that section of the Best

7    Practices memo does is it addresses voluntary

8    publication and other public disclosures.  So there's

9    some small portion of it that talks about responding to

10   FOIA requests.  But the bulk of what that discussion in

11   the Best Practices memo does is explain the voluntary

12   publication process where, even though an opinion is

13   considered to be privileged and confidential legal

14   advice within OLC, there is nonetheless this additional

15   process wholly independent from (a)(2) --

16        THE COURT:  Yes.

17        MR. SCHWEI:  -- that the agency makes about

18   whether to voluntarily waive privilege and publish --

19        THE COURT:  All right.  So just so I'm clear,

20   I'm trying to understand.  This is why I asked

21   Plaintiff's counsel whether -- so they're challenging, I

22   think, and perhaps setting it up in different ways the

23   way that you have indicated, the sort of initial

24   determination that there are certain documents that do

25   not need to be published pursuant to (a)(2).  And not

1    necessarily the categories that you have indicated with

2    regard to what you perceive to be a voluntary

3    publication requirement or whatever.

4         MR. SCHWEI:  I read the plaintiffs or

5    interpret what Plaintiffs are saying today as wanting to

6    challenge the statement in the Bies letter that as a

7    general matter OLC opinions are not subject to 552(a)(2)

8    because they don't meet the requirements of that section

9    and furthermore are generally privileged pursuant to at

10   a minimum the deliberative process privilege and the

11   attorney-client privilege.

12        THE COURT:  All right.  So why is that subject

13   to dismissal?  Why isn't that just a complaint that they

14   can bring, an allegation that they can make and then we

15   go to discovery and we have our summary judgment motion?

16        MR. SCHWEI:  Absolutely.  So there are two

17   fundamental -- apologies -- two fundamental reasons why

18   the complaint is subject to dismissal.

19        The first is ripeness; that they are seeking

20   to challenge a general policy wholly untethered to any

21   specific documents or specific circumstances that would

22   give this Court the factual, the concrete factual

23   setting necessary to permit meaningful review of whether

24   a policy is correct or not.

25        And I think to describe the claim is to

26

1    highlight its abstract nature, which is they are

2    challenging a policy to do something as a general

3    matter.  So they are not complaining about any specific

4    acts of unlawful -- of alleged unlawful action.  They

5    are complaining about a general statement in a letter

6    responding to their letter to OLC.

7              I think, you know, consistent with how the

8    D.C. Circuit has explained the ripeness doctrine, for

9    example, in the *State Farm v. Dole* case, the Court has

10   made clear that there needs to be enough of a concrete

11   factual setting to allow the Court to meaningfully

12   evaluate the case.

13             THE COURT:  All right.  Well, you know,

14   Mr. Abdo pulled out various OLC opinions that he says

15   indicates the kind of thing -- now, albeit they were

16   actually published, but setting aside that point, he

17   says we don't know how many others of these are out

18   there that aren't being published because you have this

19   general policy.  Why isn't that sufficient?

20             MR. SCHWEI:  So I think they have now at

21   argument today for the first time tried to clarify what

22   these categories are that they are claiming need to be

23   disclosed.  I think the categories are still exceedingly

24   general.  It's not clear how these two subsets that they

25   describe, whether those are the only two subsets of

1    opinions that they think need to be disclosed or whether

2    those are emblematic of the broader set.  But I think --

3              THE COURT:  Let me just be clear kind of

4    harkening back to something you previously said.  The

5    agency has not taken a categorical position that these

6    categories that they have now identified need not be

7    disclosed.  Am I right about that?  In other words, you

8    have not -- the reason why I was trying to understand if

9    the memo was the source of the challenge here or where

10   is it that the agency has taken a position is because

11   think it might matter.

12             And so to the extent that they are now trying

13   to say formal written opinions that are intended to be

14   binding interpretations that resolve -- or that resolve

15   interagency disputes, is the agency on record as

16   categorically rejecting the publication under (a)(2) of

17   those categories of documents?

18             MR. SCHWEI:  No, and to the contrary, the

19   record indicates that if OLC were to determine that any

20   of those documents were subject to (a)(2), they would

21   publish them.

22             THE COURT:  Do we even have a dispute here?

23   You know, like from an Article 3 kind of standpoint?

24             MR. SCHWEI:  I think that's exactly the

25   ripeness problem that we're arguing is that they are

asking this Court to make an advisory opinion about what

might under certain circumstances fall within (a)(2) or

what might not, but that there's no concrete dispute

presently before the Court because they haven't

identified any actual opinions that they believe have

been unlawfully withheld.  And now today they're

identifying for the first time these categories, but

they still aren't articulating a basis for believing

that specific examples of these categories have not been

published.

Now, to be clear, the Bies letter does state

OLC views as a general matter that these opinions would

be privileged and not subject to (a)(2); and we think,

you know, even if they got over the ripeness hurdle

these claims would still clearly fail on the merits,

because the categories they've identified are privileged

and are quintessential legal advice documents.

THE COURT:  So let me just take you in a

slightly different direction which I think is different,

but maybe you can tell me.  And that is, are you also

complaining about their failure to come to you with, as

sort of almost like an exhaustion but maybe a standing,

some circumstance under which instead of just

complaining about general categories that may or may not

have been included in the agency's policy related to

1    publication, do you want them to start off by saying,

2    Agency, here, you know, is a specific category of

3    documents, what is your position on that?  And then

4    perhaps we have a dispute to the extent the agency says

5    we've decided that those aren't categorically excluded.

6           MR. SCHWEI:  I think there are two parts, two

7    answers to that question.  The first is yes, we think

8    this much narrower version of the claim is neither the

9    one that was sent in the letter to the agency nor the

10   one pleaded in the complaint.  And so it wouldn't be

11   exhausted and we don't think it's, you know, properly

12   before this Court as part of the pleading.  So if they

13   want to pursue this narrower claim, I think we would say

14   that's a separate lawsuit.

15           But even apart from that, even assuming they

16   can overcome the ripeness objections, the pleading

17   objections, everything else related to this narrower

18   claim, we are also arguing that under traditional

19   12(b)(6) standards requiring a plaintiff to plausibly

20   allege a claim for relief that the complaint here fails

21   to do so because they have not, number one, plausibly

22   alleged any specific examples which sort of gets into

23   the same factors as the ripenesses inquiry.

24           But number two, even taking their examples,

25   they are clearly meritless based on long-standing D.C.

30

1    Circuit precedent and also based on the *EFF* decision

2    which they've offered for the very first time a number

3    of distinctions of that decision, none of which hold up

4    to scrutiny in light of the actual decision itself.  So

5    just to be clear --

6         THE COURT:  Help me to understand your failure

7    to state a claim piece.  I mean, I think I'm getting the

8    idea that we don't really have a dispute yet because the

9    agency's policy is not the way that they've articulated

10   it.  But with respect to failing to state a claim, why

11   are you characterizing this as a 12(b)(6) issue?

12        MR. SCHWEI:  Because when examining the

13   complaint which is the operative pleading here, all that

14   the complaint does is tautologically restate the

15   statutory language of 552(a)(2) itself.  It doesn't

16   contain any factual allegations plausibly establishing

17   that OLC has acted in any unlawful way.

18        THE COURT:  All right.  So what do they need

19   to say in order to do that?  What in your view would be

20   Sufficient facts, a sufficient factual basis to state a

21   claim?

22        MR. SCHWEI:  I think it would be identifying

23   either specific documents that they believe exist but --

24   exist, fall within (a)(2) but have not been made public.

25        THE COURT:  How can they know that?

1            MR. SCHWEI:  Well, they could, number one,

2     know from -- they could know as a general matter or

3     plead on information and belief what they think might

4     exist, and that could get over the pleading standard, or

5     they could look at the 1300 OLC opinions that are

6     available and say These are the features of this

7     particular opinion that we think apply to other ones

8     that are not being made available.

9            And so they could examine the corpus of OLC

10    opinions publicly available and say These are the types

11    of opinions that we feel fall within (a)(2), are not

12    privileged and need to be made public.  They're starting

13    to do that today.  I don't think it's part of the

14    complaint, and I don't think what they've identified now

15    is meritorious.

16            THE COURT:  By "starting to do that," you mean

17    they said formal opinions or resolving interagency

18    disputes, et cetera?

19            MR. SCHWEI:  Right.  None of which appears

20    anywhere in the complaint or in any of the briefing on

21    the motion to dismiss.  But what they've started to do

22    today is identify these types of categories.  It's still

23    not entirely clear whether the two subsets are

24    exhaustive or not.

25            But even taking those, let's start with the

32

broadest category they've identified, formal written

opinions as identified in the Best Practices memo that

involve controlling interpretations of law.  That theory

that all such opinions must be disclosed is foreclosed

by *EFF*.

THE COURT:  By *EFF*, right.

MR. SCHWEI:  Right.  And they've offered a

number of distinctions about *EFF*, none of which hold

water when reading the *EFF* opinion itself.  The

description --

THE COURT:  Do you think there was a formal

opinion in *EFF*?  They say formal opinion versus advisory

or advice about retrospective policy determinations.

That's not a distinction that you appreciate?

MR. SCHWEI:  So no for more fundamental

reasons, but it's also factually inaccurate based on

what is plain from the D.C. Circuit's decision itself,

which is, first it was a formal opinion finalized

pursuant to the Best Practices memo.

Second, it was not OLC opining on the wisdom

of whether the FBI should continue this practice or not.

