**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
CAMPAIGN FOR ACCOUNTABILITY,         )
                                                    )
                        Plaintiff,                 )
                                                    )
            v.                                       )          Civil Action No. 1:16-cv-1068 (KBJ)
                                                    )
U.S. DEPARTMENT OF JUSTICE,           )
                                                    )
                        Defendant.             )
_____)


**<u>DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF RENEWED
MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

ARGUMENT .................................................................................................................3

I.    The Court Correctly Concluded that CFA's Broad Legal Theory Is Foreclosed By the D.C. Circuit's Decision in *EFF*.................................................................................3

    A.  This Court Should Not Permit CFA to Re-Litigate Issues Previously Decided .................3

    B.  CFA Misconstrues the D.C. Circuit's Decision in *EFF*, Which Forecloses CFA's Claims Here ........................................................................................................4

    C.  Even Apart from *EFF*, CFA Mischaracterizes the Overall Framework Governing Disclosure of Legal Advice.........................................................................................7

    D.  The Categories of Documents that Section 552(a)(2) Requires to be Disclosed Do Not Include OLC Opinions......................................................................................11

II.   CFA's Four Categories of OLC Advice Documents Are Also Privileged and Need Not Be Disclosed ......................................................................................................15

    A.  Opinions Resolving Interagency Disputes.......................................................................15

    B.  Opinions Interpreting Non-Discretionary Legal Obligations ...........................................18

    C.  Opinions Adjudicating or Determining Private Rights.....................................................19

    D.  Opinions Finding that Particular Statutes Are Unconstitutional and that Agencies Therefore Need Not Comply with Them ..........................................................................21

III.  CFA's Claims Would Undermine Important Values and Raise Significant Constitutional Concerns.....................................................................................................23

CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review,*
  830 F.3d 667 (D.C. Cir. 2016) ................................................................. 14

*Beecham v. United States,*
  511 U.S. 368 (1994) .............................................................................. 12

*Brinton v. Dep't of State,*
  636 F.2d 600 (D.C. Cir. 1980) ................................................................. 8

*Coastal States Gas Corp. v. Dep't of Energy,*
  617 F.2d 854 (D.C. Cir. 1980) ............................................................... 22

*CREW v. Office of Admin.,*
  249 F.R.D. 1 (D.D.C. 2008) .................................................................... 10

*Dep't of Justice v. Reporters Comm. for Freedom of Press,*
  489 U.S. 749 (1989) .......................................................................... 11, 12

*EFF v. Dep't of Justice,*
  892 F. Supp. 2d 95 (D.D.C. 2012) ............................................................ 6

*Elec. Privacy Info. Ctr. (EPIC) v. Dep't of Justice,*
  2014 WL 1279280 (D.D.C. Mar. 31, 2014) ............................................. 11

*Elec. Frontier Found. v. Dep't of Justice,*
  739 F.3d 1 (D.C. Cir. 2014) ............................................................ *passim*

*EPIC v. Dep't of Justice,*
  584 F. Supp. 2d 65 (D.D.C. 2008) ..................................................... 11, 14

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) .............................................................................. 13

*N.Y. Times Co. v. Dep't of Justice,*
  806 F.3d 682 (2d Cir. 2015) ................................................................... 10

*N.Y. Times Co. v. Dep't of Justice,*
  --- F. Supp. 3d ----, 2017 WL 4772406 (D.D.C. Oct. 20, 2017) ............... 11

*NLRB v. Sears,*
  421 U.S. 132 (1975) .............................................................................. 19

*Pepper v. United States,*
  562 U.S. 476 (2011) ................................................................................ 3

*Pierce v. District of Columbia*,
   146 F. Supp. 3d 197 (D.D.C. 2015)......................................................................... 3, 4

*Public Citizen v. OMB*,
   598 F.3d 865 (D.C. Cir. 2010) ................................................................................ 13

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
   421 U.S. 168 (1975)........................................................................................ *passim*

*Singh v. George Washington Univ.*,
   383 F. Supp. 2d 99 (D.D.C. 2005) ............................................................................ 4

## STATUTES

5 U.S.C. § 552................................................................................................... *passim*

28 U.S.C. § 512................................................................................................... 7

Electronic Freedom of Information Act Amendments of 1996,
   Pub. L. No. 104-231, 110 Stat. 3048 (1996) .......................................................... 12

## RULES

Fed. R. Civ. P. 54............................................................................................... 3

## REGULATIONS

28 C.F.R. § 0.25 ................................................................................................ 7

## UNITED STATES CONSTITUITON

U.S. Const. art. II, § 3 ....................................................................................... 23

## OTHER AUTHORITIES

Br. of Amici Curiae CREW et al.,
   *EFF*, No. 12-5363, 2013 WL 1182676 (D.C. Cir. filed Mar. 22, 2013) ................... 5

Br. of Appellant,
   *EFF*, No. 12-5363, 2013 WL 1088742 (D.C. Cir. filed Mar. 15, 2013) ................... 5

*Constitutionality of Section 7054 of the Fiscal Year 2009 Foreign Appropriations Act*,
   33 Op. O.L.C. ___ (June 1, 2009),
     https://www.justice.gov/sites/default/files/olc/opinions/2009/06/31/section7054_0.pdf......... 22

Dep't of Justice, OIG, *A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records* (2010), http://www.justice.gov/oig/special/s1001r.pdf........................................................ 5, 6

Mem. for the Att'y Gen., *Review of the Legality of the STELLAR WIND Program* (May 6, 2004), https://www.justice.gov/sites/default/files/pages/attachments/2014/09/19/may_6_2004_golds mith_opinion.pdf....................................................................................................... 11

*The Attorney General's Role As Chief Litigator for the United States*, 6 Op. O.L.C. 47 (1982) ................................................................................................ 10

*Whether the Office of Administration Is an "Agency" for Purposes of the Freedom of Information Act*, 31 Op. O.L.C. 200 (Aug. 21, 2007), https://www.justice.gov/file/451571/download....................................................... 10

# INTRODUCTION

This Court previously dismissed the initial Complaint filed by Campaign for Accountability (CFA), which alleged a broad claim that, under the Freedom of Information Act (FOIA), the Office of Legal Counsel (OLC) must affirmatively disclose all of its formal written opinions.  *See* Mot. to Dismiss Op. (ECF No. 19) at 28-35 [hereafter "MTD Op."].  The Court permitted CFA to amend its Complaint, however, to focus on "specific, ascertainable categories of records that CfA believes are subject to the reading-room requirement and that OLC has failed to make publicly available."  *Id.* at 37.  Despite that instruction, CFA now spends the bulk of its opposition not defending the actual claim alleged in its Amended Complaint, but instead seeking to re-litigate this Court's prior decision dismissing the broad claim alleged in CFA's initial Complaint.  *See* CFA's Opp. to Mot. to Dismiss (ECF No. 30) at 7-29 [hereafter "CFA's Opp."].  And in the course of trying to re-litigate its initial claim, CFA again advances arguments that have already been considered and rejected by the D.C. Circuit in *Electronic Frontier Foundation v. Dep't of Justice*, 739 F.3d 1 (D.C. Cir. 2014) [hereafter *EFF*].

