**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CAMPAIGN FOR ACCOUNTABILITY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:16-cv-1068 (KBJ) |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Campaign for Accountability ("CfA") has filed an amended complaint that alleges that the Department of Justice's Office of Legal Counsel ("OLC") must make certain specified categories of OLC legal opinions automatically available to the public pursuant to the Freedom of Information Act's ("FOIA's") seldom-litigated reading-room provision. (*See* Am. Compl., ECF No. 22, ¶ 13 (citing 5 U.S.C. § 552(a)(2)).) In the wake of this Court's prior conclusion that not all of OLC's opinions qualify for affirmative disclosure under section 552(a)(2) of Title 5 of the United States Code, *see generally Campaign for Accountability v. Dep't of Justice ("Campaign for Accountability I")*, 278 F. Supp. 3d 303 (D.D.C. 2017), CfA now maintains that the reading-room provision requires affirmative disclosure of at least four types of OLC opinions: those that (1) resolve inter-agency disputes (*see* Am. Compl. ¶¶ 35–38); (2) interpret an agency's non-discretionary legal obligations (*see id.* ¶¶ 41–44); (3) "find[] that particular statutes are unconstitutional and that therefore

agencies need not comply with them" (*id.* at 18; *see also id.* ¶¶ 45–46); or (4) adjudicate or determine private rights (*see id.* at ¶¶ 47–49).[1]

Before this Court at present is Defendant OLC's renewed motion to dismiss CfA's amended complaint (*see* Mem. in Supp. of Def.'s Renewed Mot. to Dismiss the Am. Compl. ("Def.'s Mot."), ECF No. 29-1), which invokes Federal Rule of Civil Procedure 12(b)(6) and argues that CfA's amended complaint *still* does not plausibly allege that OLC has a legal obligation to disclose any of these categories of opinions under the FOIA (*see id.* at 19–20), primarily because, in the agency's view, OLC opinions are "legal advice documents [] rather than final agency policy decisions" (*id.* at 22) and do "not regulate private parties[]" (*id.* at 21), so these kinds of agency records do not fall within the ambit of the FOIA's affirmative disclosure provisions (*see id.*).[2]  In response, CfA both reiterates its argument that, due to their "binding" and "controlling" nature, all OLC opinions are subject to affirmative disclosure (Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), ECF No. 30, at 18), and asserts that, in any event, the identified categories of OLC opinions satisfy the statutory requirements, because they qualify as either "statements of policy and interpretations which have been adopted by the agency[,]" 5 U.S.C. § 552(a)(2)(B), or "final opinions . . . made in the adjudication of cases[,]" *id.* § 552(a)(2)(A) (*see* Pl.'s Opp'n at 31–42).

For the reasons explained below, this Court adheres to its prior conclusion that not all—but also not none—of OLC's written opinions must be affirmatively disclosed

---

[1] CfA's amended complaint specifically identified a fifth category of OLC opinions—opinions issued to independent agencies (*see* Am. Compl. ¶ 39)—but CfA subsequently withdrew its claims with respect to that separate category of records (*see infra* n.4).

[2] Page-number citations to the documents that the parties and the Court have filed refer to the page numbers that the Court's Electronic Case Filing System ("ECF") automatically assigns.

pursuant to the FOIA's reading room provision, and it further finds that only *one* of the categories of OLC opinions that CfA has now identified is plausibly included in the classes of records that an agency must affirmatively disclose under section 552(a)(2). In particular, the Court finds that CfA has plausibly alleged that OLC opinions relating to inter-agency disputes are "final opinions . . . made in the adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A), and such opinions may also plausibly be characterized as "statements of policy and interpretations" that have been adopted *ex ante* by at least one of the disputing agencies, *id.* § 552(a)(2)(B). The Court considers it implausible that any of the other types of OLC opinions to which CfA points fit into the FOIA's affirmative-disclosure classifications, and thus concludes that CfA has failed to state a claim with respect to those categories of opinions. Consequently, OLC's motion to dismiss CfA's amended complaint will be **GRANTED IN PART and DENIED IN PART**. A separate Order consistent with this Memorandum Opinion will follow.

## I.   BACKGROUND

In the initial complaint that was filed in this matter, CfA asserted that *all* of OLC's written legal opinions were uniformly and categorically subject to disclosure under the FOIA's reading-room provision, section 552(a)(2) of Title 5 of the United States Code. (*See* Compl., ECF No. 1, ¶ 31.) OLC moved to dismiss CfA's FOIA claim and, in a Memorandum Opinion concerning OLC's motion, this Court held that CfA had not "plausibly alleged that OLC opinions, as a general matter, are subject to the reading-room provision," *Campaign for Accountability I*, 278 F. Supp. 3d at 321 (cleaned up), and CfA also "ha[d] not identified an ascertainable set of OLC opinions that OLC [] withheld from the public and that is also plausibly subject to the FOIA's

reading-room requirement[,]" *id.* at 306.  The relevant background for the parties' FOIA

dispute over the characterization and release of OLC opinions is described in detail in

this Court's prior Memorandum Opinion, *see id.* at 306–12, and is incorporated into the

instant discussion by reference.  This Court will assume familiarity with those

background facts moving forward; therefore, only a brief recounting of certain relevant

background facts and legal principles is necessary here.

First of all, the reader is reminded that, as a general matter, section 552(a)(2) of

Title 5 of the United States Code furthers the FOIA's goal of fostering public access to

government records by requiring agencies to act proactively to publish and index

certain specified types of documents.  In relevant part, the provision states that

> [e]ach agency, in accordance with published rules, shall make
> available for public inspection in an electronic format—
>
> > (A) final opinions, including concurring and dissenting
> > opinions, as well as orders, made in the adjudication of cases;
> >
> > (B) those statements of policy and interpretations which have
> > been adopted by the agency and are not published in the
> > Federal Register;
> >
> > (C) administrative staff manuals and instructions to staff that
> > affect a member of the public;
> >
> > (D) copies of all records, regardless of form or format—
> >
> > > (i) that have been released to any person under
> > > paragraph (3); and . . .
> >
> > (E) a general index of the records referred to under
> > subparagraph (D)[.]

5 U.S.C. § 552(a)(2).

It is clear beyond cavil that the reading-room provision has as its "primary

objective [] the elimination of secret law."  *Dep't of Justice v. Reporters Comm. for

Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989) (internal quotation marks and

citation omitted). That is, "[t]he FOIA's reading-room provision 'represents an affirmative congressional purpose to require disclosure of documents which have the force and effect of law.'" *Campaign for Accountability I*, 278 F. Supp. 3d at 307 (quoting *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975)). And the requirement that certain categories of records be automatically published by the agency that produces them mitigates against the risk of secret law, insofar as it "prevent[s] an agency from subjecting members of the public to a rule that the agency has not publicly announced." *Id.* (internal citations omitted).

As explained in *Campaign for Accountability I*, in addition to requiring the disclosure of certain agency records, the FOIA permits an agency to withhold covered documents pursuant to certain statutory exemptions, *see* 278 F. Supp. 3d at 308 (citing 5 U.S.C. § 552(b)(1)–(9)), and one of those exemptions—Exemption 5—"correlates with, and sheds light on, the scope of the FOIA's reading-room provision[,]" *id*. Exemption 5 generally authorizes agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). Moreover, and significantly for present purposes, making a determination that an agency can properly withhold a particular record pursuant to the attorney work-product and deliberative-process privileges that Exemption 5 protects means that the record in question is also not subject to automatic disclosure under the FOIA's reading-room provision. *See Campaign for Accountability I*, 278 F. Supp. 3d at 322. The reverse is also true: documents that are not properly withheld as privileged under Exemption 5 can be deemed to reflect an agency's working law and, as such, must be affirmatively

disclosed under section 552(a)(2).  In other words, "if a record can be withheld under Exemption 5, then it is generally not subject to affirmative disclosure under the reading-room provision and vice versa[.]"  *Id.* at 308.

