**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAMPAIGN FOR ACCOUNTABILITY, <br><br>        Plaintiff, <br><br>    v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, <br><br>        Defendant. | No. 1:16-cv-1068 (Calendar Committee) |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

I.    Legal Framework ...................................................................................................... 3

    A.    The Freedom of Information Act ...................................................................... 3

    B.    The Office of Legal Counsel ............................................................................ 4

II.    Factual and Procedural History ................................................................................ 6

    A.    Plaintiff's Request to OLC ............................................................................... 6

    B.    Plaintiff's Original Complaint ......................................................................... 7

    C.    Plaintiff's Amended Complaint ....................................................................... 9

STANDARD OF REVIEW ................................................................................................ 12

ARGUMENT ..................................................................................................................... 13

I.    OLC Opinions Resolving Interagency Disputes are Predecisional Legal Advice Documents. ............................................................................................................. 14

II.    Interpreting Section 552(a) to Apply to OLC Opinions Addressing Interagency Disputes Would Undermine Important Practices that Help Ensure That Agencies Comply with the Rule of Law .................................................................................. 25

III.    The Indexing Claim Should Be Dismissed. ........................................................... 27

CONCLUSION .................................................................................................................. 28

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................................... 12, 13

*Bannercraft Clothing Co. v. Renegotiation Bd.*,
    466 F.2d 345 (D.C. Cir. 1972), *rev'd on other grounds*, 415 U.S. 1 (1974) ........................... 16

*Brayton v. Office of U.S. Trade Representative*,
    641 F.3d 521 (D.C. Cir. 2011) .................................................................................................... 12

*Chevron U.S.A. Inc. v Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) .................................................................................................... 21

*Citizens for Responsibility & Ethics in Wash. (CREW) v. Dep't of Justice*,
    846 F.3d 1235 (D.C. Cir. 2017) .................................................................................................... 5

*Coastal States Gas Corp. v. Dep't of Energy*,
    617 F.2d 854 (D.C. Cir. 1980) .................................................................................................... 17

*Common Cause v. Internal Revenue Serv.*,
    646 F.2d 656 (D.C. Cir. 1981) .................................................................................................... 18

*Diamond v. Atwood*,
    43 F.3d 1538 (D.C. Cir. 1995), *appeal after remand*, 132 F.3d 1481 (D.C. Cir. 1997) .......... 12

*Electronic Frontier Found. v. U.S. Dep't of Justice*,
    739 F.3d 1 (D.C. Cir. 2014) .................................................................................................... *passim*

*Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*,
    443 U.S. 340 (1979) .................................................................................................... 17

*Jeffries v. Barr*,
    965 F.3d 843 (D.C. Cir. 2020) .................................................................................................... 12, 13

*New York Times Co. v. U.S. Dep't of Justice*,
    806 F.3d 682 (2d Cir. 2015) .................................................................................................... 17-18

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) .................................................................................................... 3, 17, 18

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
    421 U.S. 168 (1975) .................................................................................................... 19

*Rockwell Int'l Corp. v. U.S. Dep't of Justice*,
    235 F.3d 598 (D.C. Cir. 2001) .................................................................................................... 17

*Schlefer v. United States,*
   702 F.2d 233 (D.C. Cir. 1983) ................................................................. 17

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,*
   489 U.S. 749 (1989) ........................................................................... 16

*United States v. Weber Aircraft Corp.,*
   465 U.S. 792 (1984) ............................................................................. 4

*Viet. Veterans of Am. v. Dep't of Navy,*
   876 F.2d 164 (D.C. Cir. 1989) ................................................................. 19

**ATTORNEY GENERAL OPINIONS**

*Office and Duties of Attorney General,*
   6 Op. Att'y Gen. 326 (1854) ................................................................... 26

*Opinions of Attorneys General and Decisions of Auditors,*
   5 Op. Att'y Gen. 97 (1849) .................................................................... 26

**STATUTES**

5 U.S.C. § 552 ............................................................................... *passim*

28 U.S.C. §§ 511-513 .......................................................................... 5

**FEDERAL RULES**

Fed. R. Civ. P. 56 ........................................................................... 12

**REGULATIONS**

28 C.F.R. § 0.25 ............................................................................. 5

**OTHER AUTHORITIES**

*Applicability of Government Corporation Control Act to "Gain Sharing Benefit" Agreement,*
   24 Op. O.L.C. 212 (2000) ................................................................ 22, 23

*Applicability of the Cargo Preference Act to the Transportation of Alaskan Oil to the
Strategic Petroleum Reserve,*
   7 Op. O.L.C 139 (1983) .................................................................. 20, 21

Clarifying and Protecting the Right of the Public to Information,
   H.R. Rep. No. 89-1497 (1966) .............................................................. 16

Easterbrook, *Privacy and the Optimal Extent of Disclosure Under the Freedom of
Information Act,*
   9 J. Legal Studies 775 (1980) ........................................................... 16-17

Kenneth C. Davis, *The Information Act: A Preliminary Analysis*,
     34 U. Chi. L. Rev. 761 (1967) .................................................................................. 17

Office of Legal Counsel, Opinions, Dep't of Justice (June 5, 2016),
     http://www.justice.gov/olc/opinions-main .................................................................. 6

Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the
     Office of Legal Counsel*,
     52 Admin. L. Rev. 1303 (2000) ......................................................................... 26, 27

*Scope of the Environmental Protection Agency's Discretion to Adopt Any One of Three
     Alternative Interpretations of the Mitchell-Conte Amendment to the Clean Air Act*,
     13 Op. O.L.C. 105 (1989) ................................................................................. 21, 24

*Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a
     Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social
     Security Act*,
     31 Op. O.L.C. 243 (2007) ...................................................................................... 22

**INTRODUCTION**

Plaintiff Campaign for Accountability (CFA) asks this Court to declare that OLC has an affirmative duty to publish every one of its opinions that addresses an interagency legal dispute. This is an extraordinary request; courts, including the D.C. Circuit, have often held that particular OLC legal advice documents are privileged and need not be disclosed, which necessarily precludes a categorical finding like the one CFA seeks.  This Court previously determined that CFA's claim was implausible as to three of the four categories of OLC opinions identified in the Amended Complaint.  Now, with the benefit of a factual record, the Court should determine that CFA's claim also fails as to this final category of interagency dispute opinions.

