# EXHIBIT 2

by the 9th section of the act of 1836, and the 14th section of the act of 1837.

The acts of 1836 and 1837 appropriate the Patent Fund for certain objects. It is money in the Treasury appropriated. There is no express repeal of the Patent Fund, in the act of 3d March, 1853, and nothing repugnant to, nor inconsistent with, the specific appropriation and pledge of the Patent Fund as contained in the acts of 1836 and 1837,—nothing which hints at the repeal of that pledge. We have already seen that the mention of " money in the Treasury not otherwise appropriated" does not divert the Patent Fund from the objects for which it is created and appropriated. To make the one or the other, or both, of the statutes of 1852 and 1853 work by implication a repeal of the 9th section of the act of 1836, and 14th section of the act of 1837, would be contrary to the established rules of statutory construction, to the plain import of the respective provisions, and to the legal meaning, as well as the undoubted intention, of the several acts of Congress.

My opinion, therefore, is, that the salaries of the clerks should, notwithstanding the act of 1853, nay, by the very force of the language of the act itself, continue to be paid, as required by the acts of 1836 and 1837, out of the special fund of the office.

I am, very respectfully,

C. CUSHING.

Hon. ROBERT MCCLELLAND,
     *Secretary of the Interior.*

---

## OFFICE AND DUTIES OF ATTORNEY GENERAL.

Exposition of the constitution of the office of Attorney General as a branch of the executive administration of the United States.

ATTORNEY GENERAL'S OFFICE,
*March* 8, 1854.

SIR: At the expiration of a year's experience in the discharge of my present official duties, and observation of their

relation to other branches of federal administration, it seems to me not unseasonable now to lay before you some suggestions of possible improvement in the manner of conducting the legal business of the Government.

The Constitution of the United States provides, that "the executive power shall be vested in the President of the United States;" who shall be Commander-in-chief of the Army and Navy; who shall, by and with the advice and consent of the Senate, make treaties; who shall nominate and, by and with the advice and consent of the Senate, appoint, all officers of the United States, military, judicial, diplomatic, or administrative, whose appointments are not otherwise provided for, and which shall be established by law; who shall have a qualified participation in the enactment of laws, and take care that they be faithfully executed; and who shall, from time to time, give to Congress information of the state of the Union.

The President is thus made the responsible depositary and chief functionary, for the time being, of the ministerial powers and administrative duties of the United States regarded as a political sovereignty.

But the Constitution does not specify the subordinate, ministerial, or administrative functionaries, by whose agency or counsels the details of the public business are to be transacted. It recognises the existence of such official agents and advisers, in saying, that the President "may require the opinion, in writing, of the principal officer in each of the executive departments, upon any subject relating to the duties of their respective offices;" and these officers are again recognised by the Constitution in the clause which vests the appointment of certain inferior officers "in the heads of departments;" and it leaves the number and the organization of those departments to be determined by Congress.

In the execution of this duty, the constitutional Congress proceeded, at an early day of its first session, (July 27, 1789,) to establish the Department of Foreign Affairs, with "a principal officer therein," to be called the Secretary for the Department of Foreign Affairs, and to perform and execute such duties respecting foreign affairs as the President should assign to him,

and to conduct the business of the department in such manner
as the President should, from time to time, order or instruct.
But this act, which was the commencement of the organization
of executive departments under the Constitution, and a com-
mencement in the direction of a systematic and proper distribu-
tion of duties, gave place, after the lapse of a few months,
(September 15, 1789,) to an act, which changed the name of
the Department of Foreign Affairs to that of Department of
State, though it in no respect changed the duties of the Secre-
tary, except to provide that he should receive, keep, and cause
to be promulgated, the laws enacted by Congress; and that he
should keep the seal of the United States, and affix the same to
the commissions of all civil officers of the United States lawfully
appointed by the President, whether with or without the advice
and consent of the Senate.

In changing the name of this department from Foreign Affairs
to that of State, Congress did not change the main duties of the
department, consisting then, as now, of the charge of the foreign
relations of the Government. There is no very obvious con-
nexion between the new name given to the department, and the
only important fact which accompanied the change, namely, the
commitment of the seal of the United States to the secretary,
and the duty of affixing it to the commissions of civil officers.
If on this account, as it would seem, the designation of the Sec-
retary was changed, certainly the new title had not, according
to the received previous use of the term in our mother tongue,
any special relation to the new duties, it not being coupled with
the custody of the great seal in England, and being applied
there to the office of several of the principal secretaries. Pro-
bably it was deemed convenient, in that early period, when the
public business was little in amount relatively to later times,
that the head of the most important of the departments should
bear a name indicative of higher, general, and political duty,
and so indefinite, that much miscellaneous business might be
consigned to his charge, either by act of Congress, or by direc-
tion of the President.

Next, after establishing the Department of Foreign Affairs,
Congress, at the same session, (August 7, 1789,) established the

Department of War, with a principal officer therein, to be called
the Secretary for the Department of War, and required to per-
form such duties as might from time to time be lawfully enjoined
on or intrusted to him by the President, relative to military or
naval affairs; and to conduct the business of the department in
such manner as the President might from time to time order or
instruct.

This department was also formed on proper premises of clas-
sification, even though including, as it did, the jurisdiction of
Indian affairs; for the arrangement of frontier posts, and other
considerations, devolved of necessity, at that period, the charge
of the Indians on the Secretary of War.

Next came, at the same session, (September 2, 1789,) a De-
partment of Treasury, (not *the* Treasury,) the head of it, how-
ever, being called the Secretary of the Treasury, and his general
duty being defined to be to digest and prepare plans for the
improvement and management of the revenue, and for the
support of public credit; to prepare and report estimates of the
public revenue and the public expenditures; to superintend the
collection of the revenue; to grant warants for money to be
issued from the treasury in pursuance of appropriations by law;
and to have charge of the sale of the lands belonging to the
United States.

In the organization of the business of this department by this
act, facts peculiar, as compared with the other two departments,
are prominent.

One is, that the Secretary of the Treasury, instead of being
made subject only to the direction of the President by name, is
required "generally to perform all such services, relative to the
finances, as he shall be directed to perform;" which phraseology
has relation to the provision of the act, that he shall "make
report and give information to either branch of the legislature,
*in person or writing, as he may be required*, respecting all
matters referred to him by the Senate or House of Representa-
tives, or (and) which shall appertain to his office."

