# EXHIBIT 5

# ATTORNEY GENERAL'S REMARKS, BENJAMIN N. CARDOZO SCHOOL OF LAW, NOVEMBER 15, 1992

*William P. Barr**

While the modern Attorney General is active in a broad array of policy decisions and legal matters, this evening we are concerned only with what was once the core of the Attorney General's duties: legal interpretation within the executive branch. First, I would like to trace the evolution of the office of Attorney General from part-time legal advisor for the new government to head of a major department involved in making policy across a broad range of subjects. Second, I want to discuss the Attorney General's role in interpreting the law, both in rendering legal advice to the executive branch and in determining its litigating positions. In doing so, I will discuss the alleged tension between the Attorney General's roles as a legal advisor and as a policy subordinate of the President.

## I.

Although the office of Attorney General was among the first cabinet positions created in 1789,[1] it was some time before the office carried the same weight and rank as the other departments, in both size and responsibility. Initially, the Attorney General was in many ways like an attorney on retainer. He had no staff, no office space, and no supplies.[2] It appears that he was not required to live in the capital.[3] And he was paid half what the other cabinet secretaries were paid.[4] In keeping with the contemporary practice in England, the Attorney General was a part-time government employee. Congress expected him to supplement his meager salary through private practice. In offering the job to Edmund Randolph, the first Attorney General, George Washington suggested that it would help him attract clients.[5] So much for government ethics in those days.

---

* Attorney General, 1991-1993; Deputy Attorney General, 1990-1991; Assistant Attorney General for the Office of Legal Counsel, 1989-1990.
  [1] *See* Act of Sept. 24, 1989, ch. 20, 1 Stat. 73, 93.
  [2] Luther A. Huston, *History of the Office of the Attorney General, in* ROLES OF THE ATTORNEY GENERAL OF THE UNITED STATES 1, 1-2 (1968).
  [3] *Id*. at 6.
  [4] CORNELL W. CLAYTON, THE POLITICS OF JUSTICE: THE ATTORNEY GENERAL AND THE MAKING OF LEGAL POLICY 16 (1992).
  [5] Huston, *supra* note 2, at 5-6.

Case 1:16-cv-01068-KBJ   Document 59-10   Filed 08/12/21   Page 3 of 12

Initially, the Attorney General's duties were quite limited. As specified in the Judiciary Act of 1789, he had only two responsibilities: one, "to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned,"[6] and two, "to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments . . . ."[7] Although that statute was enacted in 1789, it remains the law. As head of the Office of Legal Counsel, I was often asked by members of Congress for legal advice. I would refuse: it is not the responsibility of the Attorney General's office to give legal advice to Congress, which has its own counsel. They would protest, but the statute dictates that the Attorney General is to give advice when asked by the President.

The Attorney General was not initially responsible for the conduct of litigation in the lower courts, and did not have supervisory authority over the district attorneys. Soon it was recognized, however, that even the limited functions of the Attorney General would require more than part-time work. In 1818, Congress finally gave the Attorney General one clerk, an office, and some supplies.[8] The next year, Congress increased the Attorney General's salary to that of other cabinet officials.[9]

Yet by tradition as much as by duties, the Attorney General was primarily a detached legal advisor, and not really involved in policymaking. Abraham Lincoln's Attorney General, Edward Bates, observed: "The office I hold is not properly *political*, but strictly *legal*; and it is my duty, above all other ministers of State to uphold the Law and to resist all encroachments, from whatever quarter, of mere will and power."[10]

After the Civil War, the office of the Attorney General began to expand dramatically. In 1870, the Department of Justice was formed, and Congress placed litigation conducted by district attorneys in the lower courts under the supervision of the Attorney General.[11] Over the next century, federal law enforcement became a far greater concern, and the Attorney General acquired further duties and responsibilities. Today, the Attorney General's office is responsible for the

---

[6] Act of Sept. 24, 1789, ch. 20, 1 Stat. 73, 93.

[7] *Id.*

[8] Act of Apr. 20, 1818, ch. 87, 3 Stat. 445, 447.

