# EXHIBIT 7

AS:DRE:caj

Files
Gauf
Efroymson

DEC 19 1974

Mr. Karl E. Bakke
General Counsel
Department of Commerce
Washington, D.C.  20230

Mr. Harold S. Trimmer, Jr.
General Counsel
General Services Administration
Washington, D.C.  20405

Dear Sirs:

    Attached is our memorandum in answer to your request for our views on the applicability of the Endangered Species Act of 1973 to sales of sperm whale oil by the General Services Administration.

    As is stated in more detail in the memorandum, it is our opinion that the Endangered Species Act applies to the sales in question and prohibits them.

                              Sincerely,

                              Antonin Scalia
                              Assistant Attorney General
                              Office of Legal Counsel

DEC 19 1974

MEMORANDUM

Re: Application of the Endangered Species Act of 1973 to the Sale of Sperm Whale Oil by the General Services Administration

We have been asked by the Department of Commerce and the General Services Administration what effect the Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq., has on two contracts made by GSA for the sale of sperm whale oil.

By contracts dated December 27, 1973, the day before the Endangered Species Act became effective, and January 31, 1974, the General Services Administration (GSA) sold two lots of sperm whale oil to two private companies. This oil was originally held by the government in the strategic materials stockpile in accordance with the authority provided by the Strategic and Critical Materials Stock Piling Act, 50 U.S.C. § 98-98h. In 1972 sperm whale oil was removed from the list of strategic and critical materials and GSA was asked to dispose of the material. Pursuant to 50 U.S.C. § 98b(e) notice of the proposed disposal was published in the Federal Register (38 Fed. Reg. 1157 (Jan. 9, 1973)) and given to Congress. Negotiations regarding the sale of the whale oil took place commencing in the fall of 1972 and culminated in the contracts of December 27, 1973 and January 31, 1974. 1/ Commerce asserts that the sales are prohibited; GSA asserts the contrary.

The Endangered Species Act of 1973, which became effective on December 28, 1973, makes it unlawful for any "person" to "sell or offer for sale in interstate or foreign commerce" an endangered species (16 U.S.C. § 1538(a)(1)(F)), or to "deliver, receive, carry, transport, or ship in interstate

---

1/ All details as to the history of the acquisition and sale of the sperm whale oil are taken from a memorandum entitled "Stockpiling of Strategic and Critical Materials," prepared by GSA and attached as exhibit III to the letter of September 27, 1974 from the General Counsel of the Department of Commerce to the Assistant Attorney General, Office of Legal Counsel, Department of Justice.

or foreign commerce, by any means whatsoever and in the course of commercial activity" an endangered species (16 U.S.C. § 1538(a)(1)(E)). This prohibition extends to parts or products of "fish or wildlife" (whether dead or alive) that are designated as "endangered species". 16 U.S.C. § 1532(5). The Act was specifically made applicable to the Federal Government, since "person" is defined to include "any officer, employee, agent, department, or instrumentality of the Federal Government. . . ." 16 U.S.C. § 1532(8).

It is clear that the foregoing provisions of the Endangered Species Act would prohibit GSA's sale of the whale oil and GSA's and the buyer's transportation of the whale oil unless some exemption in the Act applies. 2/ The only exemption that is even arguably applicable is contained in 16 U.S.C. § 1538(b), which provides in pertinent part:

> "The provisions of this section [which include the prohibitions set out above] shall not apply to any fish or wildlife held in captivity or in a controlled environment on December 28, 1973, if the purposes of such holding are not contrary to the purposes of this chapter; <u>except that this subsection shall not apply in the case of any fish or wildlife held in the course of a commercial activity.</u>" (Emphasis added.)

"Commercial activity" is defined as--

> "all activities of industry and trade, including, but not limited to, the buying and selling of commodities and activities conducted for the purpose of facilitating such buying and selling." 16 U.S.C. § 1532(1).

