# EXHIBIT 16

# Obligation of Federal Agencies to Pay Stormwater Assessments Under the Clean Water Act

Section 313(c)(2)(B) of the Clean Water Act does not impose a specific-appropriation requirement for the payment of stormwater assessments. Federal agencies may pay appropriate stormwater assessments from annual—including current—lump-sum appropriations.

February 25, 2011

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
ENVIRONMENTAL PROTECTION AGENCY

Congress recently passed "An Act To amend the Federal Water Pollution Control Act to clarify Federal responsibility for stormwater pollution," Pub. L. No. 111-378, 124 Stat. 4128 (2011) (the "Stormwater Amendment"), which revised section 313 of the Clean Water Act ("CWA"), 33 U.S.C. § 1323 (2006), to clarify that reasonable service charges payable by federal agencies, as described in section 313(a), include certain stormwater assessments. Section 313(c)(2)(B), enacted as part of this amendment, provides that federal agencies may not pay certain stormwater assessments "except to the extent and in an amount provided in advance by any appropriations Act to pay or reimburse the fee, charge, or assessment." You have asked whether section 313(c)(2)(B) bars federal agencies from paying stormwater assessments unless Congress makes a specific appropriation (for example, a line-item appropriation) for such payments, or instead whether agencies may "use general, lump-sum appropriations" for such payments.[1] We believe that the best reading of

---

[1] *See* Letter for Jonathan Cedarbaum, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Scott C. Fulton, General Counsel, Environmental Protection Agency at 1 (Jan. 21, 2011) ("EPA Letter"). In preparing this opinion, we have received comments from the Tax Division, *see* Memorandum for John A. DiCicco, Acting Assistant Attorney General, Tax Division, from David A. Hubbert, Chief, Special Litigation (Jan. 26, 2011) ("Tax Memorandum"); the Bonneville Power Administration, *see* Letter for Jonathan Cedarbaum, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Randy A. Roach, General Counsel, Bonneville Power Administration (Feb. 2, 2011); the Environment and Natural Resources Division, *see* Memorandum for Karen Wardzinski, Section Chief, Law & Policy Section, Environment and Natural Resources Division, from Peter J. McVeigh, Attorney, Law & Policy Section (Feb. 3, 2011) ("ENRD Memorandum"); the General Services Administration, *see* Letter for

1

35 Op. O.L.C. 1 (2011)

section 313(c)(2)(B), when construed in accord with the structure, purpose, and history of the Stormwater Amendment, is that the provision does not impose a specific-appropriation requirement. In our view, federal agencies may pay appropriate stormwater assessments from annual—including current—lump-sum appropriations consistent with section 313(c)(2)(B) of the CWA. We emphasize that our opinion is limited to the application of that subsection.

## I.

### A.

The CWA, as amended, established a National Pollution Discharge Elimination System ("NPDES") that is "designed to prevent harmful discharges into the Nation's waters." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007). As a general matter, "the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004). Because stormwater runoff collects debris, chemicals, and other pollutants and therefore may be a source of pollution when discharged into the Nation's waters, Congress amended the CWA in 1987 to direct the Environmental Protection Agency ("EPA") to issue rules requiring and governing NPDES permits for certain categories of discharges of stormwater, including municipal and industrial discharges. *See* 33 U.S.C.

---

Daniel Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Kris Durmer, General Counsel, General Services Administration (Feb. 3, 2011) ("GSA Letter"); the U.S. Postal Service, *see* Letter for Daniel Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Carrie M. Branson, Attorney, Law Department, U.S. Postal Service (Feb. 3, 2011) ("USPS Letter"); the Council on Environmental Quality, *see* Letter for Caroline Krass, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Nancy H. Sutley, Chair, Council on Environmental Quality (Feb. 3, 2011) ("CEQ Letter"); the U.S. Department of Agriculture, *see* Letter for Daniel Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from James Michael Kelly, Associate General Counsel, U.S. Department of Agriculture (Feb. 7, 2011) ("USDA Letter"); and the Department of Defense, *see* Letter for Caroline Krass, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Robert S. Taylor, Principal Deputy General Counsel, Department of Defense (Feb. 8, 2011) ("DOD Letter").

*Obligation of Federal Agencies to Pay Stormwater Assessments*

§ 1342(p)(3)(B) (2006); Final Rule, National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47,990 (Nov. 16, 1990); Final Rule, National Pollutant Discharge Elimination System—Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. 68,722 (Dec. 8, 1999); *see also Natural Res. Def. Council v. EPA*, 526 F.3d 591, 594–601 (9th Cir. 2008) (recounting statutory and regulatory history of EPA stormwater regulations).

The EPA has issued regulations that, among other things, require municipalities operating separate storm sewer systems to obtain NPDES permits and undertake certain control measures designed to minimize the discharge of pollution from stormwater into the Nation's waters. *See, e.g.*, 40 C.F.R. § 122.34 (2010). Municipal separate storm sewer systems are "publicly owned conveyances or systems of conveyances that discharge to waters of the U.S. and are designed or used for collecting or conveying storm water, are not combined sewers, and are not part of a publicly owned treatment works." Notice, Stakeholder Input; Stormwater Management Including Discharges From New Development and Redevelopment, 74 Fed. Reg. 68,617, 68,619 (Dec. 28, 2009); *see* 40 C.F.R. § 122.26(b)(8) (defining "municipal separate storm sewer").

