# EXHIBIT 18

# Application of the Davis-Bacon Act to Urban Development Projects that Receive Partial Federal Funding

Section 110 of the Housing and Community Development Act of 1974 requires that those engaged in construction work that is financed with federal funds (whether in whole or in part) receive wages at rates prevailing in the locality as determined by the Secretary of Labor under the Davis-Bacon Act. However, if the construction work is not financed with federal funds, the Davis-Bacon Act wage rates need not be paid, even if other aspects of the construction project, such as land, fixtures, or services, receive federal funds pursuant to the Act.

This question arose pursuant to a dispute between the Secretary of Labor and the Secretary of Housing and Urban Development in the course of exercising their respective authorities under the Act. The Office of Legal Counsel has jurisdiction to resolve the dispute pursuant to Executive Order No. 12146.

August 6, 1987

MEMORANDUM OPINION FOR THE SECRETARY,
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

This memorandum responds to your request for the opinion of the Attorney General on the proper interpretation of § 110 of the Housing and Community Development Act of 1974 (Act), 42 U.S.C. § 5310. The Attorney General has referred this matter to the Office of Legal Counsel for resolution.

## I. Background

Title I of the Act authorizes the Secretary of Housing and Urban Development (HUD) to provide Community Development Block Grants (CDBG) and Urban Development Action Grants (UDAG) to States and localities for "the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c). Section 110 of the Act requires that "[a]ll laborers and mechanics employed by contractors or subcontractors in the performance of construction work financed in whole or in part with assistance received under this chapter shall be paid wages at rates . . . determined by the Secretary of Labor in accordance with the Davis-Bacon Act." 42 U.S.C. § 5310.

92

In 1985, the Department of Labor took the view that § 110 requires payment of Davis-Bacon wages not only when UDAG and CDBG funds are used directly to pay for the activities commonly thought of as "construction" of a building, but also when those funds are used for other activities that are integrally and proximately related to that construction, even if no federal funds are expended directly for the construction work. The Department of Labor provided three examples of the application of this standard:

> For example, if UDAG or CDBG funds were used to acquire the land upon which construction was later to take place, that construction should be done with Davis-Bacon wages, even if all UDAG or CDBG dollars had been expended before the commencement of the direct construction activity. . . . Other such costs could include, for example, engineering and architectural fees, materials, and equipment or machinery to be installed as part of the building.

Letter to Robert A. Georgine, President, Building & Construction Trades Department, AFL-CIO from Susan R. Meisinger, Deputy Under Secretary for Employment, Department of Labor at 2 (July 31, 1985) (Labor Opinion).

HUD disputes this interpretation on the grounds that, in HUD's view, it would initiate a drastic departure from the consistent application of Davis-Bacon requirements under the Act. Accordingly, HUD requested that Labor reconsider the position taken in its July 31, 1985 letter. On July 21, 1987, the Secretary of Labor responded by withdrawing the "integrally and proximately related" test and stating that "the question must be whether the construction work is federally financed," and that "the mere use of federal funds to finance the purchase of land . . . does not trigger Davis-Bacon coverage under the statute." Letter to the Honorable Samuel R. Pierce, Jr., Secretary, Department of Housing and Urban Development, from the Honorable William E. Brock, Secretary, Department of Labor (July 21, 1987).

The Secretary of Labor's letter, however, reserved the question of "the application of Davis-Bacon requirements to projects on which UDAG/CDBG funds are used to purchase equipment installed as part of the project," and, apparently, the question of the application of Davis-Bacon requirements to non-federally funded construction work when federal funds are used to pay for "engineering and architectural fees." *Id.* After reviewing the Secretary of Labor's letter, the Secretary of HUD noted that the letter "does not resolve other issues . . . raised [in the Labor Opinion]. In particular, whether UDAG/CDBG financing of architectural and engineering fees and purchase of equipment would require prevailing wages on related private construction work is unanswered . . . . As your letter fails to resolve all the issues springing from the [Labor Opinion], I must continue to seek a comprehensive decision from the Attorney General." Letter to the Honorable William E. Brock, Secretary, Department of Labor, from the Honorable Samuel R. Pierce, Jr., Secretary, Department of Housing and Urban Development (July 28, 1987).

