**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CAMPAIGN FOR ACCOUNTABILITY,

       Plaintiff,

   v.

U.S. DEPARTMENT OF JUSTICE,

       Defendant.

No. 1:16-cv-1068 (Calendar Committee)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Alex Abdo, *Pro Hac Vice*
Stephanie Krent, *Pro Hac Vice*
Jameel Jaffer, MI0067
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
alex.abdo@knightcolumbia.org

## Table of Contents

Table of Authorities ................................................................................................. iii

Introduction .............................................................................................................1

Background ..............................................................................................................4

    I.      Factual and Statutory Background .............................................................4

          A.      The Freedom of Information Act ..................................................... 4

          B.      The Office of Legal Counsel............................................................ 5

    II.     Procedural History ......................................................................................9

Standard of Review................................................................................................11

Argument ..............................................................................................................12

    I.      OLC opinions resolving interagency disputes must be proactively disclosed under FOIA's reading-room provision. .............................................12

          A.      OLC opinions resolving interagency disputes are "final opinions . . . made in the adjudication of cases.".............................................. 12

               1.     OLC opinions resolving interagency disputes are "final opinions."......................................................................... 13

               2.     OLC opinions resolving interagency disputes are "made in the adjudication of cases." ...................................... 16

               3.     As the Court previously held, Section 552(a)(2)(A) is not limited to cases adjudicating private rights......................................... 18

          B.      OLC opinions resolving interagency disputes are "statements of policy and interpretations which have been adopted by the agency." ...................... 20

          C.      OLC opinions resolving interagency disputes are "working law" within the meaning of *Sears* and must be affirmatively disclosed. ............... 26

          D.      OLC opinions resolving interagency disputes are not protected by Exemption 5. ................................................................................. 31

    II.     The individual OLC opinions the government cites do not help its case. ..................32

          A.      These opinions fall within § 552(a)(2)............................................. 32

B.     The government cannot sustain its burden by pointing to individual opinions that it asserts fall outside § 552(a)(2). .............................................. 37

III.   Requiring the disclosure of OLC opinions resolving interagency disputes would serve the rule of law. ............................................................................... 39

IV.    Campaign for Accountability is also entitled to summary judgment on its indexing claim. .......................................................................................................... 42

Conclusion ........................................................................................................................... 43

## Table of Authorities

**Cases**

*Am. Immigr. Lawyers Ass'n v. Exec. Office for Immigr. Rev.*, 830 F.3d 667 (D.C. Cir. 2016) .................................................................................................. 17

*AMG Cap. Mgmt. v. FTC*, 141 S. Ct. 1341 (2021) ........................................ 16

*Bristol-Meyers Co. v. FTC*, 598 F.2d 18 (D.C. Cir. 1978) .............................. 13, 16, 38

*Burgess v. United States*, 553 U.S. 124 (2008) .............................................. 17

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ................................. 34

*Citizens for Env't Quality, Inc. v. U.S. Dep't of Agric.*, 602 F. Supp. 534 (D.D.C. 1984) .................................................................................................. 40

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* (*CREW I*), 846 F.3d 1235 (D.C. Cir. 2017) ................................................................................ 37

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* (*CREW II*), 922 F.3d 480 (D.C. Cir. 2019) ................................................................................ 12, 38

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ............................................. 34

*\*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ................... passim

*\*Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1 (D.C. Cir. 2014*) ................................ passim

*Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340 (1979) ............................... 38

*Hall & Assocs. v. Env't Prot. Agency*, 956 F.3d 621 (D.C. Cir. 2020) ....................... 12

*John Doe Agency v. John Doe Corp.*, 493 U.S. 146 (1989) ............................ 4

*Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007) ................... 36

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ......................... 4, 39

*\*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ................................. passim

*Pub. Citizen v. Off. of Mgmt. and Budget*, 598 F.3d 865 (D.C. Cir. 2010) ......................... 19, 32

*Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90 (D.C. Cir. 1986) ............. 18, 29

*\*Schlefer v. United States*, 702 F.2d 233 (D.C. Cir. 1983) ............................ passim

*Sterling Drug, Inc. v. FTC*, 450 F.2d 698 (D.C. Cir. 1971) ........................... 27, 29, 39

*_Tax Analysts v. IRS_, 117 F.3d 607 (D.C. Cir. 1997) ............................................................... passim

*_Tax Analysts v. IRS_, 294 F.3d 71 (D.C. Cir. 2002) ........................................................ 5, 15, 30, 32

_Tax Analysts v. IRS_, No. CIV A. 94-923 (GK), 1996 WL 134587 (D.D.C. Mar. 15, 1996) ..................................................................................................................... 23

*_Tax'n with Representation Fund v. IRS_, 646 F.2d 666 (D.C. Cir. 1981) ................. 19, 28, 38, 42

_U.S. Dep't of Just. v. Tax Analysts_, 492 U.S. 136 (1989) ......................................................... 26, 38

**Statutes**

28 C.F.R. § 0.25 ...................................................................................................................... 5, 7

28 U.S.C. § 512 ........................................................................................................................... 5

5 U.S.C. § 551 ...................................................................................................................... 13, 16

5 U.S.C. § 552 ..................................................................................................................... passim

**Other Authorities**

_Adjudication_, Black's Law Dictionary (11th ed. 2019) ............................................................. 17

Exec. Order No. 12,146, 44 Fed. Reg. 42657 (July 18, 1979) ........................................... 7, 14, 41

Fed. R. Civ. P. 56 ...................................................................................................................... 12

**Introduction**

This lawsuit challenges the practice of the Office of Legal Counsel ("OLC") of treating its formal written opinions as categorically exempt from the reading-room provision of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (a)(2). This motion concerns only a subset of these opinions, namely opinions resolving legal disputes that arise between federal agencies. These opinions play a singularly important role within the executive branch. They settle concrete and ongoing legal disputes between agencies, superseding the agencies' preexisting legal and policy positions and dictating their rights and obligations. They have the force and effect of law. The OLC's failure to publish these opinions proactively violates FOIA's reading-room provision and also the working-law doctrine that courts have developed in applying that provision.

In its last memorandum opinion, this Court held that Plaintiff Campaign for Accountability ("CfA") had plausibly alleged that OLC opinions resolving interagency disputes fall within two subsections of FOIA's reading-room provision: § 552 (a)(2)(A), which requires the publication of "final opinions . . . made in the adjudication of cases," and § 552 (a)(2)(B), which requires the publication of "statements of policy and interpretations which have been adopted by the agency." *See* Ren. MTD Op. 3 (Sept. 11, 2020), ECF No. 40. The Court accordingly denied the government's second motion to dismiss with respect to this category of opinions. *Id.* at 30–31. It emphasized that its holding was "based simply and solely on the amended complaint's allegations." *Id.* at 39. Now on summary judgment, the factual record is complete, and it is materially identical to the record that was before the Court on the government's second motion to dismiss. Accordingly, the Court should grant CfA's cross-motion for summary judgment and deny the government's motion.

The government resists this conclusion primarily by reprising arguments that this Court has already rejected. It argues that the D.C. Circuit's decision in *Electronic Frontier Foundation v. Department of Justice* (*EFF*), 739 F.3d 1 (D.C. Cir. 2014), forecloses the categorical application of the reading-room provision to the OLC's opinions, *see* Gov't Br. 14–15, ECF No. 57, without contending with this Court's contrary holding that "*EFF* plainly leaves open th[at] possibility," Ren. MTD Op. 21. It claims that § 552(a)(2)(A) applies to "final opinions" only if they "directly adjudicate the rights of private rights," Gov't Br. 1, even though, as this Court properly held, that interpretation conflicts with the statute's text, its legislative history, and D.C. Circuit precedent. *See* Ren. MTD Op. 14–20. And it claims that § 552(a)(2)(B) does not apply because OLC opinions resolving interagency disputes sometimes leave agencies with a downstream policy decision to make, *see* Gov't Br. 1, but it ignores this Court's prior explanation that this fact is "largely irrelevant," Ren. MTD Op. 30, given that the opinions themselves establish agency policy on the legal question presented.

The government also points to five published OLC opinions that it believes are withholdable under FOIA, and it argues that CfA's entire claim fails as a result, *see* Gov't Br. 20–24, but this argument is wrong in two ways. First, it misunderstands the parties' burdens. Once CfA shows that a category of OLC opinions generally falls within the reading-room provision of FOIA, it is the government's burden to justify the withholding of particular opinions (or portions thereof) that fall within that category. Thus, even if the government *could* point to an opinion resolving an interagency dispute that falls outside of § 552(a)(2), it would entitle the government to withhold only that particular opinion. Second, and more to the point, the five opinions the government cites do not fall outside of § 552(a)(2). For instance, one of the opinions arose out of an administrative complaint filed by eleven physicians who claimed that they had been underpaid

by the Department of Veterans Affairs. After the Labor Department awarded the physicians $230,000 in back wages, the Department of Veterans Affairs appealed the matter to the OLC, which ruled that sovereign immunity foreclosed the award. Contrary to the government's claim, the opinion clearly falls within the scope of FOIA's reading-room provision: it had the concrete effect of resolving the agencies' dispute over the propriety of the award, and, in the process, it established the agencies' legal obligations, interpretations, and policy positions on the specific question presented to the OLC for resolution. (Although not necessary to bring the opinion within the ambit of § 552(a)(2), the opinion also determined the private rights of the eleven physicians whose award of back wages the OLC reversed.)

Finally, the government argues that requiring disclosure of OLC opinions resolving interagency disputes would undermine the rule of law, but this is exactly backwards. A central purpose of FOIA is to prevent the proliferation of secret law so that the public can better understand government policy and hold officials accountable for their decisions. When the OLC issues opinions for the express purpose of resolving disputes across agencies, it is establishing the law that governs the executive branch. Recipient agencies rely on these OLC opinions in the performance of their public duties. The government's concern that the forced disclosure of any OLC opinion might lead to the disclosure of truly privileged legal advice ignores the many distinctions between internal memoranda designed to aid agency decision-making and legal opinions that carry the force and effect of law within the executive branch. This is the distinction that the Supreme Court itself emphasized in its seminal decision on working law. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975).

