**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CAMPAIGN FOR ACCOUNTABILITY, | |
| Plaintiff, | |
| v. | No. 1:16-cv-1068 (Calendar Committee) |
| U.S. DEPARTMENT OF JUSTICE, | |
| Defendant. | |

<u>**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

Alex Abdo (*Pro Hac Vice*)
Stephanie Krent (*Pro Hac Vice*)
Alyssa Morones*
Jameel Jaffer (MI0067)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
alex.abdo@knightcolumbia.org

*Not yet admitted to practice law*

**Table of Contents**

Table of Authorities.................................................................................................ii

Introduction .........................................................................................................1

Argument ............................................................................................................4

    I.    OLC opinions resolving interagency disputes must be proactively disclosed
         under FOIA's reading-room provision. ..........................................................4

         A.    OLC opinions resolving interagency disputes are "final opinions . . .
             made in the adjudication of cases." ..................................................4

         B.    OLC opinions resolving interagency disputes are "statements of policy
             and interpretations which have been adopted" by the opinions'
             recipients and by the OLC. ...........................................................10

         C.    OLC opinions resolving interagency disputes are also working law. ............13

         D.    The government misstates its burden to release records subject to
             FOIA's reading-room provision. .....................................................17

    II.    Disclosure of opinions resolving interagency disputes would serve rule-of-law
         interests...................................................................................................20

    III.    Campaign for Accountability is also entitled to summary judgment on its
          indexing claim. .........................................................................................21

Conclusion............................................................................................................21

## Table of Authorities

**Cases**

*ACLU v. Nat'l Sec. Agency*, 925 F.3d 576 (2d Cir. 2019)........................................................11, 16

*Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001) ...............................................8

*Am. Immgr. Lawyers Ass'n v. Exec. Office for Immigr. Rev.*, 830 F.3d 667 (D.C. Cir. 2016)........................................................................................................................................7

*Brinton v. Dep't of State*, 636 F.2d 600 (D.C. Cir. 1980) ................................................................7

*Bristol-Meyers Co. v. FTC*, 598 F.2d 18 (D.C. Cir. 1978)........................................................5, 18

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235 (D.C. Cir. 2017)......................................................................................................................................18

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 922 F.3d 480 (D.C. Cir. 2019).......................................................................................................................12, 15, 18

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) .............2, 3, 15, 16

*Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1 (D.C. Cir. 2014) .......................12, 14, 16

*Judicial Watch v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013)............................................19

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) ...................................................20

*NLRB. v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ...........................................................passim

*Pub. Citizen v. Off. of Mgmt. & Budget*, 598 F.3d 865 (D.C. Cir. 2010) ..........................3, 7, 9, 16

*Schlefer v. United States*, 702 F.2d 233 (D.C. Cir. 1983) ..........................................2, 10, 11, 15

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997) ...............................................................passim

*Tax Analysts v. IRS*, 294 F.3d 71 (D.C. Cir. 2002) ......................................................2, 3, 7, 15

*Tax Analysts v. IRS*, No. CIV A. 94-923 (GK), 1996 WL 134587 (D.D.C. Mar. 15, 1996)........................................................................................................................................11

*Tax'n with Representation Fund v. IRS*, 646 F.2d 666 (D.C. Cir. 1981) ...........................passim

*Tereshchuk v. Bureau of Prisons*, 67 F. Supp. 3d 441 (D.D.C. 2014), *aff'd*, No. 14-5278, 2015 WL 4072055 (D.C. Cir. June 29, 2015)........................................................18

*U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136 (1989) .............................................................19

**Statutes**

5 U.S.C. § 551 ...................................................................................................................5

5 U.S.C. § 552 ..........................................................................................................passim

**Other Authorities**

*Clarifying and Protecting the Right of the Public to Information*, H.R. Rep. 89-
1497 (1966) ...................................................................................................................9

Exec. Order No. 12,146, 44 Fed. Reg. 42657 (July 18, 1979) .................................13, 21

**Introduction**

Campaign for Accountability's opening brief explained that Office of Legal Counsel ("OLC") opinions resolving interagency disputes must be proactively disclosed under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for three independent reasons: (1) they are "final opinions . . . resulting from the adjudications of cases," *id.* § 552(a)(2)(A); (2) they are "statements of policy and interpretations which have been adopted" by the opinions' recipients and by the OLC, *id.* § 552(a)(2)(B); and (3) they are the working law of the recipient agencies and of the OLC. In its prior opinion denying the government's motion to dismiss, this Court endorsed the first and second of these rationales without reaching the third. The record before the Court is now complete, and it confirms the factual foundation of the Court's earlier ruling. Notably, the government does not contend otherwise; it does not argue, for example, that the facts as developed differ in any material way from the allegations this Court previously relied upon. Instead, it resists summary judgment based almost entirely on arguments that this Court has already rejected.

