# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAMPAIGN FOR ACCOUNTABILITY,

                    Plaintiff,

            v.

UNITED STATES DEPARTMENT OF
JUSTICE,

                    Defendant.

Civil Action No. 16-1068 (JMC)

## <u>MEMORANDUM OPINION</u>

This lawsuit arises under the "reading-room" provision of the Freedom of Information Act (FOIA), which requires agencies to affirmatively make certain records available to the public, without the need for a prior request.[1] *See* 5 U.S.C. § 552(a)(2). The Campaign for Accountability (CfA) initiated this litigation seeking an order requiring the Department of Justice, Office of Legal Counsel (OLC) to make certain records available under that provision. Following two orders by this Court dismissing the majority of Plaintiff's claims, the Parties have cross-moved for summary judgment on the limited claims that remain.

Specifically, CfA seeks a judgment that the OLC's formal, written opinions resolving interagency disputes are subject to FOIA's reading-room provision because such opinions are both "final opinions . . . made in the adjudication of cases," § 552(a)(2)(A), and "statements of policy

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

1

and interpretations which have been adopted by the agency," § 552(a)(2)(B). The OLC, on the other hand, seeks a judgment that they are not. The Court agrees with CfA that such opinions are subject to disclosure under § 552(a)(2)(A) as "final opinions . . . made in the adjudication of cases," and accordingly does not reach CfA's other argument that these opinions would also be subject to disclosure under § 552(a)(2)(B). The Court DENIES Defendant's motion for summary judgment, ECF 57, and GRANTS Plaintiff's cross-motion for summary judgment, ECF 59.

## I.    BACKGROUND

### A.  The Office of Legal Counsel

The following facts are undisputed. The OLC "is a component of the Department of Justice" charged with "provid[ing] controlling legal advice to executive branch officials on questions of law involving the operations of the executive branch." ECF 56 ¶ 1.[2] Specifically, the OLC's responsibilities include "[p]reparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal adviser to the President and as a member of, and legal adviser to, the Cabinet." 28 C.F.R. § 0.25(a).

As part of its advice-giving function, the OLC sometimes prepares "formal written opinions" to advise the President and executive agencies on questions of law.[3] The guiding principles for preparing and publishing such opinions are laid out in a 2010 "Best Practices Memo" published by the agency, ECF 56-1, which has been cited as authoritative by both Parties, *see, e.g.*,

---

[2] Prior to filing its motion for summary judgment, the agency submitted a joint stipulation of facts for purposes of the litigation. ECF 56 at 1 & n.1. The Court accepts the facts in the stipulation as undisputed.

[3] The OLC also "frequently conveys its legal advice to executive agencies through informal means." *Citizens for Resp. & Ethics in Washington v. Dep't of Just. (CREW II)*, 922 F.3d 480, 484 (D.C. Cir. 2019); *see also* ECF 56-1 at 2. Such informal opinions are not at issue in this case. *See* ECF 59-1 at 11 n.2.

ECF 56 ¶ 13; ECF 57-1 at 7; ECF 59-1 at 10, as well as the D.C. Circuit, *see Citizens for Resp. & Ethics in Washington v. Dep't of Just. (CREW II)*, 922 F.3d 480, 484 (D.C. Cir. 2019). The Best Practices Memo suggests—and the OLC appears to concede—that the OLC's formal written opinions are legally binding. ECF 56-1 at 1–2; ECF 57-1 at 23.

"A [formal] written opinion is most likely to be necessary when the legal question is the subject of a concrete and ongoing dispute between two or more executive agencies." ECF 56-1 at 3. In 1979, President Carter formalized the OLC's role as the arbiter of such disputes. *See* Exec. Order No. 12,146, 44 Fed. Reg. 42657 (July 18, 1979), § 1-402. Through Executive Order 12,146, President Carter required that "[w]henever two or more Executive agencies whose heads serve at the pleasure of the President are unable to resolve [] a legal dispute, the agencies shall submit the dispute to the Attorney General." *Id.* That same executive order also "encouraged [independent agencies] to submit the[ir] dispute[s] to the Attorney General." *Id.* § 1-401. By regulation, the Attorney General has in turn delegated the responsibility to resolve such disputes to the OLC. *See* 28 C.F.R. § 0.25(a). Consistent with that responsibility, the OLC is unaware of any time it has declined an agency's request to issue an opinion resolving an interagency dispute. ECF 56 ¶ 7.