It was the -- it was OLC giving legal advice about

whether the FBI was legally permitted to do so.  And I

think that's clear from the opinion at 739 F.3d 5, the

descriptions from the OIG report and from the testimony

33

of the FBI general counsel describing the parameters of
that opinion.  And they try to characterize it now as a
retrospective opinion about past conduct.

          Of course, at the time the OLC rendered this
advice to the FBI, I think the FBI was deciding what to
do going forward about whether to continue this practice
or not.  And that's reflected in the description of the
OLC opinion from the OIG report, which is, of course,
quoted.

          THE COURT:  Which would make sense, right,
because why bother if it's over.

          MR. SCHWEI:  Precisely.

          THE COURT:  Yes.

          MR. SCHWEI:  And I think the distinctions that
they're offering apart from being inaccurate are just
fundamentally wrong, because it treats legal advice as
somehow distinct from other types of policy advice.  And
that's not how the D.C. Circuit has ever considered the
issue.  They have squarely held in *EFF*, in *Brinton v.
Department of State* that legal advice, just like any
other type of pre-decisional input, is one input into
the ultimate policy decision.  And because it's
pre-decisional going to a policymaker that then makes a
decision about what to do --

          THE COURT:  But *EFF* does leave open the

34

1    possibility that there is a world in which an OLC

2    opinion would cross into the category of, you know,

3    secret law and working law of the agency.  And so I

4    guess the question is under what circumstances could a

5    plaintiff ever make a complaint related to that

6    happening.

7         MR. SCHWEI:  So respectfully, I do not think

8    *EFF* leaves open the world in which an OLC opinion on its

9    own could be considered secret law.  The descriptions

10   that the plaintiffs offer today about secret law of

11   being binding and controlling and resembling the

12   hallmarks of a judicial precedent are exactly what the

13   D.C. Circuit acknowledged the OLC advice opinion in that

14   case to have --

15        THE COURT:  Yes, not living on its own.  But

16   to the extent that the agency adopts it and says, We've

17   read everything in your OLC opinion, we think you're on

18   the right course, and, in fact, we are going to adopt

19   that as the law of our agency --

20        MR. SCHWEI:  Absolutely.

21        THE COURT:  -- then under those circumstances

22   (a)(2) requires publication?

23        MR. SCHWEI:  Yes, with a couple caveats

24   because I want to flesh out the answer to make sure I

25   describe it accurately.

1                But in the circumstances in which OLC offers

2     advice to an agency and the agency says we are going to

3     adopt both the conclusion and the reasoning of OLC as

4     our own -- and there's a high standard to meet for this

5     sort of waiver/adoption bar -- but assuming the agency,

6     does meet it, then yes, there would be an (a)(2)

7     obligation to publish.  Critically, however, it would be

8     on the ultimate policy --

9                THE COURT:  On the agency.

10               MR. SCHWEI:  On the agency, not on OLC.

11               THE COURT:  I see.

12               MR. SCHWEI:  OLC offers pre-decisional legal

13    advice if an agency with policymaking authority

14    subsequently adopts or waives privilege over it.  Maybe

15    that subsequent agency would have an obligation to

16    publish, but the obligation to publish would not run

17    back to OLC as effectively the attorney giving advice to

18    the clients.

19               THE COURT:  All right.  That's very, very

20    interesting and very helpful.  The question, I think, is

21    doesn't it also slightly undermine your point about the

22    extent to which the plaintiff has stated a claim?

23    Because to the extent your position is as the attorney

24    who is giving legal advice to all of our various

25    clients, they may adopt, they may not adopt, and in any

1   event, if they adopt it's on them to publish pursuant to

2   (a)(2), if Plaintiff says, No, no, we read (a)(2) to

3   require you to publish, under what circumstances do they

4   need specific information, specific -- it's only -- we

5   only need adoption-specific or whatever if I think the

6   government, OLC, concedes at the end of the day that if

7   we have one of those, OLC has to publish.  To the extent

8   your point is OLC never has to publish, then I don't

9   understand why we need the specifics.

10          MR. SCHWEI:  Just to be clear, they have never

11  articulated that claim in their papers or in their

12  pleadings here.

13          THE COURT:  Yes, yes.  We're all --

14          MR. SCHWEI:  But in this hypothetical world in

15  which that claim exists, I mean, the plaintiffs here

16  are, I don't think -- I don't know if there's any real

17  dispute about whether they think it's sufficient for the

18  client agency to publish instead of OLC.

19          I think what they are actually attacking is

20  step one of the analysis, which is whether the

21  confidential legal advice is even privileged in the

22  first instance.  I think that's the claim that they want

23  to bring here and that it is wholly untethered and

24  undefined with specifics in the actual complaint.  I

25  don't know --

1            THE COURT:  Although they put that at the end

2       of their analysis.  So now I'm really confused.  In

3       other words, they say whether or not you can assert an

4       exemption under Section 5 is a separate question from

5       whether or not this counts as a formal opinion; right?

6            MR. SCHWEI:  They've made that argument today.

7       I think it's wrong and contradicted by the *Sears*

8       decision which says if a document is exempt under any of

9       the exemptions, it's not required to be made public and

10      would not fall within (a)(2).  And that's based on the

11      language of the statute itself, which in subsection (b)

12      of FOIA which describes all of the exemptions, says,

13      "This section does not apply to matters that are," dot,

14      dot, dot" and then lists the exemption.  So in other

15      words, if the material is exempt, 552 does not apply.

16            THE COURT:  So you don't see this as the same,

17      as operating in the same way as the (a)(3) world of the

18      person makes a request, the agency searches for the

19      document, finds the document, then makes a determination

20      that it's privileged and says perhaps via a Vaughn index

21      we have a document, but we're not giving it to you

22      because of the exemption.  This is not operating in that

23      same way?

24            MR. SCHWEI:  Right.  Because I think the

25      plaintiffs have chosen to bring this exceedingly broad

38

1    abstract request seeking exceedingly broad abstract

2    relief.  They are -- we are not disputing that

3    consistent with the D.C. Circuit's *CREW* decision that

4    (a)(2) requests do exist and that they can submit them.

5    But we don't think this one is what the D.C. Circuit had

6    in mind, and it's certainly not what Article 3 or

7    Rule 12(b)(6) would --

8         THE COURT:  Right.  I get Article 3.  I want

9    to come back to the need for specifics or not in a world

10   in which the claim is -- hypothetically because they

11   haven't made it -- that OLC is taking the position that

12   they don't have any (a)(2) obligations.

13        MR. SCHWEI:  And OLC has not taken that

14   position, as reflected in its letter.  They are saying

15   generally we do not think what we do as issuing

16   confidential legal advice qualifies as meeting (a)(2),

17   and in any event it would be privileged.

18        However, if we did decide in some circumstance

19   that an advice document met the requirements of (a)(2),

20   we would publish it.  So they are not denying any --

21   they are not denying that (a)(2) applies to them, which

22   is how I think the plaintiffs want to characterize this

23   case.

24        OLC, as confirmed by the record, is saying if

25   (a)(2) were to apply, we would follow its command.

39

1    However, as a general matter, it does not apply, given

2    the features of what we do, which is issue confidential

3    legal advice, which are one of many pre-decisional

4    inputs into agency's policymaking, ultimate policy

5    decisions.  And that's what secret law, that's what

6    working law is about is the ultimate policy decision,

7    not the input of legal advice.

8            And I think it's important to note that the

9    OLC legal advice here in many ways is no different than

10   legal advice that agencies receive on a routine basis

11   where an agency general counsel would, as a matter of

12   custom and practice, be the deciding authority within

13   the agency on a question of law.  Under their theory,

14   that general counsel's advice would also be subject to

15   publication under 552.

16           THE COURT:  I understand, but what I worry

17   about a little bit is that I feel like you're trying to

18   have it both ways.  And let me tell you why.

19           Because on the one hand you're saying, We need

20   the specifics, we don't really know.  There may be

21   situations in which the legal advice that is provided is

22   adopted by the agency, you know, there are certain

23   agencies I think the plaintiff is saying that are

24   independent and they have to make deals with OLC about

25   being binding or whatever, and that's one aspect of it.

40

1   And so you say yes, yes, there are all these different

2   variations.  And so, Plaintiff, your complaint is not

3   ripe or specific enough for us to really get our arms

4   around.

5           But then you seem to be suggesting with this

6   argument that as a categorical matter you can say that

7   OLC opinions are just legal advice and there is never a

8   situation in which you could ultimately get to the

9   conclusion that there was an (a)(2) obligation.  So

10  which is it?

11          MR. SCHWEI:  Two responses, Your Honor.  Just

12  on the second half of the argument, we're just defending

13  what was said in the OLC letter, which is, as a general

14  matter the advice is exempt, it's deliberative and

15  attorney-client privileged, and in any event wouldn't

16  meet the requirements of (a)(2).

17          We're not trying to defend a categorical

18  position.  We don't think it's necessary for this Court

19  to issue a categorical ruling saying all OLC advice is

20  always privileged.  We think the claim that the

21  plaintiffs have brought here --

22          THE COURT:  Nor is it possible.  That's my

23  question.  Nor is it possible, right, because there is a

24  world, I think, maybe, in which the circumstances are

25  such that some (a)(2) publication, whether it's OLC or

1   the receiving agency kicks in, and we need to know, I

2   thought you were arguing in your briefs, that the reason

3   why I can't do this in the abstract is because the

4   answer is it depends.  Like whether or not the OLC's

5   opinions are going to be published or need to be

6   published as a statutory matter.