This Court should reject CFA's attempt to re-litigate these issues yet again.  CFA does not even attempt to explain why it meets the very high standard governing requests for reconsideration of an issue previously decided.  Indeed, CFA's request for reconsideration fails, both substantively and procedurally, to comply with the requirements of this Court's standing order.  *See* General Order & Guidelines for Civil Cases (ECF No. 4) ¶ 5(e).  Thus, the Court should reject out-of-hand CFA's attempt to re-litigate issues that have already been decided.

Moreover, even if the Court were to consider CFA's arguments, they are incorrect.  First, CFA misconstrues both the facts and the import of *EFF*:  the OLC opinion at issue in that case was indeed a formal OLC opinion, used by the FBI as a pre-decisional input into its prospective policy decisions, and that provided quintessential legal advice (rather than "policy" advice).

Thus, the OLC opinion in that case is *exactly* the kind of OLC opinion that CFA argues must be disclosed here. Additionally, even apart from *EFF*, CFA distorts the overall legal framework governing disclosure of legal advice. As this Court previously recognized, the D.C. Circuit's pre-*EFF* cases all involved documents that "reflected the position of *the agency* itself," but here OLC *lacks* authority to set any agency's policy. MTD Op. at 34. Indeed, the D.C. Circuit in *EFF* expressly distinguished the very same cases that CFA seeks to rely on here. *See EFF*, 739 F.3d at 7-9. Thus, CFA's broad arguments are foreclosed by both this Court's prior decision and binding D.C. Circuit precedent.

As for the actual claim the Court permitted CFA to bring, CFA's remaining four categories of opinions also need not be disclosed. Many of CFA's arguments here are similarly foreclosed by *EFF*. For example, CFA repeatedly argues that OLC authoritatively determines agencies' policies as to legal questions, even if OLC does not determine how the agencies ultimately must act. *See, e.g.*, CFA's Opp. at 33-34, 36-37, 39. But the D.C. Circuit has rejected this very argument, holding that even if OLC's legal advice is "controlling" on the agency, that "does not overcome the fact that OLC does not speak with authority on the FBI's policy." *EFF*, 739 F.3d at 9. For this reason (and others discussed in more detail below), none of CFA's identified categories constitutes "an ascertainable set of OLC opinions *that plausibly constitute the law or policy* of the agency to which the opinion is addressed[.]" MTD Op. at 33.

Finally, CFA offers little defense of the broad implications of its legal theory. Accepting CFA's claim would threaten the Executive Branch's ability to receive confidential legal advice (as well as other kinds of pre-decisional advice), thereby undermining important rule-of-law values and raising significant constitutional concerns. For that reason alone, CFA's claims should be rejected.

**ARGUMENT**

I.  **THE COURT CORRECTLY CONCLUDED THAT CFA'S BROAD LEGAL THEORY IS FORECLOSED BY THE D.C. CIRCUIT'S DECISION IN *EFF***

    A.  **This Court Should Not Permit CFA to Re-Litigate Issues Previously Decided**

This Court dismissed CFA's original Complaint which sought to compel the disclosure of all formal OLC opinions, reasoning that CFA's claims were foreclosed by *EFF*.  *See* MTD Op. at 28-35.  CFA now "urges this Court to reconsider its prior holding," CFA's Opp. at 2, but does not even attempt to satisfy the requirements governing such requests for reconsideration.

CFA essentially argues that this Court erred in its interpretation of *EFF*.  When seeking reconsideration, however, "assertions of error, standing alone, are insufficient[.]"  *Pierce v. District of Columbia*, 146 F. Supp. 3d 197, 201 (D.D.C. 2015) (Jackson, K.B., J.).  The same is true under law-of-the-case principles.  *See Pepper v. United States*, 562 U.S. 476, 506-07 (2011) (the law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case" unless the prior decision was "clearly erroneous and would work a manifest injustice").  Indeed, this Court previously entered an Order setting forth the procedures for filing motions for reconsideration, and the high standard necessary for requesting such relief:

> Motions for reconsideration of prior rulings are strongly discouraged. Such motions shall be filed only when the requirements of Fed. R. Civ. P. 54(b), 59(e), and/or 60(b) are met. Any such motion **shall not exceed ten (10) pages in length**. Moreover, the Court will not entertain (a) motions that simply reassert arguments the party previously raised and the Court rejected, or (b) arguments that a party could have raised previously but now raises for the first time.

General Order & Guidelines for Civil Cases ¶ 5(e).

Here, CFA does not even attempt to meet this high standard, and obviously CFA's opposition devoted more than 10 pages to the issue.  *See* CFA's Opp. at 7-29.  Particularly in these circumstances—in which the Court reached its prior conclusion after extensive briefing and

a lengthy motions hearing, *see* ECF Nos. 9-1, 11, 12, 15; Tr. of Mot. to Dismiss. Hr'g (July 18, 2017) [hereafter "MTD Hr'g Tr."]—this Court should not permit CFA to re-litigate the exact same issues that were already decided at an earlier stage of the case.  *See Pierce*, 146 F. Supp. 3d at 201 ("Where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." (modifications omitted, quoting *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005))).

## B.    CFA Misconstrues the D.C. Circuit's Decision in *EFF*, Which Forecloses CFA's Claims Here

Even were the Court inclined to consider CFA's arguments, they are meritless.  As this Court correctly concluded before, "the *EFF* decision establishes that an OLC opinion does not become the 'working law' of the agency that requested it merely by virtue of the fact that it espouses a 'controlling' legal interpretation[.]"  MTD Op. at 35.  That conclusion, and the *EFF* decision itself, foreclose CFA's claim here that "[t]he OLC's formal written opinions are working law that must be proactively published under FOIA[.]"  CFA's Opp. at 7.  CFA tries to avoid this result by seeking to distinguish *EFF* on several grounds, all of which are incorrect.