This Court's previous observations about the OLC's authority to provide legal advice to the Executive Branch also warrant restating.  This responsibility is "nearly as old as the Republic itself[,]" *Citizens for Responsibility & Ethics in Washington v. Dep't of Justice ("CREW II")*, 922 F.3d 480, 483 (D.C. Cir. 2019) (internal quotation marks omitted), and "[f]or decades, [OLC] has been the most significant centralized source of legal advice within the Executive Branch[,]" *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice ("CREW I")*, 846 F.3d 1235, 1238 (D.C. Cir. 2017) (internal quotation marks and citation omitted).  OLC advises the rest of the Executive Branch on behalf of the Attorney General, and it is important to note that "the Attorney General's legal advice to the President and various executive agencies spans a wide range of issues and contexts."  *Campaign for Accountability I*, 278 F. Supp. 3d at 309; *see also* 28 C.F.R. § 0.25(a) (charging OLC with "[p]reparing the formal opinions of the Attorney General[,] rendering informal opinions and legal advice to the various agencies of the Government[,] and assisting the Attorney General in the performance of his functions as legal adviser to the President and as a member of, and legal adviser to, the Cabinet").

Notably, "[a]lthough the OLC frequently conveys its legal advice to executive agencies through informal means, it sometimes does so through 'formal written opinions.'"  *CREW II*, 922 F.3d at 484.  Furthermore, with respect to its written opinions, OLC "has a longstanding internal process in place for regular consideration

and selection of significant opinions for official publication." (Memorandum from
David J. Barron, Acting Assistant Attorney General, to Attorneys of the Office, Best
Practices for OLC Legal Advice and Written Opinions at 5 (July 16, 2010) ("Best
Practices Memo"), Ex. 3 to Def.'s Mot. to Dismiss, ECF No. 9-5.)[3]

## II.   PROCEDURAL HISTORY

In *Campaign for Accountability I*, this Court relied on the D.C. Circuit's holding
in *Electronic Frontier Foundation v. Department of Justice ("EFF")*, 739 F.3d 1 (D.C.
Cir. 2014), to conclude that "an OLC opinion does not constitute an agency's working
law merely by virtue of being a controlling and precedential statement of the legal
constraints on an agency's decision[,]" *Campaign for Accountability I*, 278 F. Supp. 3d
at 322 (internal quotation marks omitted), and it further held that a complaint that
alleges that an agency has violated the FOIA's reading-room provision can survive a
Rule 12(b)(6) motion to dismiss only if it "identif[ies] ascertainable records or
categories of records that are plausibly subject to the reading-room requirement and that
the agency has failed to make publicly available[,]" *id.* at 320.  The Court dismissed
CfA's claims in light of this holding, but granted CfA leave "to amend its complaint to
add allegations [concerning] specific, ascertainable categories of records[.]" *Id.* at 324.

Three weeks after this Court dismissed CfA's initial complaint, CfA filed an
amended complaint that identifies distinct categories of OLC written opinions (out of
the broad range of opinions that OLC typically issues) that CfA maintains are

---

[3] OLC has opted to publish approximately 1,339 opinions, dating from 1934 to the present.  *See* Office
of Legal Counsel, *Opinions*, Dep't of Justice (Sept. 11, 2020), https://www.justice.gov/olc/opinions.
*Cf.  Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (authorizing courts to take
judicial notice of the fact that material has been posted to a government website pursuant to Federal
Rule of Evidence 201).

indisputably subject to section 552(a)(2) of the FOIA.  (*See Am. Compl.* ¶¶ 35–49.)
These categories are: (1) opinions resolving inter-agency disputes (*see id.* ¶¶ 35–38);
(2) opinions interpreting non-discretionary legal obligations (*see id.* ¶¶ 41–44);
(3) opinions finding that particular statutes are unconstitutional (*see id.* at 18; *see also
id.* ¶¶ 45–46); and (4) opinions adjudicating or determining private rights (*see id.* at
¶¶ 47–49).[4]  With respect to each of these four categories of records, CfA's amended
complaint alleges that the government has failed to comply with the disclosure
obligations of section 552(a)(2) by not making these opinions automatically available
for public inspection (*see id.* ¶¶ 54–59 (Count I)), and that the government has failed to
comply with the indexing requirement of section 552(a)(2)(E) of the Act (*see id.* ¶¶ 60–
64 (Count II)).

OLC has once again moved to dismiss CfA's pleading under Federal Rule of
Civil Procedure 12(b)(6), claiming that CfA's amended complaint does not plausibly
allege that OLC has a legal obligation to disclose the specified categories of opinions.
(*See* Def.'s Mot. at 19–20.)  The agency's argument largely echoes its prior position
that *none* of OLC's opinions *ever* satisfies the FOIA's affirmative-disclosure mandates,
because OLC merely generates "legal advice documents [] rather than final agency
policy decisions[.]"  (*Id.* at 22.)  The agency also argues that none of the types of OLC
opinions that CfA specifically identifies is a "final opinion[] . . . made in the

---

[4] As explained previously (*see supra* n.1), CfA's amended compliant makes the same claims with
respect to a fifth category of OLC opinions—opinions issued to independent agencies (*see* Am. Compl.
¶ 39)—but CfA has withdrawn this distinct allegation because "[t]he OLC has now confirmed that the
express agreement that independent agencies make to be bound by the OLC's formal written opinions is
no different than the implied agreement of non-independent agencies to be bound by those opinions[.]"
(Pl.'s Opp'n at 35 n.11; *see also id.* (explaining that CfA "no longer contends that those opinions
constitute [a separate category of] working law under this Court's interpretation of *EFF*").)

adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A), because OLC opinions "do not finally dispose of any agency action" and none concerns "adversarial disputes involving private parties[.]" (*Id.* at 22–24.)  Moreover, according to OLC, CfA "does not identify any concrete features of these OLC advice documents that would make them *the recipient agencies'* law or policy" beyond the mere fact that they are considered "precedential" and "controlling[.]" (*Id.* at 33 (emphasis in original); *see also id.* at 39 (asserting that, "[e]ven when the necessary result of an OLC opinion is to foreclose a particular action or actions, that does not eliminate the need for the agency still to make a policy decision—*i.e.*, to decide how to address the underlying situation").)  OLC further maintains that it "does not purport—nor does it have authority—to adjudicate or determine any private rights" (*id.* at 43 (internal quotation marks and citation omitted)), and that interpreting the FOIA's reading-room provision to include any subset of OLC opinions "would [both] undermine important values within the Government and raise significant constitutional concerns" (*id.* at 44).

In response, CfA holds fast to its prior contention that all of OLC's opinions are subject to disclosure under section 552(a)(2) (*see* Pl.'s Opp'n at 7 ("[R]espectfully[] urg[ing] this Court to reconsider its prior holding.")), and it further insists that the four categories of OLC opinions that its amended complaint has identified are either "statements of policy and interpretations" adopted by the agency, 5 U.S.C. § 552(a)(2)(B), or "final opinions . . . made in the adjudication of cases[,]" *id.* § 552(a)(2)(A), for the purpose of the FOIA's reading-room provision, such that they are subject to automatic disclosure (*see* Pl.'s Opp'n at 30–42).  Additionally, CfA maintains that "[r]equiring the disclosure of the OLC's formal written opinions would

serve, not threaten, important constitutional values." (*Id.* at 48.)

The Court held a hearing on the government's motion to dismiss on July 20, 2018 (*see* Minute Entry of July 20, 2018), at the end of which it took the government's motion, now ripe for review, under advisement.

## III.   LEGAL STANDARDS

"Because the FOIA permits a court to order the production of any agency records improperly withheld from the complainant, a FOIA plaintiff states a claim where it properly alleges that an agency has (1) improperly (2) withheld (3) agency records[.]" *Campaign for Accountability I*, 278 F. Supp. 3d at 312 (cleaned up).  Notably, what qualifies as improper withholding can vary based upon the particular FOIA provision that the plaintiff invokes.  Unlike section 552(a)(3), which requires agencies to produce records in response to a proper request for *any* documents in the agency's possession (subject to specified withholdings), *see Shapiro v. C.I.A.*, 170 F. Supp. 3d 147, 154–56 (D.D.C. 2016), the FOIA's reading-room provision requires the agency's proactive disclosure of specific, statutorily delineated categories of records, *see, e.g.*, 5 U.S.C. §§ 552(a)(2)(A)–(B).  Accordingly, "in order to state a claim that an agency has improperly withheld records that it was obligated to make public under section 552(a)(2), the complaint must identify particular records (or categories of records) that the agency has failed to publicize and that plausibly fit within one of the statutory categories." *Campaign for Accountability I*, 278 F. Supp. 3d at 312.