The Court should grant summary judgment to the Department of Justice.  As the Court has previously recognized, FOIA's affirmative-disclosure requirement applies to an entire *category* of documents only if the documents "necessarily amount to either 'final opinions . . . made in the adjudication of cases[,]' or 'statements of policy and interpretations which have been adopted by the agency.'" Mem. Opinion, at 38 (ECF No. 40) ("Ren. MTD Op.") (quoting 5 U.S.C. § 552(a)(2)(A)-(B)).  OLC opinions that address interagency disputes are not subject to such a categorical characterization.  These interagency opinions, like OLC opinions generally, do not directly adjudicate the rights of private individuals, which represents the central focus of § 552(a)(2).  Instead of "adjudicat[ing] … cases," OLC's interagency opinions address disputes among Executive Branch agencies on legal questions.  Moreover, as previously-published examples make clear, these interagency opinions often leave the agencies with a range of policy options going forward.  While an OLC opinion could have a more direct effect on private individuals if it were adopted by the agency involved in a way that determined its prospective policy, such adoption does not occur automatically upon receipt of the OLC opinion.  And even

when such adoption does occur, the publication requirement under § 552(a)(2) would apply to the agency adopting the opinion, not to OLC.

To the extent there is any doubt or ambiguity about the scope of § 552(a)(2), CFA's claim should be rejected because it would require the disclosure of confidential legal advice (from OLC and general counsels and other legal advisers from elsewhere in the Executive Branch) even in cases where doing so would deter client agencies from seeking that legal advice. Memorandum for Attorneys of the Office, from David J. Barron, Acting Assistant Att'y Gen., Office of Legal Counsel, Re: *Best Practices for OLC Legal Advice and Written Opinions* 6 (July 16, 2010) (ECF No. 22-4) ("Best Practices Memo"). For example, assume that an agency requests advice regarding whether a proposed course of action is legal, OLC thereafter concludes that it is legally impermissible, and the agency accordingly does not engage in that action. If the reading room provision required such legal advice to be published—which would of course reveal the fact that the agency considered what turned out to be an impermissible course of conduct—agencies "would be reluctant to seek OLC advice in the early stages of policy formulation—a result that would undermine rule-of-law interests." Best Practices Memo at 6. Congress could not have intended that result. Indeed, in a number of important cases, the D.C. Circuit has interpreted FOIA to protect the confidentiality of Executive Branch legal advice.

In sum, undisputed facts, D.C. Circuit case law, and strong policy concerns establish that OLC opinions that address interagency disputes are not categorically subject to FOIA's reading room requirements and the Court should therefore enter summary judgment in favor of the Department of Justice.

## BACKGROUND

### I.  Legal Framework

#### A.  The Freedom of Information Act

Pursuant to the so-called "reading room" provisions of the Freedom of Information Act, government agencies are required to affirmatively publish certain categories of records.  *See* 5 U.S.C. § 552(a)(1), (2).  As relevant here, those provisions require that:

> Each agency . . . shall make available for public inspection . . . (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases; [and] (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register[.]

*Id.* § 552(a)(2).

For records that have not been affirmatively disclosed, FOIA permits individuals to submit requests to agencies for the disclosure of specific records:

> Except with respect to the records made available under paragraphs (1) and (2) of this subsection . . . each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

*Id.* § 552(a)(3)(A).

Not all records, however, need to be disclosed under FOIA.  The Act contains nine specific exemptions, *id.* § 552(b), which presumptively allows the agency to withhold the information falling within such exemptions.  *See id.* § 552(b).  In light of the language of § 552(b)—"[t]his section does not apply to matters that [fall within an exemption]"—agencies may withhold such exempt information regardless of whether the record falls within the affirmative-disclosure provisions of § 552(a)(2), or was requested by an individual under § 552(a)(3).  *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 160 (1975) (holding that the attorney work-product privilege

applied, and thus the document was exempt regardless of whether it fell within a § 552(a)(2) category).

Here, the most relevant exemption is Exemption 5, 5 U.S.C. § 552(b)(5), which protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]"  This exemption incorporates the privileges traditionally available to the government in civil discovery, such as the deliberative process, attorney-client, and attorney work-product privileges.  *See United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799-801 (1984).

As this Court previously noted, the scope of Exemption 5 "correlates with, and sheds light on, the scope of the FOIA's reading-room provision" because "courts generally should construe Exemption 5 and the reading-room provision such that they do not overlap."  Mem. Opinion at 7 (ECF No. 19) ("MTD Op.").  Because Exemption 5 applies to deliberative material that an agency uses "in the process of working out its policy and determining what its law shall be," whereas the reading-room requirements were enacted "only to require disclosure of documents which have the force and effect of law," Exemption 5 is thus "a kind of mirror image of the reading-room requirement."  *Id.* (citations omitted).  Put another way, "making a determination that an agency can properly withhold a particular record pursuant to the attorney work-product and deliberative-process privileges that Exemption 5 protects means that the record in question is also not subject to automatic disclosure under the FOIA's reading-room provision." Ren. MTD Op. at 5.

### B.  The Office of Legal Counsel

The Office of Legal Counsel (OLC) is a component of the United States Department of Justice charged with providing confidential legal advice within the Executive Branch. Specifically, OLC's responsibilities include "[p]reparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the various agencies of the Government;

and assisting the Attorney General in the performance of his functions as legal adviser to the President and as a member of, and legal adviser to, the Cabinet." 28 C.F.R. § 0.25(a). These functions are vested in the Attorney General by statute, 28 U.S.C. §§ 511-513, and since the 1950s OLC has assisted the Attorney General in their performance. *See* Am. Compl. ¶ 19 (ECF No. 22). "OLC's authority to render advice is, in some sense, nearly as old as the Republic itself." *Citizens for Responsibility & Ethics in Wash. (CREW) v. Dep't of Justice*, 846 F.3d 1235, 1238 (D.C. Cir. 2017) (discussing the Judiciary Act of 1789); *see also* MTD Op. at 8; Am. Compl. ¶¶ 16-19.

As part of its advice-giving function, OLC will sometimes prepare "formal written opinions," and it has developed certain guiding principles for preparing and publishing those opinions. *See* Best Practices Memo at 2-5; *see also* Am. Compl. ¶¶ 21-24. "A written opinion is most likely to be necessary when the legal question is the subject of a concrete and ongoing dispute between two or more executive agencies." Best Practices Memo at 3. As part of those principles, OLC has developed "a longstanding internal process . . . for regular consideration and selection of significant opinions for official publication." *Id.* at 5. In making publication decisions, OLC "operates from the presumption that it should make its significant opinions fully and promptly available to the public"—a presumption that "furthers the interests of Executive Branch transparency, thereby contributing to accountability and effective government, and promoting public confidence in the legality of government action." *Id.* at 5. In some cases, however, "countervailing considerations may lead the Office to conclude that it would be improper or inadvisable to publish an opinion that would otherwise merit publication." *Id.* For example, in some cases "disclosure would reveal classified or other sensitive information relating to national security." *Id.* In others, an agency may "request[] advice regarding a proposed course of action, the Office concludes it is legally impermissible, and the action is therefore not taken." *Id.* at 6.