Another peculiarity of the act is, that whereas, in the others,
provision is made for a chief and other clerks only, here, on the
other hand, is the commencement of sub-departments, or bureaus,
commonly so called, in the provision for the appointment of a

Office and Duties of Attorney General.

comptroller, an auditor, a treasurer, and a register, among whom a portion of the business of the department is distributed permanently and upon system.

At the same session of Congress, in organizing the judicial business of the United States, (September 24, 1789) provision was made for an Attorney General, to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned, and to give his advice and opinion upon questions of law, when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters which may concern their departments.

By another act of the same session of Congress, (September 22, 1789,) the office of Postmaster General was appointed, with an assistant, or clerk and deputies, subject, in performing the duties of his office, and in forming contracts for the transportation of the mail, to the direction of the President, but not in other respects then placed in the same high official relation to the Government as at the present time.

Such was the original basis of the executive organization of the Government. The Secretary of State for political and foreign affairs, the Secretary of War for military and naval matters, the Secretary of the Treasury for those of finance, and the Attorney General for legal and judicial ones, were the immediate superior ministerial officers of the President, and his constitutional counsellors during the whole period of the administration of Washington.

We find abundant evidence, both in the public archives and in the printed correspondence and other writings of Washington and Jefferson, that it was the practice in their time for the President not only to call for written opinions of the Attorney General, as at present, and to advise orally or by informal correspondence with him and the three Secretaries, but also to require of all these officers written opinions upon critical subjects of executive deliberation, as expressly provided by the Constitution.

Conspicuous illustration and evidence of these facts may be deduced from the extracts given in the text and the notes to Washington's writings. (See *e. g.*, vol. x, p. 321, note; vol. x, p. 546, note.) In one of these cases it will be perceived that the Cabinet, so called, consisting of the Secretary of State, Secre-

tary of the Treasury, Secretary of War, and Attorney General, though not in any sense an organized body with legal attributes as such, yet proceeded to act in concert, adopting joint rules, signed by them, as to the political and military questions pending between the United States and France.

By an act of the next Congress, various modifications were made in minor details of the duty of the Secretaries of Treasury and War and of the Attorney General.   (May 8, 1792.)

Meanwhile an organization had been effected of all those branches of the public service which are localized in the States, including, among other things, officers of the revenue, deputy postmasters, courts, and ministerial officers of the law, and the survey and sale of the public lands; but no material modification occurred in the great outlines of superior administration, until during the administration of John Adams, when the magnitude of our commerce, and the importance of our maritime relations, induced the Government to pay more attention to the military marine, and to establish the Department of the Navy, the chief officer of which to be called the Secretary of the Navy, whose duty it should be to execute such orders as he might receive from the President relative to the procurement of naval stores and materials, and the construction, armament, equipment, and employment of vessels of war, as well as to all other matters connected with the naval establishment of the United States.   (April 30, 1798.)

Subsequently to this, and in the long period of the administrations of Jefferson, Madison, Monroe, and John Quincy Adams, no change in the general character of the executive departments took place, although all of them underwent more or less modification in details, by the intertransfer of old, or the creation of new branches of business, and especially the establishment of new bureaus, or the enlargement of old ones, materially affecting the internal organization of the Departments of State, War, Treasury, Navy, and Post-Office.

But, at the opening of Jackson's administration, the Postmaster General, whose duties and responsibilities had grown with the growth of the country to be of vast importance, was called, as the public interests required he should be, to the same duties

Case 1:16-cv-01068-KBJ   Document 59-7   Filed 08/12/21   Page 8 of 31

of a cabinet counsellor of the President, which had been discharged theretofore by the four Secretaries and the Attorney General.

This fact constitutes the first important alteration in the arrangements of superior administrative duty and accountability which had occurred since 1798, when the Department of the Navy was established.

Perhaps an equally important fact, occurring at the same period, was the decision, by Jackson, in the circumstances attending the removal of Mr. Duane, as Secretary of the Treasury, and the appointment of Mr. Taney, of the question of the responsibility of the heads of departments to the President.

Finally, by an act passed at the close of Mr. Polk's administration, (March 3d, 1849,) in order to relieve the Departments of State, War, Treasury, and Navy, of branches of public business, created from time to time, which,—attached to those offices originally from considerations of fitness which had ceased to exist, or from the want of any more convenient destination to be given to them, now required to be placed in other hands,—a new executive department was organized, to be called the Department of the Interior, to the secretary of which was committed the supervision of the Patent Office, the General Land Office, the accounts of officers of the courts of the United States, Indian Affairs, the Pension Office, the Census, Mines, and the Public Buildings.

This act, it should be observed, does not provide in terms that the Secretary of the Interior shall be subject to the general direction of the President, as in the case of the Secretaries of State, War, Navy, and Postmaster General; nor do the acts appointing the Secretary of the Treasury and the Attorney General. On the other hand, none of the acts, except that establishing the Treasury Department, subject the chief executive officers to the duty of responding to direct calls for information on the part of the two Houses of Congress. This, however, has come, by analogy or by usage, to be considered a part of their official business. And the established sense of the subordination of all of them to the President, has, in like manner, come to exist, partly by construction of the constitu-

Case 1:16-cv-01068-KBJ   Document 59-7   Filed 08/12/21   Page 9 of 31

tional duty of the President to take care that the laws be faithfully executed, and his consequent necessary relation to the heads of departments, and partly by deduction from the analogies of statutes.

One other fact, which has been alluded to already, requires more particular attention.

It is the constitutional duty of the President, and of course his right, to recommend legislative measures to Congress, which is in effect the suggestive initiation of laws. By express provision of law, it is made the duty of the Secretary of the Treasury to communicate information to either House of Congress when desired; and it is practically and by legal implication the same with the other secretaries, and with the Postmaster and the Attorney General. But the provision of law, which enacts that the Secretary of the Treasury shall make report and give information to either branch of Congress *in person*, when required, and which, if carried into operation, would in fact confer on the Secretary the advantage, though not a member of Congress, yet of explanatory discussion both in the Senate and the House of Representatives, does not appear to have been at any time practised upon by Congress, either in regard to the Secretary of the Treasury or any other head of department by analogy. But heads of departments have in some cases been called on to make explanations in person to committees of Congress.