[9] Act of Mar. 3, 1819, ch. 54, 3 Stat. 496, 500.

[10] *See* Arthur S. Miller, *The Attorney General as the President's Lawyer, in* ROLES OF THE ATTORNEY GENERAL OF THE UNITED STATES 41, 51 (1968).

[11] Act of June 22, 1870, ch. 150, 16 Stat. 162, 164.

Immigration and Naturalization Service, the Bureau of Prisons, the Drug Enforcement Agency, the Federal Bureau of Investigation, the United States Marshals, the United States Trustees, the Pardon Attorney, the Parole Board, ninety-four U.S. Attorneys, six litigating divisions in Washington, a large grant program, an asset forfeiture program that has $1 billion in the pipeline at any one time, and numerous other responsibilities. It has been the fastest-growing department by far since 1980. Its budget is almost $12 billion. Thus, the Attorney General now has substantial policy as well as legal responsibilities.[12]

While the Attorney General has been acquiring increased policy responsibilities, the other agencies and departments have acquired their own legal staffs. This has somewhat reduced the Attorney General's burden of advising on day-to-day operations; at the same time, it has created complications and conflicts. For every day that I am glad that there is a general counsel available to each agency, there is another day that I wish there were one general counsel in the Justice Department who answered all the questions. Yet on significant and constitutional issues, the Attorney General has clearly remained the principal legal advisor to the President and to the executive branch.

II.

Today, the Attorney General remains responsible for his two initial functions: providing advice to the executive branch officials on matters of law, and conducting litigation in the Supreme Court. The advice function is performed by the Office of Legal Counsel, and the litigation function is performed by the Office of the Solicitor General. The Attorney General's greater policymaking involvement has created additional challenges in remaining a detached and effective legal advisor. Those challenges vary with the context in which the legal advice is given. Before directly addressing those issues, I will briefly discuss the Attorney General's various interpretative functions.

First, the Attorney General acts as a counselor, in a paradigmatic attorney-client sense, to the President in his official capacity and to the heads of the executive branch agencies. The most obvious example is providing opinions on contemplated executive actions. No less important is the advice provided on bills presented to the President for his approval. Second, the Attorney General is responsible for the resolution of legal disputes between agencies within the executive

---

[12] *See generally* 1992 ATT'Y GEN. ANN. REP. (describing current activities of the Department of Justice).

branch. A third and sometimes overlooked aspect of legal interpretation by the Attorney General is the control the Attorney General exerts over the litigating positions of the executive branch. But the bulk of the Attorney General's role, and certainly the most controversial aspect of it, is the legal interpretation that is done as the direct legal advisor to the President and to the cabinet. Here the Attorney General functions most like a typical attorney, advising a client on his legal options.

For example, when I was head of the Office of Legal Counsel under Attorney General Thornburgh, we gave advice about the United States's options in Panama, the legal justification for the invasion, and how we could arrest Manuel Noriega—and make it stick in court.[13] We also dealt with the international law questions that would be raised.[14] We gave advice on establishing martial law in St. Croix after Hurricane Hugo. Sometimes the questions are extremely important. Some of you may have read the book *The Commanders*,[15] about the war in the Persian Gulf. In that book, Bob Woodward writes that when Attorney General Thornburgh was out of town and I was Deputy Attorney General, I was asked to advise the President on whether or not he could initiate operations against Iraq without the authorization of Congress.[16] Woodward writes that I told President Bush that he could.[17] Of course, we also get more mundane questions, such as "What is the effective date of this statute?" and "When does the ninety days run out?" But sometimes the questions are quite interesting, and do keep one awake at night.

The unique position of the Attorney General raises special considerations. The Attorney General's oath to uphold the Constitution raises the question whether his duty lies ultimately with the President who appointed him or more abstractly with the rule of law. I said in my confirmation hearings, and have said several times since, that the Attorney General's ultimate allegiance must be to the rule of law.[18] In my experience, there has not been any substantial tension between the role of upholding the rule of law and the role of the Attorney

---

[13] 13 Op. Off. Legal Counsel 387 (1989).