GSA contends that the holding of the sperm whale oil was not "in the course of a commercial activity" and that the prohibitions of the Act therefore do not apply. While

---

2/ Note that the sale of some of the oil prior to the effective date of the Act does not affect the coverage of the Act, for it applies to the transport of the product as well as its sale. Although the first sale might not come within the prohibitions of the Act, the subsequent shipment of the oil would.

this might have been true when the oil was on the list of strategic and critical materials stockpiled by the Government, at least once the notice of proposed disposal was published the oil was being held only for sale. "Selling of commodities" is expressly included within the meaning of "commercial activity" under the Act; and holding the oil in the course of selling it was therefore a holding "in the course of a commercial acitivity."

The cases cited by GSA to support its proposition that the Government is not engaged in "normal trade" when it disposes of surplus property are inapposite to the question of whether the activity is commercial. All the cited cases stand for is the proposition that in order to protect the public treasury and the public good, the Government can impose more restrictive contractual conditions than can a private entity, and the conditions imposed will be strictly interpreted in favor of the Government. See Kirkland Distributing Co. v. United States, 276 F.2d 138 (4th Cir. 1960); United States v. Weisbrod, 202 F.2d 629 (7th Cir.), cert. denied, 346 U.S. 819 (1953); Krupp v. Federal Housing Administration, 185 F. Supp. 638 (D. Mass. 1960), rev'd, 285 F.2d 833 (1st Cir. 1961) 3/, Boy v. United States, 179 F. Supp. 67 (M.D.N.C. 1959).

The conclusion which one draws from the clear and explicit terminology of the statute might be modified if it appears to be contrary to the legislative history or the purpose of the legislation. In this case there is nothing to indicate that it is--and to the contrary, inclusion of this transaction seems necessary both in order to give effect to the apparent intent of those who introduced the limited exemption and in order to meet the concerns of those who sought to narrow it by the limiting clause in its conclusion.

The exemption was introduced on the floor of the Senate by Senator Tunney and his introductory remarks make it clear that the intended purpose was to protect from prosecution private persons who might, for non-commercial purposes, have a pet of an endangered species, or a fur coat.

---

3/ The District Court case cited by GSA was reversed on appeal. The Circuit Court stated that the Government was to be treated the same as any other litigant, 285 F.2d at 836.

3

> "This amendment would exempt from Government interference endangered species now lawfully held in captivity or in a controlled environment which might come under the provisions of this bill. These animals include pets, species held for obligation purposes for which permits might otherwise have to be secured under the bill, and species held in similar circumstances. The Government has made several attempts in the recent past to prosecute certain individuals attempting to enhance the condition of endangered species for seemingly technical violations of the law." 119 Cong. Rec. S. 14530 (daily ed. July 24, 1973) (remarks of Senator Tunney).

Senator Tunney then inserted in the Record, by way of illustration, a series of newspaper stories about the difficulties encountered by a falconer who was attempting to save the species by breeding them in captivity.

The conference committee, although continuing in the same vein, narrowed the coverage of the exemption:

> "The Senate bill restricted the prohibitions of the Act so as not to apply them to species held in captivity or in a controlled environment as of the date of enactment; the House bill was silent on the subject and hence included such animals. As drafted, the Senate language may have made it very difficult, and perhaps even impossible, to enforce the action [Act?]. The real problems envisioned by the Senate had to do with live animals in captivity, such as zoos and <u>privately-owned animal products</u>, and the conferees agreed that these animals are rarely transferred for commercial purposes.
>
> The conferees rewrote the provision to create an affirmative defense with respect to noncommercial activities, permitting a qualified person to plead in defense to a charge of violation of the Act that the goods or animals themselves were in their hands or under control on the effective date of the Act. <u>Only persons holding such goods and animals for other than commercial purposes would be enabled to plead this subsection as a defense, such as noncommercial zoos, private collectors of animals and the owners of fur coats and rugs</u>. The section would not apply in the case of later born progeny of animals alive at the time of enactment." H.R. Rep.

No. 93-740, 93d Cong. 1st Sess. 27 (1973) (emphasis added) [hereinafter; Conference Report].

The references to "privately owned animal products" and "noncommercial activities" clearly do not embrace the Government's sale of surplus material. The Government clearly does not fit within the delineated category of those for whom the exemption was meant -- "noncommercial zoos, private collectors of animals and the owners of fur coats and rugs."