Under this federal regulatory scheme, municipalities operating municipal separate storm sewer systems are required to undertake costly control efforts to minimize pollution from stormwater discharges into the Nation's waters. In response, many municipalities have adopted local stormwater ordinances that attempt to recover the costs of these compliance efforts from property owners, including federal agencies.

**B.**

The efforts by municipalities to recover stormwater assessments from federal agencies gave rise to a controversy whether federal agencies could be required to pay such assessments. The Supreme Court has explained that as a general matter "the activities of the Federal Government are free from regulation by any state," *Mayo v. United States*, 319 U.S. 441, 445 (1943), and that a state or local law that "regulate[s] the [federal] Government directly" "run[s] afoul of the Supremacy Clause." *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 425–37 (1819)); *see also Penn Dairies, Inc.*

3

35 Op. O.L.C. 1 (2011)

*v. Milk Control Comm'n*, 318 U.S. 261, 269 (1943) ("in the absence of Congressional consent, there is an implied constitutional immunity of the national government from state taxation and from state regulation" of federal entities). Nevertheless, "a clear congressional mandate" divests the presumptive immunity of federal agencies from state and local regulatory compulsion. *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 122 (1956).

Prior to Congress's enactment of the Stormwater Amendment, there was some doubt whether section 313(a) of the CWA, 33 U.S.C. § 1323(a), divested the immunity of federal agencies with respect to stormwater assessments. *See* ENRD Memorandum at 2–3; EPA Letter at 5–7; USDA Letter at 1–2. Section 313(a), in relevant part, provides that federal agencies owning property or engaged in activities that may result

> in the discharge or runoff of pollutants . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges.

33 U.S.C. § 1323(a). The section further mandates that these requirements attach "notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law." *Id.*; *see Dep't of Energy v. Ohio*, 503 U.S. 607 (1992) (interpreting section 313(a) of the CWA). In dispute was whether the phrase "reasonable service charges" in section 313(a) included stormwater assessments, thereby waiving federal immunity and requiring federal agencies to pay such assessments.[2]

As we explain further in Part II below, the Stormwater Amendment reflected an effort by Congress to resolve the controversy whether local

---

[2] For example, the Government Accountability Office ("GAO") had concluded that federal agencies could not pay the District of Columbia's stormwater assessment because it was a "tax" for which "Congress has not . . . legislated a waiver of sovereign immunity." Letter for David A. Lebryk, Commissioner, Financial Management Service, U.S. Department of the Treasury, from Lynn H. Gibson, Acting General Counsel, Government Accountability Office, B-320868, at 1 (Sept. 29, 2010); *see also* Letter for Peter J. Nickles, Attorney General of the District of Columbia, from Lynn H. Gibson, Acting General Counsel, Government Accountability Office, B-320795 (Sept. 29, 2010).

4

governments could levy stormwater assessments against the federal government for its facilities. On June 10, 2010, Senator Cardin introduced S. 3481, "A bill to amend the Federal Water Pollution Control Act to clarify Federal responsibility for stormwater pollution." *See* 156 Cong. Rec. S4855 (daily ed. June 10, 2010). He explained that "the issue of polluted stormwater runoff from federal properties has . . . gained significant attention" and that he had "grave concerns about the failure of the Federal Government to pay localities for reasonable costs associated with the control and abatement of pollution that is originating on its properties." *Id.* Senator Cardin stressed that "Uncle Sam must pay his bills" and that he was "introducing legislation that makes [that] clear." *Id.*; *see also id.* at S4856 ("Adopting the legislation that I am introducing today will remove all ambiguity about the responsibility of the Federal Government to pay these normal and customary stormwater fees."). At that time, S. 3481 would have accomplished this objective by adding a subsection (c) to section 313 of the CWA to make explicit that the "reasonable service charges" described in section 313(a) include certain stormwater assessments. S. 3481 also stated that such stormwater assessments "may be paid using appropriated funds." *Id.* at S4856 (text of S. 3481).

The Senate amended S. 3481 in the nature of a substitute, S. Amdt. 4917, on Dec. 21, 2010, a day before its passage. The apparent aim of the last-minute revision was to address certain appropriations issues that might otherwise arise with the payment of stormwater assessments. Like the original amendment, the substitute bill, which was introduced on behalf of Senator Cardin, contained language in proposed section 313(c)(1) to make explicit that the phrase "reasonable service charges" includes certain stormwater assessments. *See* 156 Cong. Rec. S10,932 (daily ed. Dec. 21, 2010) (text of amendment).[3]

---

[3] Section 313(c)(1) provided in full:

  (1) IN GENERAL.—For the purposes of this Act, reasonable service charges described in [section 313(a)] include any reasonable nondiscriminatory fee, charge, or assessment that is—

    (A) based on some fair approximation of the proportionate contribution of the property or facility to stormwater pollution (in terms of quantities of pollutants, or volume or rate of stormwater discharge or runoff from the property or facility); and

35 Op. O.L.C. 1 (2011)

The substitute bill also added a new subsection (c)(2), with the heading "Limitation on Accounts," containing the appropriations language that is at issue here. *See id.* Proposed section 313(c)(2) provided in full:

> (2) LIMITATION ON ACCOUNTS.—
>
>   (A) LIMITATION.—The payment or reimbursement of any fee, charge, or assessment described in paragraph (1) shall not be made using funds from any permanent authorization account in the Treasury.
>
>   (B) REIMBURSEMENT OR PAYMENT OBLIGATION OF FEDERAL GOVERNMENT.—Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government, as described in [section 313(a)], shall not be obligated to pay or reimburse any fee, charge, or assessment described in paragraph (1), except to the extent and in an amount provided in advance by any appropriations Act to pay or reimburse the fee, charge, or assessment.