## II. Discussion

### A. Jurisdiction

Before turning to the substantive issues presented by your request, we address a threshold jurisdictional matter: whether the Attorney General, and hence this Office, has authority to render an opinion on the proper interpretation of the Housing and Community Development Act at the request of the Secretary of HUD. The Department of Labor has suggested that Reorganization Plan No. 14 of 1950, 15 Fed. Reg. 3176 (*reprinted in* 5 U.S.C. app. at 1050 (1982) *and in* 64 Stat. 1267 (1950)), precludes the Attorney General from rendering such an opinion. In its view, the Secretary of Labor has the exclusive authority to issue a ruling concerning the proper interpretation of the Davis-Bacon provisions of the Housing and Community Development Act. This view, however, misconstrues the Reorganization Plan as well as the authority and functions of the Attorney General and the Secretary of Housing and Urban Development.

Section 110 of the Act provides:

> All laborers and mechanics employed by contractors or subcontractors in the performance of construction work financed in whole or in part with assistance received under this chapter shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act, as amended (40 U.S.C. §§ 276a, 276a-5) . . . The Secretary of Labor shall have, with respect to such labor standards, the authority and functions set forth in Reorganization Plan Numbered 14 of 1950 (15 F.R. 3176; 64 Stat. 1267) and section 276c of title 40.

42 U.S.C. § 5310. The Reorganization Plan, in turn, provides:

> In order to assure coordination of administration and consistency of enforcement of the labor standards provisions of each of the following Acts by the Federal agencies responsible for the administration thereof, the Secretary of Labor shall prescribe appropriate standards, regulations, and procedures, which shall be observed by these agencies . . . .

Reorganization Plan No. 14 of 1950, 15 Fed. Reg. 3176 (*reprinted in* 5 U.S.C. app. at 1050 (1982) *and in* 64 Stat. 1267 (1950)).

Labor argues that its interpretation of § 110 constitutes an appropriate standard, regulation, or procedure to enforce the labor standard provisions of the Act. But even assuming the validity of this argument, the Reorganization Plan speaks only to the respective functions of HUD and Labor in administering the Housing and Community Development Act. The Reorganization Plan does not preclude either the head of a department from seeking, or the Attorney General

from rendering, an opinion on a question of law arising in the administration of his department.

By law, "[t]he head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department." 28 U.S.C. § 512. The only limitation on the right of the head of an executive department to obtain an opinion of the Attorney General is that the question presented must be one that actually arises in the administration of his department. *See* 31 Op. Att'y Gen. 234 (1918); 31 Op. Att'y Gen. 127 (1917); 20 Op. Att'y Gen. 178 (1891). Thus, the initial inquiry is whether the question presented by the Secretary of HUD — whether the acquisition of land, fixtures, or architectural and engineering services with federal assistance requires a finding that "integrally and proximately related" construction work paid for entirely with non-federal funds must be deemed financed in whole or in part with federal assistance — is one "arising in the administration of his department" within the meaning of 28 U.S.C. § 512.

We think that it clearly is. The Secretary of HUD is charged with the administration of the Act. The interpretation given to § 110 determines the nature and contents of the contracts the Secretary must enter into with state and local recipients of UDAG and CDBG funds. As the Secretary stated in his letter of May 13, 1987, to the Attorney General:

> The need for a resolution of this dispute is even more urgent now than when I wrote you last October: the construction season has begun; our Urban Development Action Grant (UDAG) submissions are due in May and July; and the majority of our Community Development Block Grant (CDBG) submissions will be coming in the next two months.

Letter to the Honorable Edwin Meese III, Attorney General, from the Honorable Samuel R. Pierce, Jr., Secretary, Department of Housing and Urban Development (May 13, 1987). The Reorganization Plan confirms this conclusion. The Plan itself recognizes that although federal agencies must observe "appropriate standards, regulations, and procedures" prescribed by the Secretary of Labor, these agencies remain responsible for the administration of the underlying Acts. As the Message of the President accompanying the Reorganization Plan states: "The actual performance of enforcement activities . . . will remain the duty of the respective agencies awarding the contracts or providing the Federal assistance." 5 U.S.C. app. at 1050–51 (1982).