For these reasons and those below, the Court should grant CfA's cross-motion for summary judgment and deny the government's motion for summary judgment.[1]

## Background

### I.    Factual and Statutory Background

#### A.    The Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. § 552, was enacted "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). As relevant here, § 552(a)(2)—known as the "reading room" or "affirmative disclosure" provision of FOIA—requires agencies to proactively publish all "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases," as well as "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552 (a)(2)(A)–(B). The provision also requires agencies to maintain a public index of all such records created after 1967. *Id*. § 552(a)(2).

FOIA allows agencies to withhold information otherwise subject to disclosure only if the information is protected by one of FOIA's nine "narrowly construed" exemptions. *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). As relevant here, Exemption 5 protects from disclosure records that are subject to the deliberative-process privilege.

---

[1] CfA respectfully preserves for appellate review the claims that the Court previously dismissed: that all, or nearly all, of the OLC's formal written opinions fall within the scope of FOIA's reading-room provision, and, in the alternative, that several other specifically identified categories fall within the scope of that provision.

*See Tax Analysts v. IRS* (*Tax Analysts II*), 294 F.3d 71, 76 (D.C. Cir. 2002). Records that fall within the scope of FOIA's reading-room provision, however, may not be withheld as deliberative. *See Sears*, 421 U.S. at 153–54.

### B.   The Office of Legal Counsel

The OLC is a component of the Justice Department whose "core function" is to "provide controlling legal advice" to executive agencies. Stip. ¶ 1, ECF No. 56; *see also* 28 U.S.C. § 512 ("The head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department."); 28 C.F.R. § 0.25(a) (delegating this authority to the OLC). It does so by rendering formal written opinions that resolve questions of law submitted by one or more agencies. Stip. ¶¶ 1–4, 7. For more than 150 years, these opinions—originally issued by the attorney general but now most commonly issued by the OLC upon delegated authority—have been regarded as bearing the force of law. *See, e.g.*, *id.* Ex. A, Memorandum from David J. Barron, Acting Assistant Attorney General to Attorneys of the Office of Legal Counsel, *Best Practices for OLC Legal Advice and Written Opinions* (July 16, 2010) (the "Best Practices Memo") at 1 (explaining that OLC opinions are frequently "the final word on the controlling law"); Declaration of Stephanie Krent ("Krent Decl.") Ex. 1, *Opinions of Attorneys General and Decision of Auditors*, 5 Op. Att'y Gen. 97, 97 (1849) (explaining that the opinion-writing function of the attorney general "should be considered as law"); *id.* Ex. 2, *Office and Duties of Attorney General*, 6 Op. Att'y Gen. 326, 333–34 (1854) ("In the discharge of the second class of the [opinion-writing function], the action of the Attorney General is quasi judicial. His opinions officially define the law, in a multitude of cases, where his decision is in practice final and conclusive."); *id.* Ex. 3, *Comptroller – Solicitor of the Treasury – Attorney-General*, 20 Op. Att'y Gen. 654, 659 (1893) ("Congress contemplates that the official opinions signed or [e]ndorsed in

writing by the Attorney-General shall have some actual and practical force. Congress's intention

cannot be doubted that administrative officers should regard them as law . . . .").[2]

One crucial duty of the OLC is to issue formal written opinions when asked to resolve legal

disputes between two or more agencies. Stip. ¶ 7. The Justice Department has described this role

as akin to judicial review. For example, then–Attorney General William Barr described the OLC's

dispute-resolution function as follows:

> Because each agency has its own staff of lawyers, disputes between them come
> before the Attorney General with legal positions already well-established. Each
> agency will usually have legal authority or good arguments to support its view. The
> Office of Legal Counsel requires each side to come in with briefs, just as if it were
> a judicial proceeding. Deciding among the positions being taken requires the
> Attorney General—or in most cases the Office of Legal Counsel—to function as a
> judge.

Krent Decl. Ex. 5, William P. Barr, *Attorney General's Remarks, Benjamin N. Cardozo School. of

Law, November 15, 1992*, 15 Cardozo L. Rev. 31, 37 (1993) ("Barr Remarks"); *see also id.* Ex. 6,

*FBI Authority to Seize Suspects Abroad: Hearing Before the Subcomm. on Civ. and Const. Rights

of the H. Comm. on the Judiciary*, H.R. Rep. No. 101-134, at 122 (1989) (Letter from Richard

Thornburgh, Att'y Gen. of the United States) ("Thornburgh Letter") (describing opinions resolving

interagency disputes as necessary to "maintaining a consistent legal position" across the executive

branch).

---

[2] The OLC also issues many other types of legal opinions and advice, including informal opinions, reviews of the form and legality of executive orders, advice concerning litigation decisions and the constitutionality of pending legislation, and advice to the president. This lawsuit does not concern any of that guidance. It focuses narrowly on the OLC's "formal written opinions," which constitute a tiny fraction of the OLC's legal output. *See* Krent Decl. Ex. 4, Letter from Assistant Attorney General Peter J. Kadzik to Representatives Jason Chaffetz and Elijah Cummings at 2, 10 ("Kadzik Letter"), and this motion is focused on one particular subset of formal written opinions: opinions that resolve interagency disputes.

In 1979, then–President Carter formalized the OLC's role as the arbiter of interagency disputes. Through Executive Order 12,146, President Carter required that, "[w]henever two or more executive agencies whose heads serve at the pleasure of the President are unable to resolve such a legal dispute, the agencies shall submit the dispute to the Attorney General." Exec. Order No. 12,146, 44 Fed. Reg. 42657 (July 18, 1979), § 1-402. The order also "encouraged [independent agencies] to submit the[ir] dispute[s] to the Attorney General." *Id*. § 1-401. By regulation, the attorney general has delegated this responsibility to the OLC. *See* 28 C.F.R. § 0.25(a). Consistent with this role, the OLC has never declined a request for an opinion resolving an interagency dispute. *See* Stip. ¶ 7; *see also* Best Practices Memo at 3 ("A written opinion is most likely to be necessary when the legal question is the subject of a concrete and ongoing dispute between two or more executive agencies.").

Agencies may request OLC opinions resolving interagency disputes in a number of ways. Some agencies explicitly cite Executive Order 12,146, while others do not. Stip. ¶ 8. Sometimes agencies in a dispute will submit a joint request; sometimes a single agency will submit the request. *Id.* ¶¶ 8–9. And sometimes, a dispute between agencies will emerge or become apparent only during the course of the OLC's opinion-writing process. *Id.* ¶ 10.

When resolving interagency disputes, the OLC follows an adjudicative process outlined in the agency's so-called "Best Practices Memo." *Id.* ¶ 13. It solicits detailed memoranda from each party to the dispute, "setting forth the agency's own analysis of the question." Best Practices Memo at 3. It solicits the views of other agencies not directly involved in the dispute if those agencies have subject-matter expertise or a special interest in the question presented. *Id.* It ensures that "agencies on each side of a dispute . . . share their memoranda with the other side." Stip. ¶ 17. And when the OLC deems it necessary, it will ask agencies to submit reply memoranda responding to

the arguments made by other parties to the dispute. Best Practices Memo at 3. When weighing the arguments made by each agency, OLC attorneys "consider fully and address impartially the points raised on both sides." *Id.* at 4. Before finalizing a formal written opinion, the OLC subjects it to "rigorous review within [the agency]." *Id*.

Once finalized, the OLC's formal written opinions become a part of the agency's "system of precedent," from which attorneys may not "lightly depart." *Id.* at 2. The opinions are printed on bond paper and signed by the drafting attorney. *Id.* at 4. They are added to the OLC's database and included in its "day books." *Id.* The OLC also maintains a separate file for each opinion, containing a copy of the signed opinion, the opinion control sheet, and the original request, the submissions of interested agencies, and any "obscure sources" cited in the opinion, so that future OLC attorneys may refer back to the opinion and its underlying sources. *Id.* at 4–5.

The OLC retains for itself the authority to share completed opinions with other agencies in the executive branch or with members of the public. Stip. ¶¶ 18–19. Within the executive branch, the OLC may disseminate opinions to other agencies when the analysis bears on an agency's area of expertise or operations. *Id*. ¶ 18. The OLC does not require the consent of the agencies involved in the dispute before providing opinions to others within the executive branch. *Id*. The OLC also publishes a subset of its formal written opinions to the public at large. *Id*. ¶ 19. In the forward to the first volume of OLC opinions, then–Attorney General Griffin Bell explained that the opinions' "value as precedents and as a body of executive law on important matters would be enormously enhanced by publication and distribution in a manner similar to those of the formal opinions of the Attorney General." *Id.* However, the OLC has never published all of its formal written opinions. *Id.* ¶ 20. Instead, the OLC's internal publication review committee decides whether to publish

opinions on a case-by-case basis, taking into account the views of the requesting agencies and the attorneys within the OLC who drafted or reviewed the opinion. Best Practices Memo at 5.

## II.     Procedural History

CfA first sought access to the OLC's formal written opinions by submitting a letter to the OLC on March 22, 2016, requesting that the agency make "all unpublished OLC opinions that provide controlling legal advice to executive branch agencies" available pursuant to FOIA's reading-room provision. *See* Letter from Anne Weismann to Karl Remón Thompson (Mar. 22, 2016), ECF No. 22-2. On June 8, 2016, after the OLC made clear its view that the reading-room provision does not apply to its opinions, CfA filed this suit. *See* Compl. ¶¶ 1, 7, ECF No. 1. The complaint made two claims, both articulated in the initial letter: first, that the OLC had failed to comply with its non-discretionary duty under the reading-room provision to publish its formal written opinions on an ongoing basis, *id*. ¶¶ 29–35, and second, that the agency had failed to comply with the reading-room provision's indexing requirement, *id*. ¶¶ 36–38.

The government moved to dismiss on July 21, 2016, arguing that FOIA's reading-room provision does not apply to the OLC's formal written opinions. *See* Def.'s MTD Br. 19–35, ECF No. 9-1. On October 6, 2017, the Court rejected the government's claim that the Court lacked subject matter jurisdiction to provide the relief sought, *see* MTD Op. 19–28 (Oct. 6, 2017), ECF No. 19, but it granted the motion to dismiss, interpreting the D.C. Circuit's decision in *EFF* to mean that not all of the OLC's formal written opinions can fall within the scope of FOIA's reading-room provision, *id.* at 30–36. The Court gave CfA leave to amend so that it could identify discrete categories of OLC opinions that might fall within the provision and therefore be subject to a requirement of affirmative disclosure. *See id*. at 37–38.