First, the government argues that OLC opinions resolving interagency disputes are indistinguishable from the OLC's other opinions, *e.g.*, Gov't Reply 3–5, ECF No. 62, ignoring this Court's holding to the contrary. *See* Ren. MTD Op. 14 (Sept. 11, 2020), ECF No. 40 ("[T]he narrow aperture through which OLC views its own opinions improperly fails to account for the plausible opinion-related facts and circumstances that CfA alleges . . . ."). As the Court held, and as Campaign for Accountability ("CfA") explained in its opening brief, when the OLC resolves interagency disputes, it authoritatively settles concrete conflicts over policy between agencies and, in so doing, supplants the agencies' conflicting policies and legal interpretations. Given the nature of interagency disputes submitted to the OLC and the OLC's formal process for resolving them, this Court concluded that it was plausible that the OLC speaks authoritatively on the agencies'

legal and policy positions, as an "arbiter" or "adjudicator" would. *Id*. at 26, 30. Thus, the Court held that this subset of opinions plausibly falls within FOIA's reading-room provision. *Id*. at 30–31. That analysis was consistent with D.C. Circuit precedent instructing courts to look "to the reality of the decisionmaking process in question" and to require the disclosure of legal memoranda where they actually govern agency conduct. *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1983); *see also Tax Analysts v. IRS* (*Tax Analysts II*), 294 F.3d 71 (D.C. Cir. 2002); *Tax Analysts v. IRS* (*Tax Analysts I*), 117 F.3d 607 (D.C. Cir. 1997); *Tax'n with Representation Fund v. IRS*, 646 F.2d 666 (D.C. Cir. 1981); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980).

Second, the government repeats its claims—already rejected by this Court—that only adjudications of "private rights" must be proactively disclosed under § 552 (a)(2)(A), *see* Gov't Reply 14–15, and that only legal opinions adopted *after* issuance must be proactively disclosed under § 552 (a)(2)(B), *see* Gov't Reply 12. But these proposed statutory limitations are invented from whole cloth. Section 552(a)(2)(A) is not limited to opinions adjudicating "private rights," and as this Court explained, "what matters for FOIA purposes is whether the agency record at issue reflects agency determinations, interpretations, or policies that have the force of law, and not whether it involves the regulation or adjudication of private rights." *See* Ren. MTD Op. 20. And Section 552(a)(2)(B)'s adoption requirement can be met in many ways; what is required is a demonstration that the agency has embraced the opinion as its own, which this Court rightly observed could be done *upon issuance*. *See* Ren. MTD Op. 30 ("[T]his Court finds it entirely plausible that, once OLC settles a dispute among two or more agencies over a question of law, the client agencies that have submitted that dispute to OLC for resolution can be deemed to have

'adopted' OLC's interpretation with respect to the matter that prompted their request for OLC's views within the meaning of section 552(a)(2)(B).").

Third, the government reasserts its meritless claim that FOIA's proactive disclosure provision applies only to working *policy* and not to working *law*. *See, e.g.*, Gov't Reply 3. But FOIA requires the disclosure of "secret law" used to guide and constrain agencies in the discharge of their duties. *Coastal States*, 617 F.2d at 867. In other words, the distinction the government posits between legal interpretations and policy decisions is not relevant here. Instead, the key question is whether a record actually governs agency decision making; if so, it must be disclosed. *See id.* at 869; *see also* Ren. MTD Op. 28 ("The reading-room provision does not predicate affirmative disclosure on whether the agency's 'final opinions . . . made in the adjudication of cases' have a discernable policy impact."). To the extent the government's true argument is that agencies that receive opinions resolving interagency disputes may sometimes make downstream programmatic decisions, the possibility of future decision making does not render OLC opinions predecisional. *See* Ren. MTD Op. 30 ("[W]hether or not the agencies do something with OLC's predecisional legal advice is largely irrelevant; OLC's opinion has *already* done the work of authoritatively resolving a dispute over a contested legal issue under circumstances in which it is plausible that the agencies submitted the dispute for resolution simply and solely for that purpose and with the understanding that OLC's determination would provide the governing interpretation moving forward." (cleaned up)); *see also Tax Analysts II*, 294 F.3d at 81; *Tax Analysts I*, 117 F.3d at 617; *Pub. Citizen v. Off. of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010).

Finally, the government contends, again, that the disclosure of OLC opinions resolving interagency disputes would threaten the confidentiality of truly predecisional legal advice and undermine the rule of law. Gov't Reply 17–19. As this Court observed before, these concerns are

"based on sheer speculation," Ren MTD Op. 23; they are belied by the OLC's current practice of publishing certain of its opinions, *id.*; *see also* Pl. Br. 40, ECF. No. 59-1; and they ignore the decades of D.C. Circuit decisions distinguishing between legal opinions that are genuinely advisory and those that have the force and effect of law. OLC opinions resolving interagency disputes are the latter, and it would serve the public interest to require the OLC to proactively publish them, so that the public can understand the OLC's resolution of the authorities and obligations of the agencies administering the nation's laws.

As explained more fully below, the record now before the Court is not in dispute and confirms the allegations upon which this Court relied in denying the government's motion to dismiss with respect to OLC opinions resolving interagency disputes. Accordingly, the Court should grant CfA's cross-motion for summary judgment and order the OLC to proactively disclose this category of opinions subject only to a case-by-case invocation of FOIA's exemptions.

**Argument**

I.   **OLC opinions resolving interagency disputes must be proactively disclosed under FOIA's reading-room provision.**

    A.   **OLC opinions resolving interagency disputes are "final opinions . . . made in the adjudication of cases."**

In its opening brief, CfA explained that OLC opinions resolving interagency disputes are "final opinions . . . made in the adjudication of cases" based on the text of 5 U.S.C. § 552 (a)(2)(A), prevailing caselaw, and the OLC's process for resolving interagency disputes. *See* Pl. Br. 12–20. When agencies come to the OLC with a dispute, their legal positions are "already well-established," and they provide the OLC and the other disputing agencies with briefs memorializing those views "just as if it were a judicial proceeding." Krent Decl. Ex. 5, William P. Barr, *Attorney General's Remarks*, *Benjamin N. Cardozo School of Law*, *November 15, 1992*, 15 Cardozo L. Rev.