In resolving interagency disputes, the OLC's "general practice" is to "ask" each agency to submit "a detailed memorandum setting forth the agency's own analysis of the question." ECF 56-1 at 3. The OLC then ensures that those memoranda are shared with the opposing agency so that the agency can submit "reply comments, when necessary." *Id*. The OLC sometimes solicits the views of other agencies with subject-matter expertise regarding a dispute, but will only do so after acquiring the consent of the requesting agency. *Id.* In drafting an opinion to resolve an interagency dispute, the OLC strives to address only "concrete and ongoing" disputes that focus on specific legal questions. *Id*. The Best Practices Memo is clear that the OLC should refrain from providing

"unnecessary advice," opining on "broad" or "abstract" legal issues, or making definitive statements about "the legality of past conduct." *Id.* A formal written opinion resolving an interagency dispute "should take care to consider fully and address impartially the points raised on both sides," although the OLC may sometimes also consider arguments that are not raised by a party. *Id.* at 4.[4]

Once finalized, the OLC's formal written opinions become a part of the agency's "system of precedent," from which its attorneys may not "lightly depart." *Id*. at 2. Opinions are printed on bond paper and signed by the drafting attorney. *Id*. at 4. Unclassified opinions are added to the OLC's database and included in its "day books." *Id*. In addition, the OLC maintains a separate file for each opinion, containing a copy of the signed opinion, the opinion control sheet, the original request, the submissions of interested agencies, and any "obscure sources" cited in the opinion, so that future OLC attorneys may refer back to the opinion and its underlying sources. *Id*. at 4–5.

The OLC also has a "longstanding internal process" to select and voluntarily publish "significant opinions" to the public. *Id.* at 5. In deciding which opinions to publish, the OLC "operates from the presumption that it should make its significant opinions fully and promptly available to the public"—a presumption that "furthers the interests of Executive Branch transparency, thereby contributing to accountability and effective government, and promoting public confidence in the legality of government action." *Id*. In some cases, however,

---

[4] Then-Attorney General William P. Barr described the OLC's role in resolving interagency disputes as follows:

> In this context, the Attorney General's role is much like a court's in an adversarial proceeding. Because each agency has its own staff of lawyers, disputes between them come before the Attorney General with legal positions already well-established. Each agency will usually have legal authority or good arguments to support its view. The [OLC] requires each side to come in with briefs, just as if it were a judicial proceeding. Deciding among the positions being taken requires the Attorney General—or in most cases the [OLC]—to function as a judge.

ECF 59-10 at 8.

"countervailing considerations may lead the Office to conclude that it would be improper or inadvisable to publish an opinion that would otherwise merit publication." *Id.* For example, in some cases "disclosure would reveal classified or other sensitive information relating to national security." *Id.* In others, an agency may "request[] advice regarding a proposed course of action, the Office concludes it is legally impermissible, and the action is therefore not taken." *Id.* at 6. The Best Practices Memo also cautions that, as a matter of policy, if the "OLC routinely published its advice concerning all contemplated actions of uncertain legality, Executive Branch officials would be reluctant to seek OLC advice in the early stages of policy formulation—a result that would undermine rule-of-law interests." *Id.* According to the agency's website, the OLC has published over 1,400 opinions, dating from 1934 to the present, including some that addressed interagency disputes. OLC, *Opinions*, http://www.justice.gov/olc/opinions-main (last visited April 17, 2024).

### B. Procedural History

This case has a somewhat complicated history, which is briefly recounted here. CfA originally filed a complaint seeking an order that the OLC "mak[e] available for public inspection . . . *all past and future final opinions* . . . that provide controlling legal advice to executive branch officials and agencies on questions of law."[5] ECF 1 ¶ 35 (emphasis added). CfA alleged that all such opinions are subject to the reading-room provision of FOIA for two reasons: first, because those documents are "final opinions . . . made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A); and second, because they qualify as "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register,"

---

[5] At the time this lawsuit was filed, another court in this jurisdiction had recently ruled that FOIA, and not the Administrative Procedure Act, was the proper vehicle for CfA to pursue the relief it sought. *See Citizens for Resp. & Ethics in Washington v. Dep't of Just.*, 164 F. Supp. 3d 145, 147 (D.D.C. 2016). That decision was subsequently affirmed. *See Citizens for Resp. & Ethics in Washington v. Dep't of Just. (CREW I)*, 846 F.3d 1235 (D.C. Cir. 2017).