7           MR. SCHWEI:  And I think this is why I tried

8   to start out with some of the history of this case,

9   because in some sense the briefs can only be understood

10   as responding to the prior document.  So --

11           THE COURT:  I think --

12           MR. SCHWEI:  So our motion to dismiss,

13   particularly the ripeness argument, was responding to

14   Plaintiff's requested relief in the complaint, which was

15   an order from this Court compelling publication of all

16   controlling advice documents, formal or informal.

17           Again, our ripeness argument was motivated by

18   our desire to tell this Court this Court should not

19   enter any such order because that would be effectively

20   waiving privileges over OLC advice documents that may

21   not even exist yet.

22           So an order from this Court saying You must

23   publish an OLC advice document that meets these

24   criteria, that would apply based on their requested

25   relief whether the document was classified or not,

42

1    whether it would have law enforcement-sensitive

2    materials or not.  So that's I think the genesis of our

3    ripeness argument.

4            Where we are today is Plaintiff saying we're

5    not arguing for compelled disclosure, I think.  They're

6    saying We are not challenging all OLC opinions.  We're

7    just trying to challenge a practice of generally

8    treating OLC advice documents as privileged.  We think

9    that, you know, challenge to a general presumption is so

10   wholly abstract and untethered to specific consequences

11   that it would not meet Article 3.

12           But even setting that aside, we think the most

13   fundamental reason it fails is because we think it is

14   lawful for OLC as a general matter to treat its

15   confidential legal advice as privileged and not subject

16   to publication under (a)(2).  So we're trying to assure

17   this Court that it has -- that it goes through the

18   process of checking all the Article 3 boxes, but

19   assuming that's done, then we're happy to engage on the

20   merits of Plaintiff's case.

21           THE COURT:  Let me just flesh it out and have

22   Plaintiff's counsel come back to respond.

23           So on the second point that we think it is

24   legal for us to have a general policy of treating these

25   documents as privileged and confidential and therefore

43

1     not publishing them and, I think you hear you say, to

2     the extent that the plaintiff is contending that it is

3     not, then it's on them to identify the particular

4     circumstances under which the exercise of that policy

5     has resulted in unlawful withholding.

6              MR. SCHWEI:  Correct.  And I think if there

7     were specific examples that would help this Court

8     satisfy Article 3 ripeness and the plausible, the

9     12(b)(6) problem that currently their complaint suffers

10    from, I think on the merits, you know, we think it's

11    highly unlikely specific examples would change the

12    ultimate analysis or not.  We've cited a wealth of --

13             THE COURT:  You say you win, but usually --

14    the thing that has been troubling me this entire time is

15    understanding the line between who's obliged to do what

16    at the motion-to-dismiss stage as opposed to on summary

17    judgment.

18             The plaintiff has talked a little bit about

19    discovery and what we can learn and, you know, as long

20    as we get past this stage we'll get more information.

21             You're saying, No, no, no, we have to cut it

22    off at the pass, right here in the motion-to-dismiss

23    world.  And so we're focused -- at least I am -- on

24    plausibility, *Iqbal*, *Twombly*, what is it that they need

25    to say even if I'm looking only at the complaint, do

44

1    they state a claim.  And I think I understood you to be

2    arguing that the reason why they don't in addition to

3    the ripeness and whatever else, but from a failure to

4    state a claim perspective, is that in order for them to

5    state a claim that you have violated the law, they have

6    to say how so.

7            And to the extent their challenge is you have

8    this general policy in which you choose not to publish

9    things and we acknowledge that you don't have to publish

10   everything, then they've got to say, I think, in order

11   to state a claim, Here are the circumstances in which

12   you were required to publish and you didn't.  Because

13   other than that, I'm not sure I understand that they

14   have a claim.

15           MR. SCHWEI:  Right.  Or at a minimum they

16   would have to identify the types of documents that they

17   need, that OLC would have to disclose and some basis for

18   thinking OLC is not disclosing them.

19           THE COURT:  Correct.

20           MR. SCHWEI:  And I think to explain our

21   position fully, it's all rooted in the *Iqbal* decision's

22   language about how legal conclusions are not entitled to

23   a presumption of truth at the 12(b)(6) stage and it is

24   not enough for plaintiffs to merely recite the elements

25   of a cause of action, and that's exactly how we view the

1    complaints here, which is saying OLC is not complying

2    with 552(a)(2), full stop.

3              There are no factual allegations.  There's a

4    host of legal conclusions, but there's no factual

5    allegations plausibly establishing any way in which OLC

6    has failed to comply with 552(a)(2).  At least not in a

7    meritorious way in the sense that originally the

8    complaint said you're failing to comply with 552(a)(2)

9    because you do not publish all of your controlling legal

10   opinions.  Obviously that claim is not meritorious.

11             THE COURT:  In light of *EFF*.

12             MR. SCHWEI:  Correct.

13             THE COURT:  Right.

14             MR. SCHWEI:  And now that they're trying to

15   shift to some narrower claim with certain categories of

16   opinions that they think are required, there's certainly

17   no factual allegations in the complaint that would allow

18   this complaint to survive the standards that are

19   required in every case under 12(b)(6).  There's no

20   exception under Rule 12(b)(6) for FOIA cases, and I

21   think, you know, the typical (a)(3) FOIA case, the

22   complaint is very easy and amply, you know, satisfies

23   the 12(b)(6) standard just by laying out the history of,

24   you know, the agency's back-and-forth with the

25   requester.

46

1        This case is on a whole different footing

2   where they are seeking to broadly challenge --

3        THE COURT:  A policy and not the withholding

4   of a particular document.

5        MR. SCHWEI:  Correct.

6        THE COURT:  Yes.

7        MR. SCHWEI:  And so I think whatever the

8   12(b)(6) standard is and how it gets applied in a

9   typical FOIA case, certainly this one there has to be

10  some meaningful standard.  And I think that's rooted as

11  well in the D.C. Circuit's *CREW* decision where at the

12  very end the Court indicated that they thought it would

13  be a rare instance in which these types of claims would

14  lead to injunctive relief against an agency.

15        I think the D.C. Circuit is warning that, you

16  know, these types of broad-based claims challenging

17  entire agency publication practices should not be

18  permitted and that although an (a)(2) remedy is

19  available, courts should be circumspect about when

20  permitting them to proceed.  And I think that's exactly

21  what Rule 12(b)(6) does is require plausible

22  allegations, plausible factual allegations which are

23  absent here.

24        THE COURT:  Thank you.  You'll have a chance.

25  Let me allow, is it Abdo?

47

1          MR. ABDO:  Yes.

2          THE COURT:  Yes, to come back.

3          MR. ABDO:  If I can start by saying,

4    Your Honor, I think the government's ripeness argument

5    is a smokescreen.  We know that the OLC has never, not a

6    single time, published an opinion under (a)(2).  We know

7    this because they've never published an index, because

8    they, in responding to Campaign for Accountability's

9    response, didn't say, Here are the places where we

10   publish (a)(2) documents.  You should look there.

11   They've never done any of that.

12          And we know, secondly, that at least some OLC

13   opinions fall within (a)(2).  The ones that I've

14   described to you that are subset, that are a subset of

15   the ones that we've focused on, are clearly opinions and

16   these would be the ones that we would put before the

17   Court --

18          THE COURT:  I'm sorry.  Help me to understand

19   the implications of your first observation in light of

20   *CREW*.  So --

21          MR. ABDO:  Yes.

22          THE COURT:  There are 1300 opinions that the

23   agency has published.

24          MR. ABDO:  Pursuant to its discretionary

25   authority.

48

1          THE COURT:  What difference does it make?

2     They've been published.

3          MR. ABDO:  Because we're also entitled to an

4     index separately under (a)(2) that is an independent

5     claim.  And window into the legal obligation -- the

6     obligation -- I think there are two reasons why that's

7     important.

8          THE COURT:  Yes.

9          MR. ABDO:  Is that they publish them under the

10    discretionary policy versus (a)(2).

11         THE COURT:  Okay.

12         MR. ABDO:  One is the statutory one, which is

13    we have a separate entitlement to an index.  And the

14    reason why index is important is because even in

15    circumstances where an opinion, portions of it may be

16    exempt for some reason, the public still knows of its

17    existence and can decide whether to individually

18    challenge those exemptions through index.

19         THE COURT:  I'm sorry.  Maybe I need to look

20    at the statute to understand --

21         MR. ABDO:  Sure, (a)(2), it's the final

22    paragraph language under (a)(2) which appears under

23    (a)(2)(E) but I think is maybe just under (a)(2).  Let

24    me get my copy.  So at the very end of (a)(2) --

25         THE COURT:  Yes.

1        MR. ABDO:  -- it says, "Each agency shall also

2    maintain" -- not quite the very end.  A few sentences

3    up.  "Each agency shall also maintain and make available

4    for public inspection in electronic format indexes

5    providing identifying information for the public as to

6    any matter issued, adopted or promulgated under July --

7    after this date -- "and required by this paragraph"  --

8    namely (a)(2) -- "to be made available or published."

9        The government -- the OLC has never once

10   purported to comply with that provision.  And the reason

11   it hasn't purported to comply with it is because it

12   doesn't think (a)(2) applies to any actual OLC opinions.

13       Now, the government maintains the fiction that

14   it might at some point apply in the future, but its view

15   is clear, as stated in the Bies letter, as defended in

16   its briefs and as articulated by counsel this morning,

17   that it doesn't actually apply to any opinions, and it's

18   because they have categorical views about the privileges

19   that apply to OLC opinions, and those are the views that

20   we are challenging.