**1.**  First, CFA questions whether "the OLC opinion at issue in *EFF* was even a 'formal written opinion.'"  *Id.* at 18.  But the OLC opinion at issue there was indeed a formal written opinion.  The record in *EFF* makes this clear:  the OLC declarant described the document as an "Opinion" or "OLC Opinion" (with a capital "O") throughout the declaration; identified it as having been prepared in response to an "opinion request" from the FBI's General Counsel; and described the opinion's preparation as consistent with the OLC Best Practices Memo's characterization of how formal opinions are prepared.  *See* Decl. of Paul P. Colborn, *EFF v. Dep't of Justice*, Case No. 11-cv-939 (D.D.C. Nov. 10, 2011), ECF No. 11-4 ¶¶ 9-10 & n.2 [hereafter "*EFF* Colborn Decl."].  This description is inconsistent with CFA's suggestion that the OLC

opinion was only an informal advice document, as opposed to a formal written opinion.

Moreover, the plaintiff in *EFF* certainly understood the OLC opinion at issue to be a formal one. *See* Br. of Appellant, No. 12-5363, 2013 WL 1088742, at *35 (D.C. Cir. Mar. 15, 2013) ("In November 2009, the FBI sought *a formal opinion from OLC* on the questions raised by the Bureau's interpretation of the applicable statutory provisions." (emphasis added)).[1]  And the OIG report describing the OLC opinion similarly reflects that it was a formal opinion rather than informal advice. *Compare* Dep't of Justice, OIG, *A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records* (2010), http://www.justice.gov/oig/special/s1001r.pdf [hereafter "OIG Report"], at 263-65 (describing the OLC opinion at issue in *EFF* as a "legal opinion" requested by the FBI), *with id.* at 112 (describing an earlier OLC opinion as an "*informal* written opinion" (emphasis added)).

**2.**  CFA next argues that the OLC opinion "was *retrospective*—that is, it concerned only past conduct and was not intended to lay a legal foundation for future conduct." CFA's Opp. at 17.  Again, the parties have already litigated this argument, and the Court correctly rejected it. *See* MTD Hr'g Tr. at 8-9, 12-13, 32-34.

First and most fundamentally, this argument is also foreclosed by the record in *EFF*. OLC's declarant made clear that the opinion was prepared for the purpose of guiding FBI's future decisionmaking.  In particular, the opinion was prepared in connection with FBI's "re-evaluation" of certain investigative techniques, which was part of FBI's ongoing "efforts to ensure that any information-gathering procedures comply fully with the law."  *EFF* Colborn

---

[1] Citizens for Responsibility and Ethics in Washington (CREW), which filed an amicus brief in *EFF*—authored by the same counsel who initiated this lawsuit, *see* MTD Op. at 10-11—appears to have shared this same understanding regarding the OLC opinion. *See* Br. of Amici Curiae CREW et al., No. 12-5363, 2013 WL 1182676, at *19 (D.C. Cir. Mar. 22, 2013) ("There is nothing in the record or the circumstances surrounding [the opinion's] creation to suggest OLC's views on this matter were anything less than final or definitive[.]").

Decl. ¶ 13; *see also id.* ¶ 14 (describing how OLC's advice was sought "[i]n the context of the FBI's evaluation of its procedures"); *EFF v. Dep't of Justice*, 892 F. Supp. 2d 95, 103 (D.D.C. 2012) ("It is apparent that the OLC Opinion is both predecisional and deliberative in nature" because it "was generated as part of a continuous process of agency decision-making" and was intended "to assist the FBI in arriving at its policy decision.").

The D.C. Circuit clearly understood the OLC opinion to have been issued in connection with the FBI's prospective decision-making; otherwise the D.C. Circuit could not have held that the opinion "compris[ed] part of a process by which governmental decisions and policies are formulated[.]" *EFF*, 739 F.3d at 10. The parties in *EFF* also understood the prospective nature of the opinion. *See id.* at 9 (describing each side's arguments, both of which reflect the OLC opinion being prospective).

Finally, the OIG Report likewise confirms that the OLC opinion was part of the FBI's prospective decision-making process. After the OLC opinion concluded that "under certain circumstances [a redacted statutory authority] allows the FBI to ask for and obtain these records on a voluntary basis from the providers, without legal process or a qualifying emergency," the FBI *subsequently* made a policy decision not to rely on that potential authority. *See* OIG Report at 264-65 & n.283. Thus, the opinion was indeed prospective because it informed the FBI's subsequent policy decision not to rely on that authority. CFA cannot plausibly describe the opinion as being "neither sought nor issued to guide future agency action." CFA's Opp. at 19.

**3.** Lastly, CFA seeks to distinguish the OLC opinion in *EFF* as "appear[ing] to have offered policy advice" rather than "controlling legal advice." *Id.* at 19. But as this Court held before, under the governing statutes and regulations "*all* of OLC's opinions constitute 'the opinion of the Attorney General on questions of law,'" and therefore "OLC's opinions *always*

advise on legal questions, even if the agency that receives an OLC opinion will use it to inform a policy decision." MTD Op. at 35; *see* 28 U.S.C. § 512; 28 C.F.R. § 0.25(a), (c). Thus, OLC did not issue the *EFF* opinion "in a diminished, policy-advisory role[.]" MTD Op. at 35.

CFA's argument that the OLC opinion involved policy (rather than legal) advice appears to be based on the D.C. Circuit's statement that the opinion "merely examines policy options available to the FBI." *EFF*, 739 F.3d at 10. In context, however, that statement was clearly intended only to underscore that OLC lacks authority to determine the FBI's ultimate policy— not to suggest that OLC was providing "policy" rather than legal advice. Indeed, that same paragraph of the D.C. Circuit's opinion repeatedly refers to the OLC opinion as providing legal advice. *See id.* (stating that the OLC opinion "describes the legal parameters" of the FBI's actions, and that the opinion "deemed legally permissible" certain investigative tactics). And again, OLC's declarant confirmed that the opinion provided legal advice. *See EFF* Colborn Decl. ¶ 14 (stating that "[i]n providing the Opinion, OLC was serving an advisory role *as legal counsel*" and that "the FBI sought OLC advice regarding the *proper interpretation of the law* with respect to information-gathering procedures" (emphasis added)).

In short, the OLC opinion at issue in *EFF* was *exactly* the type of OLC opinion that CFA argues must be disclosed here. And because the D.C. Circuit affirmed the withholding of that OLC opinion as privileged, the *EFF* decision squarely forecloses CFA's broad arguments here.

**C.    Even Apart from *EFF*, CFA Mischaracterizes the Overall Framework Governing Disclosure of Legal Advice**

**1.** CFA contends that "interpreting *EFF* as the Court did . . . conflicts with the D.C. Circuit's prior panel precedent." CFA's Opp. at 17. As this Court previously noted, however, those prior precedents are the very same ones that *EFF* itself distinguished. *See* MTD Op. at 33; *EFF*, 739 F.3d at 7-10. By once again relying on those same cases, *see* CFA's Opp. at 8-12, CFA

is seeking to re-litigate not only this Court's decision on the motion to dismiss but also the very holding of *EFF* itself.  Regardless of what CFA believes to be the best interpretation of pre-*EFF* D.C. Circuit precedents, the D.C. Circuit has already addressed the issue in *EFF* itself.  This Court need not look beyond *EFF* to conclude that OLC opinions are not "working law."