In the context of a complaint that alleges improper withholding of agency records in violation of section 552(a)(2) the FOIA, a plaintiff states a claim upon which relief can be granted if the records that the complaint identifies as having been withheld

plausibly qualify as, *inter alia*, "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A), or "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register[,]" *id.* § 552(a)(2)(B). And because courts are required to dismiss a complaint that "fail[s] to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6), Fed. R. Civ. P. 12(b)(6), "[t]o survive a motion to dismiss, [such] a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[,]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## IV.   ANALYSIS

The parties in this case have repeatedly asked the Court to adopt an all-or-nothing stance with respect to the OLC's affirmative disclosure obligations: either *all* OLC opinions must be disclosed pursuant to the FOIA's reading-room provision because such opinions are binding on the agencies to which they are issued, as CfA argues (*see* Pl.'s Opp'n at 7), or *none* of OLC's opinions is subject to proactive disclosure, as OLC contends, because OLC is not itself a policymaking authority and instead only advises administrative agencies that regulate private parties (*see* Def.'s Mot. at 22). This Court persists in rejecting this dichotomy and, as explained fully below, it further finds that one of the four types of OLC opinions that CfA points to—opinions that resolve inter-agency disputes—can plausibly be classified as either "final opinions . . . made in the adjudication of cases[,]" or "statements of policy and interpretations" that one or more of the disputing agencies have adopted, for the

purpose of the FOIA's reading-room provision.  5 U.S.C. §§ 552(a)(2)(A)–(B).  The
Court also concludes that it is not plausible that the remaining types of OLC opinions
that appear in CfA's amended complaint fit into any of the section 552(a)(2)
classifications that CfA has invoked.

### A. This Court Will Not Reconsider Its Prior Conclusion That OLC's Formal Written Opinions Do Not Necessarily Constitute The Working Law Of The Recipient Agency

In *Campaign for Accountability I*, this Court held that "CfA cannot state a
plausible claim that OLC violated its obligation to make such reading-room documents
publicly available simply by pointing to OLC's failure to publicize all of its opinions
that provide controlling advice to executive branch officials and agencies on questions
of law and that serve as precedent[,]" 278 F. Supp. 3d at 322 (internal quotation marks
and citation omitted), because where "OLC does not speak with authority on the [client
agency]'s policy[,]" *id.* at 321 (internal quotation marks and citation omitted), "an OLC
opinion does not necessarily reflect the adopted policy of the agency that requests it[,]"
*id.* at 323.  In its opposition to the agency's motion to dismiss its second amended
complaint, CfA "respectfully[] urges this Court to reconsider [this] prior holding[]" and
to rule that all of OLC's formal written opinions are subject to section 552(a)(2)'s
affirmative disclosure requirement.  (Pl.'s Opp'n at 7; *see also id.* at 12–34.)  The thrust
of CfA's argument is that this Court was wrong to conclude otherwise.  (*Id.*)  But "it is
well established that such assertions of error, standing alone, are insufficient" for a
court to reconsider a prior ruling.  *Pierce v. District of Columbia*, 146 F. Supp. 3d 197,
201 (D.D.C. 2015).  Indeed, "where litigants have once battled for the court's decision,
they should neither be required, nor without good reason permitted, to battle for it

again." *Singh v. George Washington Univ.*, 383 F.Supp.2d 99, 101 (D.D.C. 2005) (internal quotation marks and citation omitted); *see also, e.g.*, *All. of Artists & Recording Companies, Inc. v. Gen. Motors Co.*, 306 F. Supp. 3d 413, 416 (D.D.C. 2016) (denying reconsideration).

CfA does not contend that the Court misunderstood its legal argument, nor does it point to any change in law or facts that might persuade this Court to revisit its prior ruling. *Cf. AFL-CIO v. N.L.R.B.*, No. 20-cv-0675, 2020 WL 3605656, at *3 (D.D.C. July 1, 2020) ("[I]t is clear beyond cavil that justice requires reconsideration when, among other things, a court has patently misunderstood a party or has made an error not of reasoning but of apprehension" (cleaned up)).  To the contrary, if anything, intervening developments strongly suggest that this Court's prior holding was *not* erroneous.  In a recent ruling, a panel of the D.C. Circuit explicitly blessed the reasoning in *Campaign for Accountability I*, by reaffirming that the Circuit's holding in *EFF* precludes a "universal claim" for the proactive publication of all OLC opinions simply because they are "controlling" and "binding[.]"  *CREW II*, 922 F.3d at 486–87 (affirming another district court ruling concerning FOIA's reading-room provision, and noting the overlap between that case and the instant litigation); *see also id.* at 488–89 (explaining that *EFF* "adopted the broader rule that the OLC's formal written opinions are not the 'working law' of an agency simply because they are nominally 'controlling.'" (internal citation omitted)).  Thus, this Court confidently adheres to its rejection of CfA's contention that all OLC opinions are subject to the FOIA's reading-room provision, and it respectfully declines CfA's invitation to reconsider that holding.

**B.  OLC Mischaracterizes The Reading-Room Provision And Fails To Accept The Amended Complaint's Allegations Concerning The Nature Of At Least Some Of Its Opinions**

The Court also rejects OLC's contention that its formal written opinions can *never* qualify for affirmative disclosure under section 552(a)(2).  (*See* Def.'s Mot. at 21–23.)  OLC's argument in this regard rests, first, on the much-heralded assertion that the affirmative disclosure requirements of the FOIA's reading-room provision are "limited" to records that pertain to "agency regulation of private citizens' rights and obligations" (*id.* at 23), which effectively excludes OLC because that agency "does not regulate private parties" (*id*. at 21).  OLC also insists that its written opinions are merely "legal advice documents—rather than final agency policy decisions"—and that only the latter are subject to disclosure under the reading-room provision.  (*Id.* at 22.)  Neither of these contentions carries the day, for OLC's cramped characterization of the scope of the reading-room provision does not comport with a plain reading of the statute, and the narrow aperture through which OLC views its own opinions improperly fails to account for the plausible opinion-related facts and circumstances that CfA alleges in its second amended complaint.

1.  The FOIA's Reading-Room Provision Is Not Limited To Agency Records That Regulate Private Parties

The fact that "OLC does not issue any opinions in adversarial disputes involving private parties" (Def.'s Mot. at 22) seems neither here nor there, given that nothing in the plain text or history of section 552(a)(2), or in the few cases that have interpreted that statutory provision, establishes that the FOIA's affirmative obligation to publish certain agency records extends only to agency records that pertain to the regulation of private entities.  In fact, as explained in Part I, *supra*, section 552(a)(2) specifies each

14

kind of document that an agency must "make available for public inspection," 5 U.S.C.
§ 552(a)(2), and none of the relevant categories explicitly states that, to be disclosable
per section 552(a)(2), the record has to have been generated in connection with the
agency's regulation of private parties.  To be sure, section 552(a)(2)(C)—which is not
invoked in the instant case—requires affirmative disclosure of "administrative staff
manuals and instructions to staff *that affect a member of the public*[,]" *id.*
§ 552(a)(2)(C) (emphasis added), but no other subdivision of section 552(a)(2) is
similarly qualified and, as a result, one cannot assume that Congress intended the
public-impact limitation to apply to any of the other listed categories.  *Cf. N.L.R.B. v.
SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) ("If a sign at the entrance to a zoo says 'come
see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the
giraffe is sick,' you would reasonably assume that the others are in good health.").
Likewise, it is well established that Congress's primary concern when it enacted section
552(a)(2) was mandating the disclosure of government records that might constitute the
working law of an agency, *see CREW II*, 922 F.3d at 486, and that objective obviously
encompasses more than merely requiring automatic publication and indexing of the
subset of agency records that pertain to the regulation of "private citizens' rights and
obligations" (Def.'s Mot. at 23).