OLC often does not publish its opinion in such a case because "[i]f OLC routinely published its advice concerning all contemplated actions of uncertain legality, Executive Branch officials would be reluctant to seek OLC advice in the early stages of policy formulation—a result that would undermine rule-of-law interests." *Id.*

Consistent with OLC's publication process, "OLC has published over 1,300 opinions, dating from 1934 to the present," MTD Op. at 9 (citing Office of Legal Counsel, Opinions, Dep't of Justice (June 5, 2016) http://www.justice.gov/olc/opinions-main), including some that addressed interagency disputes. OLC does not separately store or identify opinions addressing interagency disputes in its records. Stip. ¶ 12.

## II.    Factual and Procedural History

### A.  Plaintiff's Request to OLC

On March 22, 2016, CFA sent a letter to the then-head of OLC, Principal Deputy Assistant Attorney General Karl Thompson, requesting that OLC "comply immediately with its obligations under 5 U.S.C. § 552(a)(2) to make available for public inspection and copying on an ongoing basis all unpublished OLC opinions that provide controlling legal advice to executive branch agencies and a general index of all such opinions." Am. Compl. ¶ 50; *see also* Letter from Weismann to Thompson (ECF No. 22-2). CFA asserted that "OLC opinions . . . function as binding law on the executive branch" and therefore "must be made publicly available as either 'final opinions . . . made in the adjudication of cases' or 'statements of policy and interpretations which have been adopted by the agency[.]'" Weismann Letter at 3 (quoting 5 U.S.C. § 552(a)(2)(A), (B)).

OLC responded to CFA's letter on May 26, 2016. Am. Compl. ¶ 51; *see also* Letter from Bies to Weismann (ECF No. 22-3). The response explained that "OLC does not have policymaking authority, nor does it enforce laws against or adjudicate the rights of private

individuals," but instead "OLC provides confidential legal advice within the Executive Branch." Bies Letter at 1.   "As such, OLC's advice is ordinarily covered by the attorney-client and deliberative process privileges, and is therefore exempt from mandatory disclosure under the FOIA[.]"   *Id.* (citing 5 U.S.C. § 552(b)(5)).   Additionally, the Bies Letter stated that "as confidential and pre-decisional legal advice, our opinions generally constitute neither 'final opinions . . . made in the adjudication of cases' nor 'statements of policy and interpretations which have been adopted by the agency.'"   *Id.* (quoting 5 U.S.C. § 552(a)(2)(A), (B)).

The Bies Letter went on to explain that, notwithstanding the fact that OLC opinions are generally exempt from FOIA, OLC nonetheless "make[s] an individualized, case-by-case determination with respect to whether each opinion of our Office is appropriate for publication." *Id.* (citing Best Practices Memo at 5-6).   When OLC receives a FOIA request and an OLC opinion is responsive to that request, OLC similarly "consider[s] whether to waive applicable privileges and release the [opinion] as a matter of administrative discretion."  *Id.* at 2 (citing Best Practices Memo at 6).   OLC's letter made clear that if at any point OLC concluded that an advice document needed to be disclosed under § 552(a)(2), it would do so:   "If OLC were to conclude during the publication review process, the FOIA response process, or at any other time that the Department had an obligation under 5 U.S.C. § 552(a)(2) to make a particular opinion publicly available, we would do so at that time."  *Id.*

### B.  Plaintiff's Original Complaint

Shortly after receiving OLC's response, CFA filed its initial Complaint containing two claims.   The primary claim was that OLC had failed to comply with the affirmative-disclosure provisions of § 552(a)(2), in particular by failing to publish "those written opinions issued by OLC that provide controlling advice to executive branch officials and agencies on questions of law, whether formal or informal, those opinions that serve as precedent within OLC and the executive

branch, and those opinions that serve as interpretive guides for the executive branch."  Compl. ¶ 35 (ECF No. 1).  Such opinions, CFA alleged, were within §§ 552(a)(2)(A) and (B) because they are "final opinions made in the adjudication of cases and statements of policy and interpretations that have been adopted by the agency and not published in the Federal Register."  Compl. ¶ 30. The non-disclosure of those opinions allegedly "resulted in the creation of a body of authoritative controlling secret law."  *Id.* ¶ 28.

CFA's second claim was that OLC had failed to index its opinions under 5 U.S.C. § 552(a)(2), which also requires each agency to "maintain and make available for public inspection . . . current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published."  5 U.S.C. § 552(a)(2)(e); *see* Compl. ¶¶ 37-38.

The Government moved to dismiss CFA's Complaint, raising several threshold arguments, and also arguing, as relevant here, that CFA had not plausibly alleged that OLC had failed to disclose advice documents subject to § 552(a)(2).  *See* Mem. in Supp. of Def.'s Mot. to Dismiss at 19-40 (ECF No. 9-1).  In particular, the Government argued that CFA's theory was contrary to the D.C. Circuit's decision in *EFF*, in which the D.C. Circuit held that a formal OLC opinion of the type sought by CFA was properly withheld under the deliberative process privilege, did not represent "working law" of the policymaking agency, and was privileged regardless of its "controlling" nature.  *See Electronic Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 9 (D.C. Cir. 2014).

Following briefing and argument, this Court granted the Government's motion to dismiss. The Court held that "CfA has not identified an ascertainable set of OLC opinions that OLC has withheld from the public and that is also plausibly subject to the FOIA's reading-room

requirement." MTD Op. at 3. In particular, the Court held CFA's claim that the "controlling" and "precedential" nature of OLC opinions required their publication was contrary to the *EFF* decision, which "makes clear that these features of an OLC legal opinion *do not* render it subject to the reading-room requirement[.]" MTD Op. at 29; *see also id.* at 35 ("[A]n OLC opinion does not become the 'working law' of the agency that requested it merely by virtue of the fact that it espouses a 'controlling' legal interpretation[.]"). Thus, CFA had failed to plausibly allege a violation of the reading-room requirements. *See also id.* at 30-36. And because CFA had not plausibly alleged a violation of the reading-room requirements, it likewise had not plausibly alleged a violation of FOIA's indexing requirements. *See id.* at 29-30 n.11.

Despite the Complaint's failure to allege a violation of the reading-room requirements, the Court noted that, at oral argument, CFA had tried to "identify[] two discrete subsets of OLC opinions that, according to CfA, . . . must be made available to the public." *Id.* at 36. Those "delineated categories of records do not appear in CfA's complaint as the basis for CfA's claims," however, and therefore "CfA's oral assertion . . . cannot be the means by which CfA alleges a plausible violation of the reading-room provision." *Id.* The Court thus dismissed the Complaint, but granted CFA leave to file an Amended Complaint to "cure the fatal pleading defect"—*i.e.*, to "add allegations of specific, ascertainable categories of records that CfA believes are subject to the reading-room requirement and that OLC has failed to make publicly available." *Id.* at 37.