It has appeared necessary to take this retrospective survey of the formation of the several executive departments, and of their general relation one to another, as preliminary to an explanation of the manner, in which existing laws provide for the superintendence and management of the judicial and legal business of the Government.

We have seen that the act establishing the office of Attorney General expressly imposed on him two classes of duty: first, to prosecute all suits in the Supreme Court in which the United States are concerned, and secondly, to give his advice and opinion in questions of law to the President and to the heads of departments.

In the discharge of the second class of the above-mentioned

duties, the action of the Attorney General is quasi judicial. His opinions officially define the law, in a multitude of cases, where his decision is in practice final and conclusive,—not only as respects the action of public officers in administrative matters, who are thus relieved from the responsibility which would otherwise attach to their acts,—but also in questions of private right, inasmuch as parties, having concerns with the Government, possess in general no means of bringing a controverted matter before the courts of law, and can obtain a purely legal decision of the controversy, as distinguished from an administrative one, only by reference to the Attorney General.

Accordingly, the opinions of successive Attorneys General, possessed of greater or less amount of legal acumen, acquirement, and experience, have come to constitute a body of legal precedents and exposition, having authority the same in kind, if not the same in degree, with decisions of the courts of justice.

It frequently happens that questions of great importance, submitted to him for determination, are elaborately argued by counsel; and whether it be so or not, he feels, in the performance of this part of his duty, that he is not a counsel giving advice to the Government as his client, but a public officer, acting judicially, under all the solemn responsibilities of conscience and of legal obligation.

Although the act, requiring this duty of the Attorney General, does not expressly declare what effect shall be given to his opinion, yet the general practice of the Government has been to follow it;—partly for the reason already suggested, that an officer going against it would be subject to the imputation of disregarding the law as officially pronounced, and partly from the great advantage, and almost necessity, of acting according to uniform rules of law in the management of the public business: a result only attainable under the guidance of a single department of assumed special qualifications and official authority.

But the Attorney General is under no obligation to render an award, or determine a question of fact in cases referred to him; nor does an appeal to him lie from another department

TO THE PRESIDENT.              .        335

Office and Duties of Attorney General.

by any party assuming to be aggrieved by its action, and seeking to have it reviewed; nor is he to give advice to heads of departments on matters which do not concern their departments, and in which the United States have no interest; nor is he authorized to give official opinions in any case not falling within the scope of his duties, so as to connect the Government with individual controversies, in which it has no concern, and with which it ought not to interfere; nor is he in general to give official opinions to subordinate officers of the Government; nor ought he to advise individuals in regard to any question of legal right depending between them and the Government.

Some uncertainty has existed upon the point whether it is the duty or the right of the Attorney General to give *mere legal* opinions to the Senate or the House of Representatives, it having been denied in one case by Mr. Wirt. But he, in common with other persons holding the office, has recognised, by his action in sundry cases, the right of either House of Congress to call on him for information in any matters within the scope of his office, and his duty to communicate the same.

The other duty prescribed by the act of 1789, that of conducting the suits of the United States in the Supreme Court, is, of course, the function of an advocate, subject to the conditions only of the conscientious and honorable discharge of such a function, and with official relation both to the Government and the Supreme Court.

The act speaks of the Supreme Court alone, and it is the regular statute duty of the Attorney General only to conduct in person the causes of the United States there; but the President may undoubtedly, in the performance of his constitutional duty, instruct the Attorney General to give his direct personal attention to legal concerns of the United States elsewhere, when the interests of the Government seem to the President to require this. An example of this, having the force of contemporaneous exposition, occurs in the case of the instructions of Washington to the Attorney General, in 1792, to attend the circuit court at York, on occasion of certain indictments pending there, "to see that that business be conducted in a manner to which no exception can be taken with propriety, and for the

purpose of giving to the measures of Government a more solemn and serious aspect." This precedent has been followed in other and later cases, which seemed to call for the special direction of the Government.

At successive periods in the history of the Government, the Attorney General has been invested with various other powers and duties, some of them special and temporary, and some permanent, some of them purely legal, and some administrative rather than legal, but all of them having apparent relation to the general nature of his office, and which it may be well to briefly indicate.

By an act passed at the second session of the first constitutional Congress, (April 10, 1790,) the foundations were laid for the system of granting letters patent of exclusive privileges for useful inventions or discoveries, this branch of public business being placed in the joint charge of the Secretaries of State and War and the Attorney General. Subsequently, (February 21, 1793,) it was committed to the charge, first, of the Secretary of State,—then of a bureau created for it, under the immediate authority of a special commissioner, and subject to the supervision of the Secretary of State,—until, as before stated, it was transferred to the new Department of the Interior.

By the act establishing the Mint of the United States, it was required that the Chief Justice of the United States, the Secretary and Comptroller of the Treasury, the Secretary of State, and the Attorney General, should constitute a board to inspect the assay of gold and silver for coinage; (April 2, 1792;) but this duty has been transferred since to the district judge and district attorney of Eastern Pennsylvania.

That was a duty administrative in its nature; as was that under the provision of law which appointed the Attorney General, together with the Secretary of State and the Postmaster General, a board to prepare forms and schedules for the agricultural, commercial, and other statistical facts to be collected in the taking of the seventh census of the United States, (March 3, 1849.)

In a very early case of commissioners appointed under treaty to adjudicate claims provided for thereby, it was made the duty

Office and Duties of Attorney General.

of the President to appoint a person to act before such commissioners, in behalf of the United States, under the direction of the Attorney General, who was required to counsel such agent, and to attend in person whenever any questions of law or fact to be determined by the commissioners might render his presence necessary; and he was authorized to employ such agents, in the different parts of the United States, as the business before the commissioners should, in his opinion, require, and to be paid for their services at such rate as the President of the United States might order.   (June 30, 1797.)

If the same proceeding, or something analogous to it, had been adopted in regard to some later cases of the same character, so as to insure a contentious investigation of all claims presented, it would have tended greatly to guard the responsibility and facilitate the safe action of the commissioners, and to produce results more satisfactory to the interests of the Government.