[14] Giving advice on international law questions is a long-standing practice of the Office of the Attorney General. *See, e.g.*, 1 Op. Att'y Gen. 27 (1792) (applicability of "law of nations" to United States); 1 Op. Att'y Gen. 30 (1793) (reprisals against foreign states under law of nations); 1 Op. Att'y Gen. 68 (1797) (entry into Spanish territory to recover property under law of nations).

[15] BOB WOODWARD, THE COMMANDERS (1991).

[16] *Id.* at 356-57.

[17] *Id.*

[18] *See Confirmation Hearings on Federal Appointments*, 102d Cong., 1st Sess., pt. 2, at 1, 16-17, 80 (1991).

General as a policy subordinate of the President. As with any lawyer, the Attorney General best serves his client by providing unvarnished, straight-from-the-shoulder legal advice as to what the Attorney General thinks the law is, without regard to political considerations. Being a good legal advisor requires that I reach sound legal conclusions, even if sometimes they are not the conclusions that some may deem to be politically preferable.

Much depends on the question that is asked. As head of the Office of Legal Counsel and as Attorney General, I have paid a great deal of attention to what question is being asked of me as a lawyer. In this administration, my experience has been that the question asked usually is, what is the right answer. What is the *legally* right position? You could get another question, which is, can you advance a reasonable argument to sustain a given action. But more than nine times out of ten, the question is, is this regulation lawful, in your best judgment. That certainly was the question asked about the line-item veto. My predecessor, Charles J. Cooper, wrote a long memorandum concluding that the line-item veto was unconstitutional.[19] I spent about six months reexamining that issue. I came to the conclusion that the line-item veto was not in the Constitution, and that it would be very difficult to mount any reasonable argument that it was.

Another more recent example is the question of indexing capital gains.[20] There was a great deal of pressure—not from the administration but from writers and from Republicans on the Hill—to conclude that the President could index capital gains. There again, I paid close attention to the question that was being asked. Robert Novak wrote that the real problem was that I was not sent sufficient signals as to what answer was wanted.[21] While I agree with Novak on many things, here he was mistaken. On the contrary, I was clearly told what the question was, which was, is indexing lawful. Also, I understood the policy preferences of the administration. The question was: Can we, simply through administrative action, index capital gains. And not only did I not think we could, I did not think that a reasonable argument could be made to support that position.[22]

The reason that I had no hesitation in rejecting the legal bases for a line-item veto and capital gains indexing is rooted in my view that the President has a responsibility to his office to advance responsible

---

[19] 12 Op. Off. Legal Counsel 159 (1988).
[20] 16 Op. Off. Legal Counsel 145 (1992).
[21] *See* Rowland Evans & Robert Novak, *A Presidential Test on Capital Gains*, WASH. POST, Sept. 2, 1992, at A21.
[22] 16 Op. Off. Legal Counsel 145 (1992).

positions of law. I believe that President Bush fully shares this position. Ultimately, if you attempt to push too hard—even as a matter of litigation risks—and take legal positions that clearly will not be sustained, or that are not responsible and reasonable legal positions, you will lose ground. That certainly was the consequence of the *Steel Seizure Case*.[23] And so in this administration, that is why the question has been, what is the right legal answer—not whether we can provide a veneer of justification for a given action. Our view has been that if we go into court with untenable positions and lose, we ultimately weaken the office of the President.

Another special consideration that confronts the Attorney General that does not confront the private attorney when giving advice is that the Attorney General's opinions are binding in a way that private attorneys' opinions rarely are. Obviously, Attorney General opinions cannot bind the President, but by executive order, the Attorney General's opinions do bind the executive branch, at least with respect to interagency disputes.[24] This highlights another change from the early days of the Office of the Attorney General. Although the opinion is not uniform, many of the early Attorneys General looked upon their advice as no more binding on the executive branch than is a private attorney's on his client. Attorney General Jeremiah Black, for example, observed in 1857 that:

> The duty of the Attorney General is to advise, not to decide. . . . You may disregard his opinion if you are sure it is wrong. He aids you in forming a judgment on questions of law; but still the judgment is yours, not his. You are not bound to see with his eyes, but only to use the light which he furnishes, in order to see the better with your own.[25]

In the interest of uniformity within the executive branch, the contrary view has prevailed, although the issue is not free from debate as to so-called "independent" agencies. Therefore, when giving his opinion, the Attorney General, unlike a typical lawyer, must pay close attention to consistency and precedent, rather than simply to the immediate interests of his client. This necessary concern for continuity contributes to the Attorney General's resistance to temporary political pressures.