The examples selected in this legislative history to exemplify "noncommercial activities" are not remotely comparable to the Government's sale of a surplus commodity, nor is there any other indication in the legislative history that Congress meant to exempt such sales. Their exemption would, moreover, clearly frustrate one of the purposes sought to be achieved by the exemption as written. Significant in the Conference Report is the reference to the difficulty or impossibility of enforcement of the Senate version of the bill. The conference committee added to the Senate version the language limiting the exception to non-commercial activity (see Conference Report at 27, set out above), which it narrowly limited by defining commercial activity broadly (see 16 U.S.C. § 1532(1), and Conference Report at 24). The enforcement problem alluded to in the Conference Report would appear to be that caused by having so many endangered species and their products in legitimate circulation that detecting and proving the existence of contraband products would be nearly impossible. Clearly, the sale by the Government of 23 million pounds of sperm whale oil would cause just such a problem.

Finally, it is asserted by GSA that the prohibition of sale of the oil in the hands of a holder of the oil at the time the Act was passed constitutes a taking of the oil without just compensation raising serious constitutional questions. 4/ The answer to this contention is that if a party believes that there is a "taking", it may seek damages in the

---

4/ In not one of the cases cited by GSA (North American Co. v. Securities & Exchange Commission, 327 U.S. 686 (1946); Taylor v. United States, 320 F.2d 843 (9th Cir. 1963), cert. denied, 376 U.S. 914 (1964); Sagastivelza v. Puerto Rico Housing Authority, 195 F.2d 289 (1st Cir. 1952); and United States v. Ryan, 213 F. Supp. 763 (D. Colo. 1963)) was a challenge on the basis of lack of just compensation sustained, and only in the first (and arguably the third) cited case was this issue even given serious consideration.

5

Court of Claims. See Regional Rail Reorganization Act Cases, Nos. 74-165, 74-166, 74-167, 74-168 (U.S. Sup. Ct. Dec. 16, 1974); United States v. Causby, 328 U.S. 256 (1946); Yearsley v. W.A. Ross Construction Co., 309 U.S. 18 (1940). If the court concludes that there is a "taking" it will grant recovery of damages; if it concludes that there is no taking there will be no recovery. In either case the Act will stand.

While the point loses some of its importance in view of the above, and although the law in this area is far from clear, we are of the opinion that there is no "taking" because the action of the Congress in this case is a valid exercise of the commerce clause power (similar to the State's exercise of the police power) and is for the general public good and not in furtherance of some governmental enterprise. Regulation in this area, even when it results in the destruction of private economic value, does not give rise to a "taking" in the Fifth Amendment sense. See Mugler v. Kansas, 123 U.S. 623 (1887), upholding a state prohibition of the manufacture and sale of intoxicating beverages. See also National Board of YMCA v. United States, 395 U.S. 85 (1969); Goldblatt v. Town of Hempstead, 369 U.S. 590 (1962); United States v. Central Eureka Mining Co. 357 U.S. 155 (1958); United States v. Caltex, 344 U.S. 49 (1952) 5/ For an example of the extremes to which the Government can go without violating the strictures of the just compensation clause see Calero-Toledo v. Pearson Yacht Leasing Co., 94 S. Ct. 2080 (1974), where the Court upheld the forfeiture of a yacht in accordance with a statute providing for such action when the vessel was used for unlawful purposes (here the transportation of marijuana), even though the owner was neither involved in, nor knew of, the illegal activity.

---

5/ For a more thorough look at this problem see Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165 (1967); Sax, Takings and the Police Power, 74 Yale L.J. 36 (1964); both of which, on different grounds, support the conclusion we have reached. (Michelman would find no taking because that result is essentially "fair", i.e., the best result in the circumstances; Sax would find no taking because the Government is acting in its mediator or public interest capacity as opposed to its enterprise capacity.)

6

In sum, it is our opinion that the sale and shipment of the sperm whale oil is in violation of the Endangered Species Act of 1973, and is not covered by any exemption of that Act.

                                        Antonin Scalia
                                        Assistant Attorney General
                                        Office of Legal Counsel