*Id.* The substitute bill passed the Senate by unanimous consent on December 21, 2010, and passed the House by unanimous consent on December 22, 2010 (the last day of the 111th Congress). The President signed the enrolled bill into law on January 4, 2011.

On January 21, 2011, you requested our opinion whether "it is permissible to construe . . . section 313(c)(2)(B) as authorizing federal governmental entities to use general, lump-sum appropriations to pay the reasonable service charges described in . . . section 313(c)(1)," EPA Letter at 1, or instead whether section 313(c)(2)(B) "requires a specific appropriation"—for example, a line-item appropriation—"for the payment of the stormwater charges," *id.* at 12.

---

   (B) used to pay or reimburse the costs associated with any stormwater management program (whether associated with a separate storm sewer system or a sewer system that manages a combination of stormwater and sanitary waste), including the full range of programmatic and structural costs attributable to collecting stormwater, reducing pollutants in stormwater, and reducing the volume and rate of stormwater discharge, regardless of whether that reasonable fee, charge, or assessment is denominated a tax.

156 Cong. Rec. S10,932 (daily ed. Dec. 21, 2010). The relevant text of section 313(a) is set forth above. *See supra* p. 4.

*Obligation of Federal Agencies to Pay Stormwater Assessments*

## II.

The issue we address here is whether section 313(c)(2)(B)'s language limiting the payment of stormwater assessments "except to the extent and in an amount provided in advance by any appropriations Act to pay or reimburse the fee" forbids federal agencies from paying stormwater assessments from annual lump-sum appropriations. We conclude that it does not.

The Stormwater Amendment contains two principal provisions. The first provision, section 313(c)(1), instructs that the "reasonable service charges described in [section 313(a)] include any reasonable nondiscriminatory fee, charge, or assessment that is . . . based on some fair approximation of the proportionate contribution of the property or facility to stormwater pollution" and that is "used to pay or reimburse the costs associated with any stormwater management program." The first provision thus resolves the dispute over federal agencies' duty to pay stormwater assessments, by making clear that the phrase "reasonable service charges" in section 313(a)—which is an unambiguous waiver of immunity—includes certain stormwater assessments. *See* 33 U.S.C. § 1323(a) (requirements of section 313(a) apply "notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law").[4]

The second provision, section 313(c)(2), sets forth requirements for the payment of such stormwater assessments by federal agencies. After stating in section 313(c)(2)(A) that federal agencies may not pay these assessments from "any permanent authorization account in the Treasury," section 313(c)(2)(B) allows payment only "to the extent and in an amount provided in advance by any appropriations Act to pay or reimburse the fee, charge, or assessment." Section 313(c)(2)(B) could be read to allow

---

[4] Some agencies providing views on EPA's opinion request suggested that this Office clarify the meaning of certain terms in section 313(c)(1) and address other legal issues under the Stormwater Amendment. *See, e.g.*, GSA Letter at 2–5; USPS Letter at 1–3; USDA Letter at 5. To respond to EPA's request expeditiously, we confine this opinion to the interpretation of the appropriations language in section 313(c)(2)(B). GSA, for example, asked us to advise whether the Federal Buildings Fund may be used to pay stormwater assessments in light of section 313(c)(2)(A). *See* GSA Letter at 4–5. Although we recognize the importance of this question, it lies beyond the scope of EPA's request, which is focused on section 313(c)(2)(B).

7

35 Op. O.L.C. 1 (2011)

federal agencies to pay stormwater assessments out of lump-sum appropriations, but could also be read to impose a rule that Congress must annually enact a specific appropriation (for example, a line item) for such payments. In our view, the best reading of the text, structure, purpose, and history of the Stormwater Amendment, taken together, is that Congress did not intend to require a specific appropriation.

### A.

Although "[s]tatutory construction is a holistic endeavor," *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) (internal quotation marks omitted), our analysis of the Stormwater Amendment, "begin[s], as always, with the text of the statute." *Hawaii v. Office of Hawaiian Affairs*, 129 S. Ct. 1436, 1443 (2009). The text of section 313(c)(2)(B), standing alone, does not unambiguously resolve the issue before us. On the one hand, the phrase "except to the extent and in an amount provided in advance by any appropriations Act" might be read to authorize the payment of stormwater assessments only when Congress makes a specific appropriation of funds for that purpose. *See* USPS Letter at 1 ("The language lends itself to only one logical interpretation, i.e., federal entities are not required to pay stormwater fees unless Congress has provided specific appropriations for that purpose."); USDA Letter at 2–4. On the other hand, the phrase might be interpreted as authorizing federal agencies to pay stormwater assessments, not from a "permanent authorization account in the Treasury," declared off limits by section 313(c)(2)(A),[5] but instead from annual lump-sum appropriations.