Our conclusion that the Secretary is entitled by law to the opinion of the Attorney General is consistent with the analysis and conclusion of Attorney General Levi in a situation virtually identical to this one. *See* 43 Op. Att'y Gen. No. 8 (Jan. 11, 1977). There, the Secretary of Commerce sought the opinion of the Attorney General concerning the meaning of the phrase "contractors or subcontractors" as used in § 109 of the Local Public Works Capital Development and Investment Act of 1976. That section, in language virtually identical to that of § 110, provides:

95

> All laborers and mechanics employed by contractors or subcontractors on projects assisted by the Secretary under this Act shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act, as amended (40 U.S.C. §§ 276a-276a-5). . . . The Secretary of Labor shall have, with respect to the labor standards specified in this provision, the authority and functions set forth in Reorganization Plan Numbered 14 of 1950 (15 F.R. 3176; 64 Stat. 1267; 5 U.S.C. §§ 133z-15), and section 2 of the Act of June 13, 1964, as amended (40 U.S.C. § 276c).

The Secretary of Labor took the position that the phrase included state and local governments who performed construction work with their own work force. The Secretary of Commerce disagreed, contending that the terms "contractors or subcontractors" could refer only to those who contracted with laborers and mechanics to perform the work. The Attorney General rejected the Labor Department's claim that he was without authority to render the requested opinion, finding that "the Secretary of Commerce's administrative responsibility for implementation of the Local Public Works Act at least requires him to satisfy himself concerning any doubts he may have regarding the lawfulness of the Secretary of Labor's determination, and permits him to seek my advice for that purpose." 43 Op. Att'y Gen. No. 8, at 3. The opinion continued:

> This conclusion will be seen as particularly appropriate when it is recognized that, as will be discussed below, the present controversy does not involve a uniform interpretation which the Secretary of Labor seeks to apply to the Davis-Bacon Act and all related acts, but rather a special rule applicable to the Local Public Works Act. To the extent the outcome hinges upon the peculiar text or peculiar circumstances of that law, the policy considerations supporting an assertion of exclusive cognizance in the Secretary of Labor become less persuasive, and the issue becomes more appropriate for — if not resolution by the Secretary of Commerce — at least examination by the Attorney General at the Secretary's instance.

*Id.* at 3–4. This passage applies with equal force to the present request.

Executive Order No. 12146, concerning the resolution of interagency legal disputes, does not alter this conclusion. Executive Order No. 12146 provides in pertinent part:

> 1–401. Whenever two or more executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is encouraged to submit the dispute to the Attorney General.

1–402. Whenever two or more Executive agencies whose heads serve at the pleasure of the President are unable to resolve such a legal dispute, the agencies shall submit the dispute to the Attorney General prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere.

Section 1–401 authorizes and encourages executive agencies to submit their legal disputes to the Attorney General. This provision applies not only to the executive departments, but also to all other agencies in the Executive Branch. Executive Order No. 12146 thus expands the authority of the Attorney General to render legal opinions beyond his statutory obligation to render opinions at the request of the heads of executive departments on questions of law arising in the administration of their departments. *See* 28 U.S.C. § 512.[1]

In addition, when the heads of the agencies serve at the pleasure of the President, § 1–402 *requires* the agencies to submit legal disputes they are unable to resolve to the Attorney General "except where there is specific statutory vesting of responsibility for a resolution elsewhere." Labor contends that the exception precludes resolution of the current dispute by the Attorney General. Even assuming, however, that Reorganization Plan No. 14 of 1950 — directing the Secretary of Labor to prescribe appropriate labor-related standards, regulations, and procedures — constitutes "specific statutory vesting of responsibility for a resolution" of the present dispute within the Secretary of Labor, the reorganization legislation in no sense affects the authority of the head of an executive department to seek, or the Attorney General to render, an opinion under 28 U.S.C. § 512 on questions of law that arise in the administration of his department. Rather, under the above assumption, Reorganization Plan No. 14 of 1950 at most would mean that § 1–402 of Executive Order No. 12146 does not *require* the Secretaries of HUD and Labor to submit this legal dispute to the Attorney General.