On October 27, 2017, CfA filed an amended complaint identifying four categories of OLC opinions subject to affirmative disclosure even under the Court's broad interpretation of *EFF*: (1) those resolving interagency disputes, Am. Compl. ¶¶ 35–38 (Oct. 27, 2017), ECF No. 22; (2) those interpreting non-discretionary legal obligations, *id.* ¶¶ 41–44; (3) those finding that particular statutes are unconstitutional, *id.* ¶¶ 45–46; and (4) those adjudicating or determining private rights, *id.* ¶¶ 47–49.[3]

On September 11, 2020, the Court issued an opinion denying in part and granting in part the government's second motion to dismiss, concluding that CfA had stated a claim for relief with respect to OLC opinions resolving interagency disputes. Ren. MTD Op. 38–39. That conclusion rested on two central holdings.

First, the Court held that "CfA has plausibly alleged that OLC opinions relating to inter-agency disputes are 'final opinions . . . made in the adjudication of cases.'" *Id.* at 3 (quoting 5 U.S.C. § 552 (a)(2)(A)). The Court reasoned that these opinions are plausibly "final" given the OLC's role as "the ultimate, authoritative adjudicator of disputes between different entities within the executive branch," *id.* at 26, and given that the agency's opinions "constitute the executive branch's self-professed 'final word on the controlling law,'" *id.* (quoting Best Practices Memo at 2). It reasoned that the opinions are "plausibly issued in the context of an 'adjudication,'" *id.*, because the OLC's rigorous process for resolving disputes is "adjudicative in nature," *id.* at 27. And it reasoned that the OLC's adjudication of an interagency dispute "can plausibly be

---

[3] The Amended Complaint also identified a fifth category of OLC opinions—those issued to independent agencies—noting that the OLC requires independent agencies to expressly agree to be bound by its opinions. *See* Am. Compl. ¶¶ 39–40. After the OLC confirmed that non-independent agencies make the same agreement *impliedly*, however, CfA withdrew its argument that opinions issued to independent agencies were distinct for purposes of FOIA's reading-room provision from opinions issued to other agencies. *See* Ren. MTD Opp'n 30 n.11 (Mar. 6, 2018), ECF No. 30.

characterized as a 'case[],'" rejecting the government's counter argument—that the term "case" encompasses only adjudications involving private parties—as "contrary to both ordinary practice and the common understanding of that term." *Id*. at 14–20, 27–28. The Court also rejected the government's contention that FOIA's reading-room provision applies only to records that "finally dispose of any agency action," observing that the text of the statute contains no such limitation. *Id.* at 28.

Second, the Court held that OLC opinions resolving interagency disputes "may also plausibly be characterized as 'statements of policy and interpretations' that have been adopted *ex ante* by at least one of the disputing agencies." *Id*. at 3 (cleaned up). The Court observed that the OLC's process for resolving disputes is "plausibly akin to arbitration within the executive branch," and that "the agencies that resort to OLC as 'a neutral arbiter to resolve the[ir] differing stances[,]' accept at the outset that OLC's resolution of their disagreement will become the governing interpretation of that legal issue." *Id.* at 29 (citation omitted)). The Court held, accordingly, that OLC opinions resolving interagency disputes satisfy *EFF*, because they "'speak with authority' as to the client agency's policies and interpretations." *Id.* at 21 (quoting *EFF*, 739 F.3d at 9); *see also id.* at 30 ("CfA's amended complaint plausibly alleges that OLC essentially serves as an authoritative arbiter of legal disputes that are submitted to it in this particular context, which is quite unlike the circumstance in which a single agency elects to solicit OLC's views as the first step in an anticipated policy-making process.").

On July 9, 2021, the government filed its motion for summary judgment.

### Standard of Review

Summary judgment is appropriate if a moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). Motions for summary judgment are analyzed in the light most favorable to the non-moving party. *See Hall & Assocs. v. Env't Prot. Agency*, 956 F.3d 621, 630 (D.C. Cir. 2020).

In FOIA cases, "the burden is on the agency to sustain its action." 5 U.S.C. § 552 (a)(4)(B). Even though "FOIA's reading-room provision differs from its reactive provision," the Court's analysis "remain[s] the same." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* (*CREW II*), 922 F.3d 480, 488 (D.C. Cir. 2019). Thus, whether responding to a request for documents under § 552(a)(3) or a complaint seeking affirmative disclosure of records under § 552(a)(2), the burden is on the agency to "justify withholding" the records at issue. *Id.*

## Argument

### I. OLC opinions resolving interagency disputes must be proactively disclosed under FOIA's reading-room provision.

FOIA requires the OLC to affirmatively disclose its opinions resolving interagency disputes for three independent reasons. First, opinions resolving interagency disputes are "final opinions . . . made in the adjudication of cases." 5 U.S.C. § 552 (a)(2)(A). Second, they are "statements of policy and interpretations which have been adopted by the agency." *Id.* § 552(a)(2)(B). Third, they constitute "working law," which the Supreme Court has held to fall within FOIA's affirmative disclosure mandate.

### A. OLC opinions resolving interagency disputes are "final opinions . . . made in the adjudication of cases."

Agencies must proactively disclose all "final opinions . . . made in the adjudication of cases." 5 U.S.C. § 552 (a)(2)(A). This Court previously held that CfA had plausibly alleged that OLC opinions resolving interagency disputes fall within this provision of FOIA because they are final interpretations of law issued through an adjudicative process. *See* Ren. MTD Op. 25–28. The allegations in the Amended Complaint upon which the Court relied have now been substantiated

in the factual record, and the Court should therefore hold that opinions resolving interagency disputes must be disclosed under § 552(a)(2)(A).

### 1.    OLC opinions resolving interagency disputes are "final opinions."

As the Court earlier suggested, opinions resolving interagency disputes are "final opinions" within the meaning of § 552(a)(2)(A) because the OLC serves "as the ultimate, authoritative adjudicator of disputes between different entities within the executive branch" and because its opinions "constitute the executive branch's self-professed 'final word on the controlling law.'" Ren. MTD Op. 26 (quoting Best Practices Memo at 2 (cleaned up)). In other words, OLC opinions resolving interagency disputes are "opinions," and they are "final." The record now confirms the Court's ruling.

Although FOIA does not define the phrase "final opinions," courts have interpreted it by reference to the definition of the term "order" in the Administrative Procedure Act ("APA"), of which FOIA is a part. Under the APA, an "order" is "the whole or a part of a final disposition . . . of an agency in a matter other than rule making." 5 U.S.C. § 551(6). Thus, in *Sears*, the Supreme Court concluded that a memorandum that "explains the reasons for [a] 'final disposition' . . . plainly qualifies as an 'opinion'; and falls within 5 U.S.C. § 552 (a)(2)(A)." 421 U.S. at 159. Similarly, the D.C. Circuit has explained that an "action taken by the responsible decisionmaker in an agency's decision-making process which has the practical effect of disposing of a matter before the agency is 'final' for purposes of FOIA." *Bristol-Meyers Co. v. FTC*, 598 F.2d 18, 25 (D.C. Cir. 1978). "If such action is accompanied by a written explanation of the decisionmaker's reasoning, that explanation constitutes a 'final *opinion*' and must be disclosed." *Id.* (emphasis added).

OLC opinions resolving interagency disputes plainly fall within this definition: when the OLC issues such an opinion, it disposes of the interagency dispute before it, and it memorializes its reasoning in an opinion that establishes the executive branch's authoritative interpretation of the law. The stipulated record leaves little doubt as to the applicability of either of these statutory terms. By executive order and practice, a primary duty of the OLC is to resolve disputes presented to it for resolution by other agencies. *See* Exec. Order No. 12,146 §§ 1-401, 1-402; Best Practices Memo at 3 (explaining that formal written opinions are "most likely to be necessary" in the context of interagency disputes); Stip. ¶ 7 (noting that the OLC is not aware of any instance in which it has declined to write an opinion resolving an interagency dispute when two or more agencies maintained conflicting positions). And the OLC's opinions memorialize the agency's reasoning in resolving the disputes before it. *See* Best Practices Memo at 4 (explaining that OLC opinions should "provide [the OLC's] views of the correct answer on the law, taking into account all reasonable counterarguments"). Agencies that submit their disputes to the OLC are not subsequently free to disregard the OLC's conclusions. *See id.* at 1 (recognizing that its opinions may "constrain [the executive branch's] pursuit of desired practices or policy objectives"). Rather, the OLC's opinions convey "controlling legal advice to executive branch officials on questions of law," Stip. ¶ 1, and, given the nature of the disputes that the OLC resolves, the opinions often provide "the final word on the controlling law," Best Practices Memo at 1.

The OLC's published opinions confirm this fact. For example, in *Application of the Endangered Species Act of 1972 to the Sale of Sperm Whale Oil by the General Services Administration*, the OLC resolved an interagency dispute between the Commerce Department and the General Services Administration ("GSA") over whether the Endangered Species Act prohibited the GSA's sale of sperm whale oil to private companies. *See* Krent Decl. Ex. 7,

*Application of the Endangered Species Act of 1973 to the Sale of Sperm Whale Oil by the GSA* (1974) ("Commerce–GSA Op."). The GSA argued that the statute did not proscribe the sale; the Commerce Department argued otherwise; and the OLC resolved the dispute with its conclusion that the statute "prohibit[s] GSA's sale of the whale oil." *Id.* at 2. This opinion is plainly "final." It authoritatively disposed of the disagreement between the Commerce Department and the GSA over the correct reading of the Endangered Species Act. And it displaced the GSA's contrary legal interpretation of the statute, forcing it to accept the OLC's legal interpretation.

The government argues that OLC opinions resolving interagency disputes are not "final" because they sometimes leave agencies free to make downstream programmatic decisions, Gov't Br. 18, but as the Court previously held, that is entirely beside the point. Nothing in the plain language of § 552(a)(2)(A) suggests that it is limited to "final opinions" that establish an agency's policy. Such a reading would render § 552(a)(2)(A) superfluous, as § 552(a)(2)(B) already requires the disclosure of an agency's "statements of policy and interpretations." *See* Ren. MTD Op. 28 ("The reading-room provision does not predicate affirmative disclosure on whether the agency's 'final opinions . . . made in the adjudication of cases' have a discernable policy impact.").