4

31, 37 (1993) ("Barr Remarks"), ECF No. 59-10; *see also* Stip. ¶ 17, ECF No. 56; *id.* Ex. A, Memorandum from David J. Barron, Acting Assistant Attorney General to Attorneys of the Office of Legal Counsel, *Best Practices for OLC Legal Advice and Written Opinions* (July 16, 2010) ("Best Practices Memo") at 3. In deciding between each agency's legal positions, the OLC attorney assigned to write the opinion "function[s] as a judge," Ex. 5, Barr Remarks at 37, and must strive to "consider fully and address impartially the points raised on both sides," Best Practices Memo at 4. This process for resolving interagency disputes is an "adjudication" within the meaning of FOIA's statutory scheme because it is an "agency process for the formulation of . . . a final disposition . . . in a matter other than rule making." *See* 5 U.S.C. §§ 551(6)–(7) (defining "adjudication"); *NLRB. v. Sears, Roebuck & Co.*, 421 U.S. 132, 158–59 (1975) (applying the APA's definition of "adjudication" to § 552(a)(2)(A)). And the opinions that the OLC renders in resolving these disputes are "final" because they are issued as "the final word on the controlling law," they are precedential, and recipient agencies must embrace the conclusions contained therein, *see* Best Practices Memo at 1–2; Stip. ¶ 1, in the same way that any litigant would be forced to accept the legal outcome of a court proceeding. *See Sears*, 421 U.S. at 159 (holding that legal memoranda that "explain[] the reasons for [a] 'final disposition'" are final within the meaning of § 552(a)(2)(A)); *see also Bristol-Meyers Co. v. FTC*, 598 F.2d 18, 25 (D.C. Cir. 1978).

In reply, the government argues (1) that OLC opinions resolving interagency disputes are not "final" because they "leave all policy decisions to the agenc[ies]" who received them, Gov't Reply 13; (2) that the OLC's process for resolving disputes is not adjudicatory, *id.* at 15–17; and (3) that § 552 (a)(2)(A) is limited to "adjudication[s]" concerning private rights, *id.* at 14–15. None of these arguments is persuasive; in fact, this Court has already properly rejected each of them. *See* Ren. MTD Op. 26–28.

First, the government argues that only "policy decisions" and not legal ones must be disclosed under § 552 (a)(2)(A), *see* Gov't Reply 13, but this argument fails for multiple reasons. As the Court has already explained, the "OLC's cramped characterization of the scope of the reading-room provision does not comport with a plain reading of the statute." Ren. MTD Op. 14; *see also id.* at 28 (explaining that application of § 552(a)(2)(A) does not hinge on whether opinions "have a discernable policy impact"). The provision applies to "final opinions," which quite obviously (and perhaps most frequently) would include legal opinions. Moreover, as explained in CfA's opening brief, the government's narrow interpretation of § 552(a)(2)(A) would render that provision superfluous, because § 552(a)(2)(B) already requires the disclosure of statements of policy. *See* Pl. Br. 15. The government half-heartedly argues that the statutory provisions would still capture "different types of documents" because § 552(a)(2)(A) "looks backward at decisions rendered by an agency" while § 552(a)(2)(B) "looks forward." Gov't Reply 16–17. But that temporal distinction is not found in the statutory text, and it is also illusory, as a precedential opinion that explains the rationale for an agency's adjudication would always also "look[] forward" and guide future agency conduct.

In any event, these opinions establish legal policy. When the OLC resolves agencies' legal disputes, its opinions settle their underlying policy disagreement. The opinions also supersede the recipient agencies' governing legal interpretations, thereby establishing the agencies' legal policy. The government's real argument appears to be that, even after an OLC opinion resolves an interagency dispute, one or more of the recipient agencies may later make programmatic decisions related to the policy that was before the OLC. Gov't Reply 13–14. But this observation is "entirely beside the point," Ren. MTD Op. 28, because legal memoranda must be disclosed as final opinions even when they do not dictate the "final *programmatic* decisions of the program officers who

request them." *See Tax Analysts II*, 294 F.3d at 81 ("It is enough that they represent [the agency's] final *legal* position . . . ."); *see also Pub. Citizen*, 598 F.3d at 875 ("[A]n agency's application of a policy to guide further decision-making does not render the policy itself predecisional."); *Tax Analysts I*, 117 F.3d at 617.[1]

Second, contrary to the government's assertions, the record shows that the OLC's process for resolving interagency disputes is adjudicatory in nature. The government suggests that the OLC's dispute resolution process "do[es] not resemble [the] adjudication[] of private rights" and "lack[s] nearly all of these indicia of adjudications," Gov't Reply 15, but the government's list of "indicia" ignores controlling precedent on point. As the D.C. Circuit has explained, § 552(a)(2)(A) applies to "proceedings in which a party has a right to set the agency decision-making process in motion and obtain a final determination concerning the statute or other laws the agency is charged with interpreting and administering." *Am. Immgr. Lawyers Ass'n  v. Exec. Office for Immigr. Rev.*, 830 F.3d 667, 679 (D.C. Cir. 2016)*.* The OLC's process for resolving interagency disputes clearly qualifies. As explained in CfA's opening brief, the OLC's process for formulating an opinion resolving an interagency dispute is a decision-making process set in motion by one or more agencies in an adverse conflict, and the resulting opinion disposes of that conflict. *See* Pl. Br. 17–18. Attorneys within the OLC are instructed to follow a "careful and deliberate process" to resolve disputes, and are obliged to review detailed memoranda and "consider fully and address impartially the points raised on both sides." Best Practices Memo at 3–4. The OLC decides "the