§ 552(a)(2)(B). ECF 1 ¶ 31. The Court granted Defendant's motion to dismiss CfA's original complaint for failure to state a claim, finding that Plaintiff had failed to "identif[y] an ascertainable set of OLC opinions that OLC has withheld from the public and that is also plausibly subject to the FOIA's reading-room requirement." *CfA v. Dep't of Just. (CfA I)*, 278 F. Supp 3d 303, 306 (D.D.C. 2017). However, that dismissal was without prejudice; the Court ordered that Plaintiff would be permitted to file an amended complaint to remedy that shortcoming.[6] *Id.*

CfA took the Court up on that offer. In its amended complaint, ECF 22, CfA alleges that FOIA's reading-room provision requires affirmative publication of four, more specific categories of OLC opinions: (1) formal written opinions that resolve interagency disputes, *id.* ¶¶ 35–38; (2) formal written opinions that interpret an agency's non-discretionary legal obligations, *id.* ¶¶ 41–44; (3) opinions that "find[] that particular statutes are unconstitutional and that therefore agencies need not comply with them," *id.* ¶¶ 45–46; and (4) opinions that adjudicate or determine private rights, *id.* ¶¶ 47–49.[7] With respect to each of those four categories of records, Plaintiff alleges that the agency has failed to comply with the disclosure obligations of § 552(a)(2) by failing to make the documents automatically available for public inspection, *id.* ¶¶ 54–59 (Count I), and has therefore also failed to comply with the indexing requirement of § 552(a)(2), which requires an agency to maintain and make available for public inspection indices of materials that are subject to the reading-room provision, *see id.* ¶¶ 60–64 (Count II). CfA seeks a declaratory judgment that the OLC has failed to comply with its obligations under § 552(a)(2), an order that the OLC disclose

───────────────

[6] The Court also clarified that it lacks the authority under FOIA to order the OLC to publish any materials to the public in general. *CfA I*, 278 F. Supp. 3d at 315–16. Rather, the Court's authority under FOIA is limited to issuing an order that OLC produce materials directly to Plaintiff. *Id.*

[7] The amended complaint also identified a fifth category of OLC opinions—formal written opinions issued to independent agencies. ECF 22 ¶¶ 39–40. Plaintiff has since withdrawn its claims with respect to that category of records. ECF 30 at 35 n.11.

to CfA "all formal written opinions issued by the OLC to executive branch agencies or to executive branch officials other than the president," and an order that the OLC make indices of all such opinions available for public inspection and copying. *Id.* at 23. The OLC moved to dismiss the amended complaint, contending that Plaintiff had still failed to state a claim that the OLC has an affirmative obligation to disclose the specified categories of materials. ECF 29.

While that motion was pending, the D.C. Circuit issued an opinion in a related case, *CREW II*, 922 F.3d 480. In that case, the plaintiff brought claims similar to those made in the original complaint in this case, which were dismissed for substantially the same reasons. *Id.* at 485. However, instead of filing an amended complaint in district court, the plaintiff in *CREW II* appealed the dismissal. *Id.* The D.C. Circuit affirmed. Citing heavily to another case, *Elec. Frontier Found. v. Dep't of Just. (EFF)*, 739 F.3d 1 (D.C. Cir. 2014), the *CREW II* court held that, for a plaintiff to state a claim under 5 U.S.C. § 552(a)(2), it is insufficient to allege merely that the OLC's opinions are "controlling," "authoritative," and/or "binding." 922 F.3d at 486. The court's opinion in *CREW II* also cites to this case (and the motion to dismiss that was pending at the time), suggesting that the *CREW II* plaintiff would have been better off had it followed the same course as CfA has here, filing an amended complaint that identified specific "subcategories of OLC's formal written opinions." *Id.* at 489.

Following the release of *CREW II*, this Court turned to the OLC's motion to dismiss the amended complaint. Citing to both *EFF* and *CREW II*, the Court dismissed CfA's claims as to three of the four categories of opinions at issue: (1) those that interpret an agency's non-discretionary legal obligations; (2) those that announce the unconstitutionality of particular statutes; and (3) those that adjudicate or determine private rights. *CfA v. Dep't of Just. (CfA II)*, 486 F. Supp. 3d 424, 444 (D.D.C. 2020). For each of those three categories of documents, the

Court reasoned that CfA failed to state a claim because the amended complaint alleged only that the OLC's opinions were controlling, authoritative, and binding—not that they were final opinions made in the adjudication of cases, or that a client agency had adopted those opinions as its own. *See id.* at 441–44. As for "the OLC's opinions regarding the unconstitutionality of statutes," the Court determined that CfA did not effectively distinguish those documents from the broader category containing all of the OLC's formal written opinions—a shortcoming that would be fatal to CfA's claims given the D.C. Circuit's holding in *CREW II* that the OLC has no categorical obligation to affirmatively disclose its opinions. *See id.* at 443.