21       THE COURT:  I know, but ordinarily -- and I

22   don't know whether this is a distinction that is arising

23   out of the fact that the D.C. Circuit said FOIA is the

24   appropriate vehicle for trying these cases.  Ordinarily

25   the agency takes a position.  It establishes its policy,

1     and that becomes the basis for a challenge.

2             What's hard for me is to feel as though we're

3     backing into the agency's policy through your reasoning.

4     We have to publish an index but they haven't, so the

5     Court must interpret that to mean that they've taken a

6     categorical position against publishing indices.

7             MR. ABDO:  I think they took that categorical

8     decision in the Bies letter.  The reason why I point to

9     the index is because I think it's concrete proof that

10    gives lie to the government's argument that they think

11    (a)(2) actually applies to any OLC opinions.  And if you

12    look at the second paragraph of the Bies letter, this is

13    the May 26, 2016 letter -- I think it's Exhibit 3 to the

14    government's motion to dismiss -- they say, "OLC does

15    not have policymaking authority, nor does it enforce

16    laws against or adjudicate the rights of private

17    individuals.  Rather, OLC provides confidential legal

18    advice within the Executive Branch.  As such, OLC's

19    advice is ordinarily covered by these privileges and is

20    therefore exempt."

21            But that is the policy we're challenging, and

22    it is true that this is worded in such a way that it

23    might conceivably apply to an opinion at some point in

24    the future.  But as a matter of fact, it never has.  And

25    if the government's legal view of (a)(2) is left to

1    stand, it never will, because the government has a view

2    about OLC that it solely provides advice that it thinks

3    is exempt.  And we think that is legally wrong.  We

4    think the reading room provisions --

5         THE COURT:  I know, but don't you have a

6    little bit of a ripeness issue or a lack of concreteness

7    or something?  I mean, the government is saying and, you

8    know, maybe kudos to them for wording it in this way,

9    right, OLC's advice is ordinarily -- OLC's advice is

10   ordinarily covered by the attorney-client and

11   deliberative process privileges.

12        MR. ABDO:  To this date 100 percent.  And one

13   very concrete way in which we have obviously established

14   a case for controversy is we have not gotten the index

15   we asked for.  And if the government ever views (a)(2)

16   as applying to any actual OLC opinions, it is obligated

17   to provide an index, and it hasn't done that.  And the

18   reason it hasn't done that, again, is because of its

19   legal view of the reach of (a)(2).

20            And in that respect, this case is no different

21   from *Sears*, and it is no different from *Schlefer* or from

22   *Coastal States*.  All of those opinions or those requests

23   dealt with broad categories of opinions that the

24   requesters thought the reading room provision applied

25   to.  *Sears*, it was five years' worth of these memoranda

52

1       that were issued by the NLRB.  And the plaintiff

2       couldn't say at that point, because the plaintiff hadn't

3       had discovery yet, this particular category or subset of

4       those memos are working law and this subset isn't.  They

5       resolved that through summary judgment, and the Supreme

6       Court ultimately crafted categories that didn't actually

7       bear any resemblance to what the plaintiff --

8              THE COURT:  So is it your suggestion that the

9       plaintiff in this case doesn't have to articulate the

10      particular circumstances under which it believes

11      publication is required?

12             MR. ABDO:  That is not our view, and I think

13      we have articulated a position.  We did it in the

14      initial response, and it's done in the complaint.

15      Controlling opinions of law issued by the OLC, what the

16      Best Practices memo calls formal written opinions, that

17      is a category that we think (a)(2) applies to.

18             THE COURT:  All right.  But is that plausible

19      in light of *EFF*?

20             MR. ABDO:  It is, because *EFF* didn't deal with

21      an opinion that purported to establish the law

22      perspectively from the government going forward.  And

23      again it may be --

24             THE COURT:  I'm sorry, perspectively was not

25      in your statement.  You said "formal written opinion,"

53

1    and that's what we had in *EFF*.

2          MR. ABDO:  A controlling opinion of law which

3    is meant to govern agents -- that is meant to govern --

4    be a governing interpretation of law.  That is not what

5    the opinion in *EFF* purported to be.  And it may be that

6    after discovery we are forced to refine that category in

7    the same way as happened in *Sears* and in the same way

8    that happened in the *Tax Analyst* cases.

9          But our obligation at this point on the motion

10   to dismiss is simply to show two things:  One, that the

11   OLC is not complying with (a)(2).  And two, that at

12   least some opinions fall within (a)(2).

13         THE COURT:  All right.  So how is it that you

14   assert plausibly in your complaint that they are not

15   complying with (a)(2)?

16         MR. ABDO:  We begin the complaint by stating

17   that we are focused on controlling interpretations of

18   law and later on in the complaint set forth facts that

19   the OLC has never published an opinion or an index of

20   those opinions in compliance with (a)(2).

21         THE COURT:  But don't you have to have facts

22   that indicate that they were required to do so?  So

23   fine.  Their policy is under no circumstance does (a)(2)

24   require us to publish anything because we give private

25   and legal advice and (a)(2) doesn't require that.  To

54

1    the extent we're publishing, we're publishing on our own

2    authority pursuant to this memo related to the following

3    factors.  Fine.

4         Unless your position is that they are wrong

5    categorically across the board, all OLC opinions must be

6    published under (a)(2).

7         MR. ABDO:  Which is not our position.

8         THE COURT:  Correct.  Then don't you have to

9    demonstrate in the complaint the circumstances in which

10   you believe they needed to publish and they didn't?

11        MR. ABDO:  I think it's our obligation to set

12   forth facts that they haven't, but I don't think we need

13   to convert this into an (a)(3) request.  And the

14   government --

15        THE COURT:  No, no, no.  This is separate.

16   This is separate from what you're requesting of them and

17   whether or not they responded.  I'm talking about

18   stating a claim.

19        MR. ABDO:  Yes.  We've identified a category

20   that we think (a)(2) applies to.  In the same way as in

21   *Sears*, the requester asked for five years' worth of this

22   entire body of memoranda issued by the NLRB.  And that

23   went forward, it was litigated, and on summary judgment

24   categories were devised that actually more appropriately

25   mapped to the meaning of (a)(2).

1           And it may be that after discovery we have to

2     refine the category that we're seeking, but we that

3     there are opinions within that category, including

4     opinions that resolve interagency disputes, opinions

5     issued to independent agencies for which there's no

6     question that the OLC's opinions are the final word on

7     the law of the Executive Branch.  And that the

8     government has never treated it subject to (a)(2), and

9     we know that because they have never published an index.

10          THE COURT:  I'm granting that in my

11    hypothetical.  I'm granting in my hypothetical that OLC

12    has a policy of withholding opinions.  Because the way

13    it reads (a)(2), because the way it understands its own

14    role in the system, it says our things are not things

15    that are publishable under (a)(2).

16          Now, I hear them sort of, you know, in my mind

17    saying, That's not what we're saying.  I'm creating a

18    hypothetical.  All right.  They've stated that position.

19    I guess my question from the standpoint of trying to

20    understand the plaintiff's obligation is if you are not

21    saying that they are entirely wrong, that everything

22    that they have to, that they do comes in under (a)(2),

23    why don't you have to say in the complaint the

24    particular categories that you are alleging are a

25    violation of the law?

56

1          MR. ABDO:  Just to be clear, maybe if I can

2     give two responses.  First, that's not our view.  We

3     have identified a category.

4          THE COURT:  In the complaint?

5          MR. ABDO:  Yes.  In Paragraph 2 of the

6     complaint you can read that our focus is on controlling

7     interpretations of law.  And the reason why we're

8     focused on that category is because it's what we have

9     evidence with respect to from the Best Practices memo,

10    and it appears to map clearly on to the obligations of

11    (a)(2).

12         THE COURT:  All right.  *EFF* says you can't

13    have it at the level of controlling legal

14    interpretations of law.

15         MR. ABDO:  Respectfully, that's not the way

16    that I read *EFF*.  If I can give you an example, I don't

17    think *EFF* plausibly can be read as covering opinions of

18    the sort that I read where the OLC said Social Security

19    Administration, the Defense of Marriage Act does not

20    prevent you from according certain social security

21    benefits to Elijiah, who is the subject of that request.

22         THE COURT:  Right.  So doesn't your complaint

23    have to get us into that world?  Don't you have to solve

24    for the *EFF* problem by saying I don't mean controlling

25    legal opinions of law.  I mean the ones like this one

1    and you put it in the complaint.

2              MR. ABDO:  No, but I think those are one in

3    the same.  And I don't think --

4              THE COURT:  They're not.  *EFF* has said they're

5    not.

6              MR. ABDO:  I don't think, respectfully, that

7    *EFF* purported to decide whether all controlling opinions

8    of law are --

9              THE COURT:  Right.  And so it's up to you to

10   tell me which ones.  Which ones in the complaint.

11             MR. ABDO:  Maybe I misspoke.  I don't think

12   *EFF* stands for the proposition that controlling

13   interpretations of law are nonetheless exempt.  I think

14   if *EFF* had before it a controlling interpretation of law

15   such as the one that I read where the OLC says this

16   binds all executive agencies, there's no question, I

17   think, that the opinion would have come out differently.