In any event, CFA also misconstrues those prior precedents, as this Court previously concluded.  *See* MTD Op. at 33-34.  Each of the cases CFA relies on involved issuance of documents announcing or explaining agency policy or governing the agency's dealings with the public.  Critically, however, in each case the office announcing the policy had the *decision-making authority* to set that agency's policy (even if the office was not itself responsible for carrying out the policy).  Thus, those documents fit "the paradigm of 'final opinions,' which typically flow from a superior *with policy-making authority* to a subordinate who carries out the policy."  *Brinton v. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980) (emphasis added).

That is in stark contrast to OLC, which *lacks* any authority to determine its client agencies' policies.  *See* Letter from Curtis E. Gannon, Principal Deputy Assistant Att'y Gen., Office of Legal Counsel, to Messrs. Abdo and Jaffer (Jan. 2, 2018) (ECF No. 27-1) [hereafter "OLC Resp. Ltr."], at 2 ("OLC does not purport, and in fact lacks authority, to make policy decisions.").  Because OLC lacks policy decision-making authority, its advice documents remain privileged and need not be disclosed.  *See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188 (1975) ("[T]he Regional Boards' total lack of decisional authority brings their reports within Exemption 5 and prevents them from being 'final opinions.'"); *EFF*, 739 F.3d at 9 ("OLC is not authorized to make decisions about the FBI's investigative policy, so the OLC Opinion cannot be an authoritative statement of the agency's policy.").  The documents at issue in the pre-*EFF* D.C. Circuit cases "fell outside the scope of Exemption 5 . . . because the court

determined that they reflected the position of *the agency* itself," whereas "an OLC opinion does *not* necessarily reflect the adopted policy of the agency that requests it."  MTD Op. at 34.

CFA responds that OLC indeed determines agencies' policies, because "the OLC's formal written opinions reflect the considered legal interpretations of the executive branch *as a whole*."  CFA's Opp. at 22.  But that is nothing more than relying on the purportedly "binding" nature of OLC's legal advice, which the D.C. Circuit has already held does not render OLC's advice working law.  *See EFF*, 739 F.3d at 9.

**2.**  For similar reasons, CFA's repeated analogy between OLC opinions and court decisions is inapt.  *See, e.g.*, CFA's Opp. at 2-3 (analogizing OLC opinions to "the federal courts' precedential interpretations of the law"); *id.* at 10, 22, 26-27, 32, 38, 40.  The Supreme Court rejected this same argument in *Grumman Aircraft Engineering Corp.*, noting that the requested documents there had "no operative effect" independent of a subsequent agency action—"an inevitable event without which there is no agency decision[.]"  421 U.S. at 187.  Similarly here, OLC opinions by themselves have no operative effect, and certainly not before the client agency makes a policy decision.  Until that happens, there has been no final decision whatsoever.

The appropriate analogy, therefore, is not to OLC opinions functioning like court decisions, but rather to OLC being akin to an agency's outside counsel.  Just as when a private lawyer opines on the legality of a client's proposed actions, that advice has no operative effect on its own, and the client has ultimate responsibility for making the decision and bearing the consequences.  The same is true of OLC's relationship with its clients.  *See* OLC Resp. Ltr. at 3 ("OLC does not have direct supervisory authority over its clients.  Like any other client, a department or agency receives the opinion of its counsel, but then must bear the responsibility for making the final decision.").

To be sure, OLC's advice-giving function differs from private counsel in certain ways, including because "executive branch agencies have traditionally treated OLC's legal opinions as 'binding' in the sense that an opinion's conclusion is customarily treated as an authoritative interpretation of the law within the Executive Branch[.]"  *Id.*  Contrary to CFA's argument, however, that does not abrogate the privileges that apply to the confidential legal advice that client agencies receive from OLC.  Indeed, holding otherwise would *discourage* the creation of such norms and therefore run counter to important rule-of-law values.  *See infra* Part III; Def.'s Mot. to Dismiss Mem. (ECF No. 29-1) at 37-40 [hereafter "MTD Mem."].[2]

**3.**  Finally, while CFA crafts its argument around a series of D.C. Circuit decisions involving different types of documents from different agencies, *see* CFA's Opp. at 8-12, CFA wholly ignores (apart from *EFF*) the substantial number of cases approving the withholding of OLC opinions as privileged.  *See* MTD Mem. at 20-24.  CFA does not dispute that its arguments are contrary to these other decisions, including a published decision from the Second Circuit.  *See N.Y. Times Co. v. Dep't of Justice*, 806 F.3d 682, 687 (2d Cir. 2015) (broadly rejecting the "working law" argument with respect to a number of classified OLC advice documents); *see also, e.g.*, *CREW v. Office of Admin.*, 249 F.R.D. 1, 5-8 (D.D.C. 2008);[3] *Elec. Privacy Info. Ctr.*

---

[2] CFA relies on some of the unique features of OLC advice to question whether OLC has an attorney-client relationship with other Executive Branch agencies.  *See* CFA's Opp. at 28-29.  The applicability of the attorney-client privilege cannot seriously be questioned in light of the Best Practices Memo, the OLC Response Letter, and the substantial number of decisions applying the attorney-client privilege to OLC advice.  *See* MTD Mem. at 20-22.  Moreover, OLC's sharing of information within the Executive Branch does not undermine the attorney-client privilege.  *See* CFA's Opp. at 28.  OLC's ultimate client is not any particular agency, but rather the United States itself.  That is equally true for DOJ litigating attorneys, *see The Attorney General's Role As Chief Litigator for the United States*, 6 Op. O.L.C. 47, 54-55 (1982), yet nobody doubts the applicability of the attorney-client privilege to those attorneys' communications with the particular agencies they represent in specific cases.

[3] The document at issue in *CREW* was a formal OLC opinion, which was subsequently published by OLC.  *See Whether the Office of Administration Is an "Agency" for Purposes of the Freedom of Information Act*, 31 Op. O.L.C. 200 (Aug. 21, 2007), https://www.justice.gov/file/451571/download.

(*EPIC*) *v. Dep't of Justice*, 2014 WL 1279280, at *1 (D.D.C. Mar. 31, 2014);[4] *N.Y. Times Co. v. Dep't of Justice*, --- F. Supp. 3d ----, 2017 WL 4772406, at *2-6 (D.D.C. Oct. 20, 2017).  By asking this Court to narrow *EFF* to its facts, *see* CFA's Opp. at 22-23, CFA is also asking this Court to diverge from these numerous other decisions approving the withholding of OLC legal advice as privileged.