Thus, the Court is genuinely puzzled by OLC's insistence that the text of section
552(a)(2) "makes clear that the covered documents refer to typical adjudicatory and
regulatory contexts involving private individuals, not internal agency documents."  (*Id.*)
Again, neither section 552(a)(2)(A) nor section 552(a)(2)(B) makes any such
distinction.  And the mere fact that section 552(a)(2) subsequently notes that certain

covered records—*i.e.*, "[a] final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public"—"may be relied on, used, or cited as precedent by an agency against a party other than an agency" only under specified circumstances, 5 U.S.C. § 552(a)(2), does not make OLC's argument (*see* Def.'s Mot. at 23) any less perplexing.  This statutory provision simply prescribes the preclusive impact of an agency's violation of the affirmative disclosure provision in a certain context: a covered document may not be used *against* private parties, *unless* it has first been disclosed pursuant to the reading-room provision (or the private parties have sufficient notice).  It says nothing about whether the statutory list of covered documents must be read to include only records that pertain to private parties.

If OLC's text-based argument for concluding that agency records must pertain to private parties in order to be subject to the reading-room provision (*see id.*) derives from subdivision (A) of section 552(a)(2)—which requires affirmative disclosure of "final opinions, including concurring opinions and dissenting opinions, as well as orders, made in the adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A)—then OLC has ignored the fact that "the adjudication of cases" is not defined in the statute as the resolution of disputes *involving private parties* (indeed, it is not defined at all), and non-private entities can certainly be involved in adversarial disputes that, when adjudicated, qualify as "cases."  *See Comm. on Judiciary of United States House of Representatives v. McGahn*, 968 F.3d 755, 774 (D.C. Cir. 2020) (en banc) (rejecting the view that there is an Article III case or controversy "only when an individual right is implicated"); *see, e.g.*, *Dep't of Treasury v. F.L.R.A.*, 494 U.S. 922 (1990); *Nevada v. United States*, 463 U.S. 110 (1983); *United States v. Interstate Com. Comm'n*, 337 U.S.

16

426 (1949).  In any event, the opinions that must be disclosed under section 552(a)(2)(A) are but one of the four categories of records that the reading-room provision covers, which means that, by its plain text, section 552(a)(2) transcends agency records that opine on the adjudication and regulation of private rights and responsibilities.  *See, e.g.*, 5 U.S.C. § 552(a)(2)(B)–(C) (requiring affirmative disclosure of non-adjudicative agency materials, such as "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register[,]" and "administrative staff manuals and instructions to staff that affect a member of the public").

The legislative history of the FOIA's reading-room provision does not compel a different conclusion.  Far from OLC's representation that "Congress's primary concern in [section] 552(a)(2) was with the adjudication of private rights" (*see* Def.'s Mot. at 23), the House Report to which OLC points demonstrates that Congress enacted section 552(a)(2) to counteract the vague authorization for withholding that existed in a prior version of the FOIA, which had "permit[ted] an agency's orders and opinions to be withheld from the public if the material is 'required for good cause found to be held confidential.'"  H.R. Rep. 89-1497, at 29 (1966).  Section 552(a)(2) was aimed at eliminating that "undefined authority for secrecy[,]" and the House Report clarified that the purpose of the provision was to provide an explicit requirement that agencies "make available statements of policy, interpretations, staff manuals, and instructions that affect any member of the public."  *Id.*

It is also clear to this Court that OLC's assertion that the Supreme Court and the D.C. Circuit have embraced a reading of section 552(a)(2) that requires affirmative

disclosure only with respect to records that relate to an agency's adjudication of private rights (*see* Def.'s Mot. at 23–24 (citing cases)) is mistaken.  To the contrary, the cited rulings are consistent with the thrust of Congress's intent in enacting the reading-room provision, which was to ensure that agencies do not develop, in some way, whether through individual adjudications or otherwise, a body of "secret law" through which to "discharge . . . [their] regulatory duties and [to] deal[] with the public." *Schlefer*, 702 F.2d at 244; *see also Reporters Comm.*, 489 U.S. at 772 (noting that the "basic purpose" of the FOIA is "to open agency action to the light of public scrutiny" (internal quotation marks and citation omitted)).  And it is well established that the "working law" exception to an agency's authority to withhold records derives from more than a mere concern about how an agency has adjudicated private parties' rights; rather, requiring affirmative disclosure of the broad categories of records and information listed in section 552(a)(2) promotes the overarching objective of the FOIA, which is to codify "the citizens' right to be informed about what their government is up to." *Dep't of Def. v. F.L.R.A.*, 510 U.S. 487, 495 (1994) (internal quotation marks and citation omitted); *see also Elec. Privacy Info. Ctr. v. Dep't of Justice*, 442 F. Supp. 3d 37, 51–52 (D.D.C. 2020) ("The FOIA's policy of broad disclosure of government documents not only gives citizens access to the information on the basis of which government agencies make their decisions, thereby equipping the populace to evaluate and criticize those decisions, but also ensures an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed[.]" (cleaned up)).

    *Public Citizen v. Office of Management and Budget*, 598 F.3d 865 (D.C. Cir.

2010), provides just one example of the D.C. Circuit's consistent holdings in this regard.  In that case, the D.C. Circuit reviewed a legal challenge that sought disclosure of memoranda from the Office of Management and Budget ("OMB") that designated which agencies were permitted to submit their budgetary materials to Congress without first clearing them with OMB.  *Id.* at 867–68.  The court of appeals concluded that, because such memoranda "reflect[] OMB's formal or informal policy how it carries out its responsibilities[,]" *id.* at 875, which has "real-world effects on the behavior of . . . agencies[,]" *id.* at 872, those documents "fit comfortably within the working law framework" and, therefore, could not be withheld, *id.* at 875.

The D.C. Circuit opinion in *Vaughn v. Rosen ("Vaughn II")*, 523 F.2d 1136 (D.C. Cir. 1975) is yet another holding that casts doubt upon the OLC's view that the reading-room provision (and, thus, the working law doctrine) is limited to agency records that concern the rights of private parties.  In *Vaughn*, the D.C. Circuit considered a FOIA request that was submitted by "a law professor doing research into the Civil Service Commission[.]"  *Id.* at 1139.  The professor sought to obtain certain personnel reports that the Civil Service Commission—an administrative agency tasked with "evaluat[ing], oversee[ing], and regulat[ing] the personnel management activities of the various federal agencies[,]" *Vaughn v. Rosen ("Vaughn I")*, 484 F.2d 820, 822 (D.C. Cir. 1973)—had prepared, *see Vaughn II*, 523 F.2d at 1139.  The reports at issue had been created "in furtherance of [the Commission]'s responsibility to inspect agency personnel action and to determine whether that action conforms to applicable rules and regulations[,]" and they consisted of "the Commission's evaluation of the way the agencies' managers and supervisors are carrying out their personnel management

19

responsibilities." *Id.* (internal quotation marks and citation omitted).  And the D.C. Circuit determined that the agency could not withhold these reports under Exemption 5, *see id.* at 1143–47, notwithstanding the fact that they manifestly concerned agency operations and did not involve any agency's regulation or adjudication of private rights.

Thus, contrary to OLC's representations, it is clear that what matters for FOIA purposes is whether the agency record at issue reflects agency determinations, interpretations, or policies that have the force of law, and not whether it involves the regulation or adjudication of private rights.