### C. Plaintiff's Amended Complaint

Following the Court's decision on the motion to dismiss, CFA filed an Amended Complaint (ECF No. 22). The Amended Complaint states that "[t]his lawsuit concerns only . . . formal written opinions issued to executive branch agencies or to executive branch officials other than the president," Am. Compl. ¶ 33, and in particular it identifies five categories of such formal

opinions that CFA believes "fall within the scope of the affirmative-disclosure provisions of FOIA even under this Court's broad reading of" *EFF*.  *Id.* ¶ 34.  Those five categories are:

    (A)  opinions resolving "interagency disputes";

    (B)  opinions issued to independent agencies;

    (C)  opinions interpreting non-discretionary legal obligations;

    (D)  [o]pinions finding that particular statutes are unconstitutional and that therefore agencies need not comply with them[; and]

    (E)  opinions adjudicating or determining private rights.

*Id.* ¶¶ 35-49.  CFA also identifies five particular OLC opinions; each one, in CFA's view, falls within one of the above categories but had not yet been made public.  *See id.* ¶ 38 n.36; ¶ 40 n.38; ¶ 44 n.41; ¶ 46 n.43; and ¶ 49 n.45.

Following the filing of the Amended Complaint, this Court directed that OLC should construe the Amended Complaint "as a clarification of CfA's March 22, 2016 request for publication of documents under 5 U.S.C. § 552(a)(2)," and further directed OLC to "send Plaintiff a response to that clarification[.]"  Order Granting in Part Def.'s Mot. to Stay Proceedings, at 9 (ECF No. 26).  OLC responded to CFA's request, as clarified by the Amended Complaint, on January 2, 2018.  *See* Letter from Curtis E. Gannon, Principal Deputy Assistant Att'y Gen., Office of Legal Counsel, to Messrs. Abdo and Jaffer, *Re: Campaign for Accountability v. U.S. Dep't of Justice* (Jan. 2, 2018) (ECF No. 27-1) ("OLC Resp. Ltr.").

In that response letter, OLC further explained its role within the Executive Branch, *see id.* at 2-3, and also discussed the five particular categories discussed in the Amended Complaint.  *See id.* at 4-7.  Specifically, OLC made clear that none of the characteristics of those categories "render inapplicable the various privileges that apply to OLC documents providing legal advice," nor do

they "render those documents subject to section 552(a)(2)'s provisions as a categorical or general matter." *Id.* at 4.

Finally, OLC discussed the five specific opinions that CFA's Amended Complaint alleged were being withheld, and noted that, although "[w]e do not believe that section 552(a)(2) requires disclosure of any of the five documents," OLC has nonetheless "determined that two are appropriate for discretionary release, in whole or in part" and therefore OLC provided copies of those advice documents to CFA. *Id.* at 7; *see Payment of Attorney's Fees under the Equal Access to Justice Act*, Mem. to Stephen Colgate, Asst. Att'y Gen., Justice Management Division, Dep't of Justice from Richard Shiffrin, Deputy Asst. Att'y Gen., Office of Legal Counsel (Aug. 25, 1994) at 1-2 (ECF No. 27-2) (cited in Am. Compl. ¶ 44 n.41); *Applicability of 18 U.S.C. § 1913 to the Provision of Official Time to Employee Union Representatives to Lobby Congress on Representational Issues*, Mem. to Charlotte Hardnett, Acting Gen. Counsel, Soc. Sec'y Admin. from Daniel Koffsky, Acting Asst. Att'y Gen., Office of Legal Counsel (Mar. 23, 2001), at 3-6 (ECF No. 27-2) (cited in Am. Compl. ¶ 40 n.38).

Thereafter, the Government moved to dismiss CFA's Amended Complaint, first explaining that OLC legal advice documents are generally exempt from compelled disclosure. *See* Mem. in Supp. of Def.'s Ren. Mot. to Dismiss at 14-25 (ECF No. 29-1). Specifically, the Government identified that the deliberative process and attorney-client privileges protected the documents and explained why OLC does not create "secret law." *Id.* at 20-25. Next, the Government argued that FOIA does not invariably require affirmative disclosure of any of the five categories of opinions identified in the Amended Complaint. *Id.* at 25-37. During briefing, CFA abandoned one of its categories, leaving only four for the Court to consider. Ren. MTD Op. at 2 n.1, 8 n.4.

This Court granted the Government's motion to dismiss in large part.  As to three categories of OLC opinions—those that (a) interpret non-discretionary legal obligations, (b) announce the unconstitutionality of particular statutes, or (c) make pronouncements that are applicable to the adjudication of private rights—the Court found that CFA failed to plausibly allege that OLC had a statutory obligation to affirmatively publish all such opinions. *Id.* at 31.  The Court denied the motion to dismiss as to one category of opinions—those that address interagency disputes— because those opinions may "necessarily amount to either "final opinions . . . made in the adjudication of cases[,]" or "statements of policy and interpretations which have been adopted by the agency" for the purpose of section 552(a)(2)." *Id.* at 38 (quoting 5 U.S.C. § 552(a)(2)).  As to this final category, the Court concluded only that the "amended complaint contains a plausible allegation that OLC is required to make its opinions that resolve inter-agency disputes available for 'public inspection.'"  The Court specifically reserved that "it might eventually determine, in the context of summary judgment, that OLC opinions resolving inter-agency disputes are *not*" covered by the statute.  Ren. MTD Op. at 39.

## STANDARD OF REVIEW

FOIA cases are typically and appropriately resolved on motions for summary judgment. *See Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  As with non-FOIA cases, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995), *appeal after remand*, 132 F.3d 1481 (D.C. Cir. 1997).  A fact is material if it is one "that might affect the outcome of the suit under the governing law." *Jeffries v. Barr*, 965 F.3d 843, 859 (D.C. Cir. 2020) (quotation marks omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute "is

genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quotation marks omitted) (quoting *Anderson*, 477 U.S. at 248).

## ARGUMENT

OLC opinions resolving interagency disputes are not categorically subject to affirmative disclosure under FOIA's reading room requirements. First, these documents are prepared as predecisional legal advice that in many cases are protected from disclosure under FOIA and therefore do not come within § 552(a)(2)'s affirmative-disclosure requirements. *See* Part I, *infra*. Additionally, undisputed facts, including publicly-disclosed OLC advice documents, establish that OLC opinions resolving interagency disputes are not by their nature "final opinions . . . made in the adjudication of cases[,]" and are not, merely by virtue of their issuance, "statements of policy and interpretations which have been adopted by the agency." *See* Part II, *infra*. Instead, these terms refer to agency actions affecting private individuals or an agency's policy choices; they do not refer to OLC's conduct of advising on an issue of law, standing alone. In particular, an agency's "adoption" of OLC advice does not automatically occur; an agency must take further action after receipt of OLC advice in order to "adopt" it. And if an agency were to adopt an OLC opinion as its working law, the reading room obligation to publish would fall on that agency, not OLC. *EFF*, 739 F.3d 1, 9. Finally, to the extent that the scope of § 552(a)(2)'s mandate is ambiguous, the Court should deny CFA's claim in order to protect the strong rule of law values that are served by ensuring that agencies seek and then heed legal advice from OLC and other counsel. *See* Part III, *infra*.[1] Accordingly, the Court should grant summary judgment to the Department of Justice.