The Attorney General has himself been called on to act as commissioner to adjudicate claims under treaty, as in the case of the convention of indemnities between the United States and the Republic of Peru.   (August 8, 1841.)

But the most serious of his incidental duties has been that of supervising the litigation of land claims arising under cessions of territory made to the United States by France, Spain, or the Mexican Republic.

By a series of acts for the adjudication of land claims under the treaties ceding Louisiana and Florida to the United States, it was made the duty of the Attorney General to decide on appeals from the district courts in which the claims were in the first instance litigated; to instruct the district attorney in regard to them, and to appear and prosecute those appeals in the Supreme Court.   (May 26, 1824.)

By the various provisions of law for the adjudication of land claims in California, it is in like manner made his duty to receive and examine the transcripts of cases decided by the commissioners, before whom they are in the first instance to be heard, and determine which of the cases shall be appealed to the district courts and to the Supreme Court of the United

States, (March 3, 1851, and August 31, 1852.)   This branch
of business, though in some sort temporary in its character, yet
involves responsible present relations to, and ultimate manage-
ment of, a large number of suits of the highest importance and
interest, and therefore constitutes one of the most onerous of
the present occupations of the Attorney General.

Another class of duties of a permanent nature, and of con-
stant recurrence, is the examination, which he is required to
make, of all titles of lands or sites purchased by the United
States for the purpose of erecting thereon armories, arsenals,
forts, fortifications, navy yards, custom houses, lighthouses, or
other public buildings of any kind whatever ; and without his
certificate of the validity of the title, no public money can be
expended upon any such land or site.   (September 11, 1841.)

In all cases of suspended entries of public lands, the appro-
bation of the Secretary of the Interior and of the Attorney
General is necessary to the valid adjudication of the same by
the commissioner.   (August 3, 1846, and March 3, 1853.)

Finally, in regard to the great variety of duties appointed
for the Solicitor of the Treasury, including the collection of
debts due to the Government, the disposition of property taken
by execution in its behalf, the management of suits in the local
courts of the United States, and the instruction of district
attorneys and marshals in the premises, (concerning which busi-
ness more will be said hereafter,) it is made the duty of the
Attorney General, at the request of the Solicitor, " to advise
with and direct" him in such matters.   (May 29, 1830.)

It remains only to say, in speaking of the legislation of Con-
gress in regard to the office of Attorney General, that his de-
partment, in common with the others, has an official seal, and
all copies of records authenticated by certificate under this are
declared to be evidence equally with the original record or
paper ; that he, in common with other officers of the same class,
appoints the clerks or other persons allowed by law for the
service of his office, in virtue of the clause of the Constitution
authorizing certain appointments to be vested in the heads of
departments : and he exercises all such general powers as are
by law vested in them, such, for instance, as the employment

of counsel or other legal assistance in behalf of the United States.

Such are the general duties, ordinary and extraordinary, of the office of Attorney General, as expressly set forth by statute, and in addition to implied contingent duties, which, as already intimated, he may be called upon by the President or the Houses of Congress to perform.

On this point, which has been touched already, it may not be amiss to state more fully the constitutional and legal nature of the relation of the President to the heads of departments in matters of detail not explicitly provided for by acts of Congress.

We have cursorily seen that the act establishing the Department of State provides that the Secretary shall " perform and execute such duties as shall, from time to time, be enjoined on, or intrusted to him by the President, agreeably to the Constitution, relative to correspondence, commissions, or instructions to or with public ministers or consuls from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters respecting foreign affairs as the President of the United States shall assign to said department;" but the act does not say that the President may assign to him, or that he shall perform any duties not relating to the *foreign* affairs of the government.   It proceeds further to provide that he shall "*conduct the business of the said department in such manner* as the President of the United States shall from time to time order or instruct;" which provision decides nothing as to what shall be the business of the department.

The act establishing the Department of War in like manner provides, that the Secretary shall " perform and execute such duties as shall from time to time be enjoined upon him by the President of the United States, agreeably to the Constitution, relative to military commissions, or to the land or naval forces, ships, or warlike stores of the United States, or to such other matters respecting military and naval affairs, as the President of the United States shall assign to said department, or relative

to the granting of lands to persons entitled thereto for military services rendered to the United States, or relative to Indian affairs; and furthermore, that the said principal officer shall conduct the business of said department in such manner as the President of the United States shall, from time to time, order or instruct." Here also the statute power of the President to assign business to the Department, and to direct in it, is limited to a class of enumerated matters and the *manner* of conducting the business assigned.

In the act of 1789, "for the temporary establishment of the Post Office," it is provided " that the Postmaster General shall be subject to the direction of the President of the United States, in performing the duties of his office;" but that act at length expired by its own limitation, and the subsequent acts giving a more stable form to the Post Office, do not appear to contain any provision as to the directory power of the President. (See acts of February 20th, 1792, and March 3d, 1825.)

The act establishing the Department of Treasury, requires the Secretary "to perform all such services relative to. the finance as he shall be directed to perform," but makes no reference, *eo nomine*, to the President.

The act establishing the office of Attorney General is wholly silent on this point.

The act establishing the Department of the Navy is precise in terms, to the effect that the Secretary shall " execute such orders as he shall receive from the President of the United States, relative to the procurement of naval stores and materials, and the construction, armament, equipment, and employment of vessels of war, as well as all other matters connected with the naval establishment of the United States." Nothing is said here of any general directory power on the part of the President.

Finally, the act establishing the Department of the Interior is silent on this point.

Now, upon this full exhibition of the statute provisions on the matter, questions arise both as to the substance of the business of the Departments, and the manner of conducting it, in regard to the directory power of the President.

Office and Duties of Attorney General.

It is impossible for Congress to foresee, and circumstantially provide for, all the possible future contingencies of executive business, either in respect of the business itself or the manner of conducting it. A necessary discretion must exist in the nature of things somewhere as to all such matters. And that ultimate discretion, when the law does not speak, must reside, as to all executive matters, with the President, who has the power to appoint and remove, and whose duty it is to take care that the laws be faithfully executed. Where the laws define what is to be done by a given head of department, and how he is to do it, there the President's discretion stops; but if the law require an executive act to be performed, without saying how or by whom, it must be for him to supply the direction, in virtue of his powers under the Constitution, he remaining subject always to that, to the analogies of statute, and to the general rules of law and of right. And this view of the question has been followed, uniformly, in the practical administration of the Government.