---

[23] Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952); *see* WILLIAM H. REHNQUIST, THE SUPREME COURT: HOW IT WAS, HOW IT IS 61-98 (1987).

[24] Exec. Order No. 12,146, § 1-401, 3 C.F.R. 409 (1979), *reprinted in* 28 U.S.C. § 509 (1992); *see generally* Nelson Lund, *Rational Choice at the Office of Legal Counsel*, 15 CARDOZO L. REV. 437, 489-91 (1993) (discussing role of the Department of Justice in resolving interagency disputes).

[25] 9 Op. Att'y Gen. 32, 36 (1857).

Case 1:16-cv-01068-KBJ   Document 59-10   Filed 08/12/21   Page 8 of 12

Interagency disputes on legal matters present a particularly strong test of that resistance. By executive order, the President has delegated to the Attorney General the responsibility for resolving disputes between agencies over what the law is.[26] In this context, the Attorney General's role is much like a court's in an adversarial proceeding. Because each agency has its own staff of lawyers, disputes between them come before the Attorney General with legal positions already well-established. Each agency will usually have legal authority or good arguments to support its view. The Office of Legal Counsel requires each side to come in with briefs, just as if it were a judicial proceeding. Deciding among the positions being taken requires the Attorney General—or in most cases the Office of Legal Counsel—to function as a judge.

The Department of Justice does not in this context make policy decisions. Just as a court would, the Department confines itself to the legal questions presented. Its reason for doing so, however, is different from a court's reason. If a court were making the decision, we would say with certainty that policy choices should be left to the political branches of government. Being part of a political branch, however, the Department cannot fall back on that principle. Some observers might argue, therefore, that if both positions are arguably correct, the Attorney General should, as the President's legal advisor, favor the approach most consistent with the administration's overall program. Some argued this during the capital gains indexing debate (although this was not a dispute between two agencies).

In the context of resolving legal disputes under the executive order, we reject this view. Furthering the administration's policy goals is not our role in giving legal advice, and it is not our role in resolving disputes. The question in both contexts is, what is the right legal answer. The Attorney General's authority to decide at all comes from the President.[27] Traditionally, this mandate has been understood to encompass only legal questions. Policy disputes are resolved elsewhere within the executive branch. Any other arrangement would undermine the Attorney General's credibility in rendering legal opinions. Hence, both prudence and the President's delegation of authority require the Attorney General to consider, when resolving disputes, not the administration's policy objectives, but the rule of law. This is true unless a different question is asked, which is, can you sustain a given position with reasonable, good faith legal arguments.

Different concerns arise in the context of advice on bills

---

[26] Exec. Order No. 12,146, § 1-401, *supra* note 24.
[27] *See id.*; *see* U.S. CONST. art. II, § 2.

presented to the President for approval. The role of presidential signing statements in executive branch legal interpretation is sometimes overlooked, but is of growing importance.[28] The use of signing statements dates back at least to Andrew Jackson,[29] but Presidents Reagan and Bush have used them much more frequently to identify constitutionally problematic provisions. The Attorney General advises the President on potential constitutional problems in all legislation presented for his signature. The Department of Justice reviews more legislation than any other government agency by far. Many people in a practical, pragmatist government are contemptuous of the Department of Justice for examining constitutional details in legislation.