While the text of section 312(c)(2)(B), standing alone, does not resolve the issue, reading the section to allow payment from annual lump-sum appropriations is ultimately the better reading of the text. First, such a reading accords with basic principles of appropriations law. The "except to the extent and in an amount" language can be read to clarify that the Stormwater Amendment provides spending authority for payment of

---

[5] Although we do not address here the meaning of the phrase "permanent authorization account in the Treasury," we note that Senator Cardin explained section 313(c)(2)(A) as "rectify[ing] a specific problem in the District of Columbia, where the Department of Treasury has been paying some stormwater fees" and as reflecting "that agencies and departments *should use their annual appropriated funds to pay for stormwater fees*." 156 Cong. Rec. S11,024 (daily ed. Dec. 22, 2010) (emphasis added).

stormwater assessments, but is not itself an appropriation. *See* U.S. General Accounting Office, GAO-04-261SP, *Principles of Federal Appropriations Law* 2–5 (3d ed. 2004) ("*Federal Appropriations Law*") ("While other forms of budget authority may authorize the incurring of obligations, the authority to incur obligations by itself is not sufficient to authorize payments from the Treasury. Thus, at some point if obligations are paid, they are paid by and from an appropriation.") (internal citations omitted); 31 U.S.C. § 1301(d) (2006) ("A law may be construed to make an appropriation out of the Treasury or to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states that an appropriation is made or that such a contract may be made."). The phrase further can be understood to embody the basic principle that any stormwater assessments paid by federal agencies must come from and may not exceed an actual appropriation. *See, e.g.*, *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 14 (1990) (noting that a statute providing that payments "are effective only 'in such amounts as are provided in advance in appropriation Acts'" reflects a "concept that mirrors Art. I, § 9, of the Constitution ('No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law')"). *See generally* EPA Letter at 12; CEQ Letter at 6; Tax Memorandum at 5.

Second, this reading of the text comports with earlier opinions of this Office interpreting other authorization or appropriations provisions. For instance, faced with a statute that authorized the Secretary of Defense to make available five million dollars out of previously appropriated funds to the Director of the National Science Foundation "[t]o the extent provided in appropriations Acts," this Office concluded that this condition did not require that there have been a specific line-item appropriation in those appropriations acts. *See Funding for the Critical Technologies Institute*, 16 Op. O.L.C. 77, 79–83 (1992) ("*Critical Technologies Institute*") (interpreting section 822(d)(1) of the National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub. L. No. 102-190, 105 Stat. 1290, 1435 (1991)). In reaching this conclusion, we noted that the term "provided" can mean "to make a proviso or stipulation," but can also mean, more generally, "to make preparation to meet a need." *Id.* at 81 (citing *Webster's Ninth New Collegiate Dictionary* 948 (1986)). Construing the term against the background of the "fundamental principle of appropriations law" that "Congress is not required to enact a specific

appropriation for a program," and in the absence of any textual indication that Congress intended to depart from this principle, we concluded that a lump-sum appropriation was sufficient to meet the condition. *Id.* at 81–82; *see also id.* at 79–80 (observing that it is "axiomatic" that Congress uses lump-sum appropriations to "cover[] a wide range of activities without specifying precisely the objects to which the appropriation may be applied").[6]

---

[6] Nor do we think this Office's interpretation of section 207 of the Equal Access to Justice Act ("EAJA")—which provided that the payment of fees as provided by the statute was "effective only to the extent and in such amounts as are provided in advance in appropriations Acts," Pub. L. No. 96-481, 94 Stat. 2321, 2330 (1980)—is to the contrary. *See Funding of Attorney Fee Awards Under the Equal Access to Justice Act*, 6 Op. O.L.C. 204, 208–09 (1982) ("Olson Memorandum"). Although this Office observed in *Critical Technologies Institute* that the Department of Defense's reliance on the Olson Memorandum was inapposite because the different statutory language presented a "significantly different question" and that the addition of the phrase "and in such amounts" requires "a greater degree of precision than 'to the extent provided' would alone," 16 Op. O.L.C. at 83, we do not believe that this analysis, which effectively was dicta, precludes the interpretation of section 313(c)(2)(B) we set forth here. As explained in *Critical Technologies Institute*, section 207 of EAJA had *not* been "interpreted" by the Olson Memorandum to "require a specific line-item appropriation." 16 Op. O.L.C. at 83. Rather, "the concern motivating section 207's clause was not," we said, "whether a line-item appropriation rather than a lump-sum appropriation was required, but instead whether an appropriation was necessary at all." *Id.* On this view, section 207 was an effort to "make clear that the bill merely authorized funds, but did not appropriate them" and thus to avoid "hav[ing] the EAJA bill ruled out of order because it contained appropriations, in violation of House rules." *Id.* For these reasons, far from mandating that section 313(c)(2)(B) be interpreted to impose a specific-appropriation requirement, *Critical Technologies Institute*, read as a whole, supports our conclusion that section 313(c)(2)(B)'s function is not to impose a rigid specific-appropriation requirement but rather to clarify that the Stormwater Amendment "merely authorized funds, but did not appropriate them." 16 Op. O.L.C. at 82.