Thus, Executive Order No. 12146 is not fully apposite to the present request. Neither Reorganization Plan No. 14 of 1950 nor Executive Order No. 12146 purport in any way to preclude the head of an executive department from requesting the opinion of the Attorney General on questions of law arising in the administration of his department. Since 1789, it has been the duty of the Attorney General "to give his advice and opinion upon questions of law . . .

---

[1] Under 28 U.S.C. § 512, Attorneys General have felt constrained to decline requests for legal opinions from executive agencies not within one of the executive departments. *See, e.g.,* 37 Op. Att'y Gen. 488, 490 (1934) (declining to give an opinion at the request of the Reconstruction Finance Corporation on the ground that "the Attorney General is authorized to render opinions only upon the request of the President or the head of an executive department"); 20 Op. Att'y Gen. 312, 313 (1892) (stating that the "Civil Service Commission is not included within any of the great Departments of Government" and that "[u]ntil the Commission shall request the President, to whom they are directly responsible, to present the question of law arising in the discharge of their duties to the Attorney General, he is not called upon to give, and should not under the law give, his opinion"). With the promulgation of Executive Order No. 12146, the President has authorized all executive agencies to request the opinion of the Attorney General whenever a legal dispute arises between such agencies.

97

when requested by the heads of any of the departments, touching any matters that may concern their departments." Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93. Accordingly, by law, the heads of executive departments may require the opinion of the Attorney General, *regardless of whether a dispute exists on the question within the Executive Branch. See* 28 U.S.C. § 512. All that is required is that the question presented be one arising in the administration of the department whose head requests the opinion. Thus, even if HUD had never disagreed with Labor's interpretation of § 110 the Secretary of HUD would be entitled to request and receive the opinion of the Attorney General on that question. It goes without saying, therefore, that the Secretary of Labor's withdrawal of the Labor Department's prior interpretation of § 110 in no way relieves the Attorney General of his statutory authority — indeed, his responsibility — to provide the Secretary of HUD with his opinion.[2] The presence or absence of a contrary or consistent Labor Department interpretation is simply irrelevant to the Secretary's statutory right "to require the opinion of the Attorney General." 28 U.S.C. § 512. Because the Secretary of HUD has not withdrawn his request, the Attorney General's legal obligation is to render an opinion on the question presented.

Finally, the Attorney General's authority to give his opinion at the request of the Secretary is also confirmed by 28 U.S.C. § 516 and 5 U.S.C. § 3106. The former reserves generally to the Attorney General the conduct of all litigation in which the United States, an agency, or officer thereof is a party. The latter generally prohibits the head of an Executive department from employing an attorney for the conduct of litigation in which the United States, an agency, or an employee thereof is a party, requiring instead that the matter be referred to the Department of Justice. Both provisions admit of exceptions only when "otherwise authorized by law." Although Congress has established "a solicitor for the Department of Labor," 29 U.S.C. § 555, the solicitor has no general litigating authority; his authority is narrowly drawn, *see* 29 U.S.C. § 663 (representation of the Secretary of Labor in occupational safety and health litigation); 29 U.S.C. § 1852(b) (litigation for the protection of migrant and seasonal workers); 30 U.S.C. § 822 (representation of the Secretary of Labor in mine safety and health litigation), and nevertheless "subject to the direction and control of the Attorney General." *Id.* The Attorney General's authority to conduct litigation on behalf of the United States necessarily includes the exclusive and ultimate authority to determine the position of the United States on the proper interpretation of statutes before the courts. Thus, because this question of the proper interpretation of § 110 is the subject of pending litigation to which the Secretary of HUD is a party, *see Dairy Development Ltd.* v. *Pierce*, Civ. Action No. 86–1353–R (W.D. Okla.), the Attorney General has both the authority and the obligation to decide the question presented by the Secretary of HUD.

---

[2] *See* 2 Op. Att'y Gen. 311 (1830), in which Attorney General Berrien observed "that it is made my duty to give my opinion on all questions referred to me by the heads of departments 'touching any matters that may concern their departments.'" *Id.* at 311.