Even if § 552(a)(2)(A) applied only to final opinions that establish policy, however, the fact that opinions resolving interagency disputes supersede recipient agencies' governing legal interpretations is sufficient. The D.C. Circuit has long made clear that *legal* memoranda must be disclosed even if they do not dictate the "final *programmatic* decisions of the program officers who request them." *See Tax Analysts II*, 294 F.3d at 81 (emphasis in original). Indeed, the contrary rule proposed by the government is baffling: if a legal opinion were "final" only if it dictated all "potential avenues for action and prospective policy choices," Gov't Br. 18, then not even federal court opinions would be final. After all, judicial opinions say what the law is and resolve the

dispute at hand, but they generally do not instruct the parties on the remaining "prospective policy choices" open to them. *Cf. AMG Cap. Mgmt. v. FTC*, 141 S. Ct. 1341, 1352 (2021) (holding that the Federal Trade Commission Act does not permit the FTC to seek monetary relief in direct court proceedings, without opining on all other enforcement or legislative avenues available to the agency). To return to the example from above, it is irrelevant that the OLC opinion left the GSA with the downstream decision of how to dispose of the sperm whale oil in its possession. What is relevant is that the OLC conclusively resolved the agencies' dispute over the meaning of the Endangered Species Act and memorialized its reasoning in a "final opinion."

### 2.    OLC opinions resolving interagency disputes are "made in the adjudication of cases."

OLC opinions resolving interagency disputes are also "made in the adjudication of cases." *See* 5 U.S.C. § 552 (a)(2)(A). As the Court noted in its previous ruling, the OLC issues these opinions after receiving detailed memoranda from each party to a dispute, and it resolves each dispute after "consider[ing] fully and address[ing] impartially the points raised on both sides." Ren. MTD Op. 26–28 (quoting Best Practices Memo at 5). The Court correctly held that CfA had plausibly alleged that this process is adjudicative in nature. *Id.* The record now confirms that holding.

The APA defines an "adjudication" as an "agency process for the formulation of an order," 5 U.S.C. § 551(7), and, in turn, it defines an "order" as "the whole or a part of a final disposition . . . in a matter other than rule making," *id.* § 551(6); *accord Bristol-Meyers Co.*, 598 F.2d at 26 n.13; *Sears*, 421 U.S. at 158–59 (applying the APA's definition of "adjudication" to § 552(a)(2)(A)).[4] Although the statute does not define the term "case," the D.C. Circuit has held

---

[4] The Court previously cited both the statutory and dictionary definitions of the term "adjudication." *See* Ren. MTD Op. 27. Typically, when a statute expressly defines one of its terms,

that § 552(a)(2)(A) encompasses "final opinions resulting from proceedings in which a party has

a right to set the agency decision-making process in motion and obtain a determination concerning

the statute or other laws the agency is charged with interpreting and administering." *Am. Immigr.

Lawyers Ass'n v. Exec. Office for Immigr. Rev.*, 830 F.3d 667, 679 (D.C. Cir. 2016) (quoting

*Skelton v. USPS*, 678 F.2d 35, 41 (5th Cir. 1982)).

The OLC's process for resolving interagency disputes fits squarely within these definitions.

It is an "agency process" to develop "the whole or a part of a final disposition" of a dispute between

two or more agencies; it is designed to reach a decision about the correct interpretation of the law;

and it is set in motion by a request from one or more party agencies for a formal written opinion,

which is often triggered by the dispute-resolution process set forth in Executive Order 12,146.

Once an interagency dispute is brought to the OLC's attention, the OLC follows the process

described in its Best Practices Memo in order to resolve the precise case presented. *See Best

Practices Memo* at 2–5 (describing the OLC's "careful and deliberate process" for preparing

formal opinions). In evaluating the dispute, OLC attorneys act as adjudicators. They are obligated

to "consider fully and address impartially the points raised on both sides" of the dispute and to

address "the full range of relevant legal sources and significant arguments," including textual

analysis, an evaluation of precedent and historical practice, and "traditional tools of construction."

*Id.* at 2. OLC attorneys typically request that each agency involved in the dispute submit "a detailed

memorandum setting forth the agency's own analysis of the question" to the OLC and each other,

---

that definition controls. *See Burgess v. United States*, 553 U.S. 124, 129–30 (2008). Nothing turns
on the difference in this case, however, as the OLC's process for resolving interagency disputes
satisfies either definition. *See Adjudication*, Black's Law Dictionary (11th ed. 2019) ("[t]he legal
process of resolving a dispute"; "the effort to identify the rights of the contending parties now by
identifying what were, in law, the rights and wrongs, or validity or invalidity, of their actions and
transactions when entered upon and done." (cleaned up)).

much in the same way that parties file briefs when litigating a case in court. Best Practices Memo at 3; *see also* Stip. ¶ 17. At the end of the process, the OLC decides "the correct answer on the law," Best Practices Memo at 4, rendering an opinion that resolves the dispute. As the D.C. Circuit long-ago recognized, the OLC is an "arbiter" of disputes among agencies, *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 92 & n.2 (D.C. Cir. 1986), and its process for resolving these disputes is clearly adjudicative.

### 3. As the Court previously held, Section 552(a)(2)(A) is not limited to cases adjudicating private rights.

The government hardly addresses the text of § 552(a)(2)(A). Instead, its principal argument is one that this Court has already rejected: that § 552(a)(2)(A) applies only to opinions resulting from "adversarial disputes involving private parties." Gov't Br. 15. As this Court held, this "perplexing" interpretation of FOIA's reading-room provision is supported neither by the text nor the legislative history of § 552(a)(2)(A), and it is, in any event, foreclosed by D.C. Circuit precedent. *See* Ren. MTD Op. 14–20, 27–28.

The text of § 552(a)(2)(A) simply does not limit its reach to "adversarial disputes involving private parties." The closest textual reference to the adjudication of private rights is found in § 552(a)(2)(C), which requires agencies to affirmatively disclose "administrative staff manuals and instructions to staff that affect a member of the public." 5 U.S.C. § 552 (a)(2)(C). But this hurts rather than helps the government's cause. As this Court noted, the fact that Congress referred to private rights in subsection (C) but not in subsection (A) implies that Congress did not mean for any such limitation to apply to subsection (A). *See* Ren. MTD Op. 15.

For support, the government relies instead on other language in § 552(a)(2) that precludes agencies from citing "against a party other than an agency" material that is subject to the reading-room provision but that has not been published. *See* Gov't Br. 16 (quoting 5 U.S.C. § 552 (a)(2)).

As the Court held, however, this language limits how agencies can *use* improperly withheld records against private parties, but it "says nothing about whether the statutory list of [documents subject to affirmative disclosure] must be read to include only records that pertain to private parties." Ren. MTD Op. 16. Moreover, accepting the government's reading would turn § 552(a)(2) into a textual mess, as the language the government relies on applies to *all* of the reading-room provision's subsections, including the provision directing the publication of "staff manuals and instructions," which clearly do not arise from "adversarial disputes involving private parties." The government emphasizes the reference in § 552(a)(2)(A) to "concurring and dissenting opinions," Gov't Br. 16, but, as the Court observed, judges regularly issue concurring and dissenting opinions in cases that do not involve the adjudication of private rights. *See* Ren. MTD Op. 16–17 (citing numerous examples). Finally, the government's citation of FOIA's legislative history, Gov't Br. 16, does not help it—at most, the legislative history evidences Congress's special, but not *exclusive*, concern with the use of undisclosed law against private parties. *See* Ren. MTD Op. 17.

In any event, D.C. Circuit precedent forecloses the government's reading of § 552(a)(2)(A). In *Public Citizen v. Office of Management and Budget*, the D.C. Circuit held that an agency's legislative and budgetary clearance policies "fit comfortably within the working law framework," 598 F.3d 865, 867, 875 (D.C. Cir. 2010), even though these records clearly did not relate to private rights. *See also Tax'n with Representation Fund v. IRS*, 646 F.2d 666, 683 (D.C. Cir. 1981) (requiring the disclosure of technical memoranda relating to Treasury Department regulations under FOIA's reading-room provision). The government argues that earlier D.C. Circuit decisions imply that the term "adjudication" applies only to disputes that implicate individual rights, *see* Gov't Br. 17, but none of the cases the government cites purports to limit what constitutes an adjudication under § 552(a)(2)(A). The government's examples establish only

19

that records sought under § 552(a)(2)(A) *may* involve the rights of private parties, not that they *must*.[5]

This Court previously noted that the government's contention here is demonstrably inaccurate, *see* Ren. MTD Op. 17–20, and it should once again reject the government's attempt to read this unjustified, atextual limitation into the plain language of § 552(a)(2)(A).

### B.    OLC opinions resolving interagency disputes are "statements of policy and interpretations which have been adopted by the agency."

In addition to satisfying § 552(a)(2)(A), OLC opinions resolving interagency disputes are independently subject to affirmative disclosure under § 552(a)(2)(B) as "statements of policy" or "interpretations" of law that are "adopted" by the OLC and the agencies involved in the dispute.

The government does not meaningfully dispute that OLC opinions resolving interagency disputes are both "statements of policy" and "interpretations" within the meaning of § 552(a)(2)(B). In fact, it does not dispute at all that they are "interpretations." Nor could it; the OLC's opinions announce the executive branch's authoritative "interpretation[s]" of the law. *See* Best Practices Memo at 2. It is not necessary for this Court to resolve, therefore, whether the opinions are also "statements of policy," but as the Court previously suggested, they are. Ren. MTD Op. 28–30. When the OLC resolves an interagency dispute, its legal conclusions establish the government's controlling interpretation of the law, and they also necessarily resolve the policy dispute that the agencies presented for review. *See* Ren. MTD Op. 29 ("[T]he submission of an

---

[5] In any event, many opinions resolving interagency disputes do in fact involve the rights of private parties. *See e.g.*, Krent Decl. Ex. 8, *Whether Reservists Must Exhaust Available Leave Under 5 U.S.C. § 6323(b) Before Taking Leave Under 5 U.S.C. § 6323(a)*, 36 Op. O.L.C. 129 (2012) (determining how reservists may utilize their statutorily provided leave); *see also id.* Ex. 9, *EEOC Authority to Order Federal Agency to Pay for Breach of Settlement Agreement*, 38 Op. O.L.C. 22 (2014) (determining whether Social Security Administration employees were entitled to monetary damages).

inter-agency dispute to OLC pursuant to Executive Order 12,146 is plausibly akin to arbitration within the executive branch[.]"). The resulting opinions therefore amount to a statement of policy on the dispute presented. *See, e.g.*, Ex. 7, Commerce–GSA Op. 3 (concluding that the Endangered Species Act prohibits the GSA from selling and transporting whale oil to private companies).