---

[1] For this reason, the government's reliance on *Brinton*, Gov't Reply 13, is inapposite. The question in *Brinton* was whether the opinion's author had the authority to make final decisions on the subjects on which he was opining. *See Brinton v. Dep't of State*, 636 F.2d 600, 604–05 (D.C. Cir. 1980). It is undisputed that the OLC does.

correct answer on the law" only after reaching the end of this adjudicatory process, and its opinion reflects the culmination of that process and resolves the dispute. *Id.* at 4.[2]

For similar reasons, the government's assertion that OLC opinions resolving interagency disputes are "akin to a general counsel's legal advice," Gov't Reply 16, is also wrong. In the context of interagency disputes, agencies come to the OLC with legal opinions already formed and share memoranda memorializing those settled views, Stip. ¶ 17; Ex. 5, Barr Remarks at 37; agency heads, in contrast, would go to their general counsels to assist with the development of those legal interpretations, not to resolve disagreements over those interpretations with other agencies. In issuing opinions, the OLC's commitment is to promote a uniform understanding of law throughout the executive branch, *see* Best Practices Memo at 1; an agency general counsel giving advice, however, would be principally focused on the interests of her client. The end result of the OLC's adjudicatory process—its opinion—is finalized and issued to the requesting agencies, Best Practices Memo at 4; a general counsel's memorandum would generally be issued only for the benefit of a single client agency. And the OLC itself decides whether to publish its opinions, Stip. ¶ 18; Best Practices Memo at 5, while the decision whether to disclose the general counsel's advice belongs to the client agency. Opinions resolving interagency disputes are, as a result, wholly unlike legal advice provided to agency heads by their general counsels. *See also* Pl. Br. 41–42; Ren. MTD Opp'n 28–29, ECF No. 30. Rather, they are *final legal opinions* issued in the *adjudication of disputes*.

---

[2] The government appears to suggest that adjudications under § 552(a)(2)(A) must meet the procedural requirements for formal adjudications under 5 U.S.C. § 554, but adjudications under the APA can be formal *or* informal. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (distinguishing between informal adjudications, rulemaking processes, and formal adjudications). And the government cannot point to any text or caselaw limiting § 552(a)(2)(A) to only formal adjudications.

Third, the government continues to argue that § 552(a)(2)(A) is limited to the adjudication of private rights, Gov't Reply 14–15, ignoring the lack of statutory support and the Court's prior ruling. The government's proposed limitation is not found in the text of the statutory provision, as this Court has already explained. *See* Ren. MTD Op. 16 ("OLC has ignored the fact that 'the adjudication of cases' is not defined in the statute as the resolution of disputes *involving private parties* . . . ."). The government points to catchall language in § 552(a)(2) preventing agencies from using unpublished documents "as precedent . . . against a party other than an agency," but this language merely limits how agencies can use improperly withheld records; it does not limit the types of records subject to FOIA's reading-room provision. *See id.* (explaining that "[t]his statutory provision . . . says nothing about whether the statutory list of covered documents must be read to include only records that pertain to private parties"). The government's reliance on legislative history is also misplaced; at most, the legislative history confirms that the use of secret law against individuals in agency proceedings was one of Congress's many concerns in passing FOIA, not that it was Congress's *sole* concern. *See Clarifying and Protecting the Right of the Public to Information*, H.R. Rep. 89-1497, at 7–8 (1966); *see also* Ren. MTD Op. 17 (reaching the same conclusion). Moreover, the D.C. Circuit has required the disclosure of records under § 552(a)(2) without regard to whether the record adjudicates "private rights." *See Tax'n with Representation*, 646 F.2d at 683 (ordering the disclosure of technical memoranda relating to Treasury Department regulations); *cf. Pub. Citizen*, 598 F.3d 865 (ordering the disclosure of an agency's legislative and budgetary clearance policies under the working law doctrine).[3]

---

[3] Even if it were true that § 552(a)(2) requires a direct connection to individual rights, OLC opinions resolving interagency disputes often have that connection. Some opinions resolving interagency disputes explicitly involve the rights of private parties. *See, e.g.*, Krent Decl. Ex. 8, *Whether Reservists Must Exhaust Available Leave Under 5 U.S. C. § 6323(a)*, 36 Op. O.L.C. 129 (2012) (determining how reservists may utilize their statutorily provided leave); *see also* Pl. Br.

**B.  OLC opinions resolving interagency disputes are "statements of policy and interpretations which have been adopted" by the opinions' recipients and by the OLC.**

OLC opinions resolving interagency disputes must be proactively disclosed for a second reason: they are "statements of policy and interpretations which have been adopted" within the meaning of § 552(a)(2)(B). The OLC resolves disputes among agencies over contested policy and legal questions by issuing opinions that effectively pronounce the executive branch's "final word on the controlling law," Best Practices Memo at 1, and settle the agencies' underlying policy disputes. Because these opinions are "authoritative . . . decisions in the [disputes] to which they are addressed" and "guide subsequent Agency" action, they are statements of policy and interpretations which have been adopted by the agencies that rely on them to settle their disputes. *Schlefer*, 702 F.2d at 244; *see also* Pl. Br. 21–25. And because they are the OLC's own statements of law, they have also been "adopted" by the OLC itself. *See* Pl. Br. 25–26.