Although this Court dismissed the bulk of CfA's claims, it agreed with CfA that the D.C. Circuit's opinions in *EFF* and *CREW II* had left open the possibility that *some* categories of OLC opinions might be subject to the reading-room provision. *Id.* at 435–36. Indeed, the Court found that the first category of opinions described in the amended complaint—formal written opinions that resolve disputes between agencies—is, at least plausibly, such a category. *Id.* at 441. More specifically, the Court found that CfA had stated a plausible claim regarding those opinions for two reasons—first, OLC opinions that resolve interagency disputes are plausibly "final opinions made in the adjudication of cases," *id.* at 438 (citing § 552(a)(2)(A)); and second, such opinions are plausibly "statements of policy and interpretations" that are adopted *ex ante* by subject agencies when they consent to submit the dispute to the OLC, *id.* at 439–40 (citing § 552(a)(2)(B)). The Court, however, stressed the legal limits of its conclusions:

> [A]t this juncture, the Court's conclusion is based simply and solely on the amended complaint's allegations, and it might eventually determine, in the context of summary judgment, that OLC opinions resolving inter-agency disputes are not "statements of policy and interpretations" adopted by those agencies *ex ante*, or that "'adjudications' between two parts of the executive branch are not the kind of 'adjudication of cases' to which that section refers."

*CfA II*, 486 F. Supp. 3d at 445 (quoting *CREW II*, 922 F.3d at 491 (Pillard, J., dissenting)). The Court addresses those questions today.

## II.    LEGAL STANDARD

FOIA cases are typically decided at summary judgment. *See Laverpool v. Dep't of Hous. & Urban Dev.*, 315 F. Supp. 3d 388, 390 (D.D.C. 2018). A court will grant a motion for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In FOIA cases, it is the defending agency's burden to prove it has complied with its obligations under the statute. *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989); *see also CREW II*, 922 F.3d at 487 (stating the rule in the context of the reading-room provision). To satisfy its burden, the "agency must prove that each document that falls within the [request] has been produced, is unidentifiable[,] or is wholly exempt from the Act's inspection requirements." *Weisberg v. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980).

## III.    ANALYSIS

Two FOIA provisions are relevant here: the reading-room provision itself, § 552(a)(2), and FOIA's Exemption 5, § 552(b)(5). FOIA's reading-room provision requires an agency to "make available for public inspection" several enumerated categories of records. *See* 5 U.S.C. § 552(a)(2)(A)–(E). Two such categories are "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases," § 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register," § 552(a)(2)(B). The "primary objective" of FOIA's reading-room provision is the "elimination of secret law." *Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989). Because FOIA's reading-room provision reflects "an affirmative congressional purpose to require disclosure of documents which have the force and effect of law,"

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975), courts have sometimes referred to the categories of documents that are subject to disclosure under § 552(a)(2) as the "working law" of the agency, *see, e.g.*, *id.*; *CREW II*, 922 F.3d at 486.

"[I]n addition to requiring the disclosure of certain agency records, [] FOIA permits an agency to withhold covered documents pursuant to certain statutory exemptions." *CfA II*, 486 F. Supp. 3d at 427. Where a FOIA exemption applies, the duty to disclose "does not apply," regardless of whether a document would be otherwise disclosable. § 522(b); *see also Sears*, 421 U.S. at 154 n.21. One of these exemptions—Exemption 5—allows an agency to withhold any and all materials that would normally be privileged from discovery in civil litigation, including under the deliberative process privilege, the attorney-client privilege, or the attorney work-product doctrine. *Tax Analysts v. I.R.S.*, 117 F.3d 607, 616 (D.C. Cir. 1997). Exemption 5 is relevant to this opinion not because it may be invoked to protect specific documents from disclosure, but because the Supreme Court has suggested that there is a mutually exclusive relationship between materials protected by that exemption and materials subject to disclosure under § 552(a)(2). *See Sears*, 421 U.S. at 153 ("We should be reluctant, therefore, to construe Exemption 5 to apply to the documents described in 5 U.S.C. § 552(a)(2)."); *see also CfA II*, 486 F. Supp. 3d at 428 ("[I]f a record can be withheld under Exemption 5, then it is generally not subject to affirmative disclosure under the reading-room provision and vice versa."). More specifically, if a document is pre-decisional (i.e., if it "reflect[s] the agency's group thinking in the process of working out its policy and determining what its law shall be"), it cannot be said to constitute the agency's working law for purposes of the reading-room provision. *Sears*, 421 U.S. at 153. On the other hand, "final opinions, which not only invariably explain agency action already taken or an agency decision

already made, but also constitute final dispositions of matters by an agency," are "never" protected from disclosure under the deliberative process privilege in Exemption 5. *Id.* at 153–54.

Turning to this case, CfA argues that the OLC's final written opinions resolving interagency disputes are subject to disclosure under both §§ 552(a)(2)(A) and (B). The Court finds that the documents at issue are "final opinions . . . made in the adjudication of cases," § 552(a)(2)(A), and thus subject to affirmative disclosure. Having made this determination, the Court finds it unnecessary to opine whether the documents might also be subject to disclosure under § 552(a)(2)(B).