18   And I think that's enough.

19             And let me say, let me answer, try to answer

20   the question in another way.  If this were an (a)(3)

21   case, if we had submitted a request under (a)(3) to the

22   OLC for all formal written opinions that the OLC had

23   issued, and if after 20 days -- which is a statutory

24   exhaustion requirement -- we ran into court at that

25   point without receiving a response from the OLC, which

1    is actually typical practice with federal FOIA, there's

2    no question that we would have an Article 3 case for

3    controversy even though we didn't have a response from

4    the government, even though we didn't know within that

5    category whether any of the memos were actually exempt

6    or not because the government hadn't had a chance to put

7    that forward after summary judgment, and that would

8    unquestionably be a ripe case for controversy.

9         The only difference between that case and this

10   one is that this one is framed under (a)(2) and is

11   therefore seeking a different sort of relief.  But

12   procedurally it would work out in the same way.

13        THE COURT:  So you're saying because -- you're

14   saying that if you had what the government would argue

15   would be sort of an overbroad request for documents

16   under (a)(3), you would nevertheless be able to bring

17   your lawsuit pursuant to (a)(3) under the judicial

18   review provisions, and you wouldn't be bounced on the

19   grounds that --

20        MR. ABDO:  It's unripe.

21        THE COURT:  -- it's unripe.

22        MR. ABDO:  And respectfully I don't think that

23   would be an overly broad request.  Again, *Sears*

24   concerned a request for five years' worth of memos;

25   *Coastal States* dealt with a category that ended up

1      being, you know, I think 1500 opinions.

2                THE COURT:  Right.  But the problem here, I

3      think, with respect to that argument is that (a)(2) is a

4      different kind of duty from the government's

5      perspective; and as *CREW* has articulated, it requires an

6      affirmative obligation of the agency to do certain

7      things with respect to certain categories of documents.

8                So it seems to me that a plaintiff's

9      obligation to state a claim is different than it is in

10     the (a)(3) world.  All you have to do in the (a)(3)

11     world, because there aren't certain categories of

12     documents that you can ask for under (a)(3), all you

13     have to do in the (a)(3) world is say I would like five

14     years' worth of documents.  And then you state a claim

15     for that purpose.

16                (a)(2), to the extent you seek to enforce it

17     by bringing a lawsuit, has within it its own

18     requirements of the government, and I think the

19     government is arguing that you have to state a claim

20     that they have violated those requirements.  And that,

21     in fact, that is a different obligation of the plaintiff

22     than the (a)(3) obligation.  And I see that, right.

23                MR. ABDO:  So two responses.  One is that I

24     don't think the line between the two is so clear.  In

25     *Sears* the plaintiff presented the case as an (a)(2)

60

1    case, and the Supreme Court considered it in part as an

2    (a)(3) case because it didn't want to resolve --

3              THE COURT:  You can do it that way because

4    (a)(2) requires more than (a)(3).  The question is

5    whether you can do it the other way, which is what your

6    hypothetical points out.

7              MR. ABDO:  Well, I think there are many (a)(3)

8    cases where the Exemption 5 litigation essentially

9    concerns solely the question of whether the opinion is

10   working law within the meaning of (a)(2).  Because

11   working law, if it's working law, it can't be

12   deliberative under Exemption 5.

13             And so I don't think there is that clear

14   category.  But even setting that aside, I think we've

15   satisfied our burden at this point, which is to

16   identify -- again, there are two points that I think the

17   government cannot dispute.  Which is that we know

18   they've never published anything under (a)(2).  And we

19   know that there are at least some things that fall

20   within (a)(2).  And that is enough to establish a case

21   for controversy.  And now the question is --

22             THE COURT:  Can I ask you, do they violate the

23   law if they publish a document and one of their

24   opinions, they don't say this is pursuant to (a)(2), but

25   it's something that you perceive to be a formal, a

61

1   controlling opinion and so it would satisfy, in your

2   view, (a)(2)?

3            MR. ABDO:  It would satisfy the publication

4   requirement of (a)(2) but not the indexing requirement

5   of (a)(2).

6            THE COURT:  So really this whole case falls on

7   the internal --

8            MR. ABDO:  I don't think the whole thing falls

9   on it, but I think it's a very clear way in which there

10  is obviously, even if you agree with the government's

11  narrow view of ripeness, which again I think is a

12  smokescreen.  But even if you agree with it, the

13  indexing requirement, the fact that they've never

14  published an index gives lie to the fallacy they're

15  selling today that they actually think (a)(2) applies.

16           THE COURT:  I understand, but I'm just trying

17  to understand what difference it makes that they think

18  they're publishing under -- setting aside the index,

19  right, the document is published.  It's on the website.

20  Whether they say this is being done pursuant to (a)(2)

21  or not, why does that matter?

22           MR. ABDO:  Well, setting aside the index it

23  might not except for the fact that they not might be

24  publishing everything that they're required to publish.

25  But the fact that they haven't published an index makes

62

1    clear that they've never attempted to apply the criteria

2    of (a)(2) in a way that we think would satisfy the

3    statute.  And so we have no assurance that they've

4    actually applied the criteria of (a)(2) except in a

5    categorial way on their view that it simply doesn't

6    apply to opinions of the OLC.  And that's the view we

7    want, that we want to challenge.

8            I think part of the Court's concern deals with

9    *EFF*, obviously.  So if I can turn to one part of *EFF* for

10   a moment.

11           THE COURT:  Yes.

12           MR. ABDO:  The government wants to draw very

13   broad legal principles from what I view to be dicta in

14   *EFF*.  And I think to read *EFF* at the breadth the

15   government wants to read them, you would have to

16   effectively overturn at least five different D.C.

17   Circuit opinions.

18           So one of the principles the government wants

19   to draw from *EFF* is that controlling opinions of law

20   that do not determine policy can't be working law.

21   Again, that controlling --

22           THE COURT:  That's not what *EFF* says?

23           MR. ABDO:  I do not think -- I think what *EFF*

24   says is that deliberative policy advice that doesn't

25   determine policy can't be working law.  And the reason

63

why I think *EFF* can't stand for the broader proposition
is because the D.C. Circuit has said at least three
specific times to the contrary of what the government's
principle is.  So let me, in *Tax Analyst 1* and *2* and in
*Public Citizen*, and here is what it says --

THE COURT:  I'm sorry, the first case that
you --

MR. ABDO:  I'm sorry.  I know I'm talking very
quickly.  In *Tax Analyst 1*, *Tax Analyst 2* and *Public
Citizen*.  And let me read from *Tax Analyst 2*.  The D.C.
Circuit said, "It is not necessary that the technical
assistance memoranda" -- which is what the plaintiff was
seeking -- "reflect the final programmatic decisions of
the program officers who request them.  It is enough
that they represent the Office of Chief Counsel's final
legal position."

THE COURT:  Enough for what?

MR. ABDO:  Enough for them to fall within the
disclosure provisions of FOIA.  And the reason why that
is important and the reason why that makes sense is
because *Sears* recognized a principle in (a)(2), one that
is fundamental to a democracy, that the public has an
interest in knowing what the law is, not just
applications of the law.  Not just policy.  But the law,
it's the working law principle, and it discerned in

64

1    Congress --

2            THE COURT:  Right, but isn't *EFF*, the whole

3    thrust of it, is that it doesn't become the law until it

4    is adopted by the agency and governs the agency's

5    position?  Just because OLC purports in its own final

6    formal way to articulate the law, to the extent that the

7    agency or if the agency does not adopt that, then it

8    isn't the working law of the agency.

9            MR. ABDO:  So I think the problem with that

10   argument is that it relies on a premise about *EFF* that

11   isn't true.  *EFF*, if you understand the opinion of *EFF*

12   and if you take the D.C. Circuit's description seriously

13   where it says that it examines policy options available

14   to the FBI, and that's at page 10, and at page 8 it

15   said, it suggests in describing the principles that

16   apply that it concerned the "advisability of certain

17   policies."  If you take those descriptions seriously,

18   then the opinion at issue is not one that is meant to

19   establish authoritative interpretations of the law for

20   the government.  It is one where the OLC is serving in

21   an advisory capacity.  And we don't contest --

22           THE COURT:  But how can you read out of the

23   opinion what appears to be the thrust of it, which is

24   the extent to which OLC can speak authoritatively on the

25   FBI's policy?

1          MR. ABDO:  On the FBI's policy.  And that's

2     because --

3          THE COURT:  Can speak on the policy.

4          MR. ABDO:  Right, and yet -- and the OLC

5     can't.  If the OLC is being asked, if the FBI comes to

6     the OLC and says we have options A, B and C that we're

7     thinking through, can you help us think them through and

8     they're asking for deliberative policy advice, it is

9     true the OLC cannot speak, cannot decide that policy

10    question for the FBI.

11          But there are a large category of opinions

12    where that's not the nature of the request, where the

13    nature of the request isn't said We have a question of

14    law and we want the OLC's authoritative legal

15    interpretation.  And it's opinions like the Social

16    Security -- and these are not --

17          THE COURT:  Can I have you distinguish

18    another, a little bit further down in the same opinion,

19    I'm on page 9, OLC is not authorized to make decisions

20    about the FBI's investigative policy, so the OLC opinion

21    cannot be an authoritative statement of the agency's

22    policy.

23          MR. ABDO:  And, again, that's true if you

24    understand the D.C. Circuit to be talking about policy.

25    The OLC --

1          THE COURT:  No, no, no, it's talking about

2     whether it can make a decision about the policy.

3          MR. ABDO:  Yes, that's correct.  And -- but

4     the opinions we're seeking are not ones that make

5     decisions about policy.  They are ones that make

6     decisions about the law.  They are not deliberative with

7     respect to policy.  They are final with respect to the

8     law.