In sum, CFA mischaracterizes not only the *EFF* decision, but also the overall framework governing disclosure of legal advice.  Because OLC lacks authority to determine its client agencies' policies, OLC's legal advice remains privileged and need not be disclosed.

### D. The Categories of Documents that Section 552(a)(2) Requires to be Disclosed Do Not Include OLC Opinions

Finally, before discussing the particular categories of opinions that CFA contends must be disclosed, one more over-arching point must be addressed.  In addition to generally being privileged, OLC opinions need not be disclosed because they are neither "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases," nor "statements of policy . . . adopted by the agency."  5 U.S.C. § 552(a)(2)(A), (B); *see* MTD Mem. at 15-19.

**1.** OLC opinions do not come within § 552(a)(2) because they do not regulate any private parties' rights or obligations.  CFA mistakenly interprets this argument as applying only to the "final opinions" category of § 552(a)(2)(A), *see* CFA's Opp. at 23-24, 26, but this limitation applies to all of the § 552(a)(2) categories.  *See Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989) (describing the purpose of the reading-

---

[4] Several of the advice documents at issue in *EPIC* were formal opinions; one of them, referred to in the case as OLC 59, was subsequently released in part.  *See* Mem. for the Att'y Gen., *Review of the Legality of the STELLAR WIND Program* (May 6, 2004), https://www.justice.gov/sites/default/files/pages/attachments/2014/09/19/may_6_2004_goldsmith_opinion.pdf; *see also EPIC v. Dep't of Justice*, 584 F. Supp. 2d 65 (D.D.C. 2008) (providing additional background on the documents).

room provisions as requiring each agency to "disclose its rules governing relationships *with private parties* and its demands *on private conduct*" (emphasis added)); *see also* MTD Op. at 6 (noting that § 552(a)(2)'s requirements "prevent an agency from subjecting *members of the public* to a rule that the agency has not publicly announced" (emphasis added)).[5]

CFA contends there is no textual basis for this private-party limitation, noting that one subsection requires disclosure of only those "administrative staff manuals and instructions to staff *that affect a member of the public*," 5 U.S.C. § 552(a)(2)(C) (emphasis added), whereas that limitation is missing from other subsections.  CFA's Opp. at 26.  But the presence of that limitation in § 552(a)(2)(C)—which otherwise would impose an extraordinarily broad disclosure requirement—is fully consistent with the other subsections of § 552(a)(2) also being outward-facing, focusing only on agency documents governing interactions with the public, not purely internal agency documents.  *See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").  And, of course, this textual understanding is consistent with the Supreme Court's determination that § 552(a)(2)'s overall purpose is to require an agency to "disclose its rules governing relationships *with private parties* and its demands *on private conduct*."  *Reporters Comm.*, 489 U.S. at 772 n.20 (emphasis added).

Additional textual support for the private-party limitation is found in the sanction of § 552(a)(2)—that failure to publish a covered document precludes using the document "as precedent . . . *against a party other than an agency*," *i.e.*, against a private party.  5 U.S.C. § 552(a)(2) (emphasis added).  CFA argues that this provision does not inform the scope of what

---

[5] The only reading-room provision to which this limitation does not apply is the requirement to disclose frequently requested records, § 552(a)(2)(D).  That subsection was separately enacted much later as part of the Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231 § 4, 110 Stat. 3048, 3049 (1996).

documents must be disclosed because the sanction "applies to all of the reading-room provision's subsections, including the one directing the publication of 'staff manuals and instructions[.]'" CFA's Opp. at 27.  But there is nothing illogical about applying the sanction to an agency's failure to disclose a staff manual that affects a member of the public—that lack of disclosure may well adversely affect a private party's dealings with the agency.  Thus, applying the sanction to § 552(a)(2)(C) documents is fully consistent with § 552(a)(2)'s outward-facing purpose.

Moreover, adopting CFA's argument—that the sanction codified in § 552(a)(2) has no bearing on the categories of documents that must be disclosed under that section—would be contrary to the principle that statutory requirements must be interpreted with reference to the overall statutory scheme.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("[A] reviewing court should not confine itself to examining a particular statutory provision in isolation.").  Particularly in light of the sanction of § 552(a)(2), therefore, there is ample textual basis for holding that § 552(a)(2) requires the disclosure of only those documents governing an agency's relationship with private parties.[6]

**2.**  Even apart from that general defect in CFA's interpretation of § 552(a)(2), CFA also fails to establish that OLC opinions constitute either "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases" or "statements of policy . . . adopted by the agency."  5 U.S.C. § 552(a)(2)(A), (B).

First, CFA tries to characterize OLC opinions as "final" because "they conclusively resolve legal disputes presented to the OLC," and thus "are 'final' with respect to the

---

[6] CFA relies on *Public Citizen v. Office of Management & Budget*, 598 F.3d 865 (D.C. Cir. 2010), to argue that the working-law doctrine applies "to an agency's law even if [it] does not affect private rights."  CFA's Opp. at 27.  But that decision did not purport to address or decide the scope of § 552(a)(2).  In any event, that case is best understood as involving documents that were never privileged in the first place, *see Pub. Citizen*, 598 F.3d at 876, and the analogy to "working law" was used only to reject OMB's broad argument that *all* of its documents were deliberative.  *Id.* at 875.  And again, that decision was one of the cases that the D.C. Circuit expressly distinguished in *EFF*, 739 F.3d at 8-9.  Thus, that decision does not support expanding § 552(a)(2) beyond its intended scope.

adjudications the OLC engages in." CFA's Opp. at 27. But the Supreme Court has already rejected this type of re-definition of the decision-making process, such that each agency providing advice is considered to have produced its own "final" decision that must be disclosed. *See Grumman Aircraft Eng'g Corp.*, 421 U.S. at 188 ("By including inter-agency memoranda in Exemption 5, Congress plainly intended to permit one agency possessing decisional authority to obtain written recommendations and advice from a separate agency not possessing such decisional authority without requiring that the advice be any more disclosable than similar advice received from within the agency."). Because OLC lacks such decisional authority with respect to the policy decisions of its clients, its advice documents are outside § 552(a)(2). *See EFF*, 739 F.3d at 8-10; *see also EPIC*, 584 F. Supp. 2d at 74-78 (rejecting the "final opinion" argument with respect to OLC documents).

CFA also relies on a recent D.C. Circuit decision interpreting the scope of § 552(a)(2)(A), *see* CFA's Opp. at 25, but that decision only further confirms that § 552(a)(2)(A) is limited to documents regulating private parties. *See Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 679 (D.C. Cir. 2016) (holding that the requested documents "are not subject to FOIA's affirmative disclosure requirement" because they "do not reflect a final decision as to *the rights of outside parties*; nor do they entitle any *outside parties* to any form of relief" (emphasis added)).