2.   The D.C. Circuit's *EFF* Opinion Establishes That An OLC Opinion Has The Potential To Become The Working Law Of An Agency

To support its motion to dismiss CfA's amended complaint, OLC also vigorously restates its argument that OLC only "provides legal advice for other agencies, and those agencies in turn make policy decisions within the legal framework articulated by OLC[,]" and, therefore, section 552(a)(2) *never* requires the agency publish any of the legal opinions that it is has provided to other agencies.  (Def.'s Mot. at 26–27.)  OLC relies primarily on the D.C. Circuit's *EFF* ruling as the authority for this contention. But given this Court's explanation in *Campaign for Accountability I*, *EFF* compels a different result.  To recap, "[i]n *EFF*, a FOIA requester sought access to a legal opinion that OLC had prepared for the Federal Bureau of Investigation ('FBI') in connection with an inquiry into the FBI's information-gathering techniques[,]" and "[t]he D.C. Circuit determined that the Department of Justice had properly withheld the OLC opinion pursuant to the deliberative process privilege under FOIA Exemption 5, because it was an advisory opinion, recommendation and deliberation comprising part of a process by which governmental decisions and policies are formulated, instead of a

document reflecting a decision or policy already made." *Campaign for Accountability I*, 278 F. Supp. 3d at 321 (cleaned up). Most notably for present purposes, "the *EFF* court reasoned that the OLC Opinion could not be the working law of the FBI *unless* the FBI adopted what OLC offered, because OLC does not speak with authority on the FBI's policy[.]" *Id.* (quoting *EFF*, 739 F.3d at 9) (cleaned up) (emphasis added).

This Court's primary intention when it described *EFF* in *Campaign for Accountability I* was to respond to CfA's argument that the binding nature of OLC opinions rendered *all* such opinions susceptible to affirmative disclosure pursuant to the FOIA's reading-room provision and, as a result, the Court emphasized both the D.C. Circuit's rejection of the argument that "the OLC opinion at issue constituted the FBI's 'working law' because it was 'controlling' and 'precedential,'" *id.* (quoting *EFF*, 739 F.3d at 9), and the panel's clear holding that "these indicia of a binding legal decision do[] not overcome the fact that OLC does not speak with authority on the FBI's policy[,]" *id.* (quoting *EFF*, 739 F.3d at 9). But this Court's analysis applies equally well to OLC's argument that *no* OLC opinions can ever qualify as an agency's working law, since OLC always and inevitably serves a mere advisory role. (*See* Def.'s Mot. at 22.) To the contrary, properly understood, the D.C. Circuit's decision in *EFF* plainly leaves open the possibility that a client agency (such as the FBI) can "adopt" the OLC's legal advice such that the OLC opinion becomes that agency's working law, or that OLC might, in some cases, "speak with authority" as to the client agency's policies and interpretations. *EFF*, 739 F.3d at 9.

Nor is the mere fact that "*all* of OLC's opinions constitute the opinion of the Attorney General on questions of law[,]" and therefore "OLC's opinions *always* advise

on legal questions, even if the agency that receives an OLC opinion will use it to inform

a policy decision[,]" *Campaign for Accountability I*, 278 F. Supp. 3d at 323 (internal

quotation marks and citations omitted), sufficient to dispose of the question of whether

an OLC opinion can constitute an agency's working law.  The *EFF* panel, too,

characterized the OLC opinion at issue in that case as one that merely "describe[d] the

legal parameters of what the FBI [wa]s *permitted* to do[.]"  *EFF*, 739 F.3d at 10

(emphasis in original).  However, that description of OLC's ubiquitous function does

not establish whether, or to what extent, an OLC opinion can ever speak with authority

on the client agency's policies, or whether a receiving agency's adoption of OLC's

legal advice can trigger the OLC's affirmative disclosure obligations under the FOIA.

In other words, just as the binding or conclusive nature of an OLC opinion is

insufficient to support CfA's contention that all OLC opinions trigger section

552(a)(2)'s affirmative disclosure mandate, so, too, is the fact that all OLC opinions

provide legal advice insufficient to establish that none of the agency's opinions ever

qualify as the working law of the agency to which the opinion is directed.  *See CREW*

*II*, 922 F.3d at 487 n.2 (expressing "skeptic[ism] of the Department of Justice's position

that *none* of the OLC's formal written opinions constitutes the 'working law' of an

agency subject to disclosure under [the] FOIA's reading-room provision").

> 3.  <u>The OLC's Constitutional Avoidance And Rule-Of-Law Concerns
>      With Respect To The Disclosure of OLC Opinions Are Misplaced</u>

Lastly, this Court is unmoved by OLC's argument that mandating the proactive

disclosure of any of its opinions would have unacceptable rule-of-law and constitutional

repercussions that the Court ought to avoid by interpreting section 552(a)(2) to exclude

OLC opinions altogether.  (*See* Def.'s Mot. at 45–46.)  In this regard, OLC frets that if

the FOIA's reading-room provision is applied to OLC opinions, then its client agencies would feel less comfortable seeking OLC's advice, and the "free and candid flow of information between agency decision-makers and their outside legal advisers" will end (*id.*), and it also fears that requiring the disclosure of its opinions might interfere with the agency's obligation to provide confidential and candid legal advice to assist the President in "effectively execut[ing] his duties under Article II" (*id.* at 47).

These assertions are plainly based on sheer speculation about the potential impact of any such mandated disclosure on the operations of the executive branch, and are also not within the province of a Rule 12(b)(6) motion to dismiss. What is more, given that OLC already routinely releases certain legal opinions voluntarily and without incident (*see* Am. Compl. ¶ 6)—which the agency's website confirms (*see supra* n.2)— these concerns seem largely overblown. At the very least, it is not implausible that mandatory releases of certain OLC opinions per section 522(a)(2) would have a *de minimis* effect. And because CfA's amended complaint does not specifically seek OLC opinions that "flow up the chain of command to the president" (Pl.'s Opp'n at 49), its pleading does not fail to state a claim on the grounds that the types of opinions that *are* alleged to be subject to mandatory disclosure *might* include such a record (*see id.* at 49– 50 (arguing that, even if "formal written opinions to the president's closest advisors would implicate [interference] concerns, the government may argue that those opinions are exempt on summary judgment")).

### C. CfA Has Identified Only One Ascertainable Set Of OLC Opinions That Plausibly Constitutes The Working Law Of The Recipient Agency For Section 552(a)(2) Purposes

Notably, CfA's amended complaint invokes only two of the four FOIA

provisions that list categories of agency records that Congress has made subject to affirmative disclosure: "final opinions . . . made in the adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the agency[,]" *id.* § 552(a)(2)(B).  Moreover, as explained above, CfA's amended complaint alleges that four types of OLC opinions must be provided to the public proactively under these two statutory provisions: opinions that (1) resolve inter-agency disputes (*see* Am. Compl. ¶¶ 35–38); (2) interpret an agency's non-discretionary legal obligations (*see id.* ¶¶ 41–44); (3) find that particular statutes are unconstitutional (*see id.* ¶¶ 45–46); and (4) adjudicate or determine private rights (*see id.* at ¶¶ 47–49).

For the reasons explained below, this Court finds that it is plausible that OLC opinions that resolve disputes between agencies qualify for affirmative disclosure under the FOIA's reading-room provision, but the other types of OLC opinions that CfA identifies do not plausibly fit into the statute's affirmative-disclosure classifications.

1.  <u>It Is Plausible That OLC Opinions That Resolve Disputes Between Agencies Qualify For Affirmative Disclosure Under Section 552(a)(2)</u>

According to CfA's amended complaint, "a core function of the OLC is to adjudicate disputes between agencies concerning the law[,]" and, indeed, "Executive Order 12,146 directs executive agencies to submit legal disputes to the OLC for resolution."  (Compl. ¶ 35.)  Pursuant to that executive order, if two or more independent executive agencies "are unable to resolve a legal dispute between them . . . , each agency is encouraged to submit the dispute to the Attorney General[.]" *Executive Order 12146: Management of Federal Legal Resources* ("E.O. 12,146"), 44 Fed. Reg. 42,657, 42,658 at § 1-401 (July 18, 1979).  Moreover, Executive Order 12,146 provides that if two or more non-independent executive agencies—*i.e.*, those

"whose heads serve at the pleasure of the President"—reach a similar impasse, "the agencies shall submit the dispute to the Attorney General prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere." *Id.* § 1-402. And, by regulation, the Attorney General has delegated to OLC the authority to provide executive agencies with advice on questions of law, including resolving both types of inter-agency legal disputes. *See* 28 C.F.R. § 0.25.