---

[1] "Rule of Law values" include those that encourage government decisionmakers to seek candid legal advice about novel and challenging questions. Best Practices Memo at 6.

**I.      OLC Opinions Resolving Interagency Disputes are Predecisional Legal Advice Documents.**

First, this Court should conclude that OLC opinions that address interagency disputes are not categorically subject to affirmative disclosure under FOIA's reading room provisions because the opinions are generally privileged, predecisional legal advice documents protected by FOIA's Exemption 5.   As this Court has recognized, whether a document falls within the affirmative-disclosure requirements can be answered by asking whether the document is protected by the deliberative process privilege, because § 552(a)(2) and the deliberative process privilege are "mirror images of each other."   MTD Op. at 32.   Although these documents can lose their privileged status through subsequent acts of disclosure, adoption, or conversion into an agency's working law, determining whether such acts have occurred requires individualized, fact-based determinations.

1.      The D.C. Circuit's controlling decision in *EFF* confirms that OLC opinions are not categorically covered by FOIA's affirmative-disclosure provisions.   In that case, a requester sought a formal OLC opinion that was prepared for the FBI and the plaintiff argued that the opinion must be disclosed because it represented the agency's effective law and policy.   *See* MTD Op. at 31. The D.C. Circuit squarely rejected this argument.   First, it concluded that "OLC is not authorized to make decisions about the FBI's investigative policy, so the OLC Opinion cannot be an authoritative statement of the agency's policy."   *EFF*, 739 F.3d at 9.   The court also went on to reject the "working law" argument, notwithstanding the "precedential" nature of the OLC opinion:

> EFF argues that the OLC Opinion must be "working law" because it is controlling (insofar as agencies customarily follow OLC advice that they request), precedential, and can be withdrawn. . . That the OLC Opinion bears these indicia of a binding legal decision does not overcome the fact that OLC does not speak with authority on the FBI's policy; therefore, the OLC Opinion could not be the "working law" of the FBI unless the FBI "adopted" what OLC offered. In *Brinton*, we rejected the appellant's claim that memoranda must be released because they constituted the "final opinions" of the Department of State. We explained that while

the privilege does not protect final decisions or authoritative statements on agency policy, the "final opinions" of the Department of State's Legal Adviser, "who has no authority to make final decisions concerning United States policy in the Middle East," are not final decisions of the Department of State. . .  The same is true of the OLC Opinion in this case.

*Id.* at 9-10 (internal citations omitted).  Indeed, in that case, not only was "[t]he FBI … free to decline to adopt the investigative tactics deemed legally permissible in the OLC Opinion," but the agency had, in fact done so:  it "had 'declined, for the time being, to rely on the authority discussed in the OLC Opinion.'"  *Id.* at 10 (quoting IG Report).  *EFF* is therefore a clear example of a situation in which an agency did not "adopt" an OLC opinion.

This controlling decision makes clear that OLC opinions are not automatically "adopted" by the relevant agency and therefore need not be disclosed under § 552(a)(2).  *See* MTD Op. at 34 (describing *EFF* as distinguishing cases where the requested document "reflected the position of *the agency* itself," and instead "specifically h[o]ld[ing] that an OLC opinion does *not* necessarily reflect the adopted policy of the agency that requests it"); *see also* OLC Resp. Ltr. at 2 ("OLC does not purport, and in fact lacks authority, to make policy decisions. OLC's legal advice and analysis may inform the decision-making of executive branch officials on matters of policy, but OLC's legal advice is not itself dispositive with respect to any policy adopted.").  This is so even for opinions resolving interagency disputes, which generally differ from other OLC opinions only in that there are multiple clients with differing views seeking the advice.  Stip. ¶¶ 8-11.

2.    OLC's opinions resolving interagency disputes about the proper interpretation of a law are not "final opinions . . . made in the adjudication of cases" because OLC does not issue any opinions in adversarial disputes involving private parties. (*See* Bies Letter at 1 ("OLC does not . . . enforce laws against or adjudicate the rights of private individuals."); OLC Resp. Ltr. at 4.

As explained previously, § 552(a)(2)(A) is limited to agencies' precedential adjudications of individual rights—not legal disputes between agencies themselves.  *See* Mem. in Support of

Renewed Motion to Dismiss, at 15-17 (ECF No. 29-1) ("Ren. MTD").  This is especially true in the case of opinions resolving interagency disputes, which, by definition, resolve legal disputes between executive branch agencies, not those involving private parties. This limitation is confirmed by the text of § 552(a)(2) itself, which makes clear that the covered documents refer to typical adjudicatory and regulatory contexts involving private individuals, not internal agency documents.  *See* 5 U.S.C. § 552(a)(2) (failure to publish a covered document precludes using the document "as precedent . . . *against a party other than an agency*," *i.e.*, against a private party (emphasis added)); *see also id.* § 552(a)(2)(A) (referring to "final opinions, *including concurring and dissenting opinions, as well as orders*, made in the adjudication of cases" (emphasis added)). A passage from FOIA's House Report likewise makes clear that Congress's primary concern in § 552(a)(2) was with the adjudication of private rights:

> Subsection (b) [referring to § 552(a)(2)] would . . . requir[e] each agency to maintain for public inspection an index of all the documents having precedential significance which would be made available or published under the law. The indexing requirement will *prevent a citizen from losing a controversy with an agency* because of some obscure or hidden order or opinion which the agency knows about but which has been unavailable to the citizen simply because he had no way to discover it.

Clarifying and Protecting the Right of the Public to Information, H.R. Rep. No. 89-1497 at 8 (1966) (emphasis added); *see also Bannercraft Clothing Co. v. Renegotiation Bd.*, 466 F.2d 345, 352 (D.C. Cir. 1972) (quoting legislative history and stating that Congress enacted § 552(a)(2) because it was "troubled by the plight of those forced to litigate with agencies on the basis of secret laws or incomplete information"), *rev'd on other grounds*, 415 U.S. 1 (1974); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989) ("'The act's indexing and reading-room rules indicate that the primary objective is the elimination of secret law.  Under the FOIA an agency must disclose its rules *governing relationships with private parties and its demands on private conduct*.'" (emphasis added, quoting Easterbrook, *Privacy and the Optimal*

16

*Extent of Disclosure Under the Freedom of Information Act*, 9 J. Legal Studies 775, 777 (1980));
MTD Op. at 6 (noting that § 552(a)(2)'s requirements "prevent an agency from subjecting
*members of the public* to a rule that the agency has not publicly announced" (emphasis added)).[2]