We shall appreciate the value of this conclusion in the sequel, when we come to perceive that great branches of public business are to be found, which are not assigned by statute to any particular department, or as to which there is no provision of statute deciding all questions of the manner of transacting such business.

The Supreme Court have recognised the existence of such a discretion, as being reposed for numerous contingencies, not only in the President in regard to the business of the departments, but in the heads of the departments themselves, by implication of law or as the executive agents of the President. The court say, that to attempt to regulate by law the minute movements of every part of the complicated machinery of administration, would evince complete disregard of the limits of the possible and the impossible. While the great lines of its movements may be marked out, and limitations be thus imposed on the exercise of its powers, there are numberless things to be done which cannot be anticipated or defined, but are, nevertheless, indispensable to the action of the Government. These things must of necessity be left to a wise and judicious discre-

Office and Duties of Attorney General.

tion. (United States *v.* McDaniel, vii Peters, 1; United States *v.* Bailey, ix Peters, 238.)

Question has existed as to the relation of the President and the respective heads of departments to the chiefs of bureaus, and especially the accounting officers of the Treasury.

It is not the duty of the President, and in general it is not convenient for him, to entertain appeals from the departments on the various matters of business, and especially the private claims, on which they have occasion from time to time to pass. Though he is to take care that the laws be faithfully executed, still it is physically impossible that he should do everything in person. Therefore, the Constitution and the laws give to him agents, through whose instrumentality the executive business may be transacted. Among these are the Heads of Departments, and other subordinate officers of the Government.

Now, from the fact that the executive agents, primary and secondary, are assigned by law to particular duties, it has been somewhat hastily inferred, that while it is indubitably true that he may direct the heads of departments, yet he has no authority over the chiefs of bureaus, and especially those in the department of Treasury. It needed only to carry this course of thought one step further, to say that the heads of departments themselves had no authority over those officers. This step was taken, and the doctrine it involves was, for a time, asserted. If maintained, it would have been the singular condition of a great government, in which the executive power was vested by Constitution in the President, and he had authority over the primary executive officers, but neither he nor they had any authority over the secondary executive officers, and, of course, it would be in the power of the latter to arrest, at any time, all the action of the Government.

Such a doctrine was against common sense, which assumes that the superior shall overrule the subordinate, not the latter the former. It was contrary to the settled constitutional theory. That theory, as we shall hereafter see, while it supposes, in all matters not purely ministerial, that executive discretion exists, and that judgment is continually to be exercised, yet requires unity of executive action, and, of course, unity of executive

Office and Duties of Attorney General.

decision; which, by the inexorable necessity of the nature of
things, cannot be obtained by means of a plurality of persons
wholly independent of one another, without corporate conjunc-
tion, and released from subjection to one determining will; and
the doctrine is contradicted by a series of expositions of the
rule of administrative law by successive Attorneys General.

Thus, in a controverted matter of military allowance, re-
quiring an act of decisive judgment, Mr. Berrien adjudged that
the Third Auditor and the Second Comptroller are bound to
take the decision of the Secretary of War, who may give it
either by previous direction or by subsequent review.  (Opinion,
December 4, 1829.)

Mr. Taney gave similar advice on a question arising in the
same department.  (Opinion, September 10, 1831.)

Mr. Butler, Mr. Johnson, and Mr. Crittenden have affirmed
the same doctrine.   And on a question raised by the refusal of
the Commissioner of Customs to take the direction of the Sec-
retary of the Treasury, Mr. Crittenden elaborately reviewed the
whole subject, and determined, by unanswerable argument, the
right of the Secretary of the Treasury in the given case, and by
analogy that of other heads of departments in correspondent
cases.  (Opinion, November 13, 1852.)

Meanwhile, if an opinion delivered many years ago by Mr.
Wirt is now to be received as law, then, although an auditor, as
even he admits, is subject to the direction of the Secretary of
War, or the Secretary of the Interior, or some other Secretary,
as the case may be, yet such auditor is wholly above the
authority of the President, who, nevertheless, directs the Secre-
tary.   Had the idea presented itself as a mere question of the
*order* of business, to the effect that the President should act
upon the subordinate officers through the heads of departments,
it might have answered as a matter of convenience, but not one
of legal necessity.   But the idea utterly excludes the authority
of the President, and so, while recognising the authority of the
head of department, in effect makes the latter also superior to
the President: which is in conflict with universally admitted
principles.   Such an assumed anomaly of relation, therefore,
as this idea supposes, resting upon mere opinion or exposition,

must, of course, yield to better reflection, whenever it comes to
be a practical question demanding the reconsideration of any
Attorney General.

Upon the whole, then, heads of departments have a threefold
relation, namely: 1. To the President, whose political or confi-
dential ministers they are, to execute his will, or rather to act
in his name and by his constitutional authority, in cases in
which the President possesses a constitutional or legal discre-
tion.  2. To the law; for where the law has directed them to
perform certain acts, and where the rights of individuals are
dependent on those acts, then, in such cases, a head of depart-
ment is an officer of the law, and amenable to the laws for his
conduct.  (Marbury v. Madison, i Cranch, 49–61.)  And 3.
To Congress, in the conditions contemplated by the Consti-
tution.

This latter relation, that of the departments to Congress, is
one of the great elements of responsibility and legality in their
action.  They are created by law; most of their duties are pre-
scribed by law; Congress may at all times call on them for
information or explanation in matters of official duty; and it
may, if it see fit, interpose by legislation concerning them,
when required by the interests of the Government.

Some further explanation may be necessary, in regard to the
relation of the departments to law as represented by the courts
of justice.  I do not speak now of the responsibilities of a
head of department in the relation of crime, whether in ques-
tions of indictment or of impeachment.  That is a matter of
course.  I speak of the power of the courts to act on the ad-
ministrative business of the Government.