But consider, for example, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA),[30] the savings and loan bailout statute. The Office of Legal Counsel recognized an Appointments Clause problem in the FIRREA bill. The director of the Office of Thrift Supervision should have been appointed by the President; he could not be grandfathered in by the chairman of the Home Loan Bank Board.[31] Many people in the Treasury Department and on the Hill thought it was absurd that the Department of Justice was worried about that kind of issue, while they were trying to solve the savings and loan crisis. So the views of the Department of Justice were overridden. Political deals were made, and the bill passed. The law was then struck down by a federal court as unconstitutional.[32] This created a panic, and delayed dealing effectively with the savings and loan crisis. When a provision raises constitutional difficulties, in most cases the Attorney General should recommend veto.[33] I have— I even recommended the veto of our own appropriations bill. No other agency, I think, has ever done that.

---

[28] *See generally* Douglas W. Kmiec, *Of Balkanized Empires and Cooperative Allies: A Bicentennial Essay on the Separation of Powers*, 37 CATH. U. L. REV. 73, 81-83 (1987) (describing increasing use of presidential signing statements).

[29] Douglas W. Kmiec, *Judges Should Pay Attention to Statements by President*, NAT'L L.J., Nov. 10, 1986, at 13.

[30] 12 U.S.C. § 1462a (1992).

[31] The Office of Thrift Supervision replaced the Federal Home Loan Bank Board under FIRREA. *See* 12 U.S.C. § 1462a(e)(1) (1992).

[32] Olympic Fed. Sav. & Loan v. Assoc. Director, Office of Thrift Supervision, 732 F. Supp. 1183 (D.D.C.), *dismissed as moot*, 903 F.2d 837 (D.C. Cir. 1990).

[33] The President ultimately must act on the basis of his own understanding of the Constitution. If the Attorney General believes that a given statute is unconstitutional, but also believes that it is more probable than not that the statute would be upheld by the courts, it would still be appropriate to recommend veto on constitutional grounds. Providing one's view on a statute is not merely a question of predicting litigation risks. *See* Michael B. Rappaport, *The President's Veto and the Constitution*, 87 NW. U. L. REV. 735, 771-76 (1993) (discussing President's responsibility to veto bills believed to be unconstitutional).

Case 1:16-cv-01068-KBJ   Document 59-10   Filed 08/12/21   Page 10 of 12

In many cases, the Department of Justice will propose, as a fallback position, that an issue be addressed in a signing statement if it would be politically impossible simply to veto a bill. For instance, at the very end of its session, Congress frequently passes large bills and then leaves town. The only choice we have is to veto the bill and, say, shut down the foreign operations of the United States altogether for six months, or to sign the bill and note exception to some provision we think is unconstitutional. Thus, in some instances, signing statements have directed subordinate officials to disregard provisions of a bill that are thought to be clearly unconstitutional and severable.

The use of signing statements to say that agencies should refuse to enforce part of a law because it is unconstitutional has been extremely controversial. Our position, or my position when I was at the Office of Legal Counsel, was that the President could use signing statements in that way where the law encroached on executive authority.[34] For example, a 1990 foreign relations bill had a provision forbidding spending funds on sending a delegation to a negotiating session, unless the delegation included members of the (Congress-controlled) Commission on Security and Cooperation in Europe.[35] Essentially, Congress tried to control the President's appointment power by forcing him to appoint members of a legislative entity to a diplomatic delegation. In our view, that was a clearly unconstitutional encroachment on the President's appointment authority as well as on his authority to administer the foreign relations of the United States.[36] Since the bill contained all of our foreign relations money, we said that the President could sign the bill and at the same time announce that the provision would not be enforced.[37] In fact, that is what was done, and no legislative members were appointed. We said that the power to decline to enforce the law flows from the Take Care Clause—"take Care that the Laws be faithfully executed . . . ."[38] The Constitution is the law. If the President is confronted with a circumstance where the Constitution says one thing and a statute says another, the President or the Attorney General has to choose the supreme law of the land. Particularly where a law encroaches on executive power, the only effective way of challenging the law is by declining to enforce it. Otherwise, the President would be at the mercy

---

[34] 14 Op. Off. Legal Counsel 38 (1990).

[35] Foreign Relations Authorization Act, Fiscal Years 1990 & 1991, Pub. L. No. 101-246, § 102, 104 Stat. 15, 19 (1990).