The GAO has suggested a contrary interpretation of similar language in other statutory contexts, *see, e.g.*, Letter for Hon. William Lehman, Chairman, Subcommittee on Transportation and Related Agencies, Committee on Appropriations, House of Representatives, from Milton J. Socolar, Acting Comptroller General of the United States, B-204078 (May 6, 1988) (construing a similar phrase as reflecting "a clear prohibition on the obligation or expenditure of funds . . . unless specifically provided for in an appropriation act"), but the GAO has not addressed this particular statutory context and, to the extent that its interpretation of other provisions might be extended here, its interpretation is not binding in any event, *see, e.g.*, *Prioritizing Programs to Exempt Small Businesses from Competition in Federal Contracts*, 33 Op. O.L.C. 284, 302 (2009) ("Our Office has on many occasions issued opinions and memoranda concluding that GAO decisions are not binding on Executive Branch agencies and that the opinions of the Attorney General and

*Obligation of Federal Agencies to Pay Stormwater Assessments*

Finally, section 313(c)(2)(B)'s limitation that stormwater assessments can be paid only "to the extent and in an amount provided in advance by any appropriations Act to pay or reimburse the [stormwater assessment]," which makes clear that the amendment itself is not an appropriation, plainly responded to the need to ensure that the statute conformed to the requirements of 2 U.S.C. § 651 (2006). *See* EPA Letter at 7–8. That section provides that "[i]t shall not be in order in either the House of Representatives or the Senate to consider any bill . . . that provides," among other things, "new authority to incur indebtedness . . . for the repayment of which the United States is liable . . . unless that bill . . . also provides that the new authority is to be effective for any fiscal year *only to the extent or in the amounts provided in advance in appropriation Acts*." 2 U.S.C. § 651(a) (emphasis added). Under section 651, "legislation providing new [spending] authority will be subject to a point of order in either the Senate or the House of Representatives unless it also provides that the new authority will be effective for any fiscal year *only to such extent or in such amounts as are provided in advance in appropriation acts*." *Federal Appropriations Law* at 2–6 (emphasis added).[7] Section 313(c)(2)(B)'s confirmation that the Stormwater Amendment is not an appropriation thus served the important function of avoiding a point of order, thereby enabling passage of the bill. *See* EPA Letter at 8 (setting forth this explanation); *accord* DOD Letter at 3.[8]

---

of this Office are controlling."); *see also Critical Technologies Institute*, 16 Op. O.L.C. at 84 (disagreeing with GAO advice).

[7] Section 651 traces its statutory lineage to section 401(a) of the Congressional Budget Act of 1974 (originally codified at 31 U.S.C. § 1351(a) (Supp. IV 1974)). The legislative history of the 1974 statute explains that the purpose of the requirement was to ensure that "backdoor spending authority (such as contract authority, loan authority, and mandatory or open-ended entitlements) could not take effect until funds were provided through the appropriations process." H.R. Rep. No. 93-658, at 17 (1973), *reprinted in* 1974 U.S.C.C.A.N. 3462, 3463.

[8] Because we understand section 313(c)(2)(B) to be serving several purposes on this reading—including clarifying that the Stormwater Amendment authorizes spending but is not itself an appropriation; forbidding federal agencies from incurring any stormwater assessment obligations in excess of their appropriations; and conforming with the requirements of 2 U.S.C. § 651—we do not believe that this reading gives no effect to, and thus renders surplusage, the phrase "except to the extent and in an amount provided in advance by any appropriations Act." *Cf.* DOD Letter at 4. Indeed, we rejected a similar objection lodged against our interpretation of the phrase "[t]o the extent provided in

35 Op. O.L.C. 1 (2011)

## B.

Our textual interpretation is supported by consideration of the text in the context of the Stormwater Amendment's overall structure, purpose, and legislative history. The structure of the Stormwater Amendment favors reading section 313(c)(2)(B) to allow payment from lump-sum appropriations and undermines a specific-appropriation interpretation of that section. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole.") (internal quotation marks and citations omitted). Reading section 313(c)(2)(B) to restrict payment of stormwater assessments unless and until a *future* Congress makes a *specific* appropriation for that purpose would be in considerable tension with Congress's decision in the immediately preceding subsection—section 313(c)(1)—to clarify that federal agencies are responsible for paying reasonable stormwater assessments. Such a restriction would frustrate the ability of federal agencies to pay those assessments, and "[w]e are disinclined to say that what Congress imposed with one hand . . . it withdrew with the other." *Logan v. United States*, 552 U.S. 23, 35 (2007); *see Greenlaw v. United States*, 554 U.S. 237, 251 (2008) ("We resist attributing to Congress an intention to render a statute so internally inconsistent."). Rather, here, a provision that "seem[s] ambiguous in isolation is . . . clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Koons Buick Pontiac GMC*, 543 U.S. at 60.