*B. Substantive Issues*

Section 110 of the Act provides:

> All laborers and mechanics employed by contractors or subcontractors in the performance of construction work financed in whole or in part with assistance received under this chapter shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act, as amended (40 U.S.C. § 276a, 276a-5): Provided, That this section shall apply to the rehabilitation of residential property only if such property is designed for residential use for eight or more families. The Secretary of Labor shall have, with respect to such labor standards, the authority and functions set forth in Reorganization Plan Numbered 14 of 1950 (15 F.R. 3176; 64 Stat. 1267) and section 276c of title 40.

42 U.S.C. § 5310.

We adhere to the well-established principle that "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985); *see American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982); 2A N. Singer, *Sutherland's Statutory Construction* § 46.04 (4th ed. 1984). The operative language of § 110 is "construction work financed in whole or in part with assistance received under this chapter." 42 U.S.C. § 5310. The narrow question is whether the use of CDBG or UDAG funds to pay for the land, fixtures, or services — but not for the construction work — associated with a particular project means that the construction work is "financed in whole or in part with" such funds within the meaning of the Act. We think the language used in § 110 indicates that it is not.

Construction work that is part of a project receiving federal funds to pay for non-construction activities of the project is, of course, benefited indirectly by such funds because the federal funds reduce the total amount of nonfederal funds needed to finance the project. Nevertheless, the construction work itself is not financed with the federal funds that are used to pay for the project's other activities. The ordinary meaning of the verb, "finance," is "to raise or provide funds or capital for" or "to furnish with necessary funds." *Webster's Ninth New Collegiate Dictionary* 463 (1986). Because the funds used to finance the construction work are nonfederal, the only way to conclude that the statute applies is, in effect, to substitute "construction project" for "construction work." Such a construction, however, conflicts with both the statutory language and its history.

99

The language of § 110, requiring the payment of Davis-Bacon wages when "construction work" is financed with federal funds,[3] contrasts sharply with the broader, project-oriented approach of several other federal statutes. For example, the labor standards section of the Public Works and Economic Development Act of 1965 provides that "[a]ll laborers and mechanics employed by contractors or subcontractors on *projects* assisted by the Secretary under this chapter shall be paid [Davis-Bacon] wages." 42 U.S.C. § 3222 (emphasis added). Similarly, a 1974 amendment to the United States Housing Act of 1937 states that "[a]ll laborers and mechanics employed by contractors or subcontractors in housing or development *activities* assisted under this section shall be paid [Davis-Bacon] wages." 42 U.S.C. § 1440(g) (emphasis added).

The latter provision is particularly significant because it was enacted as part of the Housing and Community Development Act of 1974, *see* Pub. L. No. 93–383, § 802(g), 88 Stat. 633, 724, the same Act that contains the provision under consideration here. *See id.* § 110, 88 Stat. at 649. Sections 110 and 802(g) of the Act are identical in all material respects except that the former is triggered by federal funding of "construction work" and the latter by federal assistance to "housing or development activities." By its terms, § 802(g) requires more expansive Davis-Bacon coverage than § 110. Thus, the argument that § 110 requires the payment of Davis-Bacon wages whenever any activity associated with a particular project (such as the acquisition of land, fixtures, or architectural and engineering services) is financed with federal funds, even though the project's construction work is not, negates the distinction between the effect of the two provisions, in contravention of the clear and unambiguous language of the Act.

The conclusion that § 110 requires payment of Davis-Bacon wages only when construction work is financed with federal funds is also suggested by the history of the Act. The version of the Act considered initially by the Senate would have required the payment of prevailing wages to "[a]ll laborers and mechanics employed by contractors and subcontractors in the performance of *work on any construction project financed in whole or in part with funds received under this chapter.*" S. 3066, 93d Cong., 2d Sess. 314 (1974) (emphasis added). A "construction project" necessarily encompasses all activities needed in order to undertake and complete the project, most notably, the purchase of land, equipment, and raw materials, as well as actual construction. Thus, under the Senate bill, federal funding of any activity associated with a construction project would constitute partial federal financing of the project and trigger the requirement that prevailing wages be paid to all laborers and mechanics employed by contractors and subcontractors in the performance of work on the project. The report accompanying the Senate bill acknowledges the breadth of the Senate proposal, stating that the Senate bill would require the payment of prevailing wages "with respect to all multifamily housing projects

---

[3] *Accord* 49 U.S.C. app. § 1609(a) (requiring the payment of Davis-Bacon wages to "laborers and mechanics employed by contractors or subcontractors in the performance of *construction work* financed with the assistance of loans or grants under this chapter") (emphasis added).