Thus, the critical question is whether the opinions at issue are "adopted" within the meaning of § 552(a)(2)(B).

As the D.C. Circuit explained in *Schlefer v. United States*, records are "adopted" under § 552(a)(2)(B) when they are "authoritative . . . decisions in the cases to which they are addressed" or when they "guide subsequent . . . rulings." 702 F.2d 233, 244 (D.C. Cir. 1983). In that case, the court held that legal interpretations issued by the Chief Counsel of the Maritime Administration had been "adopted" by the agency because the opinions were "written and received in circumstances that establish them as definitive rulings on the legal questions they decide," and because, "in practice, requesting officials always follow the advice given." *Id*. at 237. The key consideration in the court's analysis was not whether requesting officials had formally or expressly adopted the decisions—as the government seems to suggest in this case, *see* Gov't Br. 19—but whether the officials had, in practice, conformed their behavior to the decisions and treated them as authoritative. *See Schlefer*, 702 F.2d at 238 ("Our consideration looks beneath formal lines of authority to the reality of the decisionmaking process in question."); *see also id.* (holding that the opinions fell within § 552(a)(2)(B) even though the officials requesting them "retain[ed] initial decisionmaking authority").

OLC opinions resolving interagency disputes are "adopted" in two distinct ways.

First, OLC opinions resolving interagency disputes are "adopted" by the agencies that submit a dispute to the OLC, because the agencies' legal interpretations and policy positions are

necessarily controlled by, and must be conformed to, the OLC's resolution of the dispute. As this Court previously explained, by seeking "an adjudication of their conflicting positions," the agencies in a dispute effectively agree to "adopt" the OLC's "authoritative settlement of their own interpretations." Ren. MTD Op. 28–30. The OLC's resulting opinion provides the "correct answer on the law," Best Practices Memo at 4, and so disputing agencies must necessarily conform their interpretations to—that is, "adopt"—the OLC's view.

As this Court held, this understanding of when a legal opinion is "adopted" within the meaning of § 552(a)(2)(B) is entirely consistent with the D.C. Circuit's decision in *EFF*. In *EFF*, the D.C. Circuit concluded that a particular OLC opinion was not working law because it "concern[ed] the *advisability* of a particular policy" but did not "authoritatively state or determine the agency's policy." 739 F.3d at 8. Based on this, the government asserts that an OLC opinion falls within § 552(a)(2)(B) only if, after receiving the opinion, an agency explicitly and affirmatively embraces both its reasoning and conclusion. Gov't Br. 19. Nothing in *EFF* suggests that adoption can occur only in such narrow circumstances. "[P]roperly understood," this Court has explained, "*EFF* plainly leaves open the possibility that a client agency . . . can 'adopt' the OLC's legal advice" when the OLC opinion "'speak[s] with authority' as to the client agency's policies and interpretations." Ren. MTD Op. 21 (quoting *EFF*, 739 F.3d at 9). As explained above, the OLC speaks with this authority when it resolves interagency disputes because it acts "as an authoritative arbiter of legal disputes that are submitted to it." *See id.* at 30. Therefore, the OLC's arbitration of interagency disputes is "quite unlike the circumstance [in *EFF*] in which a single agency elect[ed] to solicit OLC's views as the first step in an anticipated policy-making process." *Id*. OLC opinions resolving interagency disputes are not preludes to policymaking that agencies are "free to decline to adopt." *EFF*, 739 F.3d at 10. They are, instead, "an authoritative settlement

of [the agencies'] own interpretations." Ren. MTD Op. 30; *see also Tax Analysts v. IRS*, No. CIV A. 94-923 (GK), 1996 WL 134587, at \*2 (D.D.C. Mar. 15, 1996) *aff'd in relevant part on other grounds* 117 F.3d 607 (D.C. Cir. 1997) (concluding that memoranda issued by one component of the Treasury Department were "informally adopted" by another component because they established policies on which the latter relied in the discharge of its duties).

Consider, for example, a 2012 OLC opinion resolving a dispute involving the Department of Veterans Affairs ("VA"), the Office of Personnel Management ("OPM"), and the Department of Defense. *See* Krent Decl. Ex. 8*, Whether Reservists Must Exhaust Available Leave Under 5 U.S.C. § 6323(b) Before Taking Leave Under 5 U.S.C. § 6323(a)*, 36 Op. O.L.C. 129 (2012) ("VA–OPM Op."). In 2011, the VA asked the OLC whether a reservist who qualifies for leave under both 5 U.S.C. § 6323(b) and § 6323(a) could elect to take leave under either statutory provision. The VA did not issue this request in a vacuum, wanting to know about the "*advisability*" of different policy options at the beginning of its decision-making process. *Cf. EFF*, 739 F.3d at 8. Rather, the VA asked the OLC to decide the issue because the agency disagreed with the longstanding view of the OPM and the Comptroller General that exhaustion of § 6323(b) leave was statutorily required. Ex. 8, VA–OPM Op. 133, 135. The VA brought the OPM's policy guidance on reservist pay to the OLC's attention, arguing that the OPM's view was undermined by prior amendments to § 6323(b), was inconsistent with OPM's own regulations, and would force reservists to forfeit their accrued § 6323(a) leave. *Id*. This is not the posture of an agency interested in tentative legal advice to inform deliberations over policy. This is the posture of an agency with a concrete conflict over policy (here, "what leave is available to reservists?") that hinges on differing, established legal interpretations ("what is the meaning of § 6323?"). In response, the

OLC did not offer equivocal advice; it spoke definitively on the questions presented for resolution. *Id.* at 152 ("[W]e conclude that section 6323(b) does not contain an exhaustion requirement.").

The VA–OPM Opinion is emblematic of this subset of OLC opinions, in which agencies come to the OLC for a controlling interpretation that will supersede their own. CfA has previously cited some of these opinions. *See, e.g.*, Krent Decl. Ex. 9, *EEOC Authority to Order Federal Agency to Pay for Breach of Settlement Agreement*, 38 Op. O.L.C. 22 (2014) ("EEOC–SSA Op.") (reversing an award of monetary relief that the EEOC had ordered the Social Security Administration to pay for breach of a settlement agreement); *id.* Ex. 10, *Authority of the Department of Labor to Control the Disclosure of Federal Employees' Compensation Act Records Held by the United States Postal Service*, 36 Op. O.L.C. 217 (2012) ("DOL–USPS Op.") (preventing USPS from establishing routine uses for FECA records inconsistent with the Labor Department's Privacy Act notice, because the Labor Department, not USPS, controls the disclosure of FECA records); *id.* Ex. 11, *Payment of Back Wages to Alien Physicians Hired Under H-1B Visa Program*, 32 Op. O.L.C. 47 (2008) ("DOL–VA Op.") (reversing an award of back wages that the Labor Department had ordered the VA to pay to eleven noncitizen physicians); *id.* Ex. 12, *Administrative Assessment of Civil Penalties Against Federal Agencies Under the Clean Air Act*, 21 Op. O.L.C. 109 (1997) (rejecting the Defense Department's objection to the EPA's position that it possessed authority to assess civil penalties against other federal agencies); *see also* Krent Decl. ¶¶ 16–22 (collecting additional examples).[6]

---

[6] The government argues that the EEOC–SSA and DOL–VA Opinions do not conclusively determine the policy of any of the agencies involved in the dispute. Gov't Br. 23–24. As discussed below, *see* Part II.A *infra*, that is incorrect and, in any event, not relevant.

These opinions are precisely the sort of opinions the *EFF* court envisioned as working law: opinions that "speak with authority" on both the agency's legal and policy positions. 739 F.3d at 9.

Second, OLC opinions resolving interagency disputes are "adopted" *by the OLC*. This is so because they serve as a system of precedent that guides the OLC's future decision making. Like recipient agencies, the OLC treats its opinions resolving interagency disputes as "authoritative" and relies on them to "guide subsequent . . . rulings." *Schlefer*, 702 F.2d at 244. As the Best Practices Memo explains, the OLC treats its opinions as a "system of precedent" from which the OLC will "not lightly depart." Best Practices Memo at 2. This is borne out in the OLC's actual opinions. The OLC cites its past decisions resolving interagency disputes in much the same way it cites judicial precedents. *See, e.g.*, Ex. 9, EEOC–SSA Op. 27–28 (citing Krent Decl. Ex. 13, *Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply with Orders Issued by EEOC Administrative Judges*, 27 Op. O.L.C. 24 (2003)). The OLC also carefully assesses when to reconsider or withdraw its prior opinions, just as a court does in applying the principle of *stare decisis*. Best Practices Memo at 2. Thus, OLC opinions resolving interagency disputes are "adopted" not just by the agencies involved in the dispute, but also by the OLC itself.

The government appears to argue that FOIA applies only to agencies with "policymaking authority," and that only the agencies that request OLC opinions can be required to publish them. Gov't Mem. at 19. But the OLC *does* have the authority to adopt policies and interpretations. In adjudicating disputes between agencies, it does just that, and courts have applied § 552(a)(2) to agencies that issue such legal policies and interpretations. *See, e.g.*, *Schlefer*, 702 F.2d 233. Because the OLC has adopted the interpretations articulated in opinions resolving interagency

disputes, it cannot fob off on recipient agencies the responsibility of complying with the reading-room provision. It must do so itself. *See U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144–45 (1989) (explaining that an agency is responsible for all records that it has "create[d] or obtain[ed]," regardless of whether a requester could seek those records from other sources).[7]

### C. OLC opinions resolving interagency disputes are "working law" within the meaning of *Sears* and must be affirmatively disclosed.