The government argues that an OLC opinion resolving an interagency dispute can be "adopted" by its recipients only if those agencies expressly adopt the opinion after it has been issued, *see* Gov't Reply 12, but the Court has properly rejected this argument. *Compare* Ren. MTD Br. 19, ECF No. 29-1; Gov't Notice of Suppl. Auth. 2, ECF No. 35, *with* Ren. MTD Op. 30 ("[T]his Court finds it entirely plausible that, once OLC settles a dispute among two or more agencies over a question of law, the client agencies that have submitted that dispute to OLC for resolution can

---

20 n.5 (collecting examples). And in opining on managerial or administrative issues, the OLC often constrains how agencies interact with members of the public. *See, e.g.*, Krent Decl. Ex. 10, *Authority of the Department of Labor to Control the Disclosure of Federal Employees' Compensation Act Records Held by the United States Postal Service*, 36 Op. O.L.C. 217 (2012) (determining that the DOL controlled the disclosure of FECA records and therefore preventing the USPS from disclosing its employees' FECA records "in a manner inconsistent" with the routine uses the DOL enumerated in its Privacy Act notice).

be deemed to have 'adopted' OLC's interpretation with respect to the matter that prompted their request for OLC's views within the meaning of section 552(a)(2)(B).").

As CfA has explained, the government's adoption argument conflates the use of the word "adopted" in § 552(a)(2)(B) with the judicially created doctrine of "express adoption" in the working law context. *See* Pl.'s Resp. to Def.'s Notice of Suppl. Auth. 2, ECF No. 36. Under the working law doctrine, a predecisional record that is otherwise protected by the privileges of Exemption 5 may be transformed into postdecisional working law "if an agency chooses expressly to adopt" it. *Sears*, 421 U.S. at 161; *see also ACLU v. Nat'l Sec. Agency*, 925 F.3d 576, 593 (2d Cir. 2019) ("As we now explain, 'working law' describes a category of post-decisional material, and 'express adoption' and 'incorporation by reference' describe two methods by which pre-decisional material can become post-decisional."). But that judicial inquiry is distinct from the statutory one of whether a record must be disclosed because it embodies a "statement[] of policy [or] interpretation[] which ha[s] been adopted" under 5 U.S.C. § 552(a)(2)(B). Indeed, the D.C. Circuit's leading case on § 552(a)(2)(B) has effectively rejected the government's argument, holding that the provision requires courts to engage in a "close and complete look . . . beneath formal lines of authority to the reality of the decisionmaking process in question." *Schlefer*, 702 F.2d at 237–38; *see also Tax Analysts v. IRS*, No. CIV A. 94-923 (GK), 1996 WL 134587, at *2– 3 (D.D.C. Mar. 15, 1996) (holding that memoranda that had been "informally adopted" were subject to § 552(a)(2)(B)), *aff'd in relevant part on other grounds*, 117 F.3d 607.

For this reason, the government's discussion of express adoption in *EFF*, Gov't Reply 12, is inapposite. As this Court previously observed, "*EFF* plainly leaves open the possibility that a client agency . . . can 'adopt' the OLC's legal advice such that the OLC opinion becomes that agency's working law, or that OLC might, in some cases, 'speak with authority' as to the client

agency's policies and interpretations." Ren. MTD Op. 21; *see also Elec. Frontier Found. v. U.S. Dep't of Just.* (*EFF*), 739 F.3d 1, 7–13 (D.C. Cir. 2014) (first discussing the plaintiff's working law arguments and then separately discussing the plaintiff's express adoption arguments). To be sure, express adoption would also qualify as adoption under § 552(a)(2)(B), but it is not required.

A close and complete look at the context in which the OLC resolves interagency disputes confirms this Court's prior suggestion that opinions resolving interagency disputes are "adopted *ex ante*" by the recipient agencies. Ren. MTD Op. 31. The government argues that this category of opinions is "no different" than "any other OLC opinion" in this respect, Gov't Reply 12–13, but the record demonstrates otherwise. When one or more agencies submit a "concrete and ongoing dispute" to the OLC, *see* Best Practices Memo at 3, they understand that the resolution of their legal question will effectively settle their underlying policy dispute. The Court explained that the OLC's arbitration of these disputes is therefore "quite unlike" its issuance of opinions in other contexts "as the first step in an anticipated policy-making process." Ren. MTD Op. 30. By embracing the OLC's arbitration of their dispute, recipient agencies effectively adopt the OLC's interpretation in advance. In these particular circumstances, the resulting opinions "have been adopted by [the agencies] as [their] own," *see Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* (*CREW II*), 922 F.3d 480, 487 (D.C. Cir. 2019), and "speak with authority" on their policy and legal interpretations, *see EFF*, 739 F.3d at 9. *See also* Pl. Br. 23–24 (collecting representative opinions resolving interagency disputes).

The OLC's opinions must be disclosed under § 552(a)(2)(B) for the independent reason that they have been adopted by the OLC itself. *See* Pl. Br. 25. The government argues that the OLC's adoption of its own opinions resolving interagency disputes would be insufficient, Gov't Reply 11, but its arguments ignore the OLC's unique role under Executive Order 12,146 in

resolving interagency disputes. *See* Exec. Order No. 12,146, 44 Fed. Reg. 42657 (July 18, 1979), §§ 1-401, 1-402. The OLC's issuance of an opinion in fulfillment of this duty sets forth a legal interpretation that is not just "controlling" and "precedent[ial]," *see* Gov't Reply 11 (quoting *CREW II*, 922 F.3d at 486), but also serves to harmonize disparate views and "maintain[] a consistent legal position" across the executive branch, Krent Decl. Ex. 6, *FBI Authority to Seize Suspects Abroad: Hearing Before the Subcomm. on Civ. and Const. Rights of the H. Comm. on the Judiciary*, H.R. Rep. No. 101-134, at 122 (1989) (Letter from Richard Thornburgh, Att'y Gen. Of the United States) ("Thornburgh Letter"). These opinions are therefore "adopted" by the OLC within the meaning of the reading-room provision, even if other categories of OLC opinions may not be. But the Court need not actually resolve this question; it is enough that, as discussed above, recipient agencies adopt these OLC opinions.