**A. The OLC's formal written opinions resolving interagency disputes are "final opinions . . . made in the adjudication of cases" and must therefore be affirmatively disclosed under § 552(a)(2)(A).**

To satisfy the requirements of § 552(a)(2)(A), a document must be (1) a final opinion and (2) made in the adjudication of a case. At the motion to dismiss phase, this Court concluded that CfA's amended complaint stated a plausible claim that the OLC's formal opinions resolving interagency disputes satisfy both of those conditions and are therefore subject to disclosure under § 552(a)(2)(A). Now, the Court considers the issue under the summary judgment standard, ultimately concluding that the documents at issue are subject to disclosure under § 552(a)(2)(A). The Court also finds that the OLC has not created a genuine dispute that those opinions are categorically protected by Exemption 5. Accordingly, the Court grants CfA's cross-motion for summary judgment and denies the OLC's motion for summary judgment.

### 1.   *Final Opinion*

Agency opinions are final when they both (1) "serve as law in the specific case to which they are addressed" and (2) "serve as law-like precedent in subsequent cases." *Schlefer v. United States*, 702 F.2d 233, 237, 244 (D.C. Cir. 1983). To be final, an opinion must have legal effect; if it has no effect until it is ratified or adopted by a higher authority, then it is not final until that

occurs. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867–68 (D.C. Cir. 1980). The mere possibility of legal review (for instance, via discretionary appeal) does not affect the finality of an agency opinion, provided the opinion has "real operative effect" prior to any review. *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 186–87 (1975). In determining whether a document is an opinion, a court may consider whether that document provides legal reasoning to explain its conclusions, *Sears*, 421 U.S. at 158–59, and whether that reasoning is communicated in "straight-forward, objective, and impersonal prose," *Schlefer*, 702 F.2d at 243.

According to the Best Practices Memo, the OLC's formal opinions constitute "controlling legal advice," which represents—short of intervention by the courts—the "final word on the controlling law." ECF 56 ¶ 13 (adopting ECF 56-1); ECF 56-1 at 1. As this Court previously explained, the OLC's authority to issue such controlling advice flows from "Article II's vesting of the 'executive power' in one President," *CfA II*, 486 F. Supp. 3d at 438, and from the agency's position as the presidential appointee that serves as a "neutral arbiter to resolve the differing stances" of two agencies, *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 92 (D.C. Cir. 1986). The OLC does not contest that client agencies treat its opinions as binding. ECF 57-1 at 23. Nor does it dispute that the OLC gives its own opinions precedential effect. ECF 56-1 at 2. The OLC has not suggested that its written opinions are mere "recommendations" that have no effect absent approval by some higher authority. Moreover, looking to the OLC opinions cited and submitted as evidence in this case, the OLC consistently explains its legal reasoning using "straight-forward, objective, and impersonal prose." *Schlefer*, 702 F.2d at 243. In other words, OLC opinions read like legal opinions, not ruminations on government policy. *See, e.g.*, *Scope of the Environmental Protection Agency's Discretion to Adopt Any One of Three Alternative Interpretations of the Mitchell-Conte Amendment to the Clean Air Act*, 13 Op. O.L.C. 105, 105

(1989) ("For the reasons set forth below, we conclude that EPA does possess the authority to adopt either the second or third alternative interpretation, in addition to the first interpretation.").

Despite all that, the OLC argues that its formal written opinions resolving interagency disputes are more like "advice documents" than final opinions. ECF 57-1 at 19. That is because those opinions sometimes "leave agencies with a broad range of potential avenues for action and prospective policy choices," and therefore do not necessarily dispose of any agency action. *Id*. at 23. The OLC cites several opinions that it contends illustrate that point. For example, in *Scope of the Environmental Protection Agency's Discretion to Adopt Any One of Three Alternative Interpretations of the Mitchell-Conte Amendment to the Clean Air Act*, the OLC determined that the EPA could lawfully choose any one of three interpretations of a statute, disagreeing with another agency that took the position there was only one valid interpretation. 13 Op. O.L.C. at 105. According to the OLC, that opinion was not final because it deferred to the EPA on the question of which of those three interpretations it should ultimately adopt. ECF 57-1 at 26. The OLC makes similar arguments regarding two other opinions. *See Whether the Defense of Marriage Act Precludes the Non-Biological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act*, 31 Op. O.L.C. 243 (2007); *Applicability of Government Corporation Control Act to Gain Sharing Benefit Agreement*, 24 Op. O.L.C. 212 (2000). Those opinions, in the OLC's view, only decided whether a client agency had the legal authority to take a proposed action, not whether the agency was required to do so. ECF 57-1 at 27–28.[8] The OLC argues that none of the above opinions are subject to § 552(a)(2)(A) because, like

---

[8] The OLC cites one additional opinion, *Applicability of the Cargo Preference Act to the Transportation of Alaskan Oil to the Strategic Petroleum Reserve*, 7 Op. O.L.C 139 (1983), in which it contends not only that the agency did not dictate the policy of the affected agency, but also that the OLC did not even fully resolve the agencies' dispute when it declined to take a position on two non-legal questions presented by one of the agencies, ECF 57-1 at 25–26. Perhaps.

the opinion in *EFF*, they are each binding only in the legal sense, and do not "speak with authority on the [agency's] policy." 739 F.3d at 9.