9          And the reason why I think -- so the D.C.

10     Circuit was very clear that this opinion was decided on

11     the basis of this record about a single OLC opinion.  It

12     didn't consider opinions of the sort that we've --

13          THE COURT:  All right.  I think I understand

14     that question.

15          Let me direct you to another piece of this,

16     which is I'm trying to understand the relief that you

17     are seeking in this case and the extent to which -- you

18     appear to acknowledge that even if you win, DOJ would

19     remain free to treat certain OLC opinions as outside the

20     scope of the (a)(2).  That you're not seeking an

21     injunction from this Court that requires OLC to put all

22     of its opinions --

23          MR. ABDO:  We've never said that, and the

24     government's description to the contrary is misleading.

25     We don't say formal and informal in our prayer for

1    relief.  We say "controlling interpretations of law."

2            THE COURT:  Fine.  I'm just focusing on what

3    you want from me.  So to the extent that this Court

4    issues the injunction, you disclaim any injunction that

5    says OLC, all of your opinions must go up.

6            MR. ABDO:  That's correct.

7            THE COURT:  And you suggest that this Court is

8    not going to be engaged in the business of overseeing

9    which opinions go up going forward forever in

10   perpetuity.

11           MR. ABDO:  That's right.

12           THE COURT:  So who makes that decision, and

13   how is that decision any different than what's happening

14   today?

15           MR. ABDO:  So let me start with the second

16   question and get back to the first.  First I'd like to

17   describe very specifically the relief that we would

18   seek.

19           THE COURT:  Yes.

20           MR. ABDO:  So on the second it would be

21   different from today because the government would be,

22   would be ordered to understand its obligations under

23   (a)(2) differently.  Currently the government's view of

24   (a)(2) is that in effect, based on its arguments about

25   privilege, does not apply to a single OLC opinion.  Our

1    hope is that after this litigation the Court will agree

2    that there are some categories of OLC opinions that, in

3    fact, are final interpretations of law, controlling

4    interpretations of law.

5              THE COURT:  And I, first of all, as a matter

6    of law in the context of this litigation would delineate

7    those categories?

8              MR. ABDO:  Yes.  And the obligation would be

9    on us through the litigation after discovery to argue to

10   the Court that specific categories fall within (a)(2)

11   and the Court and the government would have its

12   opportunity to respond and the Court --

13             THE COURT:  And you don't have to do that now?

14             MR. ABDO:  Well, I think we've done enough now

15   in the complaint by pointing to controlling

16   interpretations of law.  I think that satisfies our

17   obligation under Rule 8 and Article 3 and ripeness.

18             So on the first question, what the relief is

19   that we look for.  So first we would want a declaration

20   that the reading room provisions apply to certain

21   categories of OLC opinions.  And we would want a related

22   injunction requiring the OLC to treat those categories

23   as subject to the reading room provisions of FOIA.  We

24   would want -- you know, incidentally we would want a

25   requirement that the government index those opinions and

1   disclose them to the Campaign for Accountability.  And

2   obviously a lot of -- obviously one of the main

3   questions in the litigation will be which categories are

4   we talking about.  Right now we believe those categories

5   to be controlling interpretations of law, including

6   especially these two subsets I've identified:

7   opinions resolving interagency disputes and opinions

8   issued to independent agencies.  And it may be that we

9   refine those further through discovery.

10          But that's the very specific relief that we

11   would ask for.  And that's not asking for a continuing

12   oversight obligation on the government.  It's asking for

13   an injunction that the government apply these standards

14   to its opinions today and prospectively.

15          And the OLC then would apply those standards

16   and it would give Campaign for Accountability an index

17   of the results along with any that were not

18   independently exempt.  And then if the OLC were not

19   satisfied with the particular exemptions -- sorry, the

20   Campaign for Accountability were not satisfied with

21   particular exemptions, we can file another lawsuit and

22   challenge those exemptions, but those would not be the

23   subject of this lawsuit.  For purposes of this lawsuit,

24   our complaint is solely about compliance with the

25   indexing and disclosure requirements of (a)(2).

70

1          THE COURT:  All right.

2          MR. ABDO:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MR. SCHWEI:  Thank you, Your Honor.  I'll try

5    to be brief and just address a few discreet points.

6          The first I want to address is the indexing

7    claim.  I don't think the indexing claim gets them out

8    of any of the holes or any of the defects of the, of

9    their other claim because the predicate necessary to

10   bring an indexing claim is that they have to establish

11   there is a document that is, number one, subject to

12   (a)(2); and number two, is not otherwise privileged.

13   That's rooted in the statutory language.  The relevant

14   (a)(2) language discussing the index says that the

15   information has to be, quote, "required by this

16   paragraph to be made available or published."  So it's

17   making clear that it has, that the index requirement

18   only applies if the information satisfies (a)(2).

19          THE COURT:  Yes.  However, his point, I think,

20   is that you should have been doing this all along

21   pursuant to the statute.  And the fact that there is no

22   index tells us something about the agency's

23   interpretation of (a)(2) and its application of (a)(2)

24   with respect to its opinions.

25          MR. SCHWEI:  Well, again, I think that's just

1    the circular logic that they are advancing, because I'm

2    not sure that the index that OLC would produce would be

3    any different than the list of 1300-plus OLC opinions

4    already available online.  And so, again, for them to

5    get in to court, they have to show that that index is

6    not good enough, that there's some basis for believing

7    the indexing requirement hasn't been complied with.

8         What we know is that there are 1300 opinions

9    available online.  Their complaint doesn't have factual

10   allegations about ones that are missing, and even if

11   they could get past establishing the opinions fall

12   within (a)(2), they would also have to establish that

13   those opinions are not privileged because of the

14   language of subsection (b) in the statute, which says

15   this section does not apply to matters that fall within

16   one of the exemptions.

17        And so the -- I think it was a question

18   Your Honor asked in their first round of argument about

19   whether there's a world in which an index is required

20   but the document may nonetheless not need to be

21   published.  The answer is no.  That world does not

22   exist.  The indexing requirement pursuant to the

23   statutory language only kicks in if the document must be

24   made available and published.

25        I think turning to *EFF*, they argue that there

72

1    are --

2         THE COURT:  That's interesting.  So I'm sorry,

3    I just want to be clear.  So as you read the statute,

4    unlike -- I hear the plaintiff's thrust to be the index

5    is like a Vaughn index.  These are the things that have

6    not been published so that we kind of know what's going

7    on inside the agency, and you point to language that

8    suggests that the index perhaps is just like a table of

9    contents.  It helps us with what has actually been

10   published.

11        MR. SCHWEI:  Right.  And the index, that's

12   confirmed by the statutory language in (a)(2) and

13   subsection (b).

14        And just to be clear about the implications of

15   their argument, I think it is reminiscent of a Vaughn

16   index, and what they are seeking to compel is for OLC

17   and potentially every agency general counsel when they

18   decide a controlling legal issue for the agency, they

19   must then make the world aware and probably under their

20   view disclose the contents of their predecisional legal

21   advice.  I think that's the extraordinary request that

22   they are claiming and that as we've laid out in some of

23   the briefs would really threaten OLC's role in the

24   Executive Branch as well as raise Article 2

25   constitutional concerns.

73

1          Turning to *EFF*, they rely on prior decisions

2     from the D.C. Circuit like Public Citizen and *Tax*

3     *Analyst 1* and *2*.  Those are the exact decisions

4     distinguished by the D.C. Circuit in *EFF* as not

5     applicable to the OLC advice document at issue there.

6     And we are not seeking to read *EFF* as, you know,

7     governing -- we don't think it's necessary for this

8     Court to say *EFF* governs all OLC advice documents.  None

9     will ever be privileged.  But we think it's important

10    because it undermines the legal theory on which their

11    claim is predicated.

12          And I think their reading of it as limited to

13    the particular advice document at issue there is

14    contradicted by the Second Circuit's decision in *New*

15    *York Times v. Department of Justice* where addressing an

16    entirely distinct set of OLC documents, the Second

17    Circuit cited *EFF* and embraced the rationale and

18    rejected the working law argument.

19          As a factual matter, Plaintiffs contend that

20    the opinion in *EFF* was a policy advice-type document

21    based on, you know, singular quotes of words and phrases

22    within the D.C. Circuit's opinion.  Some of those quotes

23    are not actually describing the opinion, the OLC opinion

24    at issue.  For example, talking about the advisability

25    of a particular policy.  That particular word appears in

74

1    the section discussing other cases and doctrine more

2    generally.

3              I think it's inescapable if this Court reads

4    the factual background section of *EFF* that the opinion

5    there was about what the FBI was legally permitted to

6    do.  It was not about the wisdom of whether the FBI

7    should do it.  So I think the distinction they're trying

8    to urge with *EFF*, as I'm sure is confirmed by not only

9    the decision but the entire record in that case, is that

10   distinction simple cannot be borne out.

11             THE COURT:  Can I just turn your attention to

12   something different, which is whether and to what extent

13   this complaint has to be dismissed because the

14   plaintiffs have asked for disclosure to the public.  Can

15   I just remedy that as he suggests down the line?

16             MR. SCHWEI:  We think -- we read their

17   complaint as actually alleging that the injury they are

18   seeking to vindicate is the lack of public disclosure.

19   And so we think technically as a formal matter the

20   relief this Court would be authorized to enter post-*CREW*

21   can't does not redress the injury as alleged in the

22   complaint as a formal matter.

23             THE COURT:  But they did submit a letter

24   seeking the information.  So we're not in a world in

25   which they didn't set up or have the factual predicate

1   for claiming personal injury, right?