With respect to "statements of policy and interpretations . . . adopted by the agency," 5 U.S.C. § 552(a)(2)(B), CFA simply re-iterates the argument that OLC opinions must be disclosed because they "are binding on the agencies that request them." CFA's Opp. at 24. That argument is clearly foreclosed by *EFF*. *See* 739 F.3d at 9. Moreover, CFA's response only highlights the breadth of its underlying theory—*i.e.*, that *any* legal opinion treated as "binding," whether issued

by OLC or an agency's general counsel, must be affirmatively disclosed under FOIA. *See* CFA's Opp. at 24 (asserting that "OLC's formal written opinions . . . are just as binding on an agency as any conclusive legal interpretations issued by its general counsel"). CFA's theory would therefore call into question the ability of the Executive Branch to obtain *any* confidential legal advice, which is itself reason enough to reject CFA's claim. *See infra* Part III.

*   *   *   *

In sum, even if this Court considers CFA's attempt to re-litigate these issues, CFA's arguments are foreclosed by *EFF*, which is directly applicable here; the D.C. Circuit's other cases likewise do not support disclosure of OLC's pre-decisional legal advice; and OLC opinions, even apart from being privileged, do not come within § 552(a)(2) in the first place.

## II.    CFA'S FOUR CATEGORIES OF OLC ADVICE DOCUMENTS ARE ALSO PRIVILEGED AND NEED NOT BE DISCLOSED

Turning to the actual claim that the Court permitted CFA to bring in its Amended Complaint, CFA contends that "at least four subcategories of the OLC's formal written opinions" must be disclosed "[e]ven under this Court's interpretation of *EFF*[.]" CFA's Opp. at 30. Notwithstanding CFA's assertion that its arguments here comport with *EFF*, many of CFA's arguments are in fact precluded by *EFF*. Thus, CFA's claim fails for many of the same reasons discussed above, in addition to the particular defects of each category discussed below.

### A.    Opinions Resolving Interagency Disputes

As an initial matter, CFA does not dispute that these opinions do not regulate private parties or determine private rights or obligations. That alone is sufficient to conclude they are outside § 552(a)(2). *See supra* Part I.D. Moreover, CFA's argument that "OLC plays a court-like role, adjudicating legal disputes with the effect of determining policy," CFA's Opp. at 32, has likewise been refuted above:  because OLC functions not as a court but as outside counsel

providing legal advice, these OLC opinions are not working law and instead remain privileged as pre-decisional legal advice.

CFA tries to avoid that conclusion by using the example of an OLC opinion addressed to the Department of Labor (DOL) and the Department of Veterans Affairs (VA). CFA argues that the opinion "effectively determined agency policy" because, after OLC concluded that sovereign immunity barred the award of back wages against the VA, the OLC opinion "forced upon the DOL the opposite policy." CFA's Opp. at 33; *see also id.* ("Put simply: The DOL's policy was 'X'; the OLC said 'X' was prohibited; and the DOL was forced to change its policy to 'not X.'").

This argument improperly collapses the distinction between legal advice and policy decisions, which the D.C. Circuit has recognized are distinct. *See EFF*, 739 F.3d at 10 ("Even if the OLC Opinion describes the legal parameters of what the FBI is *permitted* to do, it does not state or determine the FBI's policy."). With respect to the DOL-VA opinion, OLC's conclusion that sovereign immunity barred the award of back wages cannot meaningfully be described as a policy decision; that is simply a legal conclusion describing which policy options are available to the agency—the same type of conclusion at issue in *EFF. See* 739 F.3d at 10; *cf.* OLC Resp. Ltr. at 2-4. And in the particular context of the DOL-VA opinion, DOL made at most two policy decisions: first, the initial order that VA must pay back wages; and second, whatever DOL chose to do after the OLC opinion (*e.g.*, perhaps DOL decided to employ one of the other enforcement mechanisms available to it). In connection with that second policy decision, OLC's advice likely played a role in DOL's decision-making—but so did any number of other pre-decisional inputs (for example, discussions weighing the relative pros and cons of alternative enforcement options). None of those pre-decisional inputs by themselves determined what DOL's ultimate policy would be, even if they had the effect of removing certain options from consideration

(whether due to legal concerns, practical concerns, or any other type of concern).  Thus, none of the pre-decisional inputs were policy decisions on their own, regardless of whether they had the effect of constraining what the ultimate policy decision would be.

An OLC opinion (which resolves a legal question) is therefore fundamentally different from a policy decision (which is a final decision about how to address a particular situation confronting the agency).  *See* MTD Mem. at 32-33.  Indeed, under CFA's approach, the opinion in *EFF* must also have been a "policy decision"—*i.e.*, because it would have "determined" the FBI's policy that, pursuant to the redacted statutory authority, the FBI could lawfully request records from providers in certain circumstances, which was not the FBI's "policy" prior to the OLC opinion.  *See EFF*, 739 F.3d at 5-6.  Thus, by defining "policy decision" so narrowly as to include pre-decisional legal advice, CFA again contradicts the D.C. Circuit's holding in *EFF*.

CFA asserts that "[d]efining the relevant policy question more broadly as the government does would effectively cast every decision that an agency makes as preamble to some distant policy goal."  CFA's Opp. at 33-34.  Not so: agencies *with policy-making authority* (and offices within those agencies that have *decision-making authority*) will still frequently make policy decisions that they must disclose.  As the D.C. Circuit and this Court have previously concluded, however, OLC lacks such authority.  *See EFF*, 739 F.3d at 9-10; MTD Op. at 32-35.

Moreover, it is CFA's narrow conception of "policy decision" that would wreak havoc.  If the doctrine of "working law" includes any pre-decisional document that has the effect of removing a policy option from consideration, *see* CFA's Opp. at 33, that would require the disclosure of *all* legal advice opining that a certain action would not comply with the law (whether from OLC or another Executive Branch lawyer).  It would also require the disclosure of every internal policy memorandum concluding that a certain option should no longer be

-17-

considered because it is too costly, risky, or for any other reason.  That type of broad, compelled disclosure is not what FOIA requires.  *See Grumman Aircraft Eng'g Corp.*, 421 U.S. at 187.

In sum, CFA's arguments on this category of opinions fail because even when OLC advice is controlling as to the applicable legal framework, that does not constitute a "policy decision" nor does it render OLC's advice "working law," as the D.C. Circuit concluded in *EFF*.