According to CfA's amended complaint, such inter-agency disputes "constitute at least 25% of opinions rendered to outside agencies[.]" (Am. Compl. ¶ 35 (internal quotation marks and citation omitted).) A memorandum from former Acting Assistant Attorney General David Barron expounds upon the OLC's established role in resolving such conflicts; among that agency's many responsibilities, it is apparently "most likely to be necessary" for the OLC to write a formal written opinion "when the legal question is the subject of a concrete and ongoing [inter-agency] dispute[.]" (*Id.* (quoting Best Practices Memo at 2 (internal quotation marks omitted)).) Thus, CfA alleges that OLC opinions adjudicating inter-agency disputes "constitute both 'final opinions . . . made in the adjudication of cases'" and "statements of policy and interpretations which have been adopted by the agency" (*see id.* ¶ 38 (quoting 5 U.S.C. § 552(a)(2)(A)–(B)), and thus must be affirmatively disclosed to the public. For the following reasons, this Court finds that allegation sufficiently plausible to survive OLC's motion to dismiss.

>   a.   *OLC Opinions That Resolve Disputes Between Agencies Are Plausibly "Final Opinions . . . Made In the Adjudication Of Cases"*

First of all, given the amended complaint's allegations, OLC opinions that resolve inter-agency disputes are plausibly characterized as "final opinions[.]" 5 U.S.C. § 552(a)(2)(A). It is indisputable that OLC writes formal opinions (*see* Best Practices

Memo at 1), and CfA's amended complaint describes OLC's role as the ultimate, authoritative adjudicator of disputes between different entities within the executive branch, such that the opinions that OLC issues in this context are plausibly final (*see* Am. Compl. ¶ 35).  The plausibility of this contention is based, in part, on Article II's vesting of the "executive Power" in one President, U.S. Const. art. II, § 1, cl. 1, and OLC's alleged position as the presidential appointee that serves as "a neutral arbiter to resolve the differing stances" of two agencies, *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 92 (D.C. Cir. 1986).  The formal, written OLC opinions that resolve such inter-agency disputes also plausibly qualify as "final opinions" insofar as they constitute the executive branch's self-professed "final word on the controlling law[.]"  (Best Practices Memo at 2.)  Indeed, there is no indication, at this stage, that such OLC opinions are only *tentative*, as would be the case if OLC's opinions must later be affirmed or reversed by a higher dispute resolution authority within the executive branch.  (*Cf. id.* at 4 (explaining that OLC issues an opinion "only if" OLC receives "an agreement that [the client agency] will conform its conduct to [OLC's] conclusion").)  Accordingly, it is at least plausible that those OLC opinions that resolve inter-agency disputes qualify as "final opinions" within the meaning of the FOIA's reading-room provision.

Such OLC opinions are also plausibly issued in the context of an "adjudication[.]"  5 U.S.C. § 552(a)(2)(A).  The Best Practices Memo indicates that, before accepting a request for an opinion concerning a dispute between agencies, OLC typically requires each side to submit "a detailed memorandum setting forth the agency's own analysis of the question[,]" and OLC further requests that "the agencies

on each side of a dispute [] share their memoranda with the other side . . . so that [OLC] may have the benefit of reply comments, when necessary." (Best Practices Memo at 4.) OLC renders its decisions partly based on this briefing, and it may even "solicit the views of other agencies not directly involved in the opinion request that have subject-matter expertise or a special interest in the question presented." (*Id.*) Furthermore, the OLC's decisions derive from that agency's duty to "consider fully and address impartially the points raised on both sides" (*id.* at 5)*,* which means that its process for resolving such disputes is adjudicative in nature, such that it is at least plausible that opinions rendered in this context fall within the scope of the plain meaning of section 552(a)(2)(A). *See, e.g.*, *Adjudication*, Black's Law Dictionary (11th ed. 2019) ("Adjudication is the effort to identify the rights of the contending parties now by identifying what were, in law, the rights and wrongs, or validity or invalidity, of their actions and transactions when entered upon and done." (cleaned up)); *see also* 5 U.S.C. §§ 551(6)–(7) (defining "adjudication" as the "agency process for the formulation of an order[,]" which is "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making").

Finally, this Court finds that OLC's resolution of an inter-agency dispute concerning a question of law can plausibly be characterized as a "case[]" for section 552(a)(2)(A) purposes. OLC's insistence that the statute's reference to "cases" can only mean "adversarial disputes involving private parties" (*see* Def.s' Mot. at 22) is contrary to both ordinary practice and the common understanding of that term. *See, e.g.*, *S.E.C. v. F.L.R.A.*, 568 F.3d 990 (D.C. Cir. 2009) (adjudicating a dispute between

two independent agencies); *see also McGahn*, 968 F.3d at 774 (rejecting the view that there is an Article III case or controversy "only when an individual right is implicated").  And, as explained previously in Section IV.B.1, nothing in the text or legislative history of section 552(a)(2)(A) suggests that Congress meant to require affirmative disclosure of only final opinions that are rendered in the context of an agency's adjudication of disputes that involve private parties.

The fact that OLC opinions that resolve inter-agency disputes "do not finally dispose of any agency action" (Def.'s Mot. at 24) is also entirely beside the point.  The reading-room provision does not predicate affirmative disclosure on whether the agency's "final opinions . . . made in the adjudication of cases" have a discernable policy impact.  5 U.S.C. § 552(a)(2)(A).  Regardless, where two disputing agencies submit their disagreement to OLC for resolution consistent with Executive Order 12,146, it is at least plausible that OLC is "speak[ing] authoritatively" with respect to the agencies' legal dispute, *EFF*, 739 F.3d at 9, and as a result, OLC's resolution of that dispute plausibly qualifies as a final opinion made in the adjudication of a case within the meaning of section 552(a)(2)(A) of the FOIA.

   b.  *OLC Opinions Resolving Disputes Between Agencies Plausibly Qualify As "Statements Of Policy And Interpretations" That Are Adopted By OLC's Client Agencies*

OLC opinions arising out of inter-agency disputes also plausibly satisfy section 552(a)(2)(B), which requires affirmative disclosure of "statements of policy and interpretations" that have been "adopted" by the agencies to which they were addressed. 5 U.S.C. § 552(a)(2)(B); *see also CREW II*, 922 F.3d at 486.  Once disputing agencies submit their legal disagreement to OLC, either because they have no other way of resolving their dispute or because they choose to do so pursuant to Executive Order

12,146, it is plausible that the OLC opinion that results from the resolution of an inter-agency disagreement is a statement of policy and/or interpretation adopted by the client agencies *ex ante*.  (*See* Pl.'s Opp'n at 38–39.)  This is because, according to CfA's amended complaint, OLC issues an opinion "only if the OLC has received in writing from that agency an agreement that it will conform its conduct to the OLC's conclusion" (Am. Compl. ¶ 3 (quoting Best Practices Memo at 4) (cleaned up)), and this arrangement suggests that the submission of an inter-agency dispute to OLC pursuant to Executive Order 12,146 is plausibly akin to arbitration within the executive branch: the agencies that resort to OLC as "a neutral arbiter to resolve the[ir] differing stances[,]" *Randolph-Sheppard*, 795 F.2d at 92, accept at the outset that OLC's resolution of their dispute will become the governing interpretation of that legal issue.