The D.C. Circuit's decisions have consistently confirmed this focus on adjudication of
private rights.  *See EFF*, 739 F.3d at 9-10 (rejecting the "working law" line of cases in the context
of an OLC opinion); *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1983) ("A strong
theme of our opinions has been that an agency will not be permitted to develop a body of 'secret
law,' used by it *in the discharge of its regulatory duties and in its dealings with the public*[.]"
(emphasis added)) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C.
Cir. 1980)); *see also Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340,
352-53, 360 n.23 (1979) (policy directives are "intra-agency memorandums" exempt from
§ 552(a)(2) because they "do not establish rules that govern the adjudication of individual rights,
nor do they require particular conduct or forbearance by any member of the public"); *Rockwell
Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 603 (D.C. Cir. 2001) (holding that a report was
not subject to affirmative disclosure because it "sets forth the conclusions of a voluntarily
undertaken internal agency investigation, not a conclusion about agency action (or inaction) *in an
adversarial dispute with another party*" (emphasis added)).  The only other appellate court to take
up the question agreed with the D.C. Circuit.  *See New York Times Co. v. U.S. Dep't of Justice*,

---

[2] The *Sears* decision and its reliance on Professor Davis's article also makes clear the
degree to which § 552(a)(2) is limited to documents involving the adjudication of private rights.
*See Sears*, 421 U.S. at 153; Kenneth C. Davis, *The Information Act: A Preliminary Analysis*, 34
U. Chi. L. Rev. 761, 774 (1967) (discussing the scope of § 552(a)(2) and stating that "[t]he case
law of the agencies has to be available for public inspection" because, as an example, "[i]f a letter
ruling interprets tax law in favor of X, fairness requires that Y who has the same problem should
have opportunity to know the interpretation in X's case").

806 F.3d 682, 687 (2d Cir. 2015) (citing *EFF* and rejecting "the general argument that the legal reasoning in OLC opinions is 'working law'").

Furthermore, OLC opinions resolving interagency disputes generally cannot be considered "final opinions" that "adjudicat[e]" "cases" because they do not finally dispose of any agency action. The Supreme Court has instructed that "final opinions," for purposes of FOIA, "not only invariably explain agency action already taken or an agency decision already made, but also constitute 'final dispositions' of matters by an agency." *Sears*, 421 U.S. at 153-54; *see also Common Cause v. Internal Revenue Serv.*, 646 F.2d 656, 659 (D.C. Cir. 1981) (holding that an internal agency opinion was not a "final opinion" under § 552(a)(2)(A) because the document only "involves the voluntary suggestion, evaluation, and rejection of a proposed policy by an agency," unlike documents that are "adjudicatory in nature and constitute[] final dispositions of pending disputes"). Although OLC legal determinations are binding on agencies in the sense that agencies are not free to act in ways that OLC has concluded they may not legally do, those determinations often leave agencies with a broad range of potential avenues for action and prospective policy choices. *See* Ren. MTD at 17-19. *See* MTD Op. at 34 ("[T]he D.C. Circuit in *EFF* . . . specifically held that an OLC opinion does *not* necessarily reflect the adopted policy of the agency that requests it."); OLC Resp. Ltr. at 3 ("OLC opinions provide legal advice regarding the overall legal framework within which policymakers act as a predecisional part of government deliberative processes, but the opinions do not compel the ultimate policy decision reached or adopted by any agency. OLC does not have direct supervisory authority over its clients. Like any other client, a department or agency receives the opinion of its counsel, but then must bear the responsibility for making the final decision.").

3.    Nor can OLC advice documents resolving interagency disputes be considered "statements of policy" within the meaning of FOIA, because, as previously explained, OLC does not have authority to act on or implement matters of policy.  *See* Ren. MTD at 19.  OLC Resp. Ltr. at 2-3.  Rather, it is the client agencies ultimately responsible for making policy decisions that may, after receiving OLC's deliberative and pre-decisional advice, choose to adopt a policy that is subject to the publication requirement of § 552(a)(2)(B)—"statements of policy [and] interpretations *which have been adopted by the* [*agency*.]" (emphasis added); *see also Viet. Veterans of Am. v. Dep't of Navy*, 876 F.2d 164, 164-65 (D.C. Cir. 1989) (holding that when an entity has authority only to dispense legal advice on certain topics, but not to actually act on behalf of the agency on those topics, the legal opinions do not constitute statements of policy); MTD Op. at 34.

It is possible for an OLC opinion resolving an interagency dispute to become a document that must be disclosed under § 552(a)(2), for the very reasons stated above.  OLC's clients are often decisionmakers and policymakers with the power to set policy and adjudicate individual rights.  Accordingly, after receiving OLC advice, a policymaking agency could adopt both the conclusion and the reasoning of the OLC advice document as the policymaking agency's *own* statement of interpretation or policy.  *EFF*, 739 F.3d at 9; *see Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184–85 (1975).  Or the agency could incorporate the OLC advice into its working law.  Even in such circumstances, however, the publication requirement would run to the policymaking agency, not OLC, which has no policymaking authority.  *Cf.* OLC Resp. Ltr. at 3, 5.  As *EFF* demonstrates, the analysis is fact-dependent and case-specific, and therefore plaintiff's insistence upon a *categorical* answer is mistaken.  In short, whatever publication obligations may rest with individual client agencies in certain circumstances, OLC

itself is not required to affirmatively publish its confidential legal advice resolving interagency disputes.

4.  As this Court previously recognized, in order for an entire category of OLC opinions to automatically be subject to the affirmative disclosure requirement in § 552(a)(2), that category of documents must "*necessarily* amount to either 'final opinions . . . made in the adjudication of cases[,]' or 'statements of policy and interpretations which have been adopted by the agency.'" Ren. MTD Op. at 38 (emphasis added) (quoting 5 U.S.C. § 552(a)(2)(A)-(B)).  CFA's claim fails if one or more OLC opinions that resolves an interagency dispute falls outside of each category. Several publicly-available OLC opinions clearly do just that.[3]  These exemplar opinions show that, contrary to CFA's allegation, OLC does not speak with authority over agencies' policies in the context of opinions resolving interagency disputes.

a.  For example, in *Applicability of the Cargo Preference Act to the Transportation of Alaskan Oil to the Strategic Petroleum Reserve*, 7 Op. O.L.C 139 (1983), OLC considered a dispute between the Department of Transportation and the Department of Energy (DOE) about whether certain oil shipments to the Strategic Petroleum Reserve from Alaska count toward the 50 percent United States-flag cargo preference in the Cargo Preference Act.  OLC determined that these particular oil shipments "may be" counted by the DOE toward the statutory requirement.  *Id.* at 148.  The opinion did not require DOE to count the oil shipments as a matter of law—that decision remained a policy choice for the agency.  *See id.*  Moreover, although OLC issued an opinion as to a disputed legal question, OLC did not fully or definitively resolve the agencies' dispute.  The opinion noted that its "legal analysis … does not dispose of the problem, because your agencies take different views as to the scope and intent of their obligations as agreed upon in

---

[3] OLC published these opinions as a matter of discretion, in accordance with its publication policy. *See* Best Practices Memo at 5-6.