The Constitution in terms vests the legislative power in Con-
gress, the executive power in the President, and the judicial
power in the Supreme Court and in such inferior courts as the
Congress may, from time to time, ordain and establish.  It is
perfectly clear that in general, and except at certain points
where they necessarily touch one another, such as the partici-
pation of the Senate in treaties and appointments, and of the
President in acts of legislation, it was intended that the three
great departments shall move apart, each in its orbit.  (Martin

Office and Duties of Attorney General.

*v.* Hunter, i Wheaton, 304, 329.)   This would not be the case
if the courts of law had the power to review and overrule the
acts of the Executive.   Therefore, on the first great occasion
in which the relation of the courts of the United States to the
Executive came up for solemn adjudication, that of Marbury *v.*
Madison, which was an attempt of a person to compel the Sec-
retary of State to deliver to him a commission, the Supreme
Court, while asserting the responsibility of a head of depart-
ment to the law, in the general terms hereinbefore cited, and
while discussing at length the legality of the act of the Secre-
tary of State in refusing to deliver the commission, and thus
voluntarily deciding *arguendo* questions of which they had con-
fessedly no jurisdiction, were compelled, in conclusion, to say
this, and to admit that the Constitution had not constituted
them to be an appellate tribunal to review and revise the
administrative acts of the President of the United States.   The
Supreme Court thereupon refused a mandamus, the process
prayed for in this case, as they did subsequently in the case of
McIntire *v.* Wood, which was an application for that process to
compel the register of a land office to issue a certificate of pur-
chase, (vii Cranch, 504 ;) and in the case of Decatur *v.* Pauld-
ing, where a party sought, by the same means, to compel the
Secretary of the Navy to pay a pension to the petitioner, (xiv
Peters, 497 ; see also McClung *v.* Silliman, vi Wheaton, 349.)
But the Supreme Court meanwhile had claimed for the courts
jurisdiction in the case of Stokes *v.* Kendall, where parties
applied to the court to compel the Postmaster General to make
what he conceived to be an illegal payment, and had granted
the order on the ground that this was a ministerial act, while
the other cases were of executive acts.   (Kendall *v.* United
States, xii Peters, 524.)   It is not easy for a head of depart-
ment to extract from these cases any very satisfactory rule of
conduct, so as to know which, of many acts which he may be
called on to perform, is ministerial, and not executive.   And the
court became, apparently, conscious of this, when the later case
of Decatur *v.* Paulding came before them.   There they refused
to take an appeal from the Secretary of the Navy on a question
of alleged legal right to a money payment, after having sus-

tained an appeal from the Postmaster General on the same pre-
cise question, that of alleged legal right to a money payment,
and proceeded to restate the limitations of the authority of the
courts to act by mandamus on the Departments, confining the
claim of jurisdiction more precisely to cases in which an act of
Congress, lawfully passed, and within the proper powers of Con-
gress, commands a specific act to be done, as, for instance, in
the case of Stokes *v.* Kendall, a definite sum of money to be
paid to a party named.

As the law now stands expounded by the Supreme Court,
therefore, it is conceded that a head of an executive depart-
ment of the Government, in the administration of the various
and important concerns of his office, is continually required to
exercise judgment and discretion.  He must do this in constru-
ing the acts of Congress, under which he is from time to time
required to act.  If he doubts, he has a right to call on the
Attorney General for counsel.  In general, his duties are not
merely ministerial.  The Supreme Court will not entertain an
appeal from his decision, nor revise his judgment, in any case
where the law authorized him to exercise discretion or judg-
ment.  Nor can it by mandamus act directly upon the officer,
and guide his judgment or discretion in the matter committed
to his care in the ordinary discharge of his official duties.  Any
such interference would involve a confusion of constitutional
powers, and produce nothing but mischief in the business of the
Government.

The organization of the executive departments of adminis-
tration implies order, correspondence, and combination of
parts, classification of duties, in a word, system : otherwise
there is waste and loss of power, or conflict of power, either of
which is contrary to the public service, in the regard of so
much work to be done by such and such persons, and at a given
cost of either time or money.  Besides which, in a political
relation, want of due arrangement of public functionaries and
their functions, is want of due responsibility to society and to
the law.

Accordingly, it has been the general purpose of Congress, at
all times, both as to the great subdivision of departments, and

Office and Duties of Attorney General.

the arrangement of the duties of each, to classify and to systematize.

This was an exigency of wise public policy, even when the business of the Government was little, and the number of its officers comparatively small; and it was, even then, accomplished approximately.   But now,—when the territorial limits of the Union have spread from the Atlantic to the Pacific Ocean,—when the vast interests of the people of the Union are co-extensive with the habitable globe,—when the progress of wealth, intelligence, and mechanical invention has wonderfully enlarged and complicated the interests of society,—when our commerce extends to every land, and our ships are abroad on every sea,—when the American Union has become a primary power in Christendom,— and when the number of persons requisite to work this mighty machine of government has been proportionally augmented,—in such a state of things, that exigency of order, which was political wisdom always, has now come to be material necessity.

At such a period of the history of the Government, it seems fitting to consider where, if at all, in the conduct of its business, its mechanism can be saved from waste or collision, and its agents subjected to more complete and exact responsibility. And on these premises it is that the present suggestions are made as to the conduct of the law business of the Government.

According to the obvious theory of the constitution of the office of Attorney General, he has the superior charge of that business.   And this theory is carried into practice in the main outlines of the duty of his office, as the following analysis will show.

1. Upon the great questions of law arising in the administration of public affairs, he gives opinion officially, both to the President and to the heads of departments.

2. As one of the confidential political counsellors of the President, it may be supposed that he advises more particularly in regard to the legal incidents of the appointments or other acts of the Government.

3. He conducts directly all suits in the Supreme Court in which the United States are concerned.

4. He advises or directs the Solicitor as to suits in which the

United States are concerned, pending in the inferior courts of
the United States.

5. He directs and prosecutes appeals in the great questions
of land-title, which involve the proprietorship of all the soil in
the successive increments of territory acquired by the United
States.

6. He performs occasional duty, from time to time, in the
protection of the interests of the United States in matters of
adjudication under treaties with foreign powers.

7. He passes upon the title of all interest in lands acquired
by the United States, by purchase for any of the local uses of
government.

8. He communicates to Congress such information as they
require, appertaining to the duties and business of his depart-
ment.