[36] 14 Op. Off. Legal Counsel 38 (1990).

[37] Statement on Signing the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991, 26 PUB. PAPERS 239 (Feb. 16, 1990).

[38] U.S. CONST. art. II, § 3.

Case 1:16-cv-01068-KBJ   Document 59-10   Filed 08/12/21   Page 11 of 12

of Congress. The only reference to this issue at the Constitutional Convention was by James Wilson, who said that one of the President's defenses to encroachments on presidential power is the President's refusal to execute those unconstitutional parts of the law.[39]

We have also used signing statements to set forth the President's understanding of how a particular provision in the bill is to be interpreted, his understanding of what it means, or his directive as to how the executive branch is going to interpret it. It is unclear what weight, if any, the courts will give such statements. The President has a constitutionally-mandated part in the legislating process. To the extent that legislative history is given effect, it may be that presidential signing statements should be viewed as part of legislative history. Beyond that, the Constitution requires that the President "take Care that the Laws be faithfully executed . . . ."[40] Signing statements provide the needed direction to guide subordinate executive officers on how to execute the law faithfully.

The final method of executive branch legal interpretation I would like to address tonight is the Attorney General's role in determining the litigating posture of the United States. Obviously, the position that the Department takes in a brief carries no weight apart from its persuasiveness. But it is in this area that it is most likely that charges of political gamesmanship will be leveled. It must be remembered that in litigation, the Attorney General represents the United States. And I believe that the Attorney General as an advocate must strive for the correct legal result. Observers often equate the correct result with that which is most consistent with a position previously adopted by the courts. Thus, when the Department tries to persuade a court to reconsider its position, or advances a novel argument on a subject previously thought to have been closed, some people have suggested that this is inappropriate—that this is being political. But it is entirely consistent with the Attorney General's duties to advocate such a position. If the Attorney General concludes that a particular line of precedent is incorrect as a matter of law, it is as much a policy decision, if not more so, to acquiesce in that line of decision as to urge that it be discarded. Like the President, the Attorney General is sworn to uphold the Constitution. While the executive branch will not disregard a decision of the Supreme Court, even one that is clearly wrong, this does not mean that presidents are forever debarred from seeking reconsideration of a position that has previously been taken by the

---

[39] 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 450-51 (Merrill Jensen ed., 1976) (statement of James Wilson on Dec. 1, 1787).

[40] U.S. CONST. art. II, § 3.

Court.[41] I believe that urging the Court to reconsider a prior decision serves the executive branch's obligation to the Constitution, without diminishing the Court's constitutional role.

### III.

The issues I have highlighted afford no easy solutions. Much depends on the personal integrity of the attorneys at the Department of Justice and throughout the executive branch who are responsible for the professional and faithful implementation and administration of the law. Of course, the policymakers themselves must value the legal conclusions of those attorneys. Robert Novak said that if Lyndon Johnson—and I do not necessarily believe this of Lyndon Johnson—were then President, William Barr would have been out on the street thirty seconds after giving the capital gains indexing opinion.[42] Indeed, it is true that President Jackson once consulted his Attorney General on a proposal to designate certain banks as depositaries of U.S. funds. The President told his Attorney General, "Sir, you must find a law authorizing the act or I will appoint an Attorney General who will."[43] Ultimately, it falls upon the Attorney General to resist such pressure, in Attorney General Bates's words, "from whatever quarter."[44] Honest legal advice is valuable to policymakers in assessing the litigation risks of their actions, but more importantly it is essential to our system of government. Nothing would be so destructive to the rule of law as to permit purely political considerations to overrun sound legal judgment.

---

[41] *See* John O. McGinnis, *Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical Prolegomenon*, 15 CARDOZO L. REV. 375, 394-96 (1993).

[42] *See* Rowland Evans & Robert Novak, *A Presidential Test on Capital Gains*, WASH. POST, Sept. 2, 1992, at A21.

[43] *See* Miller, *supra* note 10, at 51.

[44] *See supra* note 10 and accompanying text.