Interpreting section 313(c)(2)(B) to require a specific appropriation also would substantially conflict with the general purpose of the Stormwater Amendment. *See Stafford v. Briggs*, 444 U.S. 527, 535 (1980) (statutory interpretation must take account of the "'the objects and policy of the law'") (quoting *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 194 (1857)); *McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844,

---

Appropriations acts" in *Critical Technologies Institute*, reasoning, among other things, that the phrase "makes clear that the act merely authorized funds, and that a further appropriation is required." 16 Op. O.L.C. at 82. In any event, "[s]urplusage does not always produce ambiguity and [a] preference for avoiding surplusage constructions is not absolute." *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004).

861 (2005) ("[e]xamination of purpose is a staple of statutory interpretation"). The central purpose of the Stormwater Amendment was to resolve the controversy surrounding the payment of stormwater assessments by requiring that federal agencies pay such assessments. The very first words of the amendment—"[a]n Act To . . . clarify Federal responsibility for stormwater pollution"—show Congress's purpose to resolve the dispute regarding stormwater assessments and make clear that the federal government as an owner of federal facilities is responsible for the payment of stormwater assessments. Although "[t]he title of an act cannot control its words," it "may furnish some aid in showing what was in the mind of the legislature." *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 630 (1818) (Marshall, C.J.); *see Holy Trinity Church v. United States*, 143 U.S. 457, 462 (1892) ("title of the act" may shed light on the "intent of the legislature"). The title here does just that. *See* ENRD Memorandum at 4 (arguing that the "purpose is readily apparent from the title of the act").

In addition to the title, all of the available legislative history confirms this account of Congress's purpose.[9] The Senate sponsor of the bill, Senator Cardin, explained in introducing the bill: "Adopting the legislation that I am introducing today will remove all ambiguity about the responsibility of the Federal Government to pay these normal and customary stormwater fees." 156 Cong. Rec. S4856 (daily ed. June 10, 2010).[10] Several members of the House repeated this understanding of the objective of the Stormwater Amendment, including after the substitute

---

[9] This Office has previously found legislative history one potentially instructive factor to consider, along with other evidence, when confronted with ambiguous appropriations language. *See Critical Technologies Institute*, 16 Op. O.L.C. at 80 (relying on legislative history in ascertaining the meaning of similar appropriations language); *see also Authority of Chrysler Corporation Loan Guarantee Board to Issue Guarantees*, 43 Op. Att'y Gen. 219, 219–23 (1980) (construing phrase "to the extent such amounts are provided in advance in appropriations acts" based principally on legislative history).

[10] Although some of the legislative history we cite here was in connection with the bill as it existed prior to the last-minute addition of section 313(c)(2)(B), that does not render that prior history irrelevant. Senator Cardin's explanation of the purpose of the Stormwater Amendment was the same before and after the addition of the relevant appropriations language (which was added at Senator Cardin's request), and is consistent with statements made by members of the House *after* the revised language was added. Standing alone, the fact that Congress revised the Stormwater Amendment provides no basis for adopting a restrictive interpretation of section 313(c)(2)(B), especially when all available legislative evidence is to the contrary.

35 Op. O.L.C. 1 (2011)

version of the bill passed the Senate. Representative Oberstar, for example, noted that "[s]everal states and municipalities . . . have taken aggressive action to address ongoing sources of stormwater pollution" but that such action is undermined "when a significant percentage of Federal property owners take the position that they cannot be held responsible for their pollution." 156 Cong. Rec. H8978 (daily ed. Dec. 22, 2010). He explained that the amendment would "clarif[y] that Federal agencies and departments are financially responsible for any reasonable . . . charges for treating or otherwise addressing stormwater pollution that emanates from Federal property." *Id.* Other statements in the legislative record are to the same effect.[11]

Indeed, after the Senate's passage of the Stormwater Amendment, Senator Cardin again explained the purpose of the amendment in similar terms:

> [T]oday the Congress stands ready to approve S. 3481, a bill to clarify Federal responsibility to pay for stormwater pollution. This legislation, which will soon become law, requires the Federal government to pay localities for reasonable costs associated with the control and abatement of pollution that is originating on its properties. At stake is a fundamental issue of equity: polluters should be financially responsible for the pollution that they cause. That includes the Federal Government.

156 Cong. Rec. S11,023 (daily ed. Dec. 22, 2010); *see id.* at S11,024 (statement of Sen. Cardin) (the federal responsibility "to manage . . . stormwater pollution . . . needs to translate into payments to the local governments that are forced to deal with this pollution"). Senator Cardin's consistent, public, and unambiguous articulation of the intended purpose

---

[11] *See* 156 Cong. Rec. E2259 (daily ed. Dec. 29, 2010) (statement of Rep. Johnson) (describing the bill as "a simple effort to clarify . . . that the Federal Government bears a proportional responsibility for addressing pollution originating from its facilities"); *id.* at E2258 (statement of Rep. Johnson) (explaining that the "common sense bill" would "ensure[] that the Federal Government maintains its equitable responsibility for stormwater pollution runoff originating or emanating from its property"); 156 Cong. Rec. E2245 (daily ed. Dec. 22, 2010) (statement of Del. Norton, who sponsored the Stormwater Amendment in the House) ("The consequence of failing to pass this bill is that we give the Federal Government a free ride and pass its fees on to our constituents throughout the United States.").

and effect of the Stormwater Amendment confirms our view that Congress intended the Stormwater Amendment to facilitate the payment of stormwater assessments by the federal government. *See NLRB v. Fruit & Vegetable Packers, Local 760*, 377 U.S. 58, 66 (1964) ("It is the sponsors that we look to when the meaning of the statutory words is in doubt.") (internal quotation marks omitted); *see also H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989) (relying on the stated understanding of "the principal sponsor of the Senate bill" in interpreting a statute). Although the "remarks of a single legislator who sponsors a bill" may not be "controlling in analyzing legislative history," *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 (1980), Senator Cardin's remarks accord with *all* of the available legislative history. There is no indication in the legislative record that the understanding of the Stormwater Amendment offered by Senator Cardin and others was not shared universally in Congress.