..., health facilities, and land development projects." S. Rep. No. 693, 93d Cong., 2d Sess. 36 (1974).

The House bill, by contrast, would have required payment of prevailing wages to laborers and mechanics employed by contractors and subcontractors only "in the performance of *construction work financed in whole or in part with assistance received under this chapter.*" H.R. 15361, 93d Cong., 2d Sess. 110 (1974) (emphasis added). As discussed, construction work is merely one element of a construction project. The specific inquiry under the House provision, then, is whether federal funds are used to finance construction work. Whether federal funds are used to finance any other activity associated with the construction project is immaterial. The House Report reiterates the specific focus of the House provision, stating that the House bill would require the payment of prevailing wages to workers employed on "construction funded under this title." H.R. Rep. No. 1114, 93d Cong., 2d Sess. 55 (1974). Thus, whereas the Senate bill would have required payment of prevailing wages whenever federal funds were used to finance any part of a construction project (including construction work), the House bill would have required the payment of such wages only when the activity financed with federal funds was construction work.

With minor changes not relevant here, the Conference Committee adopted the labor standards provision of the House bill. As the Conference Report states, "[t]he conference report contains the House provision with a technical amendment." H.R. Conf. Rep. No. 1279, 93d Cong., 2d Sess. 133 (1974). As finally enacted, § 110 applied only to "construction work financed in whole or in part with grants received under this title."

We recognize that neither the Conference Report nor the floor debates contain an explanation of the conference decision to adopt the "construction work" language of the House bill instead of the "project" approach of the Senate bill.[4] This lack of legislative discussion hardly yields a conclusion that

---

[4] The Conference Report explains:

> The Senate bill applied the prevailing wage requirements of the Davis-Bacon Act to residential construction involving 12 or more units and to rehabilitation involving 8 or more units The House amendment applied such requirements only to the construction of 8 or more units without reference to rehabilitation. The conference report contains the House provision with a technical amendment making it clear that the requirement applies only to rehabilitation, since construction of residential structures is not a permissible use of community development funds.

H.R. Conf. Rep. No. 1279, 93d Cong., 2d Sess. 133 (1974). Contrary to Labor's suggestion, this discussion does not necessarily reveal the *exclusive* reason for Congress' adoption of the House provision. The selection of the House provision was consistent with Congress' desire to carry forward the Davis-Bacon coverage of the Housing Act of 1949. Under the 1949 Act, Davis- Bacon wage requirements applied only to the "undertakings and activities of a local public agency in an urban renewal area." 42 U.S.C. § 1460 (1976). Thus, all privately undertaken construction and activity, even though part of a project receiving federal assistance, was exempt from Davis-Bacon requirements. Section 105 of the 1974 Act, delineating the activities eligible for CDBG funding, specifically includes "payment of the cost of completing a project funded under title I of the Housing Act of 1949 " 42 U.S.C. § 5305(a)(10). By choosing the labor standards provision of the House bill, Congress ensured that the use of CDBG funds to complete outstanding projects would not result in expanding Davis-Bacon coverage to the privately funded construction work associated with such projects because such work is not financed in whole or in part with federal funds. The Senate bill,

Continued

101

Congress intended Davis-Bacon coverage to be less restrictive than the choice of the House provision would suggest. Such an anomalous conclusion would ignore the best evidence of congressional intent — the language adopted. That language is clear, and evinces an unambiguous intent to require less Davis-Bacon coverage than the Senate bill.[5]