OLC opinions resolving interagency disputes fall within FOIA's proactive disclosure provision for the related reason that they constitute "working law" within the meaning of the Supreme Court's decision in *Sears*. In that decision, the Supreme Court analyzed the relationship between Exemption 5 and FOIA's reading-room provision, concluding that the latter "represents an affirmative congressional purpose to require disclosure" of documents that "have 'the force and effect of law.'" *Sears*, 421 U.S. at 153 (quoting H.R. Rep. No. 89-1497, 1966 U.S.C.C.A.N. 2418, 2424 (1966)). Since *Sears*, lower courts have required the affirmative disclosure, or rejected the withholding under Exemption 5, of records that have the force and effect of law—that is, records that constitute an agency's "working law."

The crux of the working law framework is that records must be disclosed if they constitute "a body of 'secret law,' used by [an agency] in the discharge of its regulatory duties and in its dealings with the public." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980). When legal memoranda are not merely advisory, but actually govern agency decision making, they are working law. *See id.* at 869 (explaining that regional counsel memoranda "represent[ed] interpretations of established policy on which the agency relie[d] in discharging its

---

[7] Indeed, because the OLC itself adopts these opinions by treating them as precedent, the OLC would have to publish these opinions under the reading-room provision even if recipient agencies did not adopt them. As explained above, however, recipient agencies *do* adopt them.

regulatory duties"); *see also Tax Analysts v. IRS* (*Tax Analysts I*), 117 F.3d 607, 617 (D.C. Cir. 1997); *Schlefer*, 702 F.2d at 244; *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 708 (D.C. Cir. 1971) ("[T]o prevent the development of secret law within the Commission, we must require it to disclose orders and interpretations which it actually applies in cases before it.").

OLC opinions resolving interagency disputes are plainly working law. They constitute binding legal interpretations upon which agencies must rely "in the discharge of [their] regulatory duties." *Coastal States*, 617 F.2d at 867. In its brief opposing the government's renewed motion to dismiss, CfA explained that the OLC's formal written opinions bear all the indicia of working law. *See* Ren. MTD Opp'n 13–17 (Mar. 6, 2018), ECF No. 30. OLC opinions resolving interagency disputes even more clearly exhibit these characteristics of working law.

*First*, opinions resolving interagency disputes bind recipient agencies. As the D.C. Circuit explained in *Coastal States*, records that are "routinely used by agency staff as guidance in conducting their [duties]" constitute working law, because they "in practice represent interpretations of established policy on which the agency relies in discharging its regulatory responsibilities." 617 F.2d at 869; *see also Tax Analysts I*, 117 F.3d at 617. As such, "withholding them would serve no legitimate policy interest of the government." *Coastal States*, 617 F.2d at 869. Like the legal opinions at issue in *Coastal States* and the field service memoranda in *Tax Analysts I*, opinions resolving interagency disputes bind their recipients. They are, in the OLC's own words, "final" and "controlling." Best Practices Memo at 1; *see also* Ex. 6, Thornburgh Letter (describing the resolution of a dispute between the VA and the Labor Department as "binding on both the Department of Labor and the VA, as well as other agencies involved in the dispute"); *see also* Ren. MTD Opp'n 13–14.

*Second*, opinions resolving interagency disputes are part of a uniform system of executive branch precedent. *See Schlefer*, 702 F.2d at 241 ("A second test of the character of agency documents typed 'law' by the FOIA requester and 'deliberative' by the agency is the precedential weight the agency accords to the documents."). When the OLC resolves interagency disputes, it displaces conflicting legal positions and differing policy views with a single, governing interpretation that applies throughout the executive branch. Best Practices Memo at 2 (referring to OLC opinions as a "system of precedent" from which it will not "lightly depart"); *see also* Ex. 6, Thornburgh Letter (explaining that opinions resolving interagency disputes create "a consistent legal position within [an] Administration"). Opinions resolving interagency disputes therefore "develop a body of coherent, consistent interpretations," *Tax Analysts I*, 117 F.3d at 617, for the executive branch.

Their treatment within the OLC and across the executive branch also demonstrates their precedential value. Like the legal opinions in *Schlefer* that were "b[ou]nd, summarize[d], index[ed], and distribute[d] to . . . staff," 702 F.2d at 242, opinions resolving interagency disputes are signed, printed onto bond paper, and indexed into the agency's database and day books. Best Practices Memo at 4. They are accessible to all OLC attorneys, and they are often distributed throughout the executive branch, particularly when an opinion "bears on an agency's area of expertise, or if the legal conclusions therein are relevant to [an agency's] operations." Stip. ¶ 18; *see also* Ren. MTD Opp'n 14–15.

*Third*, opinions resolving interagency disputes flow outward to recipients that are bound to apply them, in the same way that arbitral or judicial decisions flow from an adjudicator to a party. *See Tax'n with Representation Fund*, 646 F.2d at 681 (D.C. Cir. 1981) ("[T]he paradigm of 'final opinions' (is that the documents) typically flow from a superior with policymaking authority to a

28

subordinate who carries out the policy." (quoting *Brinton v. U.S. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980)). Courts—and the government itself—have repeatedly recognized that when the OLC resolves interagency disputes, its actions are quasi-judicial, with its opinions flowing downward from an adjudicator to a party, rather than upward to a party with superseding authority. *See, e.g.*, *Randolph-Sheppard Vendors of Am.*, 795 F.2d at 92 & n.2 (describing the OLC as a "neutral arbiter" of disputes between agencies); Ex. 5, Barr Remarks at 37 ("In this context [of interagency disputes], the Attorney General's role is much like a court's in an adversarial proceeding. . . . Deciding among the positions being taken requires the Attorney General—or in most cases the Office of Legal Counsel—to function as a judge."); *see also* Ren. MTD Opp'n 15–16.[8]

*Fourth*, opinions resolving interagency disputes are issued prospectively and guide agencies in the discharge of their duties. When legal memoranda are not merely retrospective in focus, but actually govern future agency conduct, they are working law. *See, e.g.*, *Schlefer*, 702 F.2d at 244 (noting that "in practice, CCOs also guide subsequent Agency rulings"); *Coastal States*, 617 F.2d at 867; *Sterling Drug*, 450 F.2d at 708. Much like actions seeking declaratory or injunctive relief in federal court, these opinions settle concrete disputes and clarify the rights and obligations of the affected agencies going forward. For example, the OLC's conclusion in 1974 that the Endangered Species Act prohibited GSA's planned sale of sperm whale oil necessarily guided the GSA in the prospective discharge of its regulatory duties. *See* Ex. 7, Commerce–GSA Op.; *see also* Ex. 8, VA–OPM Op. (clarifying how reservists may elect to take leave for the

---

[8] OLC opinions issued to the president *do* flow upward, but CfA has excluded that subset of opinions from this litigation. Ren. MTD Opp'n 44. In any event, that subset would not encompass any opinions resolving interagency disputes.

agencies responsible for personnel management and assistance for members of the armed forces); Ren. MTD Opp'n 16.

*Fifth*, opinions resolving interagency disputes are written in a conclusive and authoritative tone. They reflect a judicial temperament in their analysis of the arguments presented by the agencies, and they generally end with conclusive language indicative of the opinion's status as internal law. *See, e.g.*, Ex. 10, DOL–USPS Op. 223 ("DOL and USPS disagree about which agency has authority over FECA records in the custody of the Postal Service . . . . DOL contends that 'it alone has authority over . . . FECA records for Privacy Act purposes' . . . . USPS, however, argues that it has the exclusive authority over FECA records in its custody."); *id.* at 236 ("In sum, we conclude that DOL has authority to control the disclosure of FECA records, including those in the possession of USPS, and that DOL's exercise of this authority is consistent with and furthers the purposes of the Privacy Act."). The structure and language of the opinions makes clear that they are working law. *See Tax Analysts II*, 294 F.3d at 81 (contrasting language stating "[i]t is the position of the Treasury Department that" and "[w]e conclude" with "such phrases as '[w]e believe' and '[w]e suggest'"); *Schlefer*, 702 F.2d at 240, 243 (same); *see also* Ren. MTD Opp'n 16–17.

*    *    *

The government argues that OLC opinions resolving interagency disputes can become working law only through individual acts of "disclosure, adoption, or conversion" by recipient agencies, Gov't Br. 14, 19, but this is doubly wrong. First, the legal interpretations that guide an agency's conduct are working law; the D.C. Circuit has never held that a separate act of adoption or conversion by non-lawyers within the agency is required. *See Tax Analysts I*, 117 F.3d at 617 (requiring the disclosure of memoranda from the Office of Chief Counsel); *Schlefer*, 702 F.2d at

245 (same with respect to "Chief Counsel Opinions"); *Coastal States*, 617 F.2d at 859–60, 868–69 (same with respect to memoranda from agency regional counsel). To hold otherwise would convert the working *law* doctrine into a working *policy* doctrine, requiring disclosure of agency policies but not the "secret law" created to guide and constrain employees in setting policies and discharging the agency's duties. *Cf. id.* at 867. Second, to the extent that there must be some act of adoption of the OLC's controlling interpretations, that act can take multiple forms. For all the reasons stated above in Part I.B and in the Court's prior opinion, Ren. MTD Op. 28–31, recipient agencies "adopt" opinions resolving interagency disputes as their working law *ex ante* by virtue of submitting to the OLC's binding dispute-resolution process.