### C.   OLC opinions resolving interagency disputes are also working law.

The OLC must disclose its opinions resolving interagency disputes for a third, independent reason: they "have the force and effect of law," *Sears*, 421 U.S. at 153, and therefore constitute the working law of both the OLC and the agencies receiving them. Opinions resolving interagency disputes are controlling and precedential, they flow outward from adjudicators to parties, they are issued prospectively to guide agencies in the discharge of their duties, and they are written in a conclusive and authoritative tone. These opinions do not merely set the parameters for what recipient agencies can do; they speak with authority on those agencies' legal and policy positions. Thus, under D.C. Circuit case law, they must be disclosed as working law. *See* Pl. Br. 26–31.

Although the government complains that CfA has not "meaningfully distinguish[ed]" opinions resolving interagency disputes from the OLC's "privileged legal advice," Gov't Reply 3–5, the factual record demonstrates the differences between this set of opinions and those like the

one deemed deliberative in *EFF*. In *EFF*, the FBI asked the OLC whether certain legal authorities authorized the agency's use of "exigent letters," 739 F.3d at 4–5, but the opinion the FBI sought was entirely backward-looking. By the time the FBI sought the OLC's opinion, it had already started—and ended—its practice of issuing "exigent letters." *Id*. The agency's issuance of "exigent letters" was therefore not premised on the OLC's decision; nor had it been premised on any of the legal authorities the FBI asked the OLC to consider. *Id*. Moreover, the FBI expressly disclaimed any intent to rely on the authority discussed in the OLC opinion. *Id*. Instead, the FBI sought the OLC opinion solely to aid in its response to a retrospective investigation by the Office of the Inspector General into the agency's surveillance tactics. *Id*. In those circumstances, the Court concluded that the OLC opinion in question was not working law because it did not "provide an authoritative statement of the FBI's policy." *Id*. at 10.

By contrast, the context in which the OLC issues opinions resolving interagency disputes demonstrates that these opinions *do* "provide an authoritative statement" of the legal interpretations and policy positions of their recipient agencies. Interagency disputes are, in the OLC's own terminology, "concrete and ongoing," crystallizing at some point before the OLC's opinion-writing process is complete and persisting until the OLC resolves the dispute. Best Practices Memo at 3; *see also* Ex. 5, Barr Remarks at 37 ("Because each agency has its own staff of lawyers, disputes between them come before the Attorney General with legal positions already well-established."). Agencies submitting disputes to the OLC for resolution, whether due to the mandatory provisions of Executive Order 12,146 or because they are simply at an impasse, understand that the OLC's resulting opinion will displace their inconsistent legal positions and policy views with a single, governing interpretation that they must embrace. Because "the agencies submitted the dispute for resolution simply and solely for the purpose and with the understanding

that OLC's determination would provide the governing interpretation moving forward," Ren. MTD Op. 30, the OLC is decisively acting, in the government's own words, "as a judge." Ex. 5, Barr Remarks at 37; *see also* Ex. 6, Thornburgh Letter (explaining the differences between the OLC's opinions that are written to advise senior executives, like the attorney general, and those "issued for the purpose of resolving disputes between agencies").[4]

The government does not rebut this evidentiary record; instead, it raises two contradictory legal arguments, both misplaced.

First, the government argues that the OLC is "not a policymaking entity," Gov't Reply 3, and appears to suggest that working law can be set only in the course of programmatic decision making, Gov't Reply 5, but this Court already rejected the government's absolutist contention that the OLC can never create working law. Ren. MTD Op. 14 ("The Court also rejects OLC's contention that its formal written opinions can *never* qualify for affirmative disclosure under section 552(a)(2)."); *see also CREW II*, 922 F.3d at 487 n.2 ("At the same time, we are skeptical of the Department of Justice's position that none of the OLC's formal written opinions constitutes the 'working law' of an agency subject to disclosure under FOIA's reading-room provision."); *see also supra* Part I.A. The government's argument is foreclosed by decades of jurisprudence in the D.C. Circuit. *See Tax Analysts II*, 294 F.3d at 81; *Tax Analysts I*, 117 F.3d at 617; *Schlefer*, 702 F.2d at 244–45; *Tax'n with Representation Fund*, 646 F.2d at 682–84; *Coastal States*, 617 F.2d at

---

[4] The government does not see why opinions resolving interagency disputes "should be treated differently than a hypothetical opinion reaching the same conclusion in response to a request from a single agency," Gov't Reply 8; *see also id*. at 4–5, but this is precisely the problem with the government's argument: it ignores context and controlling precedent requiring courts to consider the process through which an opinion was issued. The difference between this subcategory of opinions and the government's hypothetical opinion is that the former come to the OLC through ongoing disputes between agencies over actual policy disagreements, and in that context, the disputing agencies effectively adopt the OLC's final opinion as their own statement of legal policy. *See* Ren. MTD Op. 30; *Schlefer*, 702 F.2d at 237–43.