That argument misses the mark. As an initial matter, neither *EFF* nor *CREW II* were decided on the basis of § 552(a)(2)(A). Although both of those opinions cite to and discuss § 552(a)(2)(A), the requirement that an agency "adopt" an OLC opinion as its own was developed and has been applied only in the context of § 552(a)(2)(B). *See CREW II*, 922 F.3d at 486 ("An OLC opinion *in the latter category* qualifies as the 'working law' of an agency only if the agency has 'adopted' the opinion as its own." (emphasis added) (citing *EFF*, 739 F.3d at 9)). And that rule makes perfect sense in the context of § 552(a)(2)(B). After all, when it comes to a question of policy or legal interpretation where the agency has discretion to choose its preferred path, the solicitation of an OLC opinion to determine the scope of that discretion may indeed be predecisional. For example, in *EFF* the OLC issued an opinion concluding the FBI had the authority to request telephone records "without legal basis or qualifying emergency," 739 F.3d at 5, which the FBI then chose not to do as a matter of policy, *id.* at 10.

Section 552(a)(2)(A) is different. For one thing, it makes no mention of policy. *See CfA II*, 486 F. Supp. 3d at 439 ("The reading-room provision does not predicate affirmative disclosure on whether the agency's 'final opinions . . . made in the adjudication of cases' have a discernable policy impact."). The fact that an OLC opinion does not definitively resolve questions of policy has no bearing on whether it is final as to the legal issue it resolves. Consider the judicial context. Nobody would dispute that the D.C. Circuit's opinion in *CREW II* was a "final opinion." But in that case, despite the court's conclusion that the OLC has no general obligation to publish its

---

But, to the extent the OLC is correct that the cited opinion does not resolve the agencies' dispute, that opinion would lie outside the category described by the amended complaint and would not be at issue in this case.

opinions, the agency remained perfectly free to voluntarily do so. Indeed, the OLC's website shows it has continued to do just that. *See* OLC, *Opinions*, http://www.justice.gov/olc/opinions-main (including opinions published as recently as March 26, 2024). Similarly, the OLC's opinions—which represent both the "final word" on the matter at hand and are treated as binding precedent in future cases—are also final.

### 2. Made in the adjudication of cases

Having determined that the OLC's formal opinions resolving interagency disputes are "final opinions," the Court next concludes that such opinions are "made in the adjudication of cases." § 552(a)(2)(A). According to the statute, "adjudication" is an "agency process for the formulation of an order." § 551(7). An "order" is "a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making." § 551(6). An advisory opinion is not a final disposition. *See Int'l Tel. & Tel. Corp., Commc'ns Equip. & Sys. Div. v. Loc. 134, Int'l Bhd. of Elec. Workers*, 419 U.S. 428, 446 (1975).

As detailed in the Best Practices Memo, the OLC diligently avoids issuing advisory opinions—issuing written opinions only for disputes that are "concrete and ongoing." ECF 56-1 at 3. Moreover, the process by which the OLC researches, drafts, and finalizes its opinions that resolve interagency disputes is standardized, thorough, and bears many of the hallmarks of adversarial adjudication. *See generally id.* Before formulating its order, the OLC solicits a "detailed" brief from each of the client agencies laying out its side of the dispute. *Id.* at 3. Those briefs are shared with the opposing agency (or agencies) so that it (or they) may have an opportunity to respond when necessary. *Id*. The OLC functions like a neutral decisionmaker, "tak[ing] care to consider fully and address impartially" all the arguments made by each side, *id.* at 4, applying not only its own precedents, but judicial caselaw and the various tools of statutory interpretation as well, *see, e.g.*, *Payment of Back Wages to Alien Physicians Hired Under H-1B*

*Visa Program*, 32 U.S. Op. O.L.C. 47 (2008). The OLC's formal opinions, once complete, are carefully edited and cite-checked, signed, and filed away for use as precedent in the future. ECF 56-1 at 4–5.