2           MR. SCHWEI:  I think that particular argument

3   is not the foundation, the fundamental disagreement

4   between the parties.  I think whether it's resolved

5   further down the line or could be resolved through an

6   amendment of their complaint, I don't think that would

7   foreclose this lawsuit from ever going forward --

8           THE COURT:  I see.

9           MR. SCHWEI:  -- in the way what our other

10  arguments would.  So I think in our view the complaint,

11  the current complaint fails, but --

12          THE COURT:  But you're not going to totally

13  hang your hat on that?

14          MR. SCHWEI:  Correct, Your Honor.  I think one

15  thing that I do want to point out about their complaint

16  is Paragraph 35, which makes perfectly clear -- well, it

17  specifies the breadth of their claim which is actually

18  alleged in the complaint, which is to make publicly

19  available documents that fall within (a)(2) and then,

20  quote, "Such injunction shall specify that this includes

21  inter alia those written opinions issued by OLC that

22  provide controlling advice to Executive Branch officials

23  and agencies on questions of law, whether formal or

24  informal," and then it goes on to list several other

25  categories.

1          I think, you know, this is the claim that they

2     have actually alleged in their complaint.  What they've

3     tried to narrow it now to be today is not the one in the

4     complaint.  But the claim that they're trying to narrow

5     it to today is still meritless because even in this,

6     even let's take these two subsets that I gather the

7     plaintiff believes are the hallmark of what they think

8     fall within (a)(2).

9          In those circumstances, for example, where OLC

10    issues its opinion giving legal advice either to an

11    independent agency or to multiple Executive Branch

12    agencies, that legal advice is still just one of the

13    predecisional inputs that the agencies would then have

14    to take back and consider and evaluate about how to

15    actually implement and make a policy decision for

16    something that might affect members of the public, which

17    is, of course, what working law is all about.

18          THE COURT:  So just because it talks about the

19    law doesn't make it the working law of the agency for

20    the purpose of this issue?

21          MR. SCHWEI:  Correct.  And that's consistent

22    with not only *EFF* but *Brinton v. Department of State*

23    where the legal advisor for the Department of State

24    offered their view on the status of a particular

25    territory in the Middle East.  The plaintiffs sought

1    that legal view, and the D.C. Circuit said that is not

2    working law.  It is the legal advisor's legal opinion,

3    but that is just one of the predecisional inputs because

4    the State legal advisor does not have policy-making

5    authority.  It is the State Department as a whole that

6    makes policy governing the Middle East.

7            THE COURT:  Can you speak really quickly,

8    because we're running out of time here, to the point

9    that Plaintiff made about if this was an (a)(3) claim

10   and it was just as broad or general as it is now, there

11   would be no question that he would have standing, that

12   there wouldn't be an issue of ripeness or anything else.

13           MR. SCHWEI:  So I think there would be a

14   serious question about whether that satisfies all the

15   (a)(3) requirements of reasonably specific and

16   identifiable and everything.  But setting aside the sort

17   of does it procedurally meet (a)(3), it would still give

18   this Court a defined context in which to evaluate the

19   broad legal theory they're advancing.

20           I think this argument actually hurts the

21   plaintiff because it shows the manner in which they can

22   pursue this claim, this broad theory, but they can do so

23   in the broad context of specific documents that would

24   actually give this Court a concrete factual setting for

25   evaluating this broad legal theory, which is what is

1   missing here.

2          THE COURT:  So is your point that they can't

3   really make a practice or policy claim in the context of

4   (a)(3)?  They're supposed to be asking for specific

5   documents?

6          MR. SCHWEI:  I think (a)(3) is just a

7   different world for some of the reasons Your Honor

8   mentioned.  But also, you know, that complaint is still

9   subject to the typical 12(b)(6) requirements.  It's just

10  that the complaint ordinarily easily satisfies those

11  requirements by saying We requested this universe of

12  documents, either the government didn't respond, they

13  refused to provide them to us.  On information and

14  belief, you know, we believe they are not privileged.

15  They're required to be given to us.

16          And, you know, usually there's factual

17  discussion of what the types of documents are that give

18  some factual allegation and support for why the

19  documents the plaintiff believes need to be disclosed to

20  them.  Here that's what's missing, and the standard

21  should be especially demanding as their complaint seeks

22  broader and broader relief.  The (a)(3) cases, it's

23  normally very easy for a plaintiff to say These five

24  documents we think need to be disclosed.

25          THE COURT:  Or even five years' of documents.

79

1          MR. SCHWEI:  Right.

2          THE COURT:  So it's not so much, it's the

3    character of what is being requested.  It's not a

4    challenge to the agency's general policy related to

5    these kinds of documents.

6          MR. SCHWEI:  And I think this goes to what

7    Judge Mehta in the District Court *CREW* decision noted,

8    which is that a plaintiff even in an (a)(3) lawsuit

9    limited to a specific set of documents is free to

10   advance whatever broad theories they would like.  And if

11   the Court adopted those broad theories, even in the

12   context of only specific documents, then presumably the

13   government would comply with it and there would be, you

14   know, a way to achieve the end that Plaintiffs want to

15   achieve here.

16          And so I think their arguments about why this

17   lawsuit must proceed because otherwise the government

18   would go unchecked are overblown, because they do have

19   concrete remedies available to them.  They could even

20   under (a)(2) plausibly allege specific facts that give

21   rise to a claim.  But that's not what we have here, and

22   this Court should not excuse those failures and allow a

23   broad, open-ended lawsuit to proceed.  I think their

24   attempt to cabin their relief here and say they are not

25   going to return to this Court to enforce whatever

80

1   injunctions this Court enters, I think that's hard to

2   square with the Supreme Court's decision in *Norton v.*

3   *the Southern Utah Wilderness Association* when the Court

4   said of course, if a Court enters an injunction they

5   have to ensure compliance with it.  And that underscores

6   the real object of Plaintiff's suit here, which is

7   broad, open-ended oversight of OLC's publication

8   practices prospectively.  And there's no reason for this

9   Court to allow that on this complaint.

10          THE COURT:  Thank you, Mr. Schwei.

11          Mr. Abdo, I'm going to give you the last word,

12   and I hope it's a brief one.

13          MR. ABDO:  Thanks, Your Honor.  It will be

14   brief.  I just wanted to make a couple of quick points.

15          The first is that I think the government's

16   concession that this case could proceed under (a)(3)

17   shows that the government's real argument isn't that

18   this particular case is unripe.  It is that challenges

19   under (a)(2) are never permissible.  The only

20   distinction between this case and an (a)(3) one has to

21   do with the nature of the relief that we would be

22   seeking, which would be relief that isn't addressed to a

23   specific or limited to opinions that exist now.

24          THE COURT:  You don't see a distinction

25   between the claim that you're making?  If you were

1    bringing this as an (a)(3) action, surely you would have

2    to say we requested these documents.

3              MR. ABDO:  Which we did.  We sent a request to

4    OLC asking for formal written opinions.  That is in the

5    record.

6              THE COURT:  All formal written opinions?

7              MR. ABDO:  All formal written opinions.

8              THE COURT:  Time limited, no time limited?

9              MR. ABDO:  Not time limited.

10             THE COURT:  Not sent to a certain agency?

11             MR. ABDO:  No.  OLC written opinions which

12   they internally maintain and in a cataloged way, and

13   they do that precisely for all the reasons that we say

14   they're controlling.

15             THE COURT:  All right.  So why are you

16   bringing an (a)(2) claim?  Why aren't you pursuing this

17   as an (a)(3) claim?

18             MR. ABDO:  Because the relief that we're

19   seeking is relief under (a)(2), which is --

20             THE COURT:  But you can't seek it to the

21   public.  It's got to come to you.  We know that from

22   *CREW*.

23             MR. ABDO:  That's correct.  But we're

24   challenging a policy or practice that the government has

25   of not complying with (a)(2).  And even if we litigate

it under (a)(3)), the primary legal question would be whether the opinions are subject to (a)(2) such that they're not exempt under Exemption 5.

The litigation would look almost identical. We would have available to us the same litigation record that we can build in this case on discovery concerning the exact same opinions.

THE COURT:  Except you don't get discovery in (a)(3) cases, do you?

MR. ABDO:  You don't if you're -- it's rare that you get discovery if all you're complaining about is whether a particular document, whether the government has described a particular document accurately in its declarations or not.  But you do get discovery in non-rare cases or in the rare cases where policies might be an issue or the questions are broader ones.  And we think this is that one.

An example is *Tax Analyst 1* was an opinion that was issued after what the Court said was extensive discovery.  And the reason why that was necessary was because claims about working law inevitably turn heavily on the facts or the way in which the memos operate within the agency.  And that's crucial because there are general counsel memos that the D.C. Circuit has recognized have the character of working law.  And there

83

1    are also general counsel memos that the agency has

2    recognized are sent up the chain of command to the final

3    legal decision-maker as in *Brinton*, which is what the

4    government primarily relies on, that weren't working law

5    and that really are meant to be deliberative.

6            THE COURT:  Right, and I guess the question

7    that I have and I keep coming back to is that as a

8    plaintiff who is challenging what you perceive to be a

9    policy of not publishing certain things and in light of

10   the fact that you acknowledge that not all things

11   qualify, why don't you have to be more specific in your

12   complaint about what you say violates the law?

13           MR. ABDO:  I guess, you know --

14           THE COURT:  Because it doesn't, based on what

15   you said, violate the law for them to not publish

16   everything.