### B.    Opinions Interpreting Non-Discretionary Legal Obligations

CFA's primary argument on this category of opinions is that "[w]hen an agency is under a non-discretionary obligation to comply with some legal authority, and the OLC conclusively interprets that legal authority, the OLC's opinion directly determines how an agency *must act*." CFA's Opp. at 34.  But that argument assumes OLC has the authority to determine how an agency "must act," which it does not.  *See* OLC Resp. Ltr. at 2-4; *EFF*, 739 F.3d at 9 ("OLC is not authorized to make decisions about the FBI's investigative policy, so the OLC Opinion cannot be an authoritative statement of the agency's policy.").

OLC opinions in this category are no different than a private lawyer's advice that a client is legally required to perform a particular act.  The lawyer's advice is an unequivocal expression of what *the lawyer believes* the client is required to do, but the lawyer has no authority to control the client's actions.  *Cf.* OLC Resp. Ltr. at 3 ("OLC does not have direct supervisory authority over its clients.  Like any other client, a department or agency receives the opinion of its counsel, but then must bear the responsibility for making the final decision.").  Both OLC's and the private lawyer's advice remain privileged, notwithstanding that their advice may be phrased in conclusive or unequivocal terms, and notwithstanding that the client may follow the lawyer's advice.

The rest of CFA's arguments, including CFA's discussion of the two OLC opinions used as examples, again seek to collapse the distinction between OLC's resolution of a legal question,

and the client agency's policy decision about how best to address a particular situation. *See* CFA's Opp. at 34-36. As discussed above, these arguments are meritless: even when OLC's advice concludes that "one potential policy option [is] unavailable," it does "not determine the [agency's] ultimate policy regarding how to address the situation." OLC Resp. Ltr. at 6; *see also supra* Part II.A; MTD Mem. at 32-33.

Finally, CFA asserts that when OLC concludes that an agency must do something, the agency "ha[s] no choice but to 'adopt what OLC offered[.]'" CFA's Opp. at 37 (modifications omitted, quoting *EFF*, 739 F.3d at 10). In addition to incorrectly implying that OLC has authority to determine an agency's policy, this argument also misconstrues the "adoption" standard. As the D.C. Circuit stated in *EFF*, to "adopt" a pre-decisional document the agency must do more than act consistently with the document's recommendations; the agency must *expressly* adopt the entire document as its own—both the document's conclusion *and* its reasoning. *See EFF*, 739 F.3d at 10-11 (discussing *NLRB v. Sears*, 421 U.S. 132, 161 (1975); *Grumman Aircraft Eng'g Corp.*, 421 U.S. at 184); *see also* MTD Mem. at 19 & n.2. The fact that client agencies make policy decisions consistent with OLC's legal advice is therefore insufficient to demonstrate that such agencies categorically "adopt" all OLC opinions falling within this category. Thus, these OLC opinions likewise need not be disclosed, at least as a general matter.

## C.    Opinions Adjudicating or Determining Private Rights

CFA asserts that certain OLC opinions "directly determine policy as well as the private rights of individuals." CFA's Opp. at 38. But OLC lacks policymaking authority, as confirmed by the D.C. Circuit and the record here. *See EFF*, 739 F.3d at 8-10; OLC Resp. Ltr. at 6 ("Client agencies may rely upon OLC advice to assist *their* determinations about private rights. Ultimately though, OLC does not have any authority itself to make a decision determining

private rights, and the client agencies bear responsibility for their decisions.").

CFA tries to analogize these types of OLC opinions to documents at issue in other D.C. Circuit cases, where the office that actually implemented a policy decision "turned to a higher authority for an authoritative determination" of what the policy should be. CFA's Opp. at 38. But again, those are the very cases that the D.C. Circuit distinguished in *EFF*, and that this Court distinguished in its motion-to-dismiss opinion. *See EFF*, 739 F.3d at 7-9; MTD Op. at 33-34. And as discussed above, those cases are distinct because in each of them the "higher authority" *had decisionmaking authority* to actually determine the agency's policy on the relevant issue. Here, however, OLC *lacks* decisionmaking authority over its client agencies. *See* OLC Resp. Ltr. at 2-4. At most, OLC opinions are "'binding' in the sense that an opinion's conclusion is customarily treated as an authoritative interpretation of the law within the Executive Branch," *id.* at 3, but that is the very feature of OLC's advice that the D.C. Circuit held did *not* render OLC's advice "working law." *See EFF*, 739 F.3d at 9-10. Unlike the cases on which CFA relies, therefore, the client agencies receiving OLC advice remain responsible for *making* the policy decisions. *See* OLC Resp. Ltr. at 6.

CFA also contends that "OLC's formal written opinions concerning private rights are at the core of what Congress sought to expose." CFA's Opp. at 40. The Government agrees with CFA that § 552(a)(2) was intended to require disclosure of "secret law which the agency is actually applying in its dealings with the public[.]" *Id.* (modifications omitted). But OLC does not have any "dealings with the public," nor do its opinions "determine the legal scope of private rights[.]" *Id.* That is what policymaking agencies do. And to the extent *those* client agencies are applying OLC's legal advice in *their* dealings with the public, those agencies would have an obligation to disclose the underlying OLC opinions—but only if the OLC opinion has lost its

privileged status through waiver or adoption by the agency.  Absent such waiver or adoption, however, the OLC opinions remain privileged.  *See EFF*, 739 F.3d at 9.  That is true regardless of what CFA believes would be the optimal amount of public disclosure.  *See Grumman Aircraft Eng'g Corp.*, 421 U.S. at 192 ("If the public interest suffers by reason of the failure of the [agency] to explain some of its decisions, the remedy is for Congress to require it to do so. It is not for us to require disclosure of documents, under the purported authority of [FOIA], which are not final opinions[.]").

### D. Opinions Finding that Particular Statutes Are Unconstitutional and that Agencies Therefore Need Not Comply with Them

For the final category, CFA contends that these opinions "have the unique effect of freeing agencies from congressional commands, and of essentially editing the text of the U.S. Code itself."  CFA's Opp. at 40.  But again, these OLC opinions are no different than a private counsel informing her client that the lawyer believes a statute is unconstitutional as applied to the client's conduct.  That legal advice will likely shape the client's decision-making about whether to engage in the conduct, but ultimately the decision still belongs to the client.  *See* OLC Resp. Ltr. at 6 ("[T]he legal advice is provided by OLC, but the ultimate policy decision remains the province of the client agency.").

In response to the Government's explanation that this type of OLC opinion does not establish an agency's policy because the agency might still "voluntarily comply with the statute, decline to comply with it on different grounds, or pursue a strategy of seeking repeal of the statute," *id.*, CFA again seeks to define "policy decision" exceedingly narrowly.  According to CFA, the OLC opinion "determine[s] policy at that point in time, even if an agency later adopts a related policy."  CFA's Opp. at 42.  But this argument again ignores the distinction between legal and policy decisions.  Moreover, it is contrary to *EFF*:  CFA argues that the opinions in this

category purportedly "free[] the [agency] from a legal constraint on its policymaking authority," *id.* at 41, but the same would also have been true in *EFF*, because the OLC opinion would have "freed the FBI from a legal constraint" with respect to its ability to request records from providers. Yet, the opinion in *EFF* remained pre-decisional legal advice not subject to disclosure, and the same is true of the OLC opinions in this category.