Consequently, CfA's allegations are significantly different from the circumstances presented in *EFF*.  In that case, the D.C. Circuit considered whether an OLC opinion had to be disclosed as the working law of the FBI, where the FBI had solicited OLC's opinion regarding whether and to what extent that agency had the legal authority to request certain telephone records from service providers.  *See* 739 F.3d at 4–5, 8.  In holding that OLC's legal opinion did *not* constitute the working law of the FBI, and was thus subject to withholding pursuant to Exemption 5's deliberative-process privilege, the D.C. Circuit emphasized that OLC could not "authoritatively state or determine the agency's policy" with respect to the subject upon which OLC opined, *id.* at 8, and therefore that "the OLC Opinion could not be the 'working law' of the FBI unless the FBI 'adopted' what OLC offered[,]" *id.* at 9.  Not so in the instant case; here, CfA plausibly alleges that, by virtue of a dispute-resolution system in which agencies

submit contested legal issues to OLC for resolution, OLC *does* "speak with authority" concerning those particular policies or legal interpretations, *id.*, and that such disputing agencies seek an authoritative settlement of their own interpretations when they turn to OLC for an adjudication of their conflicting positions.

Put another way, CfA's amended complaint plausibly alleges that OLC essentially serves as an authoritative arbiter of legal disputes that are submitted to it in this particular context, which is quite unlike the circumstance in which a single agency elects to solicit OLC's views as the first step in an anticipated policy-making process. Thus, whether or not the "agencies do something with [OLC's] predecisional legal advice" (Hr'g Tr., ECF No. 33, at 34:5–6), is largely irrelevant; OLC's opinion has *already* done the work of authoritatively resolving a dispute over a contested legal issue under circumstances in which it is plausible that the agencies submitted the dispute for resolution simply and solely for that purpose and with the understanding that OLC's determination would provide the governing interpretation moving forward.  And, indeed, this Court finds it is entirely plausible that, once OLC settles a dispute among two or more agencies over a question of law, the client agencies that have submitted that dispute to OLC for resolution can be deemed to have "adopted" OLC's interpretation with respect to the matter that prompted their request for OLC's views within the meaning of section 552(a)(2)(B).

In sum, this Court concludes that CfA has stated a plausible claim that OLC opinions that resolve inter-agency disputes must be affirmatively disclosed under section 552(a)(2) of the FOIA, either because these types of OLC opinions are final opinions made in the adjudication of cases or because these types of OLC opinions

provide statements of policy and interpretations that have been adopted *ex ante* by the OLC's client agencies within the meaning of the FOIA's reading-room provision.

    2.  <u>The Three Other Categories Of OLC Opinions That CfA Identifies In Its Amended Complaint Are Not Plausibly Subject To Affirmative Disclosure Under Section 552(a)(2)</u>

In this Court's view, none of the three remaining categories of OLC opinions that appear in CfA's amended complaint—(a) opinions interpreting non-discretionary legal obligations; (b) opinions determining that particular statutes are unconstitutional; and (c) opinions adjudicating or determining private rights (*see* Am. Compl. ¶¶ 41–49)— plausibly qualifies as "final opinions . . . made in the adjudication of [such] cases[,]" or "statements of policy and interpretations which have been adopted by the agency[,]" 5 U.S.C. § 552(a)(2)(A)–(B), and therefore none is subject to affirmative disclosure under the FOIA.  To understand why this is so, it important to clarify exactly what CfA alleges concerning each of these categories of OLC opinions.

With respect to the first category, according to the amended complaint, OLC "issues binding interpretations of statutes and other authorities that impose non-discretionary legal obligations on federal agencies."  (Am. Compl. ¶ 41.)  One of the examples that CfA points to in this regard is a 2007 OLC opinion that "address[es] whether the Defense of Marriage Act affected the obligation of the Social Security Administration to provide 'child's insurance benefits' to children of disabled parents in same-sex unions."  (*Id.* ¶ 42 (referencing *Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act*, 31 Op. O.L.C. 243 (Oct. 16, 2007)).)  OLC's 2007 opinion allegedly "determined that the Defense of

Marriage Act did not interfere with the Administration's legal obligation to provide social security benefits" (*id.*), and, according to CfA, this OLC opinion qualifies for affirmative disclosure because (1) it "had the effect of deciding the Social Security Administration's policies and the legal entitlement to social security benefits of the children of same-sex couples" (*id.*; *see also id.* at ¶ 41 (asserting that OLC opinions such as this one "have the effect of directly determining an agency's policies and practices, because the agency is under a non-discretionary obligation to comply with the authority at issue, and because the OLC's interpretation of that authority is binding on the agency")), and (2) it "adjudicated the entitlement to social security benefits of a specific child" (*id.* at ¶ 42).

However, there is no allegation in the amended complaint that any particular regulatory or statutory provision actually bestows upon OLC the authority to adjudicate the underlying dispute, let alone issue a final opinion concerning whether a particular child is or is not entitled to benefits.  Rather, the 2007 OLC opinion simply determined that "[t]he Defense of Marriage Act would not prevent the non-biological child of a partner in a Vermont civil union from receiving child's insurance benefits under the Social Security Act."  31 Op. O.L.C. at 243.  And while the underlying claim for social security benefits that prompted the Social Security Administration ("SSA") to turn to OLC for advice plausibly is most likely a "case" within the meaning of the reading-room provision, *see, e.g.*, *Ely v. Saul*, No. 18-cv-0557, 2020 WL 2744138, at *1–2 (D. Ariz. May 27, 2020) (adjudicating a case concerning a claim for spousal benefits brought by a decedent's same-sex spouse), it is the SSA—not OLC—that has discretion to adjudicate such matters, *see* 42 U.S.C. § 416(h)(2); all that OLC can do, when its

advice on a particular legal interpretation is sought, is opine over how that agency might resolve that particular legal issue within the broader case that the SSA has been tasked with adjudicating.

Moreover, and importantly, nothing in CfA's amended complaint gives rise to a reasonable inference that this first category of OLC opinions *necessarily* announces the client agency's working law from the moment the opinion is issued.  Much like the opinion that OLC rendered to the FBI in *EFF*—where OLC could not speak with authority as to the FBI's policies—the SSA needed to adopt OLC's legal interpretation by acting upon it in the context of its adjudication or policy development in order for that opinion to be plausibly considered the SSA's working law, *see EFF*, 739 F.3d at 9—or, at the very least, CfA's pleading must allege circumstances that suggest that the SSA was constrained with respect to any subsequent decision to adopt and implement OLC's advice, such as a plausible *ex ante* decision to accept whatever OLC decides when the agency solicits OLC's interpretation.  Instead, CfA's allegations amount to little more than the assertion that this category of OLC opinions is "binding" (*see* Am. Compl. ¶ 41), and it is well established that *that* categorization is insufficient to support a plausible claim that such opinions are the working law of the agency subject to disclosure under section 552(a)(2)(B).  *See EFF*, 739 F.3d at 9; *see also CREW II*, 922 F.3d at 488–89.

Similar pleading flaws are evident with respect to CfA's allegations concerning OLC opinions that "determine that a congressional enactment is unconstitutional[.]" (Am. Compl. ¶ 45 (referring to *Constitutionality of the Direct Reporting Requirement in Section 802(e)(l) of the Implementing Recommendations of the 9/11 Commission Act of*

*2007*, 32 Op. O.L.C. 27 (Jan. 29, 2008); *see also id.* (alleging that OLC held that "certain reports of the Department of Homeland Security's Chief Privacy Officer be sent directly to Congress [] would be unconstitutional if applied to restrict the president's review of the reports")).)  In this regard, CfA alleges that OLC's written opinions "have the unique effect of freeing agencies from congressional commands, and of essentially editing the text of the U.S. Code itself[,]" and, thus, they are "the OLC's purest expressions of policy, akin to legislative repeals or judicial invalidations of the law." (Pl.'s Opp'n at 45.)  But CfA neither identifies circumstances that plausibly suggest that such opinions, however policy-infused, are "made in the adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A), nor does CfA allege any facts that support a reasonable inference that such OLC opinions are automatically "adopted" by the agency that solicited them for the purpose of section 552(a)(2)(B).  And, indeed, *EFF* suggests that, even when OLC addresses the constitutionality of a legislative command, its opinions merely "describe[] the legal parameters of what the [client agency] is *permitted* to do," which is different from "stat[ing] or determin[ing] the [client agency]'s policy." *EFF*, 739 F.3d at 10 (emphasis in original).