the interagency agreement." *Id.* at 140.  This OLC opinion was not a "final opinion" that "adjudicat[ed]" a "case," not just for the reasons already stated above but also because it left unanswered the underlying dispute between the agencies.  Underscoring this conclusion, after noting that its opinion "d[id] not dispose of the problem," OLC "recommend[ed] that, if you cannot resolve your differing interpretations of the agreement, the matter be referred to appropriate higher levels in the Executive Branch."  7 Op. O.L.C. at 140.  As *EFF* suggests, although OLC was evaluating the legal availability of an agency's statutory options, "its opinions merely 'describe the legal parameters of what the client agency is *permitted* to do,' which is different from 'stating or determining the client agency's policy.'"  Ren. MTD Op. at 34 (quoting *EFF*, 739 F.3d at 10) (alterations omitted).  Likewise, neither agency that weighed in on the legal question could have adopted OLC's opinion as a statement of policy, because OLC did not settle their disagreement by directing any agency to embrace a policy.

b.  Next, consider OLC's opinion resolving a dispute between the Office of Management and Budget (OMB) and the Environmental Protection Agency (EPA).  *Scope of the Environmental Protection Agency's Discretion to Adopt Any One of Three Alternative Interpretations of the Mitchell-Conte Amendment to the Clean Air Act*, 13 Op. O.L.C. 105 (1989).  There, OLC determined that three statutory interpretations were legally available to the EPA as reasonable interpretations, under *Chevron U.S.A. Inc. v Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), of an amendment to the Clean Air Act—rather than the one interpretation that OMB suggested.  *Id.* at 111-12.  The decision about which statutory interpretation to select, then, was for the EPA; "OLC's determination" did not "provide the governing interpretation moving forward."  *Contra* Ren. MTD Op. at 30.  Nor did the opinion "*necessarily* announce[] the client agency's working law from the moment the opinion is issued," because the choice of which

interpretation to adopt was left to the EPA.  *Contra id.* at 33.  Likewise, the EPA could not "be deemed to have 'adopted' OLC's interpretation," where OLC did not make any judgment about which of the three interpretations the agency should follow, nor did OLC dictate what the agency's policy should be.  *Contra id.* at 30.  Moreover, if the EPA had adopted one of the three interpretations that OLC viewed as permissible, the disclosure obligation under § 552(a)(2) would have applied to EPA, not to OLC.  This was also clearly not an "adjudication" as that term is used in FOIA (to refer to adjudications of private rights, *see supra* at 15-18), but merely a resolution of a disagreement of interpretation between two Executive Branch agencies.

      c.   In *Applicability of Government Corporation Control Act to "Gain Sharing Benefit" Agreement*, 24 Op. O.L.C. 212 (2000), OLC considered a dispute between the National Aeronautics and Space Administration (NASA) and the Office of Management and Budget (OMB).  Contrary to OMB's position, OLC determined that the Government Corporation Control Act did not require NASA to obtain legislative authorization to enter a gain sharing benefit agreement with a private corporation.  As relevant to the present dispute, OLC did not direct NASA to enter the agreement, OLC merely determined that it had that authority.  *Id.* at 221.  In this way, the impact of the opinion was akin to OLC's opinion that determined "[t]he Defense of Marriage Act would not prevent the non-biological child of a partner in a Vermont civil union from receiving child's insurance benefits under the Social Security Act."  *Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act*, 31 Op. O.L.C. 243 (2007) (cited by Ren. MTD Op. at 31).  Both OLC opinions advised the agencies—NASA and the Social Security Administration—about their authority under existing law; the "discretion to adjudicate such matters" and the agency decisions that affected the rights of private individuals—whether to enter

22

or not enter a contract, or to grant insurance benefits or not—remained with the agencies.  *See* Ren. MTD Op. at 32.  OLC neither issued an opinion directing that NASA enter the proposed contract, nor could NASA have adopted the opinion as the agency's policy, because the opinion was explicit that OLC did not offer a view on the "policy implications" of NASA's proposed action.  24 Op. O.L.C. at 214.

     d.    CFA cites two OLC opinions addressing interagency disputes in its Amended Complaint.  Both opinions demonstrate why this category of documents does not need to be affirmatively disclosed by OLC as statements of an agency's policy.  First, CFA mentions *Payment of Back Wages to Alien Physicians Hired Under H-IB Visa Program,* 32 Op. O.L.C. 47 (2008) (ECF No. 22-8); *see* Am. Compl. ¶ 37.  That opinion concluded that there was no waiver of sovereign immunity allowing the Department of Labor to order the Department of Veterans Affairs to pay back-wages under the H-1B visa program.  But the issuance of that opinion itself did not determine any private individuals' rights.  To the contrary, and as OLC's Response Letter noted, that opinion expressly did not determine the ultimate outcome of the underlying situation:

> [T]he opinion specifically noted that the Department of Veterans Affairs could still voluntarily provide back wages to its former employees, and that the Department of Labor, even if it lacked one form of authority, might have other tools available to ensure that the Department of Veterans Affairs complied with the statute in the future.  *See* 32 Op. O.L.C. at 54-55.  Thus, it remained up to the agencies to determine their ultimate policy positions, consistent with the legal framework articulated by OLC.

OLC Resp. Ltr. at 4.

     Second, CFA's Amended Complaint also mentions *The Authority of the Equal Employment Opportunity Commission To Order a Federal Agency To Pay a Monetary Award To Remedy a Breach of a Settlement Agreement*, 38 Op. O.L.C. 22 (2014) (ECF No. 22-7); *see* Am. Compl. ¶ 36.  But again, that opinion only addressed the EEOC's jurisdiction to order the Social Security

Administration to provide monetary relief for breach of a Title VII settlement agreement. The opinion did not itself "purport to resolve a dispute with a private party, nor did it determine the EEOC's policy" because the opinion in fact "left open the possibility that the EEOC might be able to provide a remedy through alternate means." OLC Resp. Ltr. at 5 (citing MTD slip op. at 14 & n.9). Both opinions, therefore, did not reach final determinations about policy.

In sum, the above OLC opinions establish that nothing in the interagency dispute scenario *necessarily* forecloses agencies' policymaking options any more than an OLC opinion requested by a single agency as part of its policymaking process. *Contra* Ren. MTD Op. at 30. Instead, these OLC opinions resolve a particular legal question—sometimes by acknowledging an agency's authority to reach a final legal interpretation[4]—and leave it up to the policymaking agencies to determine their ultimate positions on how to address the underlying situations in light of that legal framework. *See* OLC Resp. Ltr. at 3 ("OLC opinions provide legal advice regarding the overall legal framework within which policymakers act as a predecisional part of government deliberative processes, but the opinions do not compel the ultimate policy decision reached or adopted by any agency."). In some cases, including many of those discussed above, the agency's ultimate policy decision will not require it to "adopt" OLC's legal interpretation. Accordingly, these opinions demonstrate that CFA cannot prove that all OLC opinions addressing interagency disputes are final opinions made in the adjudication of cases or that all such OLC opinions are necessarily adopted by the client agencies. Therefore, the Court should enter summary judgment for Defendant.

---

[4] *See, e.g.*, *Scope of the Environmental Protection Agency's Discretion to Adopt Any One of Three Alternative Interpretations of the Mitchell-Conte Amendment to the Clean Air Act*, 13 Op. O.L.C. 105 (1989).

## II.   Interpreting Section 552(a) to Apply to OLC Opinions Addressing Interagency Disputes Would Undermine Important Practices that Help Ensure That Agencies Comply with the Rule of Law

An additional basis for the Court to reject CFA's claim that OLC is required to affirmatively disclose its opinions that address interagency disputes is that it would compel disclosure of a significant amount of confidential, pre-decisional legal advice in contexts that could, in turn, lead agencies to forego obtaining OLC's advice, thereby undermining OLC's ability to function as the central legal advisor for the executive branch and the rule of law values advanced by OLC serving this function.  Moreover, the same arguments offered to justify disclosure of OLC interagency opinions would result in disclosure of legal advice from agency counsels in such circumstances as well, creating a serious impediment to agencies' access to important legal advice that helps ensure that the agencies comply with the law.

As CFA acknowledges, OLC's advice-giving function is longstanding and serves important rule of law values.  *See* Am. Compl. ¶¶ 16-32; Best Practices Memo at 1-4.  The consolidation of the Executive's advice-giving function within a single office in the Department of Justice allows the office to create certain norms governing the provision of legal advice.  *See, e.g.*, Best Practices Memo at 1 ("OLC must always give candid, independent, and principled advice—even when that advice is inconsistent with the aims of policymakers.  This memorandum reaffirms the longstanding principles that have guided and will continue to guide OLC attorneys in all of their work[.]").

Prior Attorneys General and former OLC officials have recognized that the Department of Justice's advice-giving function—with that advice generally being treated as authoritative throughout the Executive Branch—is necessary for the government's orderly administration:

> Although the [Judiciary Act of 1789], requiring this [advice-giving] duty of the Attorney General, does not expressly declare what effect shall be given to his opinion, yet the general practice of the Government has been to follow it;—partly

25

for the reason already suggested, that an officer going against it would be subject to the imputation of disregarding the law as officially pronounced, and partly from the great advantage, and almost necessity, of acting according to uniform rules of law in the management of the public business: a result only attainable under the guidance of a single department of assumed special qualifications and official authority.

*Office and Duties of Attorney General*, 6 Op. Att'y Gen. 326, 334 (1854); *see also Opinions of Attorneys General and Decisions of Auditors*, 5 Op. Att'y Gen. 97, 97 (1849); Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1309-11 (2000).

Here, accepting CFA's claim would compel disclosure of *all* confidential OLC legal advice addressing interagency disputes.  As OLC has previously explained, such compelled disclosure can in some circumstances undermine the practices that are necessary to preserve the Office's important function within the Executive Branch.  *See* OLC Resp. Ltr. at 3; *id.* ("Protecting [the attorney-client] relationship of trust is especially important in the governmental context, where a free and candid flow of information between agency decision-makers and their outside legal advisers promotes broad public interests in the rule of law and the administration of justice."); *see also* Best Practices Memo at 5-6.

CFA attempts to portray OLC's advice-giving function as unique, because its "formal written opinions continue to establish the binding law of the executive branch."  Am. Compl. ¶ 20. But that feature of OLC's advice does not undermine the value of keeping its legal advice confidential in some circumstances.  For one thing, the *EFF* decision expressly rejected the argument that the "precedential" nature of OLC's legal advice made that advice any less privileged.  *See* 739 F.3d at 9; *see* MTD Op. at 30-35.  Indeed, many agencies receive similarly controlling or precedential legal advice from their in-house general counsels or chief counsels.  *See* OLC Resp. Ltr. at 3 ("[T]he authoritative nature of OLC's legal advice is not unique. In our

experience, many agencies treat legal advice from their Offices of General Counsel as 'binding,' at least as a matter of custom and practice.").  And those agencies' general counsels likewise provide legal advice in the types of categories described by CFA—*e.g.*, interpreting non-discretionary legal obligations, opining on the constitutionality of statutes, and in connection with agencies' determinations of private rights.  Thus, the controlling nature of OLC's legal advice, even in the scenarios described by CFA, is not unique within Executive Branch attorney-client relationships.  Accepting CFA's claim would thus threaten to undermine the Executive Branch's ability to receive confidential legal advice from *any* of its lawyers, which will, in turn, increase the chances that Executive officials will not understand and comply with their legal obligations.

Accordingly, § 552(a)(2) and the relevant privileges should not be construed to require that all OLC advice documents that resolve interagency disputes be disclosed by OLC.  The fact that OLC provides authoritative legal advice for the Executive Branch—or that OLC may approach its advice-giving function in a somewhat different way than private lawyers would—does not prevent OLC and its client agencies from invoking the relevant privileges in appropriate cases.

Congress has intended, since 1789, that the Attorney General (and, by extension, OLC) provide objective, authoritative legal advice to the rest of the Executive Branch.  *See* Moss, *Executive Branch Legal Interpretation*, 52 Admin. L. Rev. at 1306-16.  Construing FOIA as CFA proposes—to require the *automatic* disclosure of entire categories of OLC opinions, even in cases where such disclosure would deter agencies from seeking such advice—would undermine this long-settled and important role for OLC and the Department of Justice in our nation's government, and, by deterring Executive actors from seeking legal advice, threaten the rule of law.

## III.    The Indexing Claim Should Be Dismissed.

As this Court previously recognized, CFA's second claim regarding indexing is entirely derivative of its first claim—*i.e.*, if there is no material fact showing a violation of FOIA's reading-

room requirements in Count One, then by definition CFA has also failed to plausibly allege a viable indexing claim in Count Two:

> [T]he Court agrees with the government that [the indexing] claim is "entirely derivative" of CfA's primary FOIA claim. . . .  That is, just as CfA's complaint fails to identify records that OLC was plausibly required to (but did not) make available to the public, so too has CfA failed to identify records that OLC was plausibly required to (but did not) index.

MTD Op. at 29-30 n.11 (citations omitted).   Accordingly, because the Department is entitled to summary judgment as to Count One, CFA's Count Two must be dismissed as derivative. Thus, both remaining claims in CFA's Amended Complaint are properly subject to summary judgment and dismissal.

## CONCLUSION

For these reasons, this Court should grant Defendants' motion for summary judgment.


Dated:  July 15, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

*/s/ Brian C. Rosen-Shaud*
BRIAN C. ROSEN-SHAUD
Trial Attorney (Maine Bar No. 006018)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel:  (202) 305-7667
Fax:  (202) 616-8470
E-mail:  brian.c.rosen-shaud@usdoj.gov

*Counsel for Defendant*