In all these particulars he is, either directly or indirectly,
and by statute, either express or implied, the administrative
head, under the President, of the legal business of the Govern-
ment. So far the administrative power, and the correspondent
administrative responsibility exist, and they require modification
in details only in order to be completely adapted to the theory
of departmental organization.

Among these modifications, it is respectfully submitted, should
be provision, either by law or regulation, for a periodical report
by the Attorney General to the President, and through him to
Congress, of the business of his office, including the official
opinions given by him, and any pertinent suggestions regarding
the interests of the Government.

Then come three important branches of public business, which
the President is required, either by the Constitution or laws, to
discharge in person or through lawful agents, as to which there
is no specific provision by Congress, namely:

1. Suits in which the United States are ultimately concerned,
but in which they are not a party of record, or which are not
brought in the courts of the United States.

. Thus it is that suits, on a foreign alleged grant, against a
tenant in possession under patent from the United States, who
will be called on to indemnify the tenant if he be evicted, are

Case 1:16-cv-01068-KBJ Document 59-7 Filed 08/12/21 Page 25 of 31

brought from time to time in the States; but no provision exists for protecting the eventual interests of the United States in such cases by notice to the Government; there may be collusion in the suit in the court below, or mismanagement; and even if the case come up to the Supreme Court, it may become known to the Attorney General by accident only, if at all.

Or, suit may be brought by some individual against an officer of the United States for some official act performed by him, and judgment rendered against him for heavy damages, perhaps without due defence, but for which Congress will be required to make indemnity.

Or a suit is brought by some person, or by a State, against an officer of the United States in the alleged possession of a citadel as its commander, or of a custom-house as collector of the revenue, for the purpose of thus obtaining a judgment of ejectment, which, in fact, evicts the United States.

Or conflicts of jurisdiction may arise in the States, involving the whole question of the execution of the laws of the United States, or the domestic or foreign peace of the Union, without the United States being in any sense a party, but in which the political interests of the Government as such are above all possible estimation.

These are cases of daily occurrence, and subsisting examples of which, in various forms, do now occupy the attention of the Executive; but the legal controversies thus arising have to be conducted by this or that head of department in whose branch of service they may happen respectively to arise, without any adequate and proper provision for their conduct.

The President undoubtedly has power to assign all these cases, as they arise, to the charge of the Attorney General; and it would be fitting that he should do so, provided the correspondent changes in the organization of this office be authorized by Congress.

2. Pardons. Applications are, of course, continually made to the President for the exercise of his constitutional power to grant reprieves and pardons for offences against the United States. Being constitutional, it is a power which Congress cannot take away or impair. It might, however, as it has done

in other cases where needed, provide legal means and legal agents to aid the President in its exercise; in the absence of which he must of necessity exercise a lawful discretion in those respects. The conscientious determination of questions of this class requires, generally, the investigation of proceedings in court, and that of questions of law as well as of evidence, and the conduct of correspondence, in all which the President requires the instrumentality of a public officer. Formerly, this duty was performed by the Secretary of State; of late, it has been assigned to the Attorney General, in whose department, by reason of the nature of the business, it appropriately falls.

3. Commissions of public officers of a judicial character or relation.

No provision of law exists prescribing the department which shall receive the applications and recommendations, conduct the correspondence, and analyze or abstract the documents, in this branch of the public service. Formerly it was done by the Secretary of State; but it has no natural connection with the general duties of his office, and it has been assigned to the Attorney General as a more appropriate agent.

There is need of legislation in this respect to give method and convenience to the public business. When the commencement of organization took place in 1789, it was provided that all civil commissions should issue from the Department of State, and all military (including naval) ones from the Department of War. Thirty years afterwards, it was provided that all commissions of officers, employed in levying and collecting the public revenue, shall be made out and recorded at the Treasury Department, and sealed with its seal. As the duties of administration continued to increase, it was found convenient to give an official seal to the other departments, and to make it evidence in law; but no correspondent provision of law was enacted relative to the issue of civil commissions, which remained on the footing of the acts as to the Departments of State and Treasury. A systematic arrangement of things would require, that, as in the Departments of State, Treasury, War, and Navy, so in those of the Postmaster General, Interior, and Attorney

General, commissions should be sealed, issued, and recorded in the office to which they belong.

One remaining branch of public service is to be considered, in order to dispose of this part of the subject, namely, supervision of the accounts of judicial and legal officers of the Government.

When the Home Department was established, the supervisory power previously exercised by the Secretary of the Treasury over the accounts of marshals, clerks, and other officers of the courts of the United States was transferred to the Secretary of the Interior. In this no special fitness appears. The Secretary of the Interior does not superintend the appointment of those officers; he has no power by statute to correspond with or direct them; and in several successive reports to Congress from that department, it has been recommended that the accounts of judicial officers, in common with their appointment, be transferred to the Attorney General.

Finally, if any of these proposed changes be adopted, or whether they be so or not, it is desirable that there should be some provision for the case of temporary vacancy in the office of Attorney General. By two acts, one of 1792, and another of 1795, provision is made that, in case of the absence from the seat of government or sickness of the Secretary of State, the Secretary of the Treasury, or the Secretary of War, or the death of either, or the temporary vacancy of either office, for not exceeding six months, it shall be lawful for the President to authorize any person, at his discretion, to perform the duties of such office until a successor be appointed, or until such absence or inability by sickness shall cease. (May 8th, 1792, and February 13th, 1795.) There is also an enactment by which, in case of the death, resignation, or absence of the Postmaster General, all his powers and duties shall devolve, for the time being, on the First Assistant Postmaster General, (July 2d, 1836.) No general provision exists for a temporary appointment by the President, either in regard to this, or to the Departments of the Navy, Interior, and Attorney General. The existing legislation leads to opposite and contradictory conclusions. It may be said, on the one hand, that the power expressly conferred on the

President in three of the Departments, may be applied by analogy to the others.   On the other hand, it may be said that the express enactment conferring the power on the President in those three cases, and making special peculiar legal provision in regard to a fourth, is the implied exclusion of any power of the President as to the remaining three.   Perhaps the truer view of the question is to consider the two statutes as declaratory only, and to assume that the power to make such temporary appointment is a constitutional one.   It has been exercised in regard to all the departments.   In the most questionable of the cases, that of Attorney General, whose quasi judicial functions especially would seem to require to stand on legislative authority, proof exists in the files of the department that temporary appointment has been made by the President, as in the case of the departments whose heads are more exclusively executive officers.   But a general provision is desirable to remove all doubt on the subject, as well respecting the Attorney General as the other non-enumerated departments.

I submit the propriety, therefore, of some further provision of law as to the arrangement of the legal affairs of the Government.   The proposed changes do not enlarge the present power of the Executive in any respect.   But they devolve additional labor on this office by transfer from others: on which account, I beg leave to add a few words of personal explanation.

When the office of Attorney General was created, and for long afterwards, inequality existed between his salary and that of other officers of the same class.   The reason why he received less than the others is given by Washington in his letter to Mr. Edmund Randolph, tendering to him the first appointment of Attorney General, in which he says: "The salary of this office appears to have been fixed at what it is from a belief that the station would confer pre-eminence on its possessor, and procure for him a decided preference of professional employment."   On this basis things continued until a very late period, the Attorney General receiving less salary than his associates, but being invited, as it were, by the nature of the office, into private professional practice in the courts, for which his near association with the Government, united to the professional qualifications

which, from his being appointed to the office, he may be assumed
to possess, would serve to give him great advantages.   The pub-
lished correspondence of the eminent statesmen of the first and
second generations of our constitutional history, the reports of
legal adjudications, the printed opinions of this office, and the
documents on file in it, show that it was the received practice
of the Attorney General not only to give opinions in private
cases, and argue private causes at the seat of Government, but
also to attend, as a practising barrister, at the sittings of courts
in the States.

The office of Attorney General of the United States has been
filled, in past times, by men, who, while eminent in their special
profession, have been not less eminent in the career of parlia-
mentary, diplomatic, administrative, or judicial distinction; and
many of whom now live, enjoying, by just title, the respect and
the confidence of their countrymen.   At the bar of the Supreme
Court they did honor to their station; and their official opinions
are the law which guides the action of the Government.  Nothing
could be more foreign to my purpose than to reflect, in what
follows, upon any of those distinguished persons for pursuing a
course in office which was not forbidden, but, on the contrary,
invited by law, and was justified by official usage, and by the
approbation or acquiescence of Washington, Adams, Jefferson,
and Madison.

Heretofore, the custom of the Attorney General in this respect
did not essentially interfere with his proper official duties, nor
prejudicially affect his general relation to the Government.

Within the last few years, however, the condition of the
country has undergone changes, occasioning a vast augmenta-
tion in the amount of administrative business, which heads of
department are called upon to perform; and it would not be
possible now, as it has been heretofore, for the Attorney General,
compatibly with performing well the duties of his office, to be
frequently absent from the seat of Government, attending to
private professional pursuits, nor could he find much leisure to
prepare and argue private causes even before the Supreme
Court.

It may deserve consideration, whether Congress, in establish-

ing quite recently a common rate of salary for the Attorney
General and the other heads of departments, did not have in
mind the new state of facts above referred to, and for that
cause intend to repeal, by implication, the previous implication
of law, which prompted a continuance of the private professional
pursuits of the Attorney General.

There is one other pertinent consideration. Most of the
ordinary doctrines of law, and much of what is political organi-
zation, we have derived from the institutions of our mother
country. The original theory of the office of Attorney General
of the United States, which authorized and prompted him to
engage in private professional practice, flowed, perhaps un-
consciously, in part from the correspondent usage in Great
Britain. But there the Attorney General is not a member of
the cabinet, the Lord Chancellor performing the political duties
which devolve upon the Attorney General here. And there is
reason to doubt whether, at the present day, in the United
States, it is expedient that a head of department should, under
any circumstances, continue in the practice of law as a pro-
fession. Whatever change in the amount of public business
the present greatness and wealth of the country may have pro-
duced, they have produced a still greater change in the multi-
tude and the urgency of the private interests which assail the
Government. No person, who has been conversant with public
affairs here for the last twenty years, can fail, on comparing the
state of things at the beginning and at the end of that period, to
see how striking is the transition in this respect. Formerly, in
an age of simpler manners, when the public expenditures were
less, the number of places less, the population of the country
less, the frequentation of the capital less, the ingenuity of self-
interests less,—at such a time a Secretary, eminent in the legal
profession, might, without possibility of reproach or suspicion
of evil, take charge of private suits or interests at the seat of
Government. He may do so now, perhaps; but that is not so
clear as it formerly was; and it is not easy to perceive any
distinction in this between what befits one or another head of
department. Nay, arguments of objection could be suggested.

Employment of Counsel by a Department.

especially applicable in the existing state of society to the Attorney General.

However all these things may be, the actual incumbent of this office, in the magnitude and complication of the public interests with which it is now charged, experiences that its necessary duties are quite sufficient to task to the utmost all the faculties of one man; and he willingly regards those recent acts of Congress, which have at length placed the salary of his office on equal footing with other public offices of the same class, as intimation at least that the Government has the same precise claim on his services, in time and degree, as on those of the Secretary of State or the Secretary of the Treasury. As the corollary of that principle, he now proposes such modifications in the office as may render it really and effectually, as well as in theory, responsible for the law business of the Government.

The same thing in substance was earnestly proposed by Jackson in his first annual message to Congress, (December 8, 1829,) and has been twice recommended to Congress by later Presidents. Whatever reasons of public utility seemed then to require change in this respect, have, in the progress of time, acquired such additional force as to lead me to conviction of the propriety of presenting the subject to your notice, and with your approbation to the notice of Congress.

I have the honor to be, very respectfully, your obedient servant,

C. CUSHING.

The PRESIDENT.

────

EMPLOYMENT OF COUNSEL BY A DEPARTMENT.

Counsel, specially employed by the Secretary of State to aid the District Attorney in the prosecution of persons accused of being engaged in illegal military enterprises in Texas, should be paid out of the funds of the State Department.

ATTORNEY GENERAL'S OFFICE,
*March* 9, 1854.

SIR: I have examined the papers referred to me by your note of the 8th instant, consisting of the account of Hugh McQueen,