Reading the statute to impose a specific-appropriation requirement would frustrate that purpose. Such a requirement would place a substantial obstacle in the path of payment of stormwater assessments because of the practical burdens associated with attaining specificity in annual appropriations, especially specificity in appropriations bills applying to a range of federal agencies. *See, e.g.*, *Critical Technologies Institute*, 16 Op. O.L.C. at 80 ("A rule requiring greater specificity in appropriations would create extreme obstacles for the functioning of the Federal Government."). Indeed, we note that, to the extent some federal agencies were paying stormwater assessments from lump-sum appropriations prior to the passage of the Stormwater Amendment, a specific-appropriation interpretation would require ascribing to Congress an intent to forbid such ongoing payments unless and until Congress made a specific appropriation. We can find no indication of such a congressional intent. Equally important, a specific-appropriation interpretation of section 313(c)(2)(B), rather than resolving once and for all the obligation of the federal government as an owner of federal facilities to pay certain stormwater assessments, would effectively leave the issue where Congress found it—passing on to future Congresses the task of determining, on an annual basis, whether stormwater assessments should be paid. Such a reading of section 313(c)(2)(B) would reintroduce the same cloud of legal uncertainty Congress intended the Stormwater Amendment to dispel.

35 Op. O.L.C. 1 (2011)

Furthermore, the legislative history relating specifically to the addition of section 313(c)(2)(B) weighs heavily against interpreting the section to impose a specific-appropriation requirement. Senator Cardin explained the appropriations language at issue here as follows:

> [W]e added a provision to the bill in order to rectify a specific problem in the District of Columbia, where the Department of Treasury has been paying some stormwater fees. The provision simply says that agencies and departments should use their annual appropriated funds to pay for stormwater fees. This is exactly what they all do today in paying for their drinking water and wastewater bills or any other utility bill, for that matter. This new language requires that Congress make available, in appropriations acts, the funds that could be used for this purpose. *It does not mean that the appropriations act would need to state specifically or expressly that the funds could be used to pay these charges.* The legislative language doesn't say that, and I want to be perfectly clear that such a restrictive reading is not our intent.

156 Cong. Rec. S11,024 (daily ed. Dec. 22, 2010) (emphasis added).[12] Senator Cardin's view was echoed by several members of the House of Representatives, including the House sponsor of the Stormwater Amendment, Delegate Norton. She explained: "The bill requires that Congress make available, in appropriations acts, the funds that could be used to pay for stormwater management charges, but *not that the appropriations act would need to state specifically or expressly that the funds could be used to pay these charges*." *Id.* at H8979 (daily ed. Dec. 22, 2010) (emphasis added).[13] There is no legislative history pointing to a contrary result. *See*

---

[12] Although Senator Cardin's statement was made after the passage of the Senate version of the bill, his description is consistent with the understanding expressed by members of the House, including the sponsor, prior to passage there. *See infra* n. 13 and accompanying text.

[13] *See also* 156 Cong. Rec. H8979 (daily ed. Dec. 22, 2010) (statement of Rep. Oberstar) ("In addition, the intent of subsection (c)(2)(B) of Section 313 of the Clean Water Act, as added by S. 3481, is to require that Congress make available, in appropriations acts, the funds that could be used to pay stormwater fees, but not that the appropriations act would need to state specifically or expressly that the funds could be used to pay these charges."); *id.* at H8980 (daily ed. Dec. 22, 2010) (statement of Rep. Johnson) ("This new language requires that Congress make available, in appropriations acts, the funds

16

*Obligation of Federal Agencies to Pay Stormwater Assessments*

CEQ Letter at 5 (canvassing legislative history supporting an interpretation of section 313(c)(2)(B) as authorizing annual appropriations to pay stormwater assessments and noting "[n]o comments to the contrary appear anywhere in the legislative history" of the Stormwater Amendment).

In sum, we conclude that the best reading of the text of the appropriations provision in section 313(c)(2)(B), in light of the structure, purpose, and history of the Stormwater Amendment, is that Congress did not intend to impose a specific-appropriation requirement. Indeed, a specific-appropriation requirement—which, as we have noted, would have the predictable effect of restricting payment by federal agencies and would leave the status of future stormwater payments in legal limbo—would undermine Congress's central aims in enacting the Stormwater Amendment. We therefore believe that federal agencies may pay stormwater assessments out of annual—including current—lump-sum appropriations.[14]

---

that could be used for this purpose. It should not be interpreted as requiring appropriations act [sic] to state specifically or expressly that the funds could be used to pay these charges. The statutory language does not require this, and such a restrictive reading is not intended.").

[14] USDA suggests that section 313(c)(2)(B), in all events, forbids the use of *current* appropriations to pay stormwater assessments because an "additional act of Congress is required." USDA Letter at 4. But the conclusion does not follow from the premise. It is true that an "additional act of Congress is required"—because the Stormwater Amendment is not an appropriation, a point that is central to our reading of section 313(c)(2)(B)—but the view that section 313(c)(2)(B) may be satisfied by a lump-sum appropriation leads logically to the conclusion that such an appropriation may be a current *or* future lump-sum appropriation. Payment of stormwater assessments from a current appropriation would not countermand the statutory requirement that funds be "provided in *advance* by any appropriations Act" because federal agencies' payments of stormwater assessments going forward would be made from appropriations acts previously enacted by Congress. This same analysis largely responds to the Department of Defense's concern that section 313(c)(2)(B) "clearly require[s] some additional action by Congress." DOD Letter at 3. DOD appears to posit that the "shall not be obligated" clause in section 313(c)(2)(B) means that federal agencies *may* pay stormwater assessments out of general operating funds but that agencies *must* pay such assessments in the event that Congress enacts specific "appropriations act language." *Id.* at 4. As we have explained, we agree that "additional action by Congress" is required, but that additional action may be a current or future general lump-sum appropriation. Therefore, we disagree with DOD's suggested interpretation of the "shall not be obligated" phrase because, in our view, a general lump-sum appropriation is sufficient to trigger the "mandatory" payment of stormwater assessments. *Id.*

35 Op. O.L.C. 1 (2011)

## C.

One significant argument might be advanced against our reading of the Stormwater Amendment. It might be said that, if the plain text of section 313(c)(2)(B) does not definitively resolve the source of payment, then we must embrace a construction that restricts payment on the ground that "a condition to [a] waiver of sovereign immunity . . . must be strictly construed." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990). We disagree that this rule of construction justifies reading section 313(c)(2)(B) to impose a specific-appropriation requirement.

In our view, the appropriations language in section 313(c)(2)(B) is not properly understood as a condition on the waiver of immunity. Sections 313(a) and 313(c)(1), read together, accomplish that waiver for stormwater assessments. *See supra* p. 7. Section 313(c)(2)(B) serves a different function, operating as an internal accounting provision, directing when and how federal agencies may pay such assessments. *Cf. Henderson v. United States*, 517 U.S. 654, 667–68 (1996) (holding that, notwithstanding that the Suits in Admiralty Act is a broad waiver of sovereign immunity, the provisions in section 742 of the statute governing service of process are not "sensibly typed 'substantive' or 'jurisdictional'"—and therefore a condition on the waiver—but "[i]nstead, they have a distinctly facilitative, 'procedural' cast" as "[t]hey deal with case processing, not substantive rights or consent to suit"). The heading of section 313(c)(2), "Limitation on Accounts," supports the view that section 313(c)(2) is not a condition on a waiver of immunity but rather that it governs the sources from which federal agencies may pay stormwater assessments. *See* Government Accountability Office, GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* 2 (Sept. 2005) (defining account as "[a] separate financial reporting unit for budget, management, and/or accounting purposes"); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (noting that the "heading of a section" is a "tool[] available for the resolution of a doubt about the meaning of a statute") (internal quotation marks omitted); ENRD Memorandum at 4. For these reasons, reading section 313(c)(2)(B) not as a condition on the waiver of immunity, but as a separate internal accounting provision specific to stormwater assessments, is most faithful to the Supreme Court's instruction to "interpret [a] statute as a symmetrical and coherent regulatory scheme" that "fit[s] . . . all parts into a harmonious whole." *Brown &*

*Obligation of Federal Agencies to Pay Stormwater Assessments*

*Williamson*, 529 U.S. at 133 (internal quotation marks and citations omitted).

We recognize that section 313(c)(2)(B)'s direction that federal agencies "shall not be obligated to pay" stormwater assessments "except to the extent and in an amount provided in advance by any appropriations Act" might be read as a condition on the waiver of immunity. *See* DOD Letter at 4; *cf.* Tax Memorandum at 4 (suggesting that section 313(c)(2)(B) "read[s] more like a traditional waiver given the context of the amendment"). But we believe, in this statutory context, that the phrase "shall not be obligated to pay . . . except to the extent and in an amount provided in advance by any appropriations Act" is instead a textual cue that the Stormwater Amendment is not an appropriation and that stormwater assessment payments require a separate appropriation by Congress. In other words, the "shall not be obligated to pay" phrase is an instruction that federal agencies may not pay stormwater assessments unless there is a separate appropriation of funds by Congress to do so. Because we do not read section 313(c)(2)(B) as a condition on the waiver of immunity effected by sections 313(a) and 313(c)(1), the strict construction canon governing conditions on waivers of immunity is inapposite.

For these reasons, we conclude that section 313(c)(2)(B) of the CWA does not impose a specific-appropriation requirement. Instead, federal agencies may pay appropriate stormwater assessments from annual—including current—lump-sum appropriations.

CAROLINE D. KRASS
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*