Because there have been numerous, inconsistent interpretations of § 110 to various activities in the past, we pause to consider several applications of § 110 in light of our interpretation of the Act. For example, HUD has previously agreed with Labor that the use of CDBG or UDAG funds to purchase equipment may require the payment of prevailing wages with respect to the installation of the equipment when such installation involves "more than an incidental amount" of construction work. *See* Letter to John S. Selig, Esq., Mitchell, Williams, Selig, Jackson & Turner, from Justin L. Logsdon, Assistant to the Secretary for Labor Relations, Department of Housing and Urban Development (Dec. 1, 1986) (advising that Davis-Bacon requirements do not apply to the installation of federally funded equipment where the cost of installation is only 1.5 percent of the cost of the equipment). Assuming that installation of equipment constitutes or requires "construction work,"[6] we believe that § 110 does not require the payment of prevailing wages with respect to installation where federal funds are provided exclusively for the purchase of equipment and not for its installation. Thus, to the extent that Labor and HUD have adopted a contrary interpretation of § 110, they have misconstrued the Act.

---

[4] (. . . continued)

by contrast, would have required the payment of prevailing wages for construction work exempt under the 1949 Act. This is so because construction work is part of a construction project, and the Senate bill would have required the payment of Davis-Bacon wages whenever "any construction project is financed in whole or in part with [federal] funds."

Moreover, we wish to stress that Congress need not express an intent that clear language means what it says. Indeed, legislative history tending to contradict the plain meaning of a statute is often discounted. Here, where we have no expression in the legislative history of a congressional intent contradicting the plain language of § 110, the statutory language necessarily controls.

[5] This conclusion is consistent with the subsequent amendments to the Act authorizing the Urban Development Action Grant program *See* 42 U.S.C. § 5318  The UDAG program authorizes grants to cities and urban areas experiencing severe economic distress to help stimulate economic development activity. *Id.* § 5318(a). Under the program, the Secretary (1) must determine that there is a strong probability that without the grant, the nonfederal investment in the project would not be made, *id.* § 5318(j), and (2) "assure that the amount of the grant is the least necessary to make the project feasible." *Id.* § 5318(k). Thus, the UDAG program is designed to encourage and leverage nonfederal investment in depressed urban areas. In fact, the average UDAG project has involved six nonfederal dollars for every dollar of UDAG funds. Significantly, Congress did not change the "construction work" focus of Section 110 in adding the UDAG program to the Act. This means that if UDAG funds are used exclusively to finance the non-construction work activities of a particular project (as they often are), Davis-Bacon wages need not be paid. A conclusion that Section 110 required the payment of prevailing wages under these circumstances would substantially impair the intended effect of the program. Because the program is designed to minimize the amount of federal funds necessary to cause a project to go forward, a requirement that Davis-Bacon wages be paid with respect to the entire project could significantly increase (conceivably in excess of the total federal investment) the amount of nonfederal funds needed for the project. Given the language of Section 110 and the general, although admittedly not wholly consistent, practice of HUD to require the payment of Davis-Bacon wages only when federal funds are used to finance construction work, it is reasonable to conclude that Congress added the UDAG program with this understanding in mind. A construction of Section 110 expanding its traditional scope, therefore, could significantly undermine the program in terms of its cost and effect.

[6] If in a given case installation does not entail construction work, then § 110 is inapplicable in any event.

Similarly, we agree with Labor's position that "UDAG or CDBG financing of certain 'soft costs' would not, in and of itself, trigger Davis-Bacon coverage for building construction when there was no direct UDAG or CDBG financing of the actual construction." Labor Opinion at 2. Labor gave as examples of such "soft costs" legal services and tenant allowances for purchasing furniture or obtaining business licenses. *See id.* In short, we do not believe that § 110 requires payment of Davis-Bacon wages when federal funds are used to pay for any activity other than construction work. So long as no part of the cost of construction work is paid for with UDAG or CDBG funds, § 110 does not apply.

## Conclusion

Given the language of § 110 and Congress' contemporaneous rejection of alternative language that expressly would have required the payment of Davis-Bacon wages for all work associated with any "construction project," not just "construction work," we conclude that the Act requires the payment of prevailing wages only when federal funds are used to pay for construction work. The mere use of federal funds to acquire the land upon which that work is to take place does not constitute federal financing of the construction work.

Similarly, the use of federal funds either to purchase materials, equipment, machinery, or other fixtures installed during the construction work or to pay for the architectural and engineering services rendered prior to that work, does not trigger Davis-Bacon coverage when no federal funds are used to pay for the construction work itself.

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*