### D.    OLC opinions resolving interagency disputes are not protected by Exemption 5.

Because OLC opinions resolving interagency disputes fall within § 552(a)(2) and the working-law doctrine, the government's categorial invocation of the deliberative-process privilege fails. *See* Gov't Br. 14. FOIA's affirmative-disclosure obligations are the flip side of the deliberative-process privilege, and so "statements of an agency's legal position . . . cannot be viewed as predecisional," *Tax Analysts I*, 117 F.3d at 617, as they must to be exempt. *See also Sears*, 421 U.S. at 153–54 (explaining that courts "should be reluctant . . . to construe Exemption 5 to apply to the documents described in 5 U.S.C. § 552 (a)(2)," and holding that "with respect at least to 'final opinions' . . . Exemption 5 can never apply"). At most, the government might argue that portions of the OLC's opinions are not working law and thus susceptible to a claim of privilege, but it must do so on a case-by-case basis.[9]

---

[9] The government asserts that opinions resolving interagency disputes are "confidential," Gov't Br. 20, but it does not argue, as it did in its renewed motion to dismiss, *see* Ren. MTD Br. 21–22 (Feb. 13, 2018), ECF No. 29-1, that these opinions are shielded by the attorney–client privilege. For good reason—as explained in CfA's opposition to that motion, the OLC's relationship with

**II.    The individual OLC opinions the government cites do not help its case.**

The government points to five OLC opinions that—it argues—show that opinions resolving interagency disputes categorically fall outside of § 552(a)(2). *See* Gov't Br. 20–24. The government is wrong for two primary reasons. First, each of these opinions clearly falls within § 552(a)(2) because each conclusively resolves a legal dispute presented to the OLC for review in its capacity as the arbiter of interagency disputes. Second, even if some of these opinions (or some portion of them) were in fact genuinely deliberative, that would not rebut CfA's showing that, as a general matter, OLC opinions resolving interagency disputes are "final opinions" within the meaning of § 552(a)(2)(A) and "statements of policy and interpretations" within the meaning of § 552(a)(2)(B). These opinions would be, at most, exceptions to the general rule, and the government would be entitled to withhold or redact them on a case-by-case basis.

**A.    These opinions fall within § 552(a)(2).**

The government claims that the five opinions it cites are examples of deliberative OLC advice, but in reality, its argument about each opinion is just a repackaged version of its claim that OLC opinions "do not finally dispose of any agency action." *See* Gov't Br. 18. This argument is rebutted above, *see* Part I.A.1, and the Court has already rejected it, because the text of § 552(a)(2)(A) does not require any "discernable policy impact" and because OLC opinions resolving interagency disputes *do* determine legal policy in their resolution of the legal disputes presented for review. Ren. MTD Op. 28; *accord Pub. Citizen v. Off. of Mgmt. & Budget*, 598 F.3d at 875 (noting that an agency's possible "subsequent decisions" would not "undermine the finality of the existing policy"); *Tax Analysts II*, 294 F.3d at 81 ("final legal position[s]" must be disclosed

---

the agencies that submit requests for formal written opinions is nothing like an attorney–client relationship. *See* Ren. MTD Opp'n 28–29; *see also* Part III *infra*.

under FOIA even if they do not determine the "final *programmatic* decisions of the program officers who request them"); *Tax Analysts I*, 117 F.3d at 617 ("Although [legal opinions] may precede the field office's decision in a particular taxpayer's case, they do not precede the decision regarding the agency's legal position.").

In any event, all five opinions highlighted by the government fall within FOIA's reading-room provision. As discussed below, each opinion resulted from the adjudication of a concrete legal dispute; each culminated in a conclusive interpretation of law or statement of policy; and each guided the recipient agencies in the discharge of their regulatory duties.

1. The OLC's opinion in *Applicability of the Cargo Preference Act to the Transportation of Alaskan Oil to the Strategic Petroleum Reserve*, 8 Op. O.L.C. 139 (1983), addressed the question of whether certain commercial oil shipments to the Strategic Petroleum Reserve counted toward a statutory requirement that at least 50% of oil transported to the Reserve be carried on vessels flying the U.S. flag. The Department of Transportation ("DOT") and the Department of Energy ("DOE") disagreed on the question and submitted it for resolution by the OLC, which agreed with the DOE that it could count the shipments toward the statutory requirement. *Id*. at 143. The opinion authoritatively resolved the legal questions presented for review in the context of a concrete dispute over legal policy, and in doing so, it superseded the DOT's contrary position. Accordingly, it falls within § 552(a)(2) and the working law doctrine.

The government disagrees, arguing that the opinion did not tell the DOE what downstream policy to adopt, Gov't Br. 20, but again, that is irrelevant, because the opinion definitively resolved the immediate dispute presented and forced the DOT to conform its legal position to the OLC's interpretation. The government also argues that the opinion did not "fully" resolve the dispute presented, *id.* at 20–21, because the OLC declined to answer some of the additional questions

raised by the DOE. But it neglects to mention that the OLC fully resolved the "strictly legal" aspects of the DOE's questions, 8 Op. O.L.C. at 140, and declined to answer the extra-legal questions only because they were beyond the OLC's institutional competence, *id.* at 149–51 ("We are not the appropriate office . . . ."). In other words, much like a court would, the OLC resolved the questions appropriately before it, and directed the parties to settle their other grievances elsewhere.[10]

2. The OLC's opinion in *Scope of the Environmental Protection Agency's Discretion to Adopt Any One of Three Alternative Interpretations of the Mitchell-Conte Amendment to the Clean Air Act*, 13 Op. O.L.C. 105 (1989), resolved a dispute over the application of *Chevron* deference to three possible interpretations of an amendment to the Clean Air Act. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The OMB contended that only one interpretation was legally permissible; the EPA contended that all three were; and the OLC agreed with the EPA, superseding the OMB's conflicting interpretation of the Act. 13 Op. O.L.C. at 111. The government argues that the opinion was not working law "because the choice of which interpretation to adopt was left to the EPA," Gov't Br. 21–22, but it ignores the fact that the opinion resolved the concrete legal dispute presented over the scope of the EPA's authority. It is irrelevant that the opinion left the EPA with a downstream choice to make. Indeed, the Supreme Court did just that in *City of Arlington v. FCC*, 569 U.S. 290 (2013), when it determined that the FCC was entitled to *Chevron* deference in interpreting the scope of its regulatory authority. That opinion, like the OLC's, resolved a concrete dispute over the boundaries of an agency's discretion. And it

---

[10] *See also id*. at 152 ("We understand that our analysis of this issue will resolve much of the *actual dispute* between DOT and DOE with respect to DOE's Cargo Preference Act compliance obligations. With respect to the two questions raised independently by DOE, however, we cannot fully resolve the disagreement . . . ." (emphasis added)).

is unsurprising that the opinions declined to exercise the discretion they had determined belonged to the agencies. It is presumably true, of course, that the EPA would later exercise that discretion. If and when it did, the deliberations over which interpretation to adopt might very well be protected under Exemption 5. But the OLC's resolution of the legal fight over how much discretion the EPA had is distinct from that future deliberative process.

3. The OLC's opinion in *Applicability of Government Corporation Control Act to "Gain Sharing Benefit" Agreement*, 24 Op. O.L.C. 212 (2000), spoke with similar authority on the question of whether the Government Corporation Control Act required NASA to obtain legislative authorization before entering into an agreement with a private corporation. The OLC held that the statute did not require NASA to obtain authorization, displacing the OMB's contrary policy position. *Id.* at 215 (describing the OMB's analysis); *id.* at 218 (resolving dispute in favor of NASA's position). The government's argument that "OLC did not direct NASA to enter the agreement," Gov't Br. 22, again confuses an agency's downstream programmatic decision-making with its "statements of policy and interpretations," 5 U.S.C. § 552 (a)(2)(B). In this opinion, the OLC spoke conclusively on the latter.

4. The OLC's opinion in *Payment of Back Wages to Alien Physicians Hired Under H-1B Visa Program*, 32 Op. O.L.C. 47 (2008), arose out of administrative complaints filed by eleven physicians who claimed they had been underpaid by the VA. After investigating their complaints, the Department of Labor ("DOL") ordered the VA to pay the physicians $230,000 in back wages. *See* Ex. 11, VA–DOL Op. 48. The VA challenged that order before the OLC, which ruled that the DOL lacked authority to order the VA to pay back wages to the physicians. *Id.* at 54. This opinion is clearly a "final opinion[] . . . made in the adjudication of [a] case[]" and a "statement[] of policy and interpretation[]." Moreover, it adjudicates private rights, thus satisfying even the OLC's

cramped interpretation of § 552(a)(2)(A). The government argues that it is nonetheless deliberative because, after prevailing in the dispute, the VA could have voluntarily decided to pay back wages. Gov't Br. 23. But, again, the possibility of some future and independent programmatic decision does not change the final and conclusive nature of the OLC's opinion, which settled the legal question central to the dispute, foreclosed the DOL from taking its preferred policy course (ordering the payment of back wages), and reversed the DOL's award of mandatory damages to eleven individuals. *Cf. Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007) (holding that a claim of sex discrimination was time-barred, without foreclosing the possibility of voluntary payment of damages by the defendant). Of course, if the VA deliberated over a future change in approach, those deliberations might very well be protected, but that would have no effect on this opinion's status under § 552(a)(2).

5. The OLC's opinion in *EEOC Authority to Order Federal Agency to Pay for Breach of Settlement Agreement*, 38 Op. O.L.C. 22 (2014), is similar in most relevant respects. It arose from the EEOC's award of monetary relief to a group of federal employees who claimed that the Social Security Administration had breached a settlement agreement. *See* Ex. 9, EEOC–SSA Op. 24. The Administration challenged the award before the OLC, which concluded that the EEOC lacked the authority to issue it. *Id.* at 38. As with the previous opinion, this one arose in a concrete dispute over private rights. *Id.* at 26 ("SSA sought reconsideration of the decision [before the EEOC Office of Federal Operations, which] denied the motion. SSA then submitted its request for the views of this Office . . . ." (citation omitted)). The government argues that the OLC's opinion did not establish the policy position of either agency because it noted that the EEOC could seek to enforce the settlement agreement in other ways. *See* Gov't Br. 24. But as with the opinion above, the

36

opinion here resolved the concrete dispute before it, and the possibility that the EEOC might engage in future deliberation over a future policy does not change the working law analysis.

*     *     *

Each of these opinions thus supports CfA's view that OLC opinions resolving interagency disputes are, as a general matter, subject to § 552(a)(2). That is not to say, of course, that CfA's claim rises and falls on the character of these opinions—or of any other isolated opinion. Some opinions resolving interagency disputes may discuss classified or sensitive information exempt from disclosure. But as discussed further below, it is the OLC's duty to disclose opinions resolving interagency disputes, while justifying any withholdings or redactions on a case-by-case basis.

### B.     The government cannot sustain its burden by pointing to individual opinions that it asserts fall outside § 552(a)(2).

The government's argument would fail even if some of the opinions the government points to fell outside of § 552(a)(2).

In all FOIA cases, including cases proceeding under FOIA's reading-room provision, "the burden is on the agency to sustain its action." 5 U.S.C. § 552 (a)(4)(B); *see also Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* (*CREW I*), 846 F.3d 1235, 1240 (D.C. Cir. 2017) (explaining that FOIA's remedial provision applies equally to "sections 552(a)(1), (2), or (3)"). In this case, it must show that none of the records it has withheld are "final opinions resulting from the adjudication of cases" or "statements of policy and interpretations which have been adopted by the agency." *See* 5 U.S.C. § 552(a)(2)(A)–(B).

The government asserts otherwise—arguing that "CFA's claim fails if one or more OLC opinions that resolves an interagency dispute falls outside of each category," Gov't Br. 20—but this is incorrect. The government bases its contention on the Court's prior holding that, with respect to categories of opinions not at issue in this brief, CfA did not "allege sufficient facts . . . that could

make it plausible that these OLC opinions necessarily amount to [final opinions or interpretations within the meaning of § 552(a)(2)]." Ren. MTD Op. 38. But while it was CfA's burden at that stage to "plead a plausible claim," it now falls upon the government to "to justify its withholding of records by . . . demonstrating at summary judgment that the requested documents are exempt from disclosure." *CREW II*, 922 F.3d at 488; *see also Tax Analysts*, 492 U.S. at 142; *Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 352 (1979).

The D.C. Circuit's description of the government's burden in *CREW II* is consistent with past opinions in which courts have made clear that, once a plaintiff has established that a category of records generally falls within the scope of the reading-room provision, it becomes the government's burden to justify the withholding of records within that category on an individualized basis. In *Taxation with Representation Fund v. IRS*, for example, the plaintiff sought all IRS general counsel memoranda, technical memoranda, and actions on decisions under both § 552(a)(2) and § 552(a)(3). 646 F.2d at 669–73. The D.C. Circuit concluded that most, but not all, of the records identified by the plaintiff were subject to affirmative disclosure because they served as interpretative guides and research tools for agency personnel (including lawyers), were informally adopted by the agency as explanations of its policy, or were disseminated for use in legal research. *Id*. at 682–84. Although most of the records shared these characteristics, the court noted that some of the memoranda did not. *Id*. at 681–82. Accordingly, the court ordered the affirmative disclosure of the records sought "except with respect to" those documents. *Id*. at 681. Similarly, in *Bristol-Meyers Co. v. FTC*, the D.C. Circuit faulted the district court for failing to assess "whether *any* information" in the records sought by the plaintiff "qualifie[d] as 'final opinions . . . made in the adjudication of cases' within the meaning of *Sears*." 598 F.2d at 27–28 (emphasis added).

The government's contention that some of the records sought here fall outside the ambit of § 552(a)(2) would not, then, doom CfA's case, even if the contention were correct. At most, it would justify this Court in excluding those opinions from the relief it orders.

### III.    Requiring the disclosure of OLC opinions resolving interagency disputes would serve the rule of law.

Section 552(a)(2) does not contain a carve-out allowing agencies to withhold records on policy grounds. The statute already reflects Congress's policy judgment that "final opinions" and "statements of policy and interpretations" must be available for public inspection. The government argues, nonetheless, that the Court should substitute its own policy judgment for that of Congress based on the government's concern that a ruling for CfA would "threaten the rule of law." *See* Gov't Br. 25–27. The Court should decline that invitation.

Regardless, requiring the government to disclose OLC opinions that resolve interagency disputes would promote, not threaten, the rule of law. As the Supreme Court explained in 1978, "[t]he basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Robbins Tire & Rubber Co.*, 437 U.S. at 242. The reading-room provision of FOIA, in particular, "represents a strong congressional aversion to secret agency law,'" and "an affirmative congressional purpose to require disclosure of documents which have the force and effect of law." *Sears*, 421 U.S. at 153 (cleaned up). The D.C. Circuit has echoed that reasoning, long recognizing that "private transmittals of binding agency opinions and interpretations" constitute secret law and are anathema to a well-functioning democratic society. *See Sterling Drug, Inc.*, 450 F.2d at 708. Quite simply, the public has a right to know how the government understands the law. This is especially important in the context of opinions resolving interagency disputes, which supersede other agencies' interpretations and offer the "final word on the controlling law"

39

within the executive branch. Best Practices Memo at 1. Even the government acknowledges the unique importance of OLC opinions resolving interagency disputes to the development of legal norms throughout and functioning of the executive branch. *See* Gov't Br. 25–26. These features of opinions resolving interagency disputes make it even more important that they be publicly accessible.

The government counters that ordering the disclosure of OLC opinions resolving interagency disputes will put the government on a path leading to executive branch lawlessness. *Id*. at 27 ("Accepting CFA's claim would thus threaten to undermine the Executive Branch's ability to receive confidential legal advice from *any* of its lawyers, which will, in turn, increase the chances that Executive officials will not understand and comply with their legal obligations."). Its arguments are unavailing for at least three reasons.

First, there is no evidence to support the government's bare assertion that agencies would "forego obtaining OLC's advice," *id.* at 25, if opinions resolving interagency disputes were published pursuant to § 552(a)(2). As the Court noted in its earlier opinion, this claim is "plainly based on sheer speculation." Ren. MTD Op. 23; *see also Citizens for Env't Quality, Inc. v. U.S. Dep't of Agric.*, 602 F. Supp. 534, 539 (D.D.C. 1984) ("[C]onclusory allegations unsupported by factual data will not create a triable issue of fact." (internal quotations omitted)). Now on summary judgment, the government has not submitted any evidence in support of this claim, and what evidence there is points in the other direction. The OLC itself has published many opinions resolving interagency disputes, *see* Stip. ¶¶ 19–20, apparently without any decrease in legal compliance across executive branch agencies. *See* Ren. MTD Op. 23 (pointing to OLC's past publication as evidence that its concern is "largely overblown"); *cf. Tax Analysts I*, 117 F.3d at 618 ("Since 1976, redacted Technical Advice Memoranda have been made available to the public.

. . . Yet the IRS has offered no evidence that disclosing technical advice pursuant to § 6110 has harmed the agency or has inhibited it in reaching legal judgments."). Moreover, though important for many reasons, the OLC's formal written opinions are a tiny portion of the OLC's output, and its opinions resolving interagency disputes are an even smaller portion. From 2010 to 2015, the OLC issued 81 formal written opinions. *See* Ex. 4, Kadzik Letter at 2. During the same period, it issued at least 3,550 other forms of legal advice. *Id.* at 10. CfA does not argue that those 3,550 other forms of advice constitute working law.

Second, compelling the disclosure of opinions resolving interagency disputes is especially unlikely to diminish reliance on the OLC for dispute resolution because most agencies are *required* by Executive Order to solicit an opinion from the OLC when they have interagency disputes. *See* Exec. Order 12,146 § 1-402; *see also id.* § 1-401 ("encourag[ing]" independent agencies to submit such disputes to the OLC). But even if they were not required to submit such disputes to the OLC, agencies might not have any practical alternative. Only the president, the attorney general, and the OLC possess the authority to definitively resolve legal disputes between agencies.

Third, the government's sensational claim that a ruling for CfA would prevent agencies from seeking advice from "*any* of its lawyers," Gov't Br. 27, is profoundly flawed. Neither the OLC's formal written opinions generally, nor those resolving interagency disputes in particular, are like the confidential legal advice that agencies ordinarily obtain from their lawyers. An agency general counsel's advice to the head of an agency is typically protected by the attorney–client privilege, but the OLC does not argue here that its opinions resolving interagency disputes are similarly protected by that privilege.[11] And for good reason: as explained in CfA's opposition to

---

[11] As noted above, *see supra* note 9, the government made that claim earlier in this proceeding, but it has abandoned it here.

41

the government's renewed motion to dismiss, the OLC's relationship with the agencies that submit disputes for resolution is nothing like the relationship attorneys have with their clients. *See* Ren. MTD Opp'n 28–29. In an attorney–client relationship, the attorney must act in the client's best interest, she must not represent adverse parties, and she has an ethical obligation to protect client confidences. *Id.* When the OLC issues opinions resolving interagency disputes, however, it acts in the interest of the executive branch as a whole rather than that of any one agency, *see* Best Practices Memo at 1, it issues its opinions to agencies that are adverse in an ongoing legal dispute, *see* Stip. ¶ 7, and it retains ultimate authority to decide whether to publish its opinions, *see id.* ¶ 18; Best Practices Memo at 5. In other words, in issuing opinions resolving interagency disputes, the OLC acts as an arbiter rather than an advisor. This is entirely unlike the role that "in-house general counsels or chief counsels" occupy in advising their clients. *See* Gov't Br. 26.

The government's argument is also contradicted by the D.C. Circuit's long history of compelling the disclosure of agency counsel memoranda that *do* constitute working law rather than genuine legal advice. *See Tax Analysts I*, 117 F.3d at 617–18; *Schlefer*, 702 F.2d at 245; *Tax'n with Representation Fund*, 646 F.2d at 682–84; *Coastal States*, 617 F.2d at 868–69 (same with respect to memoranda from agency regional counsel). Courts thus routinely distinguish between legal memos that establish the law or policy of an agency and legal memos that offer genuine legal advice. And they have required the disclosure of the former without threatening the integrity of the latter.

## IV. Campaign for Accountability is also entitled to summary judgment on its indexing claim.

Because OLC opinions resolving interagency disputes are subject to § 552(a)(2)(A) and § 552(a)(2)(B), the OLC is also required to proactively disclose an index of those opinions. *See* 5

U.S.C. § 552 (a)(2). The OLC has not done so; thus, CfA is entitled to summary judgment on its indexing claim.

### Conclusion

For these reasons, the Court should grant CfA's cross-motion for summary judgment and deny the government's motion for summary judgment.

August 12, 2021                                Respectfully submitted,

                                               /s/ *Alex Abdo*
                                               Alex Abdo (*Pro Hac Vice*)
                                               Stephanie Krent (*Pro Hac Vice*)
                                               Jameel Jaffer (MI0067)
                                               Knight First Amendment Institute
                                                 at Columbia University[*]
                                               475 Riverside Drive, Suite 302
                                               New York, NY 10115
                                               (646) 745-8500
                                               alex.abdo@knightcolumbia.org

                                               *Counsel for Plaintiff*


                                               [*] The Knight Institute is grateful for the work
                                                 of its former legal fellow Xiangnong
                                                 (George) Wang on this brief.

43