869. In the words of *Coastal States*, where legal opinions "in practice represent interpretations of established policy on which the agency relies in discharging its regulatory responsibilities[,] withholding them would serve no legitimate policy interest of the government." *Coastal States*, 617 F.2d at 869. Even in *EFF*, the question was not whether the OLC itself was a "policymaking entity" that implemented programmatic decisions, but whether, in the context of the FBI's request, the OLC had the authority to "state or determine the FBI's policy." *EFF*, 739 F.3d at 10.

Rather than address the caselaw, the government repeats the same complaints it has already raised about OLC opinions that leave recipient agencies with downstream programmatic discretion, *see* Gov't Reply 5, 7–10, but these arguments fare no better upon reprisal. For example, the government argues (again) that the DOL–VA opinion was merely a "pre-decisional input" because, although the opinion barred the DOL from forcing the VA to pay back wages to its physicians, it could have subsequently attempted to find another way to assist the physicians. Gov't Reply 9. As CfA has already explained, the OLC's opinion established the agencies' policies with respect to their concrete dispute over the DOL's power to enforce its order. Pl. Br. 35–36. The possibility of subsequent programmatic decision making does not render that legal policy predecisional. *See Pub. Citizen*, 598 F.3d at 875; *see generally* Pl. Br. 32–37 (addressing this point with respect to the opinions discussed in the government's reply).

Second, the government argues that OLC opinions can become working law only "if the [recipient] agency expressly adopts both the decision and the reasoning of the OLC opinion rather than issuing its own standalone policy." Gov't Reply 4–5. As with its argument concerning § 552(a)(2)(B), the government conflates the express adoption doctrine with the working law doctrine. *See ACLU*, 925 F.3d at 593 (describing "express adoption" as one "method[] by which pre-decisional material can become post-decisional"). The working law doctrine is broader than

the express adoption doctrine, applying to all records that have "the force and effect of law," *Sears*, 421 U.S. at 153; *see also Tax'n with Representation Fund*, 646 F.2d at 683 (concluding that certain technical memoranda were "*informally adopted by the agency* and were therefore the 'working law' of the agency" (emphasis added)). For all the reasons discussed above, OLC opinions resolving interagency disputes are adopted by their recipient agencies; the fact that there may not be a subsequent act of express adoption in every instance is of no moment.

OLC opinions resolving interagency disputes are therefore working law and must be disclosed under *Sears*. For these reasons, the Court should grant summary judgment to CfA and deny the government's motion.[5]

### D. The government misstates its burden to release records subject to FOIA's reading-room provision.

The government continues to argue that it is entitled to summary judgment if it can identify a single OLC opinion resolving an interagency dispute that is not subject to disclosure, *see* Gov't Reply 10, and that the agency has no obligation to publish its opinions even if they do fall within § 552(a)(2)(B) or the working law doctrine, *see id*. at 3–4, 12–13. At this point, these arguments are academic: the government has failed to identify any opinions resolving interagency disputes that would be exempt from disclosure, and it does not dispute that the OLC must affirmatively disclose its opinions if the Court determines that they fall within § 552(a)(2)(A). In any event, both of the government's arguments are wrong.

---

[5] The government also appears to argue that summary judgment should be granted in its favor because other categories of opinions written by the OLC may also bear some of the indicia of working law. Gov't Reply 6–7. This motion concerns only opinions resolving interagency disputes, and as explained in CfA's opening brief, the Court need not agree with CfA's allegations with respect to other categories of opinions to conclude that *these* opinions are working law, because the record shows that they even more clearly exhibit the characteristics of working law. *See* Pl. Br. 27–30.

First, the government continues to argue that CfA's claim fails if the government can point to a single opinion that "[f]alls outside of the affirmative disclosure requirement." Gov't Reply 10. But in FOIA cases, including suits under FOIA's reading-room provision, the government bears the burden of justifying withholding. 5 U.S.C. § 552(a)(4)(B); *see also Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1240 (D.C. Cir. 2017). Thus, the government must "demonstrate[e] at summary judgment that the requested documents are exempt from disclosure." *CREW II*, 922 F.3d at 488. As explained in CfA's opening brief, this means that once a plaintiff has established that a category of records generally falls within the scope of the reading-room provision, the onus is on the government to justify the continued withholding of those records on a case-by-case basis. *See* Pl. Br. 37–39. The government cannot avoid this burden by pointing to a single OLC opinion in that category that does not appear to merit affirmative disclosure. *See Tax'n with Representation Fund*, 646 F.2d at 681–84 (ordering the disclosure of many, but not all, of the records sought by the plaintiff under §§ 552(a)(2) and (a)(3)); *Bristol-Meyers Co.*, 598 F.2d at 27–28 (remanding to the district court for consideration of "whether any information" in the records sought were subject to affirmative disclosure). Because CfA has identified an ascertainable set of opinions that must be disclosed pursuant to FOIA's reading-room provision, the identification of a single opinion that does not appear to share the same characteristics would entitle the government to withhold only that opinion.[6]

Second, the government's suggestion that the OLC is not responsible for publishing its opinions even if they constitute working law and "statements of policy and interpretations," *see*

---

[6] The government points to *Tereshchuk v. Bureau of Prisons*, Gov't Reply 10, but that case does not help its cause. In *Tereshchuk*, the district court granted summary judgment to the government because it concluded that *none* of the requested records fell within FOIA's reading-room provision. 67 F. Supp. 3d 441, 457 (D.D.C. 2014), *aff'd*, No. 14-5278, 2015 WL 4072055 (D.C. Cir. June 29, 2015).

Gov't Reply 3–4, 12–13, finds no support in the text of § 552(a)(2)(B) or in the working law doctrine. In fact, the government has raised this argument multiple times before, *e.g.*, Ren. MTD Br. 19, but the Court's prior ruling effectively rejected it, *see* Ren. MTD Op. 39 (concluding that CfA stated a claim with respect to *the OLC's* failure to disclose opinions resolving interagency disputes). As CfA explained in its opening brief, § 552(a)(2)(B) requires agencies to disclose "statements of policy and interpretations which have been adopted by the agency," and OLC opinions resolving interagency disputes have been adopted by the OLC itself, in addition to the recipient agencies. *See* Pl. Br. 25–26; *see also supra* Part I.B. The fact that recipient agencies have a separate duty to disclose these opinions does not relieve the OLC of *its* publication obligation. *See generally U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136 (1989) (explaining that the Tax Division was required to disclose copies of district court tax opinions and final orders, even though those records were also available through other means); *see also Judicial Watch v. U.S. Secret Serv.*, 726 F.3d 208, 232–33 (D.C. Cir. 2013) (explaining that the Secret Service was required to disclose visitor logs related to "White House offices that are themselves covered by FOIA" even though the requestors could also obtain the information by submitting requests to the relevant offices directly).

The government's arguments with respect to the OLC's obligation to disclose working law are equally misplaced. It suggests that the OLC should not bear the responsibility of disclosing opinions resolving interagency disputes because the agency "is not often in a position to know exactly how a recipient agency makes use of its advice," Gov't Reply 4, but this is merely a recycled version of its argument that OLC opinions cannot be considered working law unless there is a subsequent act of express adoption. With respect to opinions resolving interagency disputes, how agencies subsequently "make[] use of" opinions is beside the point. As the Court explained,

19

recipient agencies adopt the OLC's interpretations of law as their own at the moment the OLC resolves their interagency dispute. *See* Ren. MTD Op. 30. Opinions resolving interagency disputes are therefore working law at that moment, and the OLC has an obligation to disclose them.

## II.     Disclosure of opinions resolving interagency disputes would serve rule-of-law interests.

The OLC has a singular role in interpreting federal agencies' authorities and obligations, and its decisions affect millions of Americans. As the agency itself acknowledges, its opinions "are centrally important to the functioning of the Federal Government." Best Practices Memo at 1. This is especially apparent for opinions resolving interagency disputes. In that context, the OLC fulfills its presidential mandate to mediate disputes among agencies, and it does so by setting aside agencies' legal interpretations, replacing the agencies' preferred legal policies with its own. Disclosure of the resulting opinions resolving these disputes would promote the rule of law by ensuring public access to records that "have the force and effect of law," *Sears*, 421 U.S. at 153 (cleaned up), and it would promote "an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). This is the purpose for which FOIA was enacted. *Id.*

The government concedes that the public interest would be served by the disclosure of OLC opinions that are an agency's working law, but continues to argue that granting CfA's cross-motion would "eviscerate the confidentiality upon which the government relies in order to provide good counsel." Gov't Reply 18–19. As discussed above and in CfA's opening brief, opinions resolving interagency disputes are wholly unlike the confidential legal advice that agencies receive from their general counsels. *See supra* Part I. .A; Pl. Br. 41–42; *see also* Ren. MTD Op. 22–23 (rejecting the government's argument). These opinions are not advisory but adjudicatory, and most

agencies are compelled by executive order to solicit them when they have interagency disputes. *See* Exec. Order 12,146 §§ 1-401, 1-402.

The government appears to believe that it is impossible to draw a line between the final opinions, interpretations, and statements of policy that CfA seeks and the confidential legal advice that FOIA protects from disclosure, *see* Gov't Reply 18–19—but that is precisely what the D.C. Circuit has done for decades, without the catastrophic consequences the government predicts. *See id.*; Gov't Br. 27 ("Accepting CFA's claim would thus threaten to undermine the Executive Branch's ability to receive confidential legal advice from *any* of its lawyers . . . ."). Again, in case after case, the D.C. Circuit has distinguished between the role of government lawyers in providing genuine legal advice and their role in establishing agency law. *See* Pl. Br. 41–42. The government has repeatedly failed to recognize this precedent, however, instead taking the absolutist view that that no category of OLC opinions can ever qualify as working law. The Court has already rejected that view, and it should do so again. *See* Ren. MTD Op. 11, 38–39.

## III.    Campaign for Accountability is also entitled to summary judgment on its indexing claim.

Because OLC opinions resolving interagency disputes are subject to § 552(a)(2)(A) and § 552(a)(2)(B), the OLC is also required to disclose an index of those opinions. *See* 5 U.S.C. § 552(a)(2) (requiring agencies to "maintain and make available for public inspection in an electronic format current indexes" describing records covered by the reading-room provision). CfA is therefore entitled to summary judgment on its indexing claim.

## Conclusion

For the reasons stated above, and in CfA's opening brief, this Court should grant summary judgment in favor of CfA, deny the government's motion for summary judgment, and order the

OLC to proactively disclose this category of opinions subject only to a case-by-case invocation of

FOIA's exemptions.


November 8, 2021                          Respectfully submitted,

                                          /s/ *Alex Abdo*
                                          Alex Abdo (*Pro Hac Vice*)
                                          Stephanie Krent (*Pro Hac Vice*)
                                          Alyssa Morones*
                                          Jameel Jaffer (MI0067)
                                          Knight First Amendment Institute
                                            at Columbia University
                                          475 Riverside Drive, Suite 302
                                          New York, NY 10115
                                          (646) 745-8500
                                          alex.abdo@knightcolumbia.org

                                          *Counsel for Plaintiff*

                                          *Not yet admitted to practice law*