The OLC makes two arguments that the opinions at issue in this case are not "made in adjudications." The first of those arguments is that the OLC's procedures (as described in the Best Practices memo) lack some of the characteristics of a formal adjudication under the Administrative Procedures Act (APA), as described by 5 U.S.C. § 554. Specifically, the OLC asserts that it has "no formal procedures governing how [agency briefs] are submitted, let alone opportunity for an adversarial hearing, prohibitions on *ex parte* communications, or a requirement of a decision that rests solely on a hearing record." ECF 62 at 19 (citing ECF 56 ¶¶ 7–17). The OLC is correct that its procedures do not satisfy all the requirements of § 554. But that provision concerns only the subset of "adjudication[s] required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a). That language, as a matter of ordinary meaning, carves out a subcategory of adjudications, which must mean that the term "adjudication" encompasses something broader than only those "formal" adjudications that satisfy the requirements of § 554(a). That proposition finds additional support elsewhere in the statute, *see* 5 U.S.C. § 551(7) (defining "adjudication" broadly as any "agency process for the formulation of an order"); 5 U.S.C. § 551(6) (defining "order" as "a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making"), as well as in myriad opinions that differentiate between "formal" and "informal" adjudications, *see, e.g.*, *Watts v. SEC*, 482 F.3d 501, 506 (D.C. Cir. 2007) (referencing "the broad scope of formal and informal adjudications under the APA"). In other words, even granting that the OLC's decision-making process does not qualify as

a *formal* adjudication under the APA, that has no bearing as to whether the opinions at issue are "made in the adjudication of cases."

Next, the OLC asks the Court to revisit an argument it rejected at the motion to dismiss phase. Specifically, the OLC argues that the phrase "made in the adjudication of cases" cannot apply to the OLC's opinions because the phrase was only intended to encompass "agencies' adjudications of private rights." ECF 62 at 18; *see also id*. at 21 (asking the Court to reconsider). In support of that argument, the OLC points out that the preclusive effect of an agency's failure to disclose documents that are subject to FOIA's reading-room provision is that the undisclosed documents may not be "relied on, used, or cited as precedent by an agency *against a party other than an agency*." 5 U.S.C. § 552(a)(2)(E) (emphasis added). In the OLC's view, the nature of that remedy, considered together with the legislative history of the reading-room provision, confirms that "Congress's primary concern in § 552(a)(2) was with the adjudication of private rights." ECF 57-1 at 21. The OLC goes on to cite several cases in which the D.C. Circuit suggested that § 552(a)(2)'s central focus is to safeguard private rights. *See, e.g.*, *Schlefer*, 702 F.2d at 244 ("A strong theme of our opinions has been that an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public."); *Bannercraft Clothing Co. v. Renegotiation Bd.*, 466 F.2d 345, 352 (D.C. Cir. 1972) (Congress enacted § 552(a)(2) because it was "troubled by the plight of those forced to litigate with agencies on the basis of secret laws or incomplete information"), *rev'd on other grounds*, 415 U.S. 1 (1974); *see also Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352–53, 360 n.23 (1979) (policy directives are "intra-agency memorandums" exempt from § 552(a)(2) because they "do not establish rules that govern the adjudication of individual rights, nor do they require particular conduct or forbearance by any member of the public").

The Court is unpersuaded and reaffirms its earlier conclusion that the phrase "made in the adjudication of cases" has no such meaning. *See CfA II*, 486 F. Supp. 3d at 432–35, 439. As the Court has explained, there is "nothing in the plain text or history of section 552(a)(2), or in the few cases that have interpreted that statutory provision, [to] establish[] that [] FOIA's affirmative obligation to publish certain agency records extends only to agency records that pertain to the regulation of private entities." *Id.* at 432. Moreover, the Court finds that the overarching purpose of the reading-room provision—to prevent the development of secret law—casts a wider net than the OLC imagines. FOIA embodies the principle that the public has a strong interest in keeping "informed about what their government is up to." *Dep't of Def. v. F.L.R.A.*, 510 U.S. 487, 495 (1994). That purpose encompasses all manner of documents that are not themselves adjudications of private rights. *See, e.g.*, *Pub. Citizen v. Off. of Mgmt. & Budget*, 598 F.3d 865 (D.C. Cir. 2010) (Office of Management and Budget memoranda designating which agencies are permitted to submit budgetary materials to Congress without prior clearance "fit comfortably within the working law framework"); *Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975) (reports evaluating how various federal agencies had been carrying out their personnel management responsibilities not subject to Exemption 5). Even if one accepts that FOIA's drafters were primarily concerned that a "citizen [might] los[e] a controversy with an agency because of some obscure or hidden order or opinion which the agency knows about but which has been unavailable to the citizen," ECF 57-1 at 21 (quoting *Clarifying and Protecting the Right of the Public to Information*, H.R. Rep. No. 89-1497 at 2425 (1966)), that is not decisive because it is easy to imagine scenarios in which many of the opinions cited by the OLC, if undisclosed, could be cited as "secret law" in a subsequent proceeding that directly involves the adjudication of individual rights.

In summary, there is no requirement in the APA that an "adjudication" must involve members of the public, and the Court declines to create one based on the legislative history alone. Here, the record shows that the OLC has developed a process to formulate a final disposition of an adversarial dispute that has been submitted to the agency as a neutral decisionmaker. That is an adjudication. Accordingly, the Court finds that the OLC's formal written opinions that resolve interagency disputes are "made in the adjudication of cases." § 552(a)(2).

### 3.  Deliberative process

Finally, the OLC argues that, if the Court concludes that even a subset of its opinions are subject to disclosure under § 552(a)(2), the precedent could be invoked to require the publication of all sorts of legal advice throughout the executive branch. ECF 57-1 at 30. The result would be not only to discourage agencies from seeking advice from the OLC itself, but to hamstring agencies' ability to access confidential legal advice in general, even from their own counsel. *Id.* at 31–32. In the OLC's view, that result would fly in the face of the deliberative process privilege and constitute a serious threat to "rule-of-law values," outweighing any interest the public might have in the publication of the narrow category of opinions at issue in this case. ECF 62 at 21–23.

The OLC's argument touches on a real concern. The deliberative process privilege is meant to protect "confidential [] advisory opinions disclosure of which would be injurious to the consultative functions of government." *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 677 (quoting *Sears*, 421 U.S. at 149). It "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism." *Coastal States*, 617 F.2d at 866. To the extent agencies rely on the OLC's expertise as part of their decision-making process, subjecting its opinions to the harsh and sometimes distorting glare of the public spotlight could affect agencies' ability to think through their decisions. At the very least, that outcome would

create some tension with the Supreme Court's observation in *Sears* that the deliberative process privilege and the reading-room provision are generally mutually exclusive. *See* 421 U.S. at 153.

The Court has carefully considered that argument, but it is unpersuaded for three reasons. First, the Court does not find that there is any ambiguity as to whether § 552(a)(2)(A) applies to the opinions at issue here. Having found that the plain text of § 552(a)(2)(A) encompasses the documents, the Court is "reluctant" to construe § 552(b)(5) to apply to those documents. *Sears*, 421 U.S. at 153. Second, the OLC's predictions as to how agencies will respond to the Court's decision is entirely speculative. There is nothing in the record that can be construed as evidence that agencies would stop turning to the OLC to resolve their disputes—particularly given that many of the OLC's opinions resolving interagency disputes are already published voluntarily under the status quo. *See* ECF 56-1 at 5. Finally, the OLC's argument that today's decision will have serious "rule-of-law" ramifications throughout the executive branch ignores the limited scope of this opinion. All the Court decides today is that the subset of the OLC's formal opinions that resolve interagency disputes are subject to the requirements of § 552(a)(2)(A), and (by implication) that they are not categorically protected by the deliberative process privilege. Any individual document might still be shielded from disclosure under one or more of FOIA's other exemptions. Those exemptions protect, amongst other things, classified materials, § 522(b)(1), materials that pertain to the internal practices of an agency, § 522(b)(2), materials that would be subject to the attorney-client privilege,[9] § 522(b)(5), and materials compiled for law enforcement purposes, § 522(b)(7). The Court makes no ruling as to those exemptions, even with regard to the documents in this case.

---

[9] Although the OLC invoked the attorney-client privilege in its pre-litigation correspondence with CfA, ECF 22-3 at 2, it does not do so now.

In short, the Court finds little reason to conclude that today's opinion will drastically change the process by which the OLC releases its opinions to the public, let alone eviscerate the ability of the executive branch to obtain candid advice. Accordingly, the Court determines that the deliberative process privilege does not categorically protect the OLC's formal written opinions resolving interagency disputes, and that those opinions are therefore subject to the affirmative disclosure requirements of FOIA's reading-room provision.

## IV.    CONCLUSION

The Court DENIES the Department of Justice's motion for summary judgment, ECF 57, and grants CfA's cross-motion for summary judgment, ECF 59. As this Court explained in *CfA I*, FOIA grants the Court the authority to order that documents and indices be *produced* to the Plaintiff individually, not that they be *published* to the public at large. 278 F. Supp. 3d at 315–16; *see also CREW I*, 846 F.3d at 1244 ("CREW may, in a FOIA suit to enforce section 552(a)(2), seek an injunction that would . . . require disclosure of documents and indices only to CREW, not disclosure to the public."). Accordingly, the Court's order requires OLC to produce its responsive, formal written opinions that resolve interagency disputes to CfA, along with an index of those materials. A separate order accompanies this opinion, which includes the date upon which the Parties should submit a status report to propose a schedule for further proceedings.

**SO ORDERED.**

DATE: April 19, 2024

_____
Jia M. Cobb
U.S. District Court Judge