17           MR. ABDO:  That's right.  And --

18           THE COURT:  Right.

19           MR. ABDO:  We've never asked for everything.

20   We've asked for controlling interpretations of law.  I

21   know I've tried a number of ways to explain why I think

22   that's satisfactory.  Maybe the best way I can say it is

23   that is as specific as the plaintiffs were in *Sears*.  It

24   is as specific as the plaintiffs were in *Coastal States*

25   and *Tax Analysts*.

84

1          THE COURT:  All right.  I'll look at those

2     cases, yes.

3          MR. ABDO:  If I can make one --

4          THE COURT:  Sure.

5          MR. ABDO:  -- final point.  The government,

6     again, argues about *EFF* taking the position that legal

7     advice is predecisional.  And the reason I think why you

8     can't read *EFF* so broadly is because the D.C. Circuit

9     has specifically rejected the broad argument that all

10    legal advice is predecisional.

11          In the cases I've mentioned, they've said that

12    general counsel opinions, even though legal advice in a

13    sense, are at times and in many instances based on the

14    D.C. Circuit's rulings working law.  And the question

15    becomes on the balance between *Brinton* on the one hand

16    and *Public Citizen* and *Tax Analyst 1, 2, Sears* and

17    *Public Citizen*, the line is --

18          THE COURT:  I'm sorry, where is *EFF* in that?

19          MR. ABDO:  *EFF* says that the opinion that they

20    are examining was one that examined policy choices and

21    was deliberative on the side of *Brinton*.  We think

22    there's a broad category of OLC opinions that fall on

23    the other side.  You have to consider those opinions.

24    It didn't have that record before it and so it couldn't

25    have.

85

1          And if to read *EFF* as broadly as the

2     government would want this Court to read it, you would

3     have to not only find that memo didn't fall on that kind

4     of factual line, but you'd have to also conclude that

5     the rest of those D.C. Circuit opinions were no longer

6     good law.

7          THE COURT:  You said that *EFF*, which came

8     after, distinguished that.

9          MR. ABDO:  Distinguished on the basis of fact.

10    It said that the OLC opinion before it was not one of

11    those.  It was one akin to those that concern the

12    advisability of policy.  That's why I quoted that

13    language, because at the beginning of that discussion

14    where it uses the word "advisability," it says, "We

15    think that the opinions that control this case are ones

16    that concern advice that goes to the advisability of

17    policy rather than" --

18         THE COURT:  And you're saying in your world of

19    distinctions ones that concern the advisability of

20    policy are not controlling?

21         MR. ABDO:  Yes.  Those are deliberative.

22         THE COURT:  So the way you define

23    "controlling" is not an OLC opinion that speaks to the

24    law --

25         MR. ABDO:  That's right.  The question is as

86

1    in all working law cases is it meant to be treated as

2    essentially binding or controlling interpretation of law

3    that is precedential within the agency, or is it purely

4    deliberative in the way that the opinion in *Brinton* was.

5              THE COURT:  I'm sorry.  The way in which the

6    agency receives it and adopts it or not or how the

7    agency treats it, how does that play into your

8    understanding of whether or not something is

9    controlling?

10             MR. ABDO:  Well, I think probably the single

11   most significant fact about how the OLC operates that

12   would go to this question is that --

13             THE COURT:  No, no, no, how the perceiving

14   agency operates.

15             MR. ABDO:  The receiving agencies ask for

16   these controlling opinions of law on the understanding

17   that what they're going to get is controlling opinions

18   of law and they have the custom and practice of treating

19   them as controlling opinions of law.  That is what

20   every -- that is what the Best Practices memo says, that

21   is what the old Best Practices memo says.  In 2004,

22   19 --

23             THE COURT:  Maybe I don't understand what

24   "controlling" means in your interpretation.

25             MR. ABDO:  It's like that language -- it's

1    like that language from the *Small Business Act* opinion

2    which says, "This opinion binding all executive

3    agencies."  There are whole categories of opinions that

4    read like that.

5              THE COURT:  I understand how the -- I'm asking

6    about a different perspective. right.  The OLC can say

7    whatever it wants.  We're binding, we're controlling,

8    this is our final word, we're on fancy paper.  Okay.

9              I want to understand what the agency who

10   receives that opinion does with it and its relationship

11   to OLC, because I think that that's what *EFF* was focused

12   on.  I don't hear that in your analysis of whether

13   something is controlling.

14             MR. ABDO:  Well, when it comes to controlling

15   interpretations of law issued by OLC, the custom and

16   practice of those agencies is to treat those opinions as

17   the law of the government.  That is what many former OLC

18   lawyers have described as the effect of these opinions,

19   and the reason why *EFF* comes out the other way, again,

20   is because I don't think that's the kind of opinion that

21   was at issue.  I think the kind of opinion that was at

22   issue is one that as *EFF* described examined policy

23   options available to the FBI.  Not one that purports to

24   decide a legal question for the government.

25             Discussion held off the record.)

1              MR. ABDO:  Sorry about that.  Your Honor, if I

2     can make one final point on the OLC.  The reason why OLC

3     occupies this special role within the government, an

4     issue of controlling interpretations of law, is not by a

5     historical accident.  It is because the Attorney General

6     by the First Judiciary Act in 1789 was invested with the

7     authority to decide questions of law for the government,

8     and it delegated that authority to OLC.  And the only

9     governmental operators who have the authority to

10    overturn controlling opinions of law of the OLC are not

11    agency heads.  They are the Attorney General and the

12    President of the United States.  Those are the only two

13    Executive Branch operators who have that authority.

14             THE COURT:  Can I just have you appreciate one

15    distinction that I see and maybe speak to it and then

16    we'll close.

17             MR. ABDO:  Sure.

18             THE COURT:  I don't know that we're talking

19    about whether the receiving agency is overturning,

20    contradicting, opposing the statement of law that is

21    being presented to them by OLC, which is what you are

22    suggesting.  I think the question in *EFF* is whether or

23    not, given that statement of law, which is

24    authoritative, controlling, however, whatever you want

25    to talk about, binding to the extent that it is saying

1     this is what the law is, whether and to what extent that

2     statement becomes a part of the agency's policy for the

3     purpose of moving forward.

4          So fine, given that this is the law, the

5     agency can or cannot, I hear the judges saying in *EFF*,

6     use that to decide we are going to act in a certain way

7     in light of that legal principle or not.  And that it's

8     only in the world in which that authoritative statement

9     of the law becomes the working law of the agency, the

10    reason why the agency is proceeding in a policy manner

11    in a certain way and it's adopted for that purpose do we

12    have a situation in which this issue of publication even

13    becomes a thing.

14         MR. ABDO:  So can I first cabin that question

15    before frontally addressing it.  Which is I'm cabining

16    it by saying even accepting that argument, I don't think

17    that touches agency opinions, OLC opinions issued to

18    independent agencies where they agree to conform their

19    conduct of the opinion in advance.

20         THE COURT:  All right.

21         MR. ABDO:  And I don't think it addresses or

22    it goes to interagency disputes where the whole purpose

23    of going to the OLC -- as directed by executive order,

24    the president has directed agencies to take their

25    disputes to the OLC so that the OLC can resolve them.

90

1   The whole point of going there so that the OLC resolves

2   those disputes -- and you can read some of those

3   opinions, and they speak about resolving the dispute,

4   not about offering abstract policy-making advice --

5            THE COURT:  So in those two circumstances,

6   which are the ones that you now say your complaint is

7   really about --

8            MR. ABDO:  I think those are particularly -- I

9   think those are subsets that show that the subset of

10  opinions that we are talking about is not nil, which is

11  what the government would have to show I think to

12  prevail on a motion to dismiss at this stage.

13           We also disagree even within the other

14  categories, the broader categories, formal written

15  opinions, and it may just be that there is a distinction

16  the D.C. Circuit has drawn between final legal

17  conclusions and final programmatic decisions.  And it

18  has said that the fact that a legal opinion does not

19  resolve a policy decision is not a basis for holding

20  that the opinion that controls on law is not working

21  law.

22           THE COURT:  And they said that in -- is that

23  *Tax Analyst* or what?

24           MR. ABDO:  They said it in several opinions.

25  *Tax Analyst 1*, *Tax Analyst 2*, I think they said it in

1    *Schlefer* and maybe *Public Citizen 2*.  It has been clear

2    by that.  And I think that's important because

3    understanding that background legal principle clarifies

4    that what was important in the *EFF* case is that they

5    weren't talking about a controlling interpretation of

6    law that was meant to bind the executive.  They were

7    talking about policy advice.

8         We don't contest that the OLC maybe frequently

9    offers pure policy advice.  And they are asked questions

10   where they're not being asked to issue controlling

11   interpretations of law.  They are being asked for

12   deliberative help.

13        We do not argue and we don't think there's an

14   argument that (a)(2) applies to those unless they're

15   adopted later on.  But that's not what our case is

16   about.  Our case is about the different category that I

17   don't think *EFF* considered that looked like the ones I

18   was talking about where the OLC says, Elijiah can't be

19   prevented by the Defense of Marriage Act from getting

20   Social Security benefits.  Those are the types of

21   opinions that we think (a)(2) applies to and that the

22   government has not been applying (a)(2) to.

23        THE COURT:  Very, very interesting.  Excellent

24   arguments.  I will take the motion under advisement.

25             (Proceedings adjourned at 12:30 p.m.)

92

* * * * * * * * * * * * * * * * * * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Barbara DeVico, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.

_____                    10-10-17

SIGNATURE OF COURT REPORTER                          DATE