Indeed, both of the examples that CFA relies on demonstrate why such opinions should not be affirmatively disclosed. Both opinions make clear that the client agency retains ultimate responsibility for deciding whether to comply with a statute that OLC concluded was unconstitutional. *See* MTD Mem. at 34-35; *see also Constitutionality of Section 7054 of the Fiscal Year 2009 Foreign Appropriations Act*, 33 Op. O.L.C. ___ (June 1, 2009), https://www.justice.gov/sites/default/files/olc/opinions/2009/06/31/section7054_0.pdf, slip op. at 1 (noting that "the State Department *may* disregard" the statute (emphasis added)).

The OLC opinions thus determine the legal question, but do not determine in practice how the agencies will respond to the statutes. Yet CFA argues that the opinions should be affirmatively disclosed by OLC *immediately*, before the agencies even establish their policies on whether to comply with the statutes. *See* CFA's Opp. at 41-42. Affirmative disclosure in these circumstances would be counter to the rationales underlying the deliberative process privilege. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (the privilege "protect[s] against premature disclosure of proposed policies," which could "confus[e] the issues and mislead[] the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action"). Immediate disclosure of these OLC opinions, before the agencies have even made their own policy decisions about how to respond, would certainly implicate those concerns. *See also*

*Grumman Aircraft Eng'g Corp.*, 421 U.S. at 186 ("Indeed, release of the Regional Board's reports on the theory that they express the reasons for the Board's decision would, in those cases in which the Board had other reasons for its decision, be affirmatively misleading.").

Thus, this category of OLC opinions also need not be affirmatively disclosed, at least as a general matter. Unless and until a particular client agency takes actions that would qualify as express adoption or waiver of the applicable privileges, OLC's opinions remain pre-decisional legal advice that need not be disclosed under FOIA.

## III.   CFA'S CLAIMS WOULD UNDERMINE IMPORTANT VALUES AND RAISE SIGNIFICANT CONSTITUTIONAL CONCERNS

The above discussion demonstrates that, even under straightforward FOIA principles, CFA has not identified "an ascertainable set of OLC opinions *that plausibly constitute the law or policy* of the agency to which the opinion is addressed[.]" MTD Op. at 33. Were there any doubt, moreover, CFA's opposition effectively confirms that its claims would undermine important rule-of-law values and raise significant constitutional concerns. For those reasons alone, CFA's claims should be rejected. *See* MTD Mem. at 37-42.

In response, CFA first argues that "[r]ecognizing that the OLC's formal written opinions are working law would not impair the ability of government officials to seek confidential legal advice" because "the OLC's formal written opinions are a tiny portion of the OLC's output." CFA's Opp. at 43. Even if true, the legal theory CFA advances here is much broader and would almost certainly encompass far more than just OLC's formal written opinions. CFA could just as easily advance the above arguments with respect to *informal* OLC opinions that are "controlling" (and thus allegedly determine agencies' policies). And CFA itself admits that its theory would encompass not just OLC advice, but also "binding" legal advice provided by agency general counsels. *See id.* at 24. CFA cannot seriously deny the breadth of the legal theory it seeks to

advance here.  *See also supra* Part II.A.

CFA also suggests that disclosure of formal opinions is appropriate because "[a]gencies have complete control over whether to seek opinions that have the character of working law." CFA's Opp. at 44.  But this assertion only highlights the rule-of-law values imperiled by CFA's claim.  Agencies should be *encouraged* to seek formal legal advice from OLC and/or their agency general counsels.  As CFA now implicitly admits, however, compelled public disclosure of that formal legal advice would *discourage* agencies from seeking such advice in the first place.  *See also* OLC Resp. Ltr. at 2-3; Best Practices Memo (ECF No. 22-4) at 5-6.  That result is contrary to important rule-of-law values that have been universally recognized since shortly after our Nation's founding.  *See* MTD Mem. at 38; *see also* Am. Compl. ¶¶ 16-19.

In addition, for similar reasons, CFA's broad legal theory would raise significant constitutional concerns, including by threatening the President's ability to ensure that agencies are faithfully executing the law.  *See* U.S. Const. art. II, § 3; *see also* MTD Mem. at 40-42.  CFA first offers a procedural response—that any constitutional concerns can be accounted for at summary judgment.  *See* CFA's Opp. at 44-45.  But there is no reason to allow a claim to proceed to summary judgment when the claim on its face would raise significant constitutional concerns.

CFA's only other response is that its "legal theory here no more implicates constitutional concerns than does FOIA itself in commanding that agencies disclose working law[.]"  *Id.* at 45. But that simply begs the question, because the dispute here is about what particular records constitute "working law."  CFA's broad interpretation of "working law" would raise significant constitutional concerns, and it is no answer to that charge simply to refer back to the concept of "working law" itself.

Finally, CFA accuses the Government of seeking "blanket secrecy," whereas CFA is

seeking only "the transparency that Congress commanded through FOIA." *Id.*   Again, this rhetoric is merely question-begging, and does not advance CFA's argument for a broad interpretation of what must be disclosed under FOIA.   And the Government certainly is not seeking "blanket secrecy"; the Government's argument is simply that OLC opinions are pre-decisional legal advice documents, which remain privileged unless they are expressly adopted by an agency with policymaking authority or the applicable privileges are otherwise waived.   It is those *policymaking* agencies that bear affirmative disclosure obligations under FOIA's reading-room provisions, because it is only those agencies that apply their "working law" in dealings with the public.   OLC merely provides legal advice, which need not be disclosed, as the D.C. Circuit confirmed in *EFF*.   Thus, CFA has failed to plausibly allege that any ascertainable category of OLC opinions must be affirmatively disclosed under FOIA.

## CONCLUSION

CFA's Amended Complaint should be dismissed with prejudice.

Dated: March 20, 2018                                   Respectfully Submitted,

CHAD A. READLER
Acting Assistant Attorney General

JESSIE K. LIU
United States Attorney

ELIZABETH J. SHAPIRO
Deputy Branch Director

*/s/   Daniel Schwei*
DANIEL SCHWEI
Senior Trial Counsel (N.Y. Bar)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Tel.:       (202) 305-8693
Fax:       (202) 616-8470
Email:    daniel.s.schwei@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address:
20 Massachusetts Avenue N.W.
Washington, D.C. 20001

*Counsel for Defendant*