To the extent that CfA is suggesting that OLC opinions that declare an act of Congress unconstitutional are an expression of OLC's *own* policy—separate and apart from the client agency that requested OLC's opinion (*cf.* Pl.'s Opp'n at 46–47 (asserting that "effectively invalidating congressional enactments determine[s] policy at that point in time, even if an agency later adopts a related policy"))—CfA fails to provide any allegations or arguments that could plausibly distinguish OLC legal opinions that pertain to the constitutionality of a statute from any other legal conclusion

that that agency makes.  In either case, OLC is conceivably setting forth its own policy concerning what the law is or what it requires and, yet, such advice only qualifies as working law for FOIA purposes when it has been adopted by the client agency or is, in some way, authoritatively stating that agency's policy and/or interpretation.  *See EFF*, 739 F.3d at 9; *CREW II*, 922 F.3d at 489–90.

CfA's allegations concerning OLC opinions that "directly or indirectly determine private rights" (Am. Compl. ¶ 47) fare no better.  The amended complaint lists various examples of OLC opinions that concern "the availability of monetary relief for the violation of an agreement settling discrimination claims, the availability of back wages to redress improperly withheld pay, the entitlement to service credit under a federal retirement and disability plan, and the entitlement to social security benefits for the children of same-sex couples" (*id.* ¶ 48), and it alleges that all of these pronouncements by OLC are "similar in effect to administrative or judicial decisions concerning private rights" because "they define, at least in the first instance, the rights and liabilities of private individuals vis-à-vis the government" (*id.* ¶ 47; *see also id.* ¶ 48 (characterizing these kinds of OLC opinions as "decid[ing] the rights of classes of individuals as well as the rights of specific individuals whose claims, entitlements, or benefits the OLC was addressing").)  But, here again, the amended complaint does not allege that OLC has the *authority* to "adjudicat[e]" the rights of the private individuals whom OLC's client agencies regulate.  5 U.S.C. § 552(a)(2)(A).  And there are no facts that support any inference that OLC *controls* its client agencies' own policy-related determinations, such that OLC opinions concerning the rights of individuals necessarily qualify as pronouncements of the client agency's own policies and interpretations with respect to

that agency's adjudication of private rights.  *Id.* § 552(a)(2)(B).  At most, such OLC

opinions are plausibly conceived of as "binding" and "controlling" statements of

relevant law that the client agency *may* adopt and apply to a particular case adjudicating

private rights, *EFF*, 739 F.3d at 9; however, as explained above, unless and until that

adoption occurs, this category of OLC opinions is not plausibly within the scope of

section 552(a)(2)(B) of the FOIA in light of *EFF*.

CfA's arguments to the contrary are unpersuasive.  CfA's view is that "OLC

opinions in this category conclusively resolve discrete legal questions that have the

effect of resolving an agency's adjudication of private rights[,]" and thus resemble

instances where "a federal court adjudicating private rights certifies a question of law to

a state supreme court," because, "[w]hile the federal court ultimately issues the

judgment in the case, the state court's interpretation of law is an essential component of

that judgment."  (Pl.'s Opp'n at 43.)  This certification analogy misses the mark for at

least two reasons.  First, even if CfA's construct is accepted, it is indisputably the

federal court (*i.e.*, the entity with jurisdiction over the underlying matter) that issues the

final opinion adjudicating the case, not the state court whose opinion was solicited;

thus, it would be the client agency (not OLC) that would have the affirmative disclosure

obligation under section 552(a)(2)(A).  Second, unlike state courts that have ultimate

authority over certified questions of state law, CfA does not allege that any provision of

law makes *OLC* the entity that conclusively determines the client agency's own

interpretation regarding applicable law in a dispute concerning the allocation of private

rights.  In other words, there is no allegation in the amended complaint—short of the

fact that OLC opinions are generally binding and controlling—that suggests that OLC

36

opinions concerning private rights actually and indisputably establish the client agency's policies or legal interpretations such that those OLC opinions may plausibly be subject to the FOIA's reading-room requirement.

In this regard, CfA would apparently have this Court *assume* that, even in cases where the client agency "ha[s] primary responsibility for adjudicating private rights," the agency's request for OLC's opinion on the matter is, in effect, the invocation of "a higher authority for an authoritative determination of the scope of those rights" such that "the legal determination issued in response to the request constitute[s] the agency's final legal position with respect to the private rights of a class of individuals[.]"  (Pl.'s Opp'n at 43–44.)  But courts need not accept such legal conclusions when evaluating a motion to dismiss under Rule 12(b)(6), *see Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994), and the plain holding of the D.C. Circuit in *EFF* belies CfA's assumption, *see EFF*, 739 F.3d at 9 (concluding that, notwithstanding the fact that the FBI sought OLC's legal advice, "the OLC Opinion could not be the 'working law' of the FBI unless the FBI 'adopted' what OLC offered" or if OLC could "speak with authority on the FBI's policy").  CfA has also failed to provide any precedents that adopt its "higher authority" characterization, given that the two D.C. Circuit cases upon which it relies involved an agency's invocation of a higher authority *within the agency itself.  See Tax Analysts v. I.R.S.*, 117 F.3d 607, 617 (D.C. Cir. 1997) (holding that the FOIA's Exemption 5 did not apply to legal memoranda that the IRS's Office of Chief Counsel had distributed to the agency's field offices, on the ground that the memos amounted to "considered statements of the agency's legal position"); *Tax Analysts v. I.R.S.*, 294 F.3d 71, 81 (D.C. Cir. 2002) (holding that memoranda from the IRS's Office

of Chief Counsel did not qualify for Exemption 5 because the fact that they traveled "horizontally" to individual agency offices indicated that those statements actually represented the agency's "final legal position" on various matters).

*   *   *

In sum, CfA has failed to state a plausible claim that OLC opinions that (a) interpret non-discretionary legal obligations, (b) announce the unconstitutionality of particular statutes, or (c) make pronouncements that are applicable to the adjudication of private rights are subject to affirmative disclosure under the FOIA's reading-room provision.  Unlike the allegations concerning OLC opinions that resolve inter-agency disputes, CfA's amended complaint does not allege that client agencies seek OLC's advice with respect to these categories of opinions pursuant to some presidential or congressional mandate, and it does not allege sufficient facts—beyond the general binding and controlling nature of OLC opinions—that could make it plausible that these OLC opinions necessarily amount to either "final opinions . . . made in the adjudication of cases[,]" or "statements of policy and interpretations which have been adopted by the agency" for the purpose of section 552(a)(2).  5 U.S.C. § 552(a)(2)(A)–(B).

## V.   CONCLUSION

Over the span of its prior Memorandum Opinion and the instant one, this Court has now firmly rejected the parties' polarized propositions that either *all* of OLC's opinions are subject to affirmative disclosure under the FOIA's reading-room provision, or *none* of them is required to be made automatically available per that statute.  Instead, the Court concludes that one of the ascertainable sets of records that CfA has now identified plausibly qualifies as "final opinions . . . made in the adjudication of

cases[,]" 5 U.S.C. § 552(a)(2)(A), or "statements of policy and interpretations which have been adopted by the agency[,]" *id.* § 552(a)(2)(B): OLC opinions that adjudicate inter-agency disputes.

Notably, at this juncture, the Court's conclusion is based simply and solely on the amended complaint's allegations, and it might eventually determine, in the context of summary judgment, that OLC opinions resolving inter-agency disputes are *not* "statements of policy and interpretations" adopted by those agencies *ex ante*, or that "'adjudications' between two parts of the executive branch are not the kind of 'adjudication of cases' to which that section refers." *CREW II*, 922 F.3d at 491 (Pillard, J., dissenting).  But, for now, the Court finds that CfA's amended complaint contains a plausible allegation that OLC is required to make its opinions that resolve inter-agency disputes available for "public inspection" under section 552(a)(2) of the FOIA, for the reasons explained above, and that the other categories of OLC opinions identified in the amended complaint do not plausibly violate the FOIA's reading-room provision. Therefore, as set forth in the accompanying Order, OLC's motion to dismiss is **GRANTED IN PART and DENIED IN PART**.

DATE:  